# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| ALAN EUGENE MILLER, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| KIM T. THOMAS, Commissioner of the | ) | |
| Alabama Department of Corrections, | ) | |
| | ) | |
| Respondent. | ) | |

## PETITION FOR WRIT OF HABEAS CORPUS
## BY PRISONER IN STATE CUSTODY UNDER SENTENCE OF DEATH

Audrey Y. Dupont
Maynard Cooper & Gale P.C.
1901 Sixth Avenue North
2400 AmSouth/Harbert Plaza
Birmingham, AL 35203
Phone: (205) 254-1105
Fax: (205) 254-1999

James S. Whitehead (*pro hac*)
(Lead Counsel)
Marah Stith McLeod (*pro hac*)
Catharine B. DeJulio (*pro hac*)
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
Phone: (312) 853-7000
Fax: (312) 853-7036

Counsel for Petitioner Alan Eugene Miller

Prisoner's Name: Alan Eugene Miller

Prisoner's Number: Z-672

Place of Confinement: Holman State Prison

Petitioner Alan Eugene Miller ("Petitioner" or "Mr. Miller"), now incarcerated on death row at Holman State Prison in Atmore, Alabama, respectfully petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 upon the ground that Petitioner is held in the custody of the Respondent in violation of the Constitution and Laws of the United States. As set forth more fully herein, Petitioner contends that his conviction and sentence were secured by the State of Alabama in violation of his rights under the United States Constitution.[1]

## I.    INTRODUCTION

1.    On June 17, 2000, Mr. Miller was convicted of capital murder in the Circuit Court of Shelby County, Alabama, for the workplace shooting deaths of co-workers Christopher Scott Yancy and Lee Michael Holdbrooks and former co-worker Terry Lee Jarvis.

2.    As explained in detail below, Mr. Miller received constitutionally ineffective assistance from his appointed Trial Counsel, Mickey Johnson,[2]

---

[1]References to the record appear as follows: "C" refers to the Clerk's Record on direct appeal. "R" refers to the transcript of Mr. Miller's original trial and pretrial proceedings. "R2" refers to the transcript of the hearing on the Motion for New Trial. "PC" refers to the Clerk's Record from the Rule 32 proceedings. "PSC" refers to the supplemental record filed on September 2, 2009. "PR" refers to the transcript of the February 11-14, 2008, Rule 32 Hearing. "PR2" refers to the transcript of the August 6, 2008, Rule 32 Hearing. Mr. Miller's Rule 32 Hearing exhibits are cited as "PX."

[2] Attorney Johnson initially was assisted by Attorney Rodger Bass, who withdrew prior to trial. Attorney Johnson was accompanied at trial by Attorney Ronnie H. Blackwood, who played no active role. PR 110, 217. Accordingly, all references to "Trial Counsel" in this Petition are to Attorney Johnson, unless otherwise indicated.

throughout every phase of his criminal trial, in violation of his rights under the United States Constitution.

3. From the outset Trial Counsel's investigation into possible mitigating evidence regarding Mr. Miller was grossly inadequate. Although Trial Counsel had been granted funds from the court to conduct the constitutionally required investigation, none was ever undertaken. Instead, Trial Counsel did virtually nothing to prepare for the penalty phase of Mr. Miller's trial. As a result, Trial Counsel did not gather a wealth of readily available information from family members, institutional records, Mr. Miller's employers, or experts that would have been instrumental in shaping a coherent and compelling mitigation case on Mr. Miller's behalf.

4. Trial Counsel retained a psychiatrist, Dr. Charles Scott, solely to ascertain whether Mr. Miller had been insane at the time of the shootings. Trial Counsel then sabotaged Dr. Scott's work by failing to provide him with critical and readily available information, including information about the extensive history of mental illness in the Miller family and the physical and emotional abuse Mr. Miller had suffered throughout his formative years at the hands of his father, Ivan. Trial Counsel also withheld from Dr. Scott recordings of Mr. Miller's statements to the police at the time of his arrest that indicated he did not understand what was happening to him. Most importantly, Trial Counsel failed to provide Dr. Scott with

(or even inform him of the existence of) the report and file materials compiled by the State's expert, Dr. Harry McClaren, in which the State's expert acknowledged that Mr. Miller may have been experiencing a period of dissociation at the time of the shootings.

5.     When Dr. Scott's preliminary report indicated that there was evidence both for and against the conclusion that Mr. Miller had been insane under the standards of Alabama law and that his opinion might change if he could receive additional information, Trial Counsel supplied nothing more and, instead, simply withdrew Mr. Miller's insanity plea and presented no defense during the guilt phase of trial, conceding Mr. Miller's guilt of capital murder even though there was clear evidence that the killings were the result of a severe mental illness. Trial Counsel's defeatist attitude was publicly displayed when, just before the start of trial, he inexplicably admitted to the media that he had no idea how to mount a defense for Mr. Miller.

6.     Trial Counsel's performance during the penalty phase of trial was equally objectively unreasonable and violated Mr. Miller's constitutional rights. Trial Counsel called only one witness – Dr. Scott (who had neither been retained nor prepared for this role) – despite the many Miller family members who could have presented the large amount of readily available mitigating evidence on Mr. Miller's behalf. Trial Counsel did not adequately present testimony regarding the

extent and significance of the family's multi-generational history of mental illness, Mr. Miller's impoverished upbringing, the instability of his home life, and the extreme emotional and physical abuse he had received from his father.

7.     Trial Counsel also failed to present readily available evidence that would have humanized Mr. Miller to the jurors and failed to present important positive character evidence, such as the fact that for all of his adult life he provided financial support to his mother and siblings or the loving relationships he maintained with his nieces and nephews. The jury and the trial judge never heard about the good employment record Mr. Miller achieved. In addition, Trial Counsel failed to present any testimony regarding Mr. Miller's non-violent nature or his lack of any prior criminal record. Ultimately, Trial Counsel concluded that anything he might do on Mr. Miller's behalf would be viewed by the jury as frivolous. PR 272-273.

8.     Rather than humanizing Mr. Miller to the jury and the Court, Trial Counsel distanced himself from Mr. Miller and instead vilified him throughout the trial. Trial Counsel told the jurors at the close of the guilt phase that he was not proud to be representing Mr. Miller. Then, in a shocking penalty phase opening statement, he described Mr. Miller as a "violent," "mean," "cruel," "atrocious," and "vile" "tortured soul." Trial Counsel told the jurors that Mr. Miller believed in the death penalty and was willing to kill "everyday" whenever he thought people

deserved it. Trial Counsel said that, if it could restore the victims to life, he would beg the jurors to sentence Mr. Miller to death and would volunteer to serve as a thirteenth juror to sign a death verdict, were he needed, because that would achieve "real justice." Counsel's denigrating statements, coupled with the woeful inadequacy of his mitigation presentation, guaranteed that the jury would recommend that Mr. Miller be put to death and that the court would follow that recommendation.

9. After over three hours of deliberations, two of the twelve jurors recommended that Mr. Miller be sentenced to life in prison despite the manifestly ineffective performance of Trial Counsel. Had only one more juror been convinced that Mr. Miller should live, the jury would have continued its deliberations. If, ultimately, seven jurors had voted against the death penalty, the jury's recommendation would have been a sentence of life imprisonment, which the Court would have been required to consider as yet an additional mitigating circumstance. *Ex parte Carroll*, 852 So. 2d 833, 836 (Ala. 2002). If fewer than seven so voted, a mistrial would have been declared, and a new sentencing hearing would have had to be conducted. *See* Ala. Code § 13A-5-46(f), (g).

10. Despite the manifestly incompetent performance of Trial Counsel, the sentencing judge, Honorable D. Al Crowson, described the death sentence he gave Mr. Miller as "the most difficult sentence that I've ever had to consider." R 1471.

11.     The ineffective assistance Mr. Miller received from his Trial Counsel was compounded by the dismally ineffective representation he received in connection with a motion for a new trial and on direct appeal from his appointed Appellate Counsel, William R. Hill and J. Haran Lowe, who unreasonably raised the issue of Trial Counsel ineffectiveness in their new trial motion even though there was no need to do so because the trial transcript had not been prepared, ineffectively argued those very few aspects of Trial Counsel's ineffectiveness they did identify but failed to present any evidence of the resulting prejudice Mr. Miller had suffered, and ignored a host of additional ways in which Trial Counsel had ineffectively represented Mr. Miller, all to his prejudice.

12.     Appellate Counsel did even less than Trial Counsel to investigate and prepare Mr. Miller's case: they did not interview Mr. Miller, his family members or co-workers, nor did they gather any records or develop any evidence pertaining to Mr. Miller's life that Trial Counsel had missed. Their failure to present evidence demonstrating the prejudice Mr. Miller had suffered from Trial Counsel's ineffectiveness prevented Mr. Miller from receiving the new trial or new sentencing hearing he deserved and denied him his constitutional rights to the effective assistance of counsel.

13.     In *Ring v. Arizona*, 536 U.S. 584 (2002), the Supreme Court squarely held that juries - not judges - are required to make all factual findings necessary to

support a death sentence. Thus, the jury in Mr. Miller's case was required to find beyond a reasonable doubt that the State had proven the sole aggravating factor on which the State relied: that the killings were "especially heinous, atrocious, or cruel, compared to other capital offenses." Under the Sixth Amendment, the jury's determination in this regard was binding on the Circuit Court.

14. However, the jurors in Mr. Miller's case were told no fewer than twenty times that their sentencing decision was merely a recommendation to the court. The jurors were never advised that any aspect of their decision (in particular their determination with respect to an aggravating factor) was binding on the trial court, let alone that they were responsible for making the necessary predicate finding of the existence of an aggravating factor, without which Mr. Miller could not be sentenced to death. By so diminishing the jury's sense of sentencing responsibility, the instructions in Miller's case violated Miller's Eighth Amendment rights under *Caldwell v. Mississippi*, 472 U.S. 320 (1985).

15. The state court adjudication of Mr. Miller's claims resulted in a decision that was contrary to, and/or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. In addition, the state court adjudication of Mr. Miller's claims was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

## II. PROCEDURAL HISTORY

### A. Trial and direct appeal

16. On August 5, 1999, Christopher Scott Yancy and Lee Michael Holdbrooks were shot and killed in their workplace, Ferguson Enterprises, in Pelham, Alabama. That same morning, Terry Lee Jarvis was shot and killed where he worked, Post Airgas, also in Pelham. Mr. Miller was arrested shortly thereafter.

17. On August 6, 1999, the Circuit Court of Shelby County, Alabama, appointed Mickey Johnson and Rodger Bass as Mr. Miller's Trial Counsel. C 12.

18. On August 13, 1999, Mr. Miller was indicted on one count of capital murder under Ala. Code § 13A-5-40(a)(10) ("Murder wherein two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct"). C 18.

19. On August 17, 1999, Trial Counsel entered a plea of not guilty by reason of mental disease or defect. Ala. Code § 13A-3-1 ("It is an affirmative defense to a prosecution for any crime that, at the time of the commission of the acts constituting the offense, the defendant, as a result of severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts."). C 1.

20. On May 24, 2000, Trial Counsel withdrew the insanity plea and entered a plea of not guilty. R 66-67.

21.     On June 1, 2000, the Court allowed Attorney Bass to withdraw and appointed Ronnie H. Blackwood to assist Trial Counsel Johnson. C 4.

22.     Mr. Miller's trial commenced on June 12, 2000. R 69. On June 17, 2000, the jury found him guilty of capital murder. C 73. The penalty phase of trial commenced immediately thereafter. At the close of the penalty phase, the jury recommended that Mr. Miller be sentenced to death by the minimum-required vote of 10-2. C 74.

23.     On July 31, 2000, the trial judge conducted a sentencing hearing, at the conclusion of which he sentenced Mr. Miller to death. C 89. The judge found a single aggravating factor: that the killings were "especially heinous, atrocious, or cruel, compared to other capital offenses." R 1471; C 106. He found three statutory mitigating circumstances: (1) Mr. Miller's lack of significant prior criminal activity (before this offense, he had never even been in jail in his home county of Autauga); (2) his commission of the offense while under the influence of extreme mental or emotional disturbance; and (3) the fact that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. C 106-07. He also considered as a non-statutory mitigating circumstance that, as a child, Mr. Miller had moved to a number of locations and that he had "an estranged and difficult relationship with his father." C 107.

24.     Following sentencing, Mr. Miller's Trial Counsel were allowed to withdraw, and William R. Hill and J. Haran Lowe were appointed as Mr. Miller's Appellate Counsel. C 90. They subsequently filed a Motion for New Trial and an Amended Motion for New Trial in which they raised the issue of the ineffective assistance Mr. Miller had received from Trial Counsel, even though the trial transcript had not yet been prepared. C 95-97.

25.     On December 7, 2000, and January 31, 2001, a hearing was held on the new trial motion. R2 1-176. The court denied the Motion for New Trial on February 21, 2001. PX 14-0010 to 0011.

26.     Mr. Miller, still represented by Appellate Counsel, appealed from his capital murder conviction to the Alabama Court of Criminal Appeals. On August 15, 2002, Appellate Counsel submitted a supplemental brief addressing the effect of the Supreme Court's decision in *Ring* on Mr. Miller's death sentence. PX 13-0001. On January 6, 2004, the Appeals Court remanded the case to the trial court for more specific findings to justify its sentencing order and the denial of the motion for a new trial. *Miller v. State*, 913 So. 2d 1148 (Ala. Crim. App. 2004). The trial court made the required findings (C 98-107), following which the Alabama Court of Criminal Appeals affirmed Mr. Miller's conviction and death sentence. *Miller v. State*, 913 So. 2d 1148 (Ala. Crim. App. 2004).

27.    Both the Alabama Supreme Court and the United States Supreme Court (*Miller v. Alabama*, 546 U.S. 1097 (2006)) denied petitions for review.

**B.    Rule 32 proceedings**

28.    On May 19, 2006, Mr. Miller, represented by his current counsel, filed a Petition under Rule 32 of the Alabama Rules of Criminal Procedure, seeking relief from his conviction and death sentence. PC 14.

29.    On April 4, 2007, he filed a First Amended Petition, in which he alleged that the ineffective representation he had received from both his Trial Counsel and Appellate Counsel had violated his constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. PC 269.

30.    In addition, Mr. Miller alleged that his rights under the Sixth, Eighth, and Fourteenth Amendments had been violated because (a) the jurors in his criminal trial had not been told that their determination of whether the State had established the requisite aggravating factor was binding on the court, as required by *Caldwell v. Mississippi*, 472 U.S. 320 (1985); (b) the jurors were not told that it was their responsibility to determine beyond a reasonable doubt whether any aggravating factor they found the State had proved beyond a reasonable doubt outweighed any mitigating factors Mr. Miller had proved and that such a determination was binding on the court, as required by *Ring* and *Apprendi v. New Jersey*, 530 U.S. 499 (2000); and (c) that Mr. Miller's death sentence was

unsupported by any verifiable jury findings as required by *Ring*. The jury's 10-2 vote, as reflected in the general verdict form given the jurors, failed to indicate what findings, if any, the jury made in support of Mr. Miller's death sentence.

31.     On July 31, 2007, the Circuit Court (G. Daniel Reeves, J.) ruled that Mr. Miller's claim of Trial Counsel ineffectiveness and his claims based on *Ring* and *Caldwell* were barred because Appellate Counsel had raised them on direct appeal. PC 1327.

32.     However, the court ruled that Mr. Miller's claim of ineffective assistance of Appellate Counsel was not barred. PC 1328. Accordingly, the court recognized that it was necessary to receive evidence concerning Trial Counsel's ineffectiveness in order to determine whether Appellate Counsel had been ineffective in raising and presenting the issue of Trial Counsel ineffectiveness in the motion for a new trial and/or on direct appeal.

33.     The Circuit Court held an evidentiary hearing on Mr. Miller's First Amended Petition on February 11-14 and August 6, 2008.

34.     Following the submission of Mr. Miller's initial post-hearing brief (PC 1520), the State filed its post-hearing brief. PC 1702. Although not requested to do so by the court, the State also submitted a 157-page Proposed Order that was word-for-word identical (but for its title, introduction, and conclusion) to the contents of its brief. PSC 29-185. Mr. Miller filed his reply, responding to the

State's arguments and identifying ones the State had not addressed in its brief and, accordingly, in its Proposed Order. PC 1895.

35.     On May 5, 2009, the trial court adopted the State's 157-page Proposed Order in its entirety, denying Mr. Miller all relief. PC 1951. On May 18, 2009, Mr. Miller objected to the court's verbatim adoption of the State's Proposed Order. PC 2108. The court denied the objection on June 3, 2009. PC 2117. Mr. Miller filed his Notice of Appeal on June 9, 2009. PC 2119.

36.     On July 8, 2011, Mr. Miller's appeal was denied by the Alabama Court of Criminal Appeals. *Miller v. State*, 2011 Ala. Crim. App. LEXIS 47 (Ala. Crim. App. July 8, 2011). His timely application for rehearing was overruled on October 21, 2011.

37.     Mr. Miller filed a petition for a writ of certiorari in the Alabama Supreme Court on November 30, 2011, seeking review on two grounds:

1. Was the Court of Criminal Appeals' rejection of Mr. Miller's claim that the Circuit Court's verbatim adoption of the State's proposed order, which was word-for-word identical to the State's Post-Hearing Brief, denied him due process in conflict with this Court's decisions in *Ex Parte Ingram*, 51 So. 3d 1119 (Ala. 2010), and *Ex Parte Scott*, 2011 Ala. LEXIS 37 (Ala. March 18, 2011)?

2. Was the Court of Appeals' affirmance of the Circuit Court's determination that Mr. Miller's federal and state constitutional rights were not violated by the ineffective representation he received from his Appellate Counsel and the resulting prejudice he suffered therefrom in conflict with the standards established in *Strickland v. Washington* and its progeny?

38.     On January 23, 2012, the Alabama Supreme Court granted review with respect to Ground 1. It further ordered that all other grounds raised by Mr. Miller in his petition be held in abeyance pending the Court's consideration of Ground 1. However, on June 22, 2012, the Alabama Supreme Court issued a judgment quashing the writ it previously had issued on Ground 1 of Mr. Miller's petition without issuing an opinion and denying the writ as to Ground 2.

39.     This is Mr. Miller's first and only application for habeas corpus relief. Mr. Miller has exhausted all state court post-conviction procedures on all claims raised in this Petition.

## III.    GROUNDS SUPPORTING THE PETITION FOR RELIEF

### A.     MR. MILLER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BY HIS TRIAL COUNSEL IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE U. S. CONSTITUTION.

40.     The United States Supreme Court has recognized that inherent in "the right to counsel is the right to effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Indeed, the adversarial system of justice depends on effective defense counsel. *United States v. Cronic*, 466 U.S. 648 (1984).

41.     To prepare effectively for trial, counsel must investigate every possible avenue of defense, investigate and challenge all assertions by the State,

and subject the State's case to rigorous examination and testing. *Strickland*, 466 U.S. at 688; *Wiggins v. Smith*, 539 U.S. 510, 527-528 (2003).

42.     In this case, Mr. Miller's Trial Counsel did not render objectively reasonable effective representation and thereby denied Mr. Miller his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. *Wiggins, supra; Williams v. Taylor*, 529 U.S. 362 (2000); *Strickland, supra*.

> **i.     Trial Counsel denied Mr. Miller effective assistance when he failed to conduct an adequate investigation and, as a result, failed to uncover a wealth of relevant evidence that could have led the jury to find Mr. Miller not guilty of capital murder or to recommend that he not receive the death penalty or could have led the Court to sentence him to life in prison rather than death.**

43.     In *Strickland*, 466 U.S. at 688-689, the United States Supreme Court ruled that "[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable" attorney performance as required by the Sixth Amendment. *See also Wiggins*, 539 U.S. at 522. The ABA Guidelines provide that counsel must conduct an independent investigation relating to both the guilt and penalty phases of the trial. American Bar Association, *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, 11.4.1(A) (1989).

44.     The elements of an appropriate investigation include, but are not limited to, seeking out and interviewing "witnesses familiar with aspects of the client's life history that might affect . . .  possible mitigating reason(s) for the offense(s) and/or other mitigating evidence to show why the client should not be sentenced to death;" investigating and evaluating medical history, employment history, educational history, and family and social history; and investigating "other potential sources of information relating to . . .  the client's mental state . . . and any mitigating factors." ABA Guideline 11.4.1.

45.     Trial Counsel was unfamiliar with the ABA Guidelines. PR 201-202. He failed in every aspect of his investigation and preparation for Mr. Miller's defense. Trial Counsel was ineffective because he failed to adequately interview Mr. Miller and his close relatives and did not even try to speak with other family members who would have been willing to testify on Mr. Miller's behalf.

46.     Trial Counsel also was ineffective because he failed to collect and evaluate Mr. Miller's employment, educational, and medical records, and the medical records of his numerous family members with documented, serious mental illnesses.

47.     Because Trial Counsel failed to meet the minimum requirements of an adequate investigation, his performance was ineffective under *Strickland* and its progeny. Had trial counsel provided effective representation, there is a reasonable

probability that Mr. Miller would not have been convicted of capital murder and sentenced to death. *Williams*, 529 U.S. at 390-391.

48.     In the ten months between his appointment and the start of trial, Trial Counsel Johnson spent only 48.1 out-of-court hours on the Miller case. PX 3-0003 to 3-0004. Original co-counsel Bass spent only 59.4 out-of-court hours prior to withdrawing on June 1, 2000. PX 4-0002 to 4-0003. Attorney Bass spent no time on the case after April 20, 2000. PX 4-0003.

49.     Trial Counsel met with Mr. Miller on only a few occasions and for only brief periods. He met with Mr. Miller on the date of his appointment, August 5, 1999, on August 15, 1999, and on March 1, 2000 for 90 minutes. He did not meet with Mr. Miller again until May 30, 2000, less than two weeks before trial. PX 3-0003 to 3-0004. He had no clear recollection of what he discussed with Mr. Miller at any of the meetings. PR 47. Co-counsel Bass also met with Mr. Miller on August 5 and 15, 1999, and on November 21, 1999 for three hours. He never met with Mr. Miller again. PX 4-0002 to 4-0003. Trial Counsel Johnson did not know what Attorney Bass discussed with Mr. Miller. PR 46.

50.     Aside from an initial, perfunctory meeting with Mr. Miller's mother, father, and brother shortly after Mr. Miller's arrest (PR 38-39), Trial Counsel Johnson did not interview Miller family members. He had no contact with the family until he had a series of short telephone calls with Mr. Miller's mother,

Barbara, in April, 2000, and met with her for two hours on May 30, 2000, less than two weeks before the start of trial. PX 3-0004 to 3-0005.

51.    Trial Counsel Johnson had no other contact with Mr. Miller's father, sisters, or brother or any other family members concerning the myriad circumstances in Mr. Miller's life that would have provided a compelling and substantial mitigation presentation during the penalty phase of the trial. PX Ex. 3-0004 to 3-0005; *see also* PR 160-161.

52.    Trial Counsel never spoke with Mr. Miller's brother, Richard, to determine the positive things Richard could say about Mr. Miller, even though he knew that Richard could testify about Mr. Miller's loving and caring relationship with his mother, Barbara. PR 159-160.

53.    Trial Counsel never spoke with Mr. Miller's half-sister, Cheryl Ellison, about the evidence she could present concerning Mr. Miller's upbringing, character, and close and loving relationships with family members. PR 161.

54.    Trial Counsel never spoke with Mr. Miller's uncle George Carr, his Aunt Bonnie Carr, his niece Alicia Sanford, his nephew Jacob Connell, his half-brother Jeff Carr, his uncle Richard Carr, or his aunt Pamela Miller Kinnerham. PR 161-162, 164, 169-170. He may have spoken with Mr. Miller's cousin Brian Miller but did not get any information he felt would be "compelling." PR 163-164.

55.     During Trial Counsel's brief conversations with Mr. Miller's mother, Barbara, he made no effort to develop mitigating information, including the abuse of Mr. Miller by his father, Ivan, Ivan's drug use in the home, Mr. Miller's exposure to violent criminals, the history of mental illness in the family, Mr. Miller's financial support to the family, his loving relationships with family members, his non-violent nature, and his good employment history. PR 159-160, 175, 434. At most, Trial Counsel Johnson may have asked Mrs. Miller, "'Do you know of anything that might help us' or something like that." PR 158.

56.     As a result of Trial Counsel Johnson's failure to investigate Mr. Miller's life and background, he acknowledged that he was "sure . . . there are stories about Mr. Miller's life that I didn't inquire about or wasn't told." PR 179. He knew that there were facts concerning the poverty that the family experienced, the criminality of the relatives to whom Mr. Miller was exposed, and other background facts "I may not have known at the time." *Ibid.* In particular, he never learned about the extent of the emotional and physical abuse that Mr. Miller suffered at the hands of his father, Ivan. "*I didn't know that was in the family.*" *Ibid.*; emphasis added.

57.     Original co-counsel Bass had limited additional family contacts prior to withdrawing as Mr. Miller's attorney. He had short telephone conferences with Barbara Miller on August 6 and 12, September 1, October 4, November 8, and

December 20, 1999, and April 18 and 20, 2000. He spoke with Mr. Miller's sister Lisa on August 29, 1999, and April 20, 2000. He talked to an aunt and one of Mr. Miller's sisters on September 1, 1999. PX 4-0002 to 4-0003. However, Trial Counsel Johnson had no knowledge of what his former co-counsel may have learned as a result of any of these contacts, and, thus, any such information was lost to the defense team by the time of trial. PR 41-46.

58.     On November 10, 1999, Trial Counsel filed an Ex Parte Application for Investigative Expenses (PX 8), in which he explained to the Court:

> In order to prepare properly for all trial phases, counsel is required to obtain information relevant to Mr. Miller's medical history, educational history, employment and training history, family and social history, his correctional history, and any religious or cultural influences.

59.     Trial Counsel acknowledged that, if he failed to conduct such a comprehensive investigation, he would deny Mr. Miller his constitutional right to effective assistance of counsel. PX 8-0005. Trial Counsel concluded, "It is clear from the above-cited cases that counsel would be remiss and constitutionally ineffective if he did not conduct a thorough investigation of all aspects of Mr. Miller's case." *Id.* at ¶ 18; PX 8-0005. *See also* Motion for Adequate Compensation of Counsel, filed by Trial Counsel on November 10, 1999, C 22, 23, ¶¶ 7, 10 ("Penalty phase preparation requires extensive investigation into personal and family history, unheard of in other cases. . . . [T]he investigation into [Mr.

Miller's] history and background in this and other states will have to be very extensive, for both the culpability and the penalty phases of his trial.").

60.    In granting Trial Counsel's motion, the court authorized the expenditure of $3,000.00 for investigative expenses and indicated that addition funds could be made available if necessary. PX 8-0001; R 37-38. No such costs were ever incurred. PX 3-0002.

61.    Despite Trial Counsel's recognition of his responsibility to "conduct a thorough investigation of all aspects of Mr. Miller's case," he never gathered Mr. Miller's education records, employment records, medical records, or other available family and governmental records showing the poverty Mr. Miller had experienced during his youth. PR 81-82, 184-185, 264.

62.    In addition, Trial Counsel made virtually no effort to obtain the available mental health records of Mr. Miller's family. PR 252. He did not collect the available mental health records of Mr. Miller's grandfather, Hubert L. Miller. PR 81. He never tried to obtain the available mental health records of Perry L. Miller or James Miller, Mr. Miller's uncles, or medical records concerning Ivan R. Miller, Mr. Miller's father. PR 81-82, 265, 349-350.

63.    Finally, Trial Counsel neither used the services of or consulted with a mitigation expert to ensure that a comprehensive search for mitigating evidence was made and to present such evidence to the jurors and the Court to help them

understand what it was in Mr. Miller's background that could explain the shooting of his three co-workers, despite the fact that Trial Counsel knew that a mitigation expert might have delved deeper into Mr. Miller's history and background. PR 255.

64.    It was not because of strategic considerations that Trial Counsel did not conduct the required investigation and did not learn any of these facts. Instead, he failed in his obligations to Mr. Miller simply because of his defeatist belief that anything he might say on Mr. Miller's behalf would be "trumped" by the State. Trial Counsel justified his failure to gather records concerning Mr. Miller and the Miller family on this basis in his Rule 32 Hearing testimony:

> [I]t's hard for me [to] imagine any record that you might have about your lifetime that could not be – that would be particularly useful in this context and it is very difficult to say anything positive about a defendant that cannot be trumped by the State.

PR 185. He further attempted to justify his failure to comprehensively interview Miller family members in order to develop helpful mitigating evidence on this same basis:

> There was not any family member that I was aware of, albeit there is family members out there that I didn't talk to[,] that I felt like would have any impact – and you always have to make that decision. But like I say you don't do this in a void. You just can't say anything in a situation like this that the state can't trump, easily trump you.
>
> If you say your client is a good guy they talk about how good the other three people were. If you talk about this person was disadvantaged then they – you know what I am saying? So that's a

part of the consideration every time. You would have to have something pretty compelling . . . . I didn't have any of that.

PR 245-246. Convinced that any mitigating evidence he might present on behalf of Mr. Johnson would be "trumped" by the State – even though he had no idea what helpful information might have been available to him – Trial Counsel simply made no effort to gather, much less present, such evidence.

65.　As a result of this inadequate investigation, Trial Counsel did not learn a wealth of information about Mr. Miller's family, social, and mental health history, including (i) the extent of instability, poverty and hardship Mr. Miller suffered in childhood as a result of his father's constant uprooting of the family and erratic employment history; (ii) the well-documented history of mental illness that traced back through at least four generations of the Miller family; (iii) the extreme physical and psychological abuse Ivan inflicted on the family, including the particular wrath he reserved for Mr. Miller; (iv) the criminal behaviors to which Mr. Miller was exposed during his formative years; (v) notwithstanding this adversity, Mr. Miller's strong work ethic and good employment history; (vi) the financial support he provided his family and the loving relationships he had with his brothers, sisters, nieces and nephews; (vii) the radical changes in Mr. Miller's behavior in the days leading up to the shootings; and (viii) Mr. Miller's bizarre behavior at the time of the shootings.

66.     Because of Trial Counsel's inadequate investigation, he never learned and, accordingly, failed to present to the jury and court during the penalty phase of trial, the following facts:

### a.     Mr. Miller's impoverished and unstable upbringing

67.     Alan Eugene Miller was born on January 20, 1965. PX 20-0001. Throughout his upbringing he experienced severe poverty and repeated dislocations.

68.     In 1966, Barbara commenced divorce proceedings against Mr. Miller's father, Ivan, and Mr. Miller was placed in the custody of the Department of Human Resources. PR 398. After the divorce was finalized, Barbara regained custody of the children. PR 398-399. Shortly after the divorce, Barbara was unable to make ends meet. PR 398-399. The family lived in a rent-controlled community called Elyton Village, and Barbara's father would need to sneak in to provide necessities for Mr. Miller. PR 399. Barbara's brother and Mr. Miller's uncle, George Carr, also had to provide necessities to Mr. Miller and his siblings, such as food and diapers. PR 460-461. Barbara and her children were on welfare and food stamps at this time. PR 462; PX 25-0031, 0045, 0047, 0077. Unable to support her children and thinking Ivan would change, Barbara remarried him in order to have a means to support the children. PR 400. But Ivan did not change. PR 400-401.

69.     On one occasion when George Carr brought food and diapers to help the Millers, he witnessed Mr. Miller as a baby in a crib, with a "soaking wet diaper, empty bottle, no shirt on and his dad right there in the same room" not taking care of Mr. Miller. PR 461.

70.     Ivan did not hold a steady job. In any given year, he may have had ten to twelve W-2s to submit with his income tax return. Ivan would usually just quit his job because he thought somebody had been plotting against him, or he had become angry with somebody. His financial assistance to the family was very limited. PR 413.

71.     Barbara also had trouble keeping a job. PR 414. Ivan would discourage her from working. PR 415. When Barbara did work, Ivan repeatedly would call her and appear at her place of employment, accusing her of having affairs with coworkers. PR 414-415.

72.     When the family did have money, Ivan would take it for himself, or use it to buy drugs. Ivan also would take anything of value from the home to pawn it or sell it, once selling Barbara's car to buy drugs. PR 414. The family was forced to go on food stamps to compensate. PR 415. Barbara described the homes the family lived in as "junky, rat infested, roach infested, just falling in." PR 416. The rodents and bugs were everywhere, and Barbara described it as a constant battle. PR 418.

73.     Ivan's inability to hold a steady job led to the family moving eighteen to twenty times during Mr. Miller's childhood. PR 415. The family did not have good relationships with neighbors, who wanted nothing to do with the Millers because they were fearful of Ivan. PR 418. When Mr. Miller burned his leg as a child, Ivan asked the neighbors for handouts to help pay for a skin graft. PR 418. Some neighbors gave Ivan the money, but Mr. Miller never received the skin graft; Ivan simply kept the money. PR 419.

74.     As a boy, Mr. Miller attended seven or eight different schools, sometimes switching schools in the middle of a school year. PR 415. This made it difficult for him to make any friends in school. PR 558. Mr. Miller had very few friends growing up, and those he did have were reluctant to come to the Miller house because of the way Ivan acted. PR 419. Other children constantly made fun of Mr. Miller, calling him names, because they could tell he was poor from his clothing. PR 558.

**b.      The Miller family history of mental illnesses**

75.     Three prior generations of the Miller family suffered from severe, well-documented mental illness.

76.     Mr. Miller's paternal great-grandmother, Victoria Granade, suffered from insanity and was a patient at Bryce Hospital (Alabama's oldest inpatient

psychiatric facility) for years until her death. PX 33-0008, 33-0175. Once she tried to kill her children. PR 646.

77. Mrs. Granade's son, Hubert Miller (Mr. Miller's paternal grandfather), was diagnosed as Schizophrenic Reaction, Paranoid Type, and as having mild mental deficiency. PX 33-0001. In earlier years he also was diagnosed as suffering from Manic Depressive Psychosis and Dementia Praecox, Paranoid Type. PX 33-0003. Hubert was admitted to Bryce Hospital at least five times between 1947 and 1965. PX 33-0003. Hubert stayed at Bryce for years at a time. PR 644.

78. The Miller family was extremely afraid of Hubert. Because of Hubert's violent behavior, his wife, Inez Miller, did not want her husband back home because of the harm he did to her children. She wrote numerous letters to the staff at Bryce chronicling Hubert's bizarre and violent behaviors and the family history during these years. *See*, *e.g.*, PX 33-0124, 33-0158, 33-0178. In one, she also expressed concerns about the mental health of her son Ivan (Mr. Miller's father):

> I am writing to let you know that my son Ivan Ray Miller said that he was going to come down there to check his daddy out side and leave with him. Dr. Tarwater *my son is not normal – he act[s] very much like his daddy* so please be careful about let him check his daddy out.

PX 33-0114; emphasis added. Her letters noted that her sons exhibited many of the same violent behaviors as their father and that, at a young age, they turned to a life

of crime. *See* PX 33-0124 to 0125 ("My oldest boys are in trouble and they will tell you that it is because of the way their daddy treated them.").

79. Hubert Miller's Bryce records showed

> that he had been at Bryce for many, many years. Some of the behaviors that got him in there were paranoia, believing that people around him were wearing masks or were not quite who they were supposed to be. He once cut his own throat. He was violent toward his wife and family. And in the hospital he was given a variety of diagnoses some of which are certainly outdated now. One of them was paranoid schizophrenia.

PR 644-645. *See also* PX 33-0293 to 33-0294 (summarizing Hubert Millers' mental health history).

80. Inez and Hubert Miller had four sons: Hubert, James, Perry, and Ivan, at least three of whom were seriously mentally ill.

81. One of Mr. Miller's two paternal uncles, James Miller, had a history of violent behavior, including incarceration for murder. He has been diagnosed with irregular brain waves, black out spells, and psychotic tendencies that have resulted in his confinement to the psychiatric ward of University Hospital in Birmingham. PX 41-0038.

82. Mr. Miller's other paternal uncle, Perry Miller, also was seriously mentally ill, diagnosed with bipolar disorder and depression. PR 648; PX 36-0001 *et seq.*; PX 36-0063 to 36-0064. In addition, his medical records contain additional

information concerning the mental health histories of Mr. Miller's family members:

> Mr. [Perry] Miller states that his father [Hubert Miller] spent most of his adult life in Bryce Hospital but he is unaware of his diagnosis. However, his father also had a history of violence. In addition to his father's psychiatric treatment his brother [James Miller] attempted suicide in prison and received some treatment there. He reports that his paternal grandfather was quite wealthy but had a reputation for ruthlessness and was not beyond being violent himself.

PX 36-0001. Perry has been referred for psychiatric evaluations and counseling and has been prescribed a multitude of medications, including Wellbutrin, Paxil, Remeron, Prozac, Effexor, Zoloft, and Serzone. He has a history of lashing out violently in reaction to stress, including physically abusing his wife. Like his brother Ivan, Perry also has had suicidal thoughts and a history of substance abuse and has been unable to maintain stable employment. *See generally* PX 36.

83.    As his mother, Inez Miller, had predicted in her letter to Bryce Hospital officials, Mr. Miller's father, Ivan Miller, had a lengthy history of mental illness before his death in September, 2004. PR 385, 667; PX 34-0005, 34-0006, 34-0008, 34-0027. Ivan had a history of treatment for depression, including treatment at Cooper Green Mercy Hospital. PR 667; PX 34-0005, 34-0006, 34-0008, 34-0027. In 1996, he was diagnosed as suffering from "Major depression, recurrent." PX 34-0029.

84.     Records from the divorce proceedings between Ivan and Mr. Miller's mother, Barbara, described Ivan's aberrant behavior:

> [D]uring the marriage [Ivan] has threatened to destroy all household furnishings and personal property belonging to [Barbara] and/or of the parties; [Ivan] has slapped [Barbara] in the past; [Ivan] has come to [Barbara's] place of employment, causing her harassment and interfering with her job, resulting in the necessity of having the police called to have him removed therefrom; [and] [Ivan] has threatened to cause bodily harm to [Barbara] . . . .

PX 26-0009.

85.     Ivan believed people were always plotting against him, trying to harm him, that the police were always after him, and that his own wife had tried to poison him. PR 403, 410. Ivan was a paranoid person, who always thought somebody was talking about him, had his job, or was after his job and was out to get him somehow. PR 558. Ivan's family, including Mr. Miller, witnessed this paranoia. Ivan was a jealous man who accused his wife of having an affair with the church preacher after she had spoken with him. PR 392. Ivan repeatedly accused Barbara of having affairs and openly claimed that Mr. Miller was a product of one of those affairs, rather than acknowledging him as his own child. PR 393. Even after Mr. Miller's birth, Ivan continued denying his paternity, calling him a "little red headed bastard" and telling him that he was not his child. PR 394.

86.     Even as the Miller children grew up, they had to hear their father calling their mother names such as "fucking whore, a fucking slut, [and] tramp"

and listen to Ivan tell them that their mother "wasn't any good." PR 394. Mr. Miller and his brothers did not just overhear Ivan making these statements; Ivan specifically spoke to his sons, telling them their mother was a whore. PR 557. One Easter, when Barbara took Mr. Miller and his eldest brother, Ivan Ray, to her parents' house, Ivan arrived and in front of the children accused her of "running around," took the children from her, and threatened to kill Barbara if she came home. PR 396

87.     Ivan believed he had the power to heal. PR 410. When Ivan attempted to "heal" his son Ivan Ray's psoriasis and could not, he threw over a table and fired his gun into the walls of the home. PR 549. He told Mr. Miller and his other children that Ivan Ray was not healed because they were devils. PR 410-411. Ivan repeated this sort of behavior two to three times per week. PR 411.

88.     Ivan would try to instill fear in Mr. Miller and the other children. PR 548. Mr. Miller's brother Richard recalled that Ivan told him and Mr. Miller when they were young how "[h]e used to read from the Bible about—somewhere in the Bible that God told him to take his son in the wilderness and put him on the alter and kill him and when he didn't kill him he was going to stab his son and God told him no. And dad said he was going to do that to us one time, that God told him to kill us and he hoped God would tell him to stop." PR 550-551. Every new year, Ivan would threaten his children that the end of the world was coming and that

famine would strike. PR 551. When Mr. Miller and Richard were young, Ivan would randomly, and without any explanation, rub anointing oil on the boys' bedroom doors and then enter the room and rub the oil on their foreheads. PR 551.

### c. The physical and emotional abuse Mr. Miller received from his father

89.    Throughout his upbringing, Mr. Miller was the subject of constant and severe physical and emotional abuse from his father, Ivan. Ivan was "controlling, domineering, mean, hateful;" he would "slap you around if you looked at him cross-eyed or if you didn't look at him." PR 392. The Miller children's childhoods were "very violent" and "just terrible." PR 545. Ivan threatened to kill or beat their mother, Barbara, on a daily basis. PR 555. Ivan raped his wife, beating her until she would submit (PR 392), even when she was pregnant. PR 395.

90.    Ivan repeatedly punched, slapped, and kicked his son. PR 402, 503, 546. Ivan's physical abuse of Mr. Miller "was frequent, . . . it ranged from actual physical assaults to threats with guns and knives to the point of shooting into the floor, shooting into the wall, threats to harm, threats to kill the family, intimidating, bullying, that kind of thing." PR 670. Ivan's abuse of Mr. Miller was "sort of a regular thing in the family." Ivan hit him with his fists "*at least a thousand times. It was just so much a part of the routine that you could walk by and he suddenly reached out and just punch you for no reason. . . . [I]t was certainly a regular

feature of life in that family." PR 671-672; emphasis added. No one in the family could anticipate when these attacks would occur. PR 403, 548.

91.     Mr. Miller's older half-sister, Cheryl Ellison, witnessed Ivan punching Mr. Miller and his siblings, hitting them, and telling them how stupid and ignorant they were during her weekly visits to the Miller house. PR 503. When Barbara was present, she would try to protect Mr. Miller and his siblings, but then Ivan would beat her. PR 547. On one occasion, another boy told Ivan that Mr. Miller had done something wrong at school, and without asking any questions, Ivan "just grabbed [Mr. Miller] when he came in the door and started punching him in the head and chest, in the stomach, anywhere." PR 403. Ivan even beat Mr. Miller when another Miller child did something wrong. PR 404.

92.     Ivan would threaten Mr. Miller with the guns and knives he always carried. PR 405, 547-548. On one occasion, Ivan held a loaded gun in the house and pointed it at various family members, including Mr. Miller, saying he did not know which one of them to kill. Ivan then fired the gun into the baseboards of the room until he emptied it of ammunition. Ivan behaved similarly on other occasions, firing into the walls. PR 405. Mr. Miller's brother, Richard, recalled that Ivan would "get real mad at us and pull knives on us and talk about how he was going to cut us all up." PR 547. Ivan's threats with guns and knives against Mr. Miller and the family occurred approximately weekly or every other week. PR 406.

93. Ivan blamed Mr. Miller for events out of Mr. Miller's control. For example, Ivan blamed him when his sister suffered an appendicitis. PR 404, 552. Ivan would unpredictably knock over furniture. On one occasion he tossed up the dinner table, leaving food all over the ceiling. PR 405-406. If Ivan lost his job, or something in the house was broken, he would take his frustration and anger out on the children, including Mr. Miller. PR 556. Moreover, if Mr. Miller and his brothers did not cut the grass to Ivan's satisfaction, he would beat them. PR 556.

94. Ivan treated Mr. Miller worse than any of his other children, yelling at him more and calling him more names. PR 546. Ivan would verbally belittle Mr. Miller, in public and private, calling him names such as "little bastard" and "little son of a bitch." PR 406. Ivan also called Mr. Miller "retarded," "stupid," and "moron." PR 550.

95. Ivan's emotional abuse of Mr. Miller took many forms. For example, while Ivan would spend time watching his nephews play little league sports, he would discourage Mr. Miller from participating. PR 406. Ivan also discouraged Mr. Miller from any educational pursuits. PR 407. Ivan told Mr. Miller he was stupid and would never amount to anything. PR 407, 550.

96. Mr. Miller quit school in the eleventh grade and went to work for a year. PR 408. When he decided he wanted to return to school and get his degree, Ivan became upset because he would not be bringing home a paycheck. PR 408.

Ivan wanted his children to drop out of school. PR 552. Despite Ivan's discouragement, Mr. Miller did return and achieve his high school diploma. PR 408. Later he had his high school transcript sent to Texas Tech University. PX 19-0037.

97.     As Mr. Miller grew into a teenager, Ivan encouraged him to go out drinking, hang out in bars, chase random women, get in trouble, and steal. PR 408. Indeed, Ivan used Mr. Miller's good behavior to challenge his masculinity, calling him a homosexual. PR 409.

### d.     Mr. Miller's exposure to the criminal and antisocial behavior of members of his family

98.     Ivan and his brothers and friends used drugs and drank in the Miller house, even in front of Mr. Miller and his siblings. PR 419-420, 502. Ivan openly used marijuana, speed, and drugs that appeared to be heroine and cocaine in front of his children, telling them to keep their mouths shut. PR 420, 502, 557-558.

99.     Ivan had a criminal record, spent time in jail, and had been convicted of burglary and larceny. PR 420-21; PX 39-0002, 39-0003. Ivan once spent five months in prison and spent single nights in jail on other occasions for drunken or disorderly conduct. PR 421. The family members were relieved when Ivan was in jail because he could not physically abuse them. PR 421.

100.    Mr. Miller's maternal grandparents disliked their son-in-law, Ivan, which impacted Mr. Miller as well. While Barbara was welcome to visit her

parents' home, Ivan was not because Barbara's parents knew he was a criminal and exhibited criminal behavior and did not want the other children they raised being exposed to him. PR 501-502. As a result, Mr. Miller's maternal grandmother openly treated Mr. Miller and his siblings differently than the rest of her grandchildren. When Barbara and her children visited Barbara's parents' house for a family reunion, Barbara's mother permitted all her other grandchildren in the house, but forced Mr. Miller and his siblings to remain outside. PR 401.

101. Ivan's brothers, Hubert, Perry, and Jim, spent a good deal of time around Mr. Miller while he was growing up. One of Mr. Miller's uncles, Hubert, went to prison for armed robbery. Another, Jim, has been in and out of prison all his life, had at least five felony convictions, and now is in prison for murder. *See* PX 41-0001, *et seq.* These were the men Mr. Miller witnessed using drugs, drinking, and cursing in his home. PR 422-423.

102. Despite witnessing his father and uncles using drugs, drinking, and engaging in criminal behaviors, Alan did not drink, smoke, or do drugs, and had no criminal record. PR 462; R 1317. Instead, he grew up to be a quiet, hard-working man who didn't bother people and who had a good employment record. PR 424.

### e. Mr. Miller's good employment history

103. At an early age, Mr. Miller went to work to pay the family expenses. PR 424. He also helped pay the bills of his siblings. PR 485, 511, 560, 563. He continually worked, only leaving jobs for better-paying ones. PR 425, 462.

104. Mr. Miller was an excellent employee wherever he worked. One employer stated that he was a "good worker" and was "very seldom out sick." The office manager at Post Airgas, Mr. Miller's prior place of employment, told the *Birmingham News*, "Alan worked good as far as I'm concerned." PX 35-0050. Another described him as a "good employee" who "worked well with others" and left employment in "good standing." PX 20-0002. A third said that Alan had no employment problems, arrived to work on time, and was "dependable." *Ibid.*

105. At Ferguson Enterprises, where Mr. Miller worked at the time of the shootings, he was given a 4% merit pay increase on June 28, 1999, because he had done an "excellent job as a driver in his short time he has been with [Ferguson]." PX 20-0050. The operations manager at Ferguson told the *Birmingham News*, "I don't think anyone here would have anything negative to say about [Mr. Miller]. He ran his truck route. Never had any problems. Never had complaints. Never called in sick. Never was late." PX 35-0051.

106. Mr. Miller's good work performance was also supported by statements co-workers made to the police following the shootings. For example,

Ferguson employee David Hasenbein said that Mr. Miller was "a very good driver," "was willing to help where needed," and "was always willing to work overtime." PX 29-0056. Ferguson's Chris Nicoletta called Mr. Miller a "very reliable and dependable associate." PX 29-0117. Likewise, Ferguson employee Mary Ann Todisco stated that, while Mr. Miller was introverted, he was not unpleasant. She too noted that she had never witnessed any incidents of anger. PX 29-0119. Norman Speanman, a Ferguson co-worker, told the police he knew of no problems or conflicts between Mr. Miller and any other Ferguson employee. PX 29-0126.

### f.    Mr. Miller's loving relationships with family members

107.   Mr. Miller was close with his siblings, especially his late brother, Ivan Ray, Jr. PR 423. His other brother, Richard, described Mr. Miller as a "good person," "a good brother," and a "very loving" uncle to all his nieces and nephews: Alicia, Christy, Junior, Jake, Jordan, and Kelly. PR 559.

108.   When Mr. Miller grew older and began working, he contributed to paying the family expenses. PR 424. In 1990, before Barbara divorced Ivan for good, Mr. Miller advised his mother she did not need to put up with Ivan any longer and assured her that she was no longer financially dependent on Ivan because Mr. Miller and his brothers would provide for her. PR 425-426. When Mr. Miller's brother, Ivan Ray, died, Mr. Miller again assured his mother that he and

Richard would financially provide for her. PR 424. Mr. Miller managed the family expenses because, as his sister Cheryl put it, he "was like a rolling calculator. He would know exactly how much money he had to have to pay the bills that were due this week, and how much was due next week . . . ." PR 510.

109.   Mr. Miller also financially helped his siblings. When Ivan Ray needed money for gas, he turned to Mr. Miller. PR 511. When Richard needed money to fix his car, Mr. Miller was there for him, too. PR 560. One time Richard wished to go to an Alabama football game with his nephew, Jake Connell, and Jake's father, Ronnie. PR 511, 560. Richard had a blow-out on a tire of his truck and, because of the unexpected expense, could not afford the football ticket. PR 511. Because he knew football was so important to Richard, Mr. Miller bought Richard the ticket and never asked for repayment. PR 511, 560. Even after the shootings, when his family visited him in jail, Mr. Miller told Richard to use the money in his wallet to pay the bills and take care of their mother. PR 563.

110.   Mr. Miller worked hard, went to work every day, and as a result helped Richard get a job. When Richard needed a job, Mr. Miller spoke to a supervisor at Post Airgas. PR 560-561. Richard went in to see the supervisor and told the man he was Mr. Miller's brother. The supervisor agreed to hire him based on his relation to Mr. Miller because Mr. Miller was such a good worker. PR 561.

111. Barbara Miller and her brother, George Carr, observed that Mr. Miller continually worked, only quitting an employer to accept a better-paying job elsewhere. PR 425, 462. Mr. Miller wanted to better himself in other ways as well. He spoke to his uncle, George Carr, about entering the Air Force. PR 464.

112. Mr. Miller was a loving uncle and had an especially close relationship with his niece, Alicia Sanford, his sister Lisa's daughter. PR 426. Alicia considered Mr. Miller to be like a father to her, always giving him a card on father's day. PR 426-427, 476. Alicia lived with Mr. Miller until she was six years old. PR 426, 473. Alicia did not consider her own mother to have raised her but, instead, felt she had been raised by her uncle, Mr. Miller. PR 474-475. In about 1991, when Alicia was six years old, she moved to Fayette with her mother and step-father. Even then, Mr. Miller made sure to see his niece at least two weekends per month. PR 475-476. He would drive over 100 miles each way to pick her up for the weekend and take her back home on Sundays. PR 427. In addition, Alicia would live with Mr. Miller during the summers. Even when Alicia lived with her mother and step-father, Mr. Miller spoke to her every day. PR 476.

113. When Alicia hurt herself as a young girl, she would run to Mr. Miller. PR 476-477. Mr. Miller was the one who taught her about looking out for dangerous things outdoors, such as snakes, poison ivy, coyotes, or wolves. PR 479. When Alicia was eleven years old, she and her cousin Jordan were riding ATVs

away from the house. A man had been watching them for five to ten minutes, and the girls became frightened and hurried home. When they told Mr. Miller what happened, he immediately got in his truck to go investigate. PR 480.

114. When Alicia needed permission for anything, she first asked Mr. Miller. Mr. Miller spent time with Alicia taking her to get movies. He spent time with Alicia outdoors, teaching her about hunting, riding ATVs, and watching sports, among other things. PR 477.

115. Mr. Miller also spent time taking Alicia fishing. One time Mr. Miller took her fishing when she was five or six years old and hooked a fish on her line, unbeknownst to her, making her believe she had caught and reeled in a fish. On the trip home, Mr. Miller stopped at a Captain D's Restaurant and bought fish for the family dinner. When they arrived home, Mr. Miller pretended to cook the fish, making Alicia feel as if she had fed the family with the fish she caught. PR 478.

116. When Alicia was in the 4th grade, her performance in school began to slip because she had greater responsibility at home, taking care of her cousins because her mother and step-father were divorcing. Alicia's step-father did not encourage her to do her homework. Instead, when she brought home poor marks, she would get grounded or beaten. But Alicia's uncle, Mr. Miller, was concerned about her slipping performance and encouraged her to spend more time doing her school work. PR 483-484.

117.   Once when Alicia was going to take a vacation to Florida, her step-father would not give her any money to go, but Mr. Miller gave her the money so she could take the vacation. PR 485. Mr. Miller assisted in taking care of Alicia, including buying her necessities, such as clothing, that her mother and step-father did not provide.  PR 427-428. On one Friday when Mr. Miller picked Alicia up in Fayette, it was cold and Alicia was shivering. Alicia's grandmother, Barbara, asked if the jacket Alicia was wearing was her best coat. When Alicia replied that she did not have a warmer coat, Mr. Miller immediately went to a store to buy her a warm coat so she would not be cold. PR 427-428.

118.   Mr. Miller was also a devoted uncle to his nephew Jake Connell, his sister Cheryl Ellison's son. Jake had been very close with Mr. Miller's brother, Ivan Ray, prior to his death. When Ivan Ray passed away, Mr. Miller filled the void left in Jake's life. PR 504. Mr. Miller became like an older brother to his nephew. PR 505, 579. They spent time together mainly on weekends, and Mr. Miller did the sort of things with Jake that Jake's father could not because Jake's father always worked on weekends. PR 505-506. Mr. Miller taught Jake how to drive a pickup truck. The two watched football games, played video games, watched movies, and went mud riding in the dirt roads together. PR 505. Mr. Miller also taught Jake how to hunt. PR 578. He taught Jake about safety in hunting, especially in handling guns. PR 578-579.

119. Mr. Miller was very protective of Jake. PR 579. In particular, Mr. Miller protected Jake from Mr. Miller's father, Ivan, who would pick on the boy. PR 580. When Mr. Miller observed Ivan pick on Jake, Mr. Miller stuck up for him and would tell Ivan to quit. Mr. Miller was also protective of Jake's health and discouraged him from smoking and drinking and from getting tattoos. PR 581-582.

120. In addition to being a loving uncle and father-figure to his niece and nephew, Mr. Miller also financially helped his sister, Lisa, and her children. PR 485. When Mr. Miller's sister called him to ask for money to help pay her bills, Mr. Miller always provided what his sister needed, without asking questions. PR 485.

121. Lisa told the *Birmingham News* that Mr. Miller loves his nieces and nephews "as if they were his own." PR 166; PX 35-0029. Mr. Miller's uncle, George Carr, similarly told the *Birmingham News* how good Mr. Miller was with children. PR 165; PX 35-0029.

122. Other family members observed Mr. Miller's positive character and gentle nature. For example, Mr. Miller's paternal cousin, Brian Miller (a former Midfield City Councilman), had positive experiences with Mr. Miller. PR 531. Brian's mother did not want Brian spending time around Mr. Miller's father, Ivan. PR 535. Brian began spending time with Mr. Miller when he was 16 or 17 years old, shortly after Ivan had left the Miller house. They went hunting, fishing, and to

football games together. PR 532. Brian described Mr. Miller as "just a nice guy" and "a gentle person." PR 533. In fact, Brian described Mr. Miller as "a gentle giant" in a *Birmingham News* article published shortly after the shootings. PR 534; PX 35-0052. Mr. Miller looked out for his younger cousin, and Brian did the same for him. PR 533-534. Brian Miller considered Mr. Miller to be a good influence in his life. PR 543.

### g.     The changes in Mr. Miller's behavior prior to the shootings

123.   In the days and weeks before the August 5, 1999, shootings, Mr. Miller started staring off into space and talking to himself more often. PR 491, 512, 561. His niece, Alicia, noticed that Mr. Miller was not aware of his surroundings several times a day. PR 492. His sister, Cheryl, described that "he would just sit there like he was day dreaming and you would speak to him and he wouldn't hear you and then he would just jump like he would snap out of it." PR 512-513. In the months prior to the shootings, his mother, Barbara, and his brother, Richard, noticed Mr. Miller exhibiting similar behavior more frequently. PR 431, 433, 561. "He would be sitting there and looking off and you could tell he wasn't with you," Barbara recalled. PR 431. If someone spoke to Mr. Miller while he was exhibiting this behavior, he would have no reaction. PR 433.

124.   During this period Mr. Miller was in pain from frequent headaches. PR 492, 511. Previously, Mr. Miller would only occasionally get a headache, but

near the time of the shootings he was suffering from constant headaches. PR 492, 512, 562. Mr. Miller also spoke of a ringing sound in his ears. PR 511. To alleviate the constant pain, Mr. Miller took three to four packets of Goody's Powders a day. PR 512, 562.

125.  In addition, Mr. Miller stopped paying attention to certain aspects of life. In the months before the shootings, he did not shave or cut his hair as often as before, letting his beard grow long. PR 491, 562. Finally, Mr. Miller began forgetting to turn the headlights off in his truck when he came home from work. PR 562.

### h.  Mr. Miller's behavior in connection with the shootings at Ferguson Enterprises and Post Airgas

126.  At 7:00 a.m. on August 5, 1999, Johnny Cobb, Vice President of Operations at Ferguson Enterprises in Pelham, Alabama, arrived at work. He saw Mr. Miller's truck parked in its usual parking spot. R 833. Upon entering the building, he saw Mr. Miller in the office foyer with a pistol in hand. Mr. Miller said, "I am sick and tired of people telling rumors on me." He told Mr. Cobb to leave the premises and then left the building himself and drove away. R 818-821. Mr. Cobb returned to the building and saw that employees Lee Holdbrooks and Scott Yancy had been shot. R 822.

127.  Shortly after 7:05 a.m. that morning, David Andrew Adderhold, the store manager of Post Airgas in Pelham, where Mr. Miller had previously worked,

was in his office. Mr. Miller entered the office and asked for employee Terry Jarvis. R 842-844. He approached Mr. Jarvis and said, "Terry, you've been spreading all kinds of rumors around about me." R 844. He shot Mr. Jarvis several times. R 845. Mr. Adderhold said to Mr. Miller, "Don't shoot me. Please don't shoot me." R 847. Mr. Miller responded, "All right then. Go out that door right there right now. Right now." R. 848. Mr. Miller stepped back to let him pass. R 860. Mr. Adderhold walked past him to get out the door Mr. Miller had indicated. R 856, 858.

128. Sergeant Stuart Davidson of the Pelham Police Department received a report of the shootings at Ferguson Enterprises and Post Airgas. While traveling south on I-65, he saw a vehicle matching the description of Mr. Miller's truck. Mr. Miller was traveling below the posted speed limit. R 863-870. When the police called his name over their loud speaker, Mr. Miller pulled over and stopped, exited his truck when ordered to do so, and was handcuffed. R 872-874, 887. He made no effort to use his pistol, which was on the seat beside him or otherwise to evade capture. R 889.

129. Mr. Miller was taken to the police station and read his rights. Immediately following his arrest on August 5, 1999, he was interrogated by the police, and audio and video recordings were made of that interrogation. During the

recorded questioning, Mr. Miller asked, "I'm being charged with something? . . . I don't understand anything you're saying." PX 27-0027.

> ### ii. Trial Counsel denied Mr. Miller effective assistance by sabotaging the work of the defense psychiatric expert, Dr. Scott, and then withdrawing Mr. Miller's insanity defense

130.   On November 10, 1999, the trial court granted Trial Counsel $3,000.00 for expert psychiatric and psychological assistance. R 38. Nonetheless, Trial Counsel did not have Mr. Miller examined or evaluated by a mental health expert until early April, 2000, five months later and eight months after the shootings.

131.   In the meantime, Mr. Miller was evaluated by two mental health experts employed by the State.

132.   James F. Hooper, M.D. of the Taylor Hardin Secure Medical Facility saw Mr. Miller on October 4, 1999, only two months after the shootings. PX 29-0002, 29-0206 to 29-0211. Dr. Hooper spent only 30 minutes with Mr. Miller (PR 680; PX 28-0009) and administered no psychological tests. *See* PX 31-0022. He reported, "I can find no psychiatric illness that would rise to the level of insanity defense." PX 29-0210.

133.   Mr. Miller's Trial Counsel was given a copy of Dr. Hooper's report, but he made no effort to obtain Dr. Hooper's underlying files and, consequently, did not know what they contained. PR 67, 70, 249.

134. Mr. Miller also was evaluated by Harry A. McClaren, Ph.D., a psychologist for the State, who prepared a written report on December 2, 1999 (PX 27-0029 to 27-0033), a copy of which Trial Counsel also received. PR 71-73, 90-91, 321.

135. Dr. McClaren reported that Mr. Miller had suffered periods of amnesia prior to, and had no memory of, the shootings. PX 27-0030. He acknowledged in his written report that "*the possibility of a brief period of dissociation cannot be ruled out* as he reported experiencing a sort of feeling of 'tunnel vision' near the time of his arrest." PX 27-0030 to 27-0031; emphasis added.

136. Nonetheless, Dr. McClaren did nothing further to confirm or refute this possibility. PR 835, 837-838. He not ask Mr. Miller or members of his family about the possible causes of any such dissociative state, including possible abuse Mr. Miller may have suffered during his youth. PR 800-805, 841. In particular, Dr. McClaren obtained no information concerning any physical or emotional abuse Mr. Miller may have suffered from his father, Ivan. He did not ask about any such abuse during his interviews of Mr. Miller or his mother, Barbara. PR 799-801, 804-805. His questions were not designed to elicit that information. PR 803. Dr. McClaren also did not ask follow up questions to Mr. Miller about his response to a question on the Rotter Incomplete Sentences Blank that Dr. McClaren

administered, where Mr. Miller answered, "My father is nothing to me." PR 827. He interviewed no other family members. PR 805.

137.  Dr. McClaren administered no psychological tests to explore whether Mr. Miller was suffering from post-traumatic stress disorder or dissociation. PR 842. He concluded that Mr. Miller did not suffer from post-traumatic stress disorder (PTSD) simply because "[h]e has not expressed that to me. . . . He never mentioned anything about this kind of disorder to me." PR 786-788. In his Rule 32 testimony, Dr. McClaren admitted that, had he asked Mr. Miller whether he had been beaten by his father and received a positive response, that would have been "important information" indicating he should have explored further for PTSD. PR 845.

138.  In addition, Dr. McClaren noted in his written report that Mr. Miller reported "some ideas of suspiciousness and persecution involving feeling that co-workers spoke in a demeaning way about him intimating that he might be a homosexual both by means of a reported note posted on the Internet by one of the victims and by means of co-workers 'grabbing their crotch' when around him." As a result, Dr. McClaren observed that "he did give the impression of being rather paranoid in regard to being labeled a homosexual by various individuals in his work place." PX 27-0031. The testing Dr. McClaren administered showed that Mr. Miller was "generally unlikely to display aggressive and violent behavior." PX 27-

0033. He noted that Mr. Miller "gave the impression of suffering from a Personality Disorder with Schizoid and Paranoid Features."

139. Dr. McClaren's file contained statements by Mr. Miller denying any memory of the shootings (PX 27-0005) as well as interviews with the arresting officers that confirmed Mr. Miller's confused state of mind at the time of his arrest. *See* PX 27-0026. The file also contained the results of the psychological tests Dr. McClaren administered, which supported his hypothesis that Mr. Miller had suffered a period of dissociation at the time of the shootings. PR 281. Trial Counsel never asked the State to produce Dr. McClaren's file and did not know what it contained. PR 75-78, 249.

140. Trial Counsel finally retained an expert psychiatrist, Dr. Charles Scott, on April 4, 2000 (PX 29-0029), eight months after becoming Mr. Miller's attorney, five months after having been granted funds by the trial court for mental health assistance and just two months before the start of trial. Dr. Scott was asked solely to evaluate Mr. Miller's sanity at the time of the shootings. PR 53, 311. He was not told that he would be expected to play any other role. PR 311; *see also* PX 29-0001. In particular, he was not retained by Trial Counsel to serve as a mitigation expert. PR 342.

141. Dr. Scott retained the services of evaluating psychologist Barbara McDermott, Ph.D. of Tulane University to conduct psychological testing of Mr.

Miller to determine whether he suffered from a mental disease or disorder at the time of the shootings. PR 316.

142. Dr. Scott was entirely dependent on Trial Counsel to provide the documents, materials, and information necessary to perform his evaluations and assessments of Mr. Miller's mental state at the time of the shootings. PR 56, 91, 309-310, 595-596.

143. Dr. Scott asked Trial Counsel to provide all documents that might show Mr. Miller's mental state at the time of the shootings. PR 318-319. In particular, Dr. Scott asked Trial Counsel to send him any information concerning any statements Mr. Miller may have made near the time of the shootings. PR 318-319.

144. As Trial Counsel advised the court in his Application for Funds for Expert Psychiatric and Psychological Assistance, filed on March 16, 2000, Dr. Scott also asked Trial Counsel to provide him with "[a]ll psychological examinations conducted on the defendant including, but not limited to, all reports or summaries of such testing, all original notes taken by such examiners during such testing, and all raw data used or acquired during such testing" "in order to do a complete and thorough evaluation of this case." C 52-53.

145. Trial Counsel sent Dr. Scott Dr. Hooper's report (PR 318; PX 29-0030) and some documents concerning the shootings from the State's files. PR 56,

63; PX 29-0001 to 29-0003. Trial Counsel had other materials he did not send Dr. Scott because he thought they were "irrelevant," although Trial Counsel admitted he was "not a psychology person." PR 64-65, 279; PX 29-0080. In particular, he did not provide Dr. Scott with Dr. Hooper's file (PR 66-67, 69-70, 320-321), Dr. McClaren's expert report (PR 73-74), or Dr. McClaren's underlying file. PR 74-75, 321.

146.   In fact, Trial Counsel never even informed Dr. Scott that Mr. Miller had been evaluated by Dr. McClaren, who was going to be the State's expert witness at trial if Trial Counsel presented an insanity defense. PR 321.   Nor did Trial Counsel ever inform Dr. Scott of Dr. McClaren's conclusion that Mr. Miller may have been suffering either from a dissociative disorder or trauma-related dissociation. PR 73, 76, 90-91.

147.   Dr. Scott testified at the Rule 32 hearing that he "absolutely" would have wanted to review Dr. McClaren's report, both because Dr. McClaren evaluated Mr. Miller closer to the time of the shootings and because it would have contained information that could have influenced or affected the psychological tests Dr. Scott would have chosen and the diagnosis he would have made. PR 321-322.

148.   Trial Counsel simply may have "overlooked" the report of the State's expert. "I must not have considered that to be that important," he explained at the Rule 32 hearing. PR 279.

149.   Trial Counsel also did not inform Dr. Scott that he had an audio tape or video tape in his possession showing Mr. Miller's initial interrogation by the police on the date of the shootings. PR 322. Dr. Scott explained in the Rule 32 hearing that he "absolutely" would have wanted to review these materials in performing his assessment of Mr. Miller's sanity at the time of the shootings. PR 323-324.

150.   Dr. Scott met with Mr. Miller for 6.5 hours and also met briefly with Mr. Miller's mother, his brother, and his half-sister. PR 56-57, 314-315. Those interviews focused on Mr. Miller's behavior at the time of the shootings. PR 315. Dr. Scott obtained only "some cursory background information" about Mr. Miller, such as "where did he grow up, a little bit about his life." PR 343-344. He was not provided Mr. Miller's education and medical records or the medical or psychiatric records of other members of the Miller family. PR 346-349.

151.   Dr. McDermott administered various psychological tests to Mr. Miller to assist in the evaluation of his mental state at the time of the shootings and prepared a report that Dr. Scott reviewed. PX 28-0001 to 28-0016.

152.   On May 11, 2000, one month before the start of trial, Dr. Scott sent Trial Counsel his report. PX 29-0001. Dr. Scott diagnosed Mr. Miller as suffering from a Delusional Disorder, Persecutory Type and a Schizoid Personality Disorder with avoidant traits. PX 29-0018; PR 330. He explained that "Mr. Miller had false beliefs of several months duration that employees at his present and former work site were accusing him through a variety of seemingly innocent body gestures or movements of their mouth that he was gay." PX 29-0019. He found Mr. Miller suffered from

> a longstanding maladaptive personality style characterized by a pervasive pattern of detachment from social relationships and a restricted range of expressions of emotions in interpersonal settings beginning by early adulthood.

PX 29-0020. He concluded that Mr. Miller was not malingering, faking, or exaggerating his reported delusional beliefs. *Ibid.*; PR 328-329.

153.   In his May 11, 2000, report, Dr. Scott stated that it was his opinion that at the time of the shootings, "Mr. Miller was suffering from a severe mental illness and that severe mental illness was Delusional Disorder, persecutory type." Dr. Scott further opined that Mr. Miller "was able to appreciate the nature and quality of his actions" but that his actions had not been planned. Indeed, he concluded that "at the moment of the first shooting, Mr. Miller may not have appreciated the nature and quality of his actions as he expressed that he suddenly found himself shooting without the intention of doing so." Nonetheless, Dr. Scott

ultimately concluded that the evidence he had been provided "indicates that he appreciated the nature and quality of his actions toward each victim." PX 29-0022.

154. However, Dr. Scott explained that "[a] review of the records and interview of Mr. Miller provides evidence *both for and against* his ability to appreciate the wrongfulness of his acts." *Ibid.*; emphasis added. Dr. Scott observed that Mr. Miller's behaviors indicated that he had not sought to avoid detection, hide his weapon, or evade legal authority and, accordingly, had not appreciated the wrongfulness of his conduct. Similarly, the evidence that he had made no attempts to shoot witnesses, cover up evidence, hide or get rid of his weapon following the shooting supported the conclusion that he had no appreciation of the wrongfulness of his acts. *Ibid.*; PR 330-331.

155. In particular, Dr. Scott noted in his report that he had not been provided with specific witness statements regarding any comments Mr. Miller may have made at the time of his arrest. Dr. Scott told Trial Counsel that these statements "could be potentially helpful in clarifying if Mr. Miller was actually fleeing because he appreciated he had committed wrongful acts or if he was genuinely surprised that he was being apprehended or charged as a result of his alleged actions." PX 29-0023; PR 331-332. Based on Mr. Miller's statements at arrest, Dr. Scott's opinion on his sanity at the time of the shootings "could have gone either way." PR 333. Accordingly, he expressly asked Trial Counsel to

provide him with information about anything Mr. Miller had said at that time. *Ibid*.

Dr. Scott explained in the Rule 32 hearing that such statements would have been "extremely important" to his opinion. PR 334.

156. Ultimately, Dr. Scott concluded:

> *At this time*, it is my opinion that although Mr. Miller was delusional on the day of the crime and his behavior resulted from his delusional beliefs, the content of these delusions in and of themselves did not render Mr. Miller unable to appreciate the wrongfulness of his acts.

But Dr. Scott emphasized, "*This opinion is based on that evidence I have been given and would certainly be reconsidered if additional evidence is forwarded to me.*" *Ibid.*; emphasis added; PR 335-336.

157. Trial Counsel did not forward any "additional evidence" to Dr. Scott. PR 336.

158. Trial Counsel gave Dr. Scott no information concerning the nature and extent of the abuse Mr. Miller had suffered at the hands of his father, Ivan. PR 336-337.

159. Trial Counsel did not obtain and, accordingly, did not provide Dr. Scott with the work file prepared by Dr. Hooper of Taylor Hardin. Among the materials in the Hooper file was the Defense Attorney Information form completed by Trial Counsel Johnson on September 23, 1999, less than two months after the shootings. PX 31-0007 to 31-0008. In that document Trial Counsel Johnson informed Dr. Hooper that Mr. Miller was suffering from "the apparent loss of some

memory surrounding the events" and that "he seems confused about the effect and seriousness of his actions." In addition, Trial Counsel Johnson reported that, "when Defendant was pulled over in his vehicle on the interstate following the incident, he . . . asked the officers if they were going to charge him." PX 31-0007. Trial Counsel did not provide this Defense Attorney Information form to Dr. Scott, even though he knew that would have been significant information for Dr. Scott to have. PR 69-70, 93-94.

160.    The Taylor Hardin files also contained Dr. Hooper's notes of his interview with Mr. Miller. Under the heading "Summary of Alleged Offense," Dr. Hooper wrote, "Denies any memory." Under the heading "Defendant's Version of Alleged Offense," Dr. Hooper wrote that Mr. Miller told him he "went to sleep, next memory is of arrest." Dr. Hooper also recorded the phrase "Day Dreams." PX 31-0019.

161.    Finally, the Taylor Hardin files confirmed that Dr. Hooper had not administered any psychological tests in forming his conclusions concerning Mr. Miller's sanity. *See* PX 31-0022.

162.    Trial Counsel also did not supply Dr. Scott with the written report prepared by the State's expert, Dr. McClaren, even though Trial Counsel had a copy in his possession. PR 71-74, 90-91, 321, 336; PX 27. Thus, Dr. Scott was unaware of Dr. McClaren's report that Mr. Miller had suffered periods of amnesia

prior to the shootings and had no memory of the shootings themselves. Nor was Dr. Scott told by Trial Counsel that Dr. McClaren acknowledged the possibility that Mr. Miller had been suffering from a period of dissociation at the time of the shootings.

163.   Trial Counsel did not bring Dr. McClaren's hypothesis to Dr. Scott's attention and did not ask Dr. Scott to consider whether there was evidence that Mr. Miller may have been suffering from a period of dissociation at the time of the shootings. PR 90. Trial Counsel did not ask Dr. Scott or Dr. McDermott whether they could administer any psychological tests to determine whether Mr. Miller had suffered either from a dissociative disorder or trauma-related disorder. PR 91.

164.   Trial Counsel also made no effort to obtain and, accordingly, did not provide Dr. Scott with Dr. McClaren's work file, which contained the notes of his interviews with Mr. Miller, the arresting officers, and others, as well as the results of the psychological tests he had administered. PR 74, 75, 249, 281, 321, 336. Trial Counsel did not know what the McClaren file contained and never asked the State to list its contents. PR 75, 76-77.

165.   The notes taken by Dr. McClaren and his associates contained statements by Mr. Miller denying any memory for the events of August 5, 1999. *See*, *e.g.*, PX 27-0005 (when apprehended, "I asked if I was being charged with anything"). In addition, the McClaren file contained notes of interviews with the

arresting officers in which they confirmed Mr. Miller's confused state of mind when he was apprehended concerning what had happened. *See*, *e.g.*, PX 27-0026 (Lt. Mark Hall reported that at time of arrest, Mr. Miller stated, "What's going on?").

166. The McClaren file also contained Dr. McClaren's summary of the taped interview police conducted with Mr. Miller on the day of the shootings, when he said, "I am being charged with something? . . . I don't understand anything they are saying." PX 27-0027; PR 818. The file also contained Dr. McClaren's notes of an interview with Mary Margaret Denman of the Shelby Chilton Mental Health Center, who saw Mr. Miller the day after the shootings and reported that he "showed no affect – negative or positive" and may have been in a state of shock. PX 27-0025.

167. The McClaren file contained the structured interview forms and psychological tests that Dr. McClaren had administered to Mr. Miller, which contained information concerning his mental state at the time of the shootings and the possibility he had suffered from a period of dissociation. PR 281. For example, in his answers to the Rotter Incomplete Sentences Blank, Mr. Miller disclosed, "When I was a child, *I dreamed a lot*" (which Dr. McClaren understood referred to "day dreams" (PR 827)), and "Sometimes *I forget things*." PX 27-0190. Similarly, the Minnesota Multiphasic Personality Inventory administered by Dr. McClaren

flagged as a "critical item" Mr. Miller's answers ("True") to the statements "I have had blank spells in which my activities were interrupted and I did not know what was going on around me" and "I often feel as if things were not real." PX 27-0198.

168.   Trial Counsel never obtained and, hence, did not supply Dr. Scott with the available mental health and medical records of Mr. Miller's relatives: Hubert Miller, James Miller, Perry Miller, and Ivan Miller. PX 33, 34, 36; PR 80-82.

169.   Finally, despite Dr. Scott's specific request for information regarding any comments Mr. Miller may have made at the time of his arrest and his explanation in his written report that these statements "could be potentially helpful in clarifying if Mr. Miller was actually fleeing because he appreciated he had committed wrongful acts or if he was genuinely surprised that he was being apprehended or charged as a result of his alleged actions" (PX 29-0023), Trial Counsel did not provide Dr. Scott with the video and audio tape recordings of Mr. Miller's arrest-day questioning by the police, which Trial Counsel had in his possession (PR 78, 336), during which Mr. Miller said, "I'm being charged with something? . . . I don't understand anything you're saying." PX 27-0027. Trial Counsel told the *Birmingham News* that the video tape showed "a look of total disconnect or total indifference on Mr. Miller's face." PR 79-80; PX 35-0070.

170.   Trial Counsel admitted in his Rule 32 testimony that it would have been important for Dr. Scott to hear Mr. Miller's statements to the police and to

view his demeanor at the time of his arrest. PR 70. Dr. Scott told Trial Counsel that such statements would be significant pieces of information. Nonetheless, he did not provide the tapes to Dr. Scott. PR 79, 85, 93, 334.

171. Dr. Scott explained at the Rule 32 Hearing that the materials Trial Counsel had withheld from him, including the notes of the interviews with Mr. Miller in the Hooper and McClaren files, were "very significant." PR 339. They would have been "evidence that he didn't believe that what he was doing was legally wrongful." PR 340.

172. Had Trial Counsel provided Dr. Scott with Dr. McClaren's report, Dr. Scott would have done more investigation on the nature and extent of the abuse Mr. Miller suffered from his father, because one of the most commonly reported causes of dissociative disorder is a history of physical abuse in childhood. PR 354-355, 361-362. Had Dr. Scott been provided with this additional information and had the result of additional testing focused on post-traumatic stress disorder or dissociative disorders indicated that Mr. Miller suffers from those maladies, his opinion may have been that, at the time of the shootings, Mr. Miller was unable to appreciate the nature and quality or wrongfulness of his acts. PR 363-364.

173. In addition to failing to provide Dr. Scott with any of this additional evidence, Trial Counsel Johnson took no other steps to develop an insanity defense for Mr. Miller. He did not have Mr. Miller examined by another mental health

expert (particularly one to whom Trial Counsel had supplied all relevant materials, including the Taylor Hardin files and the McClaren Report and files) to determine whether that individual concurred in Dr. Scott's ultimate opinion or whether the second expert was able to opine that Mr. Miller met the statutory definition of insanity at the time of the shootings. PR 94-95; R2 30.

174.    During Mr. Miller's Rule 32 proceedings, Psychologist Dr. Catherine Leigh Boyer was retained to understand Mr. Miller's psychological functioning and adjustment up to the time of the shootings in light of his history and family background. PR 592.

175.    Dr. Boyer interviewed Mr. Miller, administered a variety of psychological tests (particularly ones testing for post-traumatic stress and dissociative disorders) and reviewed available records of his background and his family members. In particular, Dr. Boyer reviewed Mr. Miller's employment records (PX 20) and medical records (PX 21), the Pelham Police Department file (PX 22), Shelby County jail records (PX 23), Dr. McClaren's file (PX 27), Dr. McDermott's file (PX 28), Dr. Scott's file (PX 29), a Shelby Baptist Medical Center radiology report on Mr. Miller (PX 30), the Taylor Hardin file on Mr. Miller's evaluation by Dr. Hooper (PX 31), Department of Human Resources records for the Miller family (PX 25), divorce records for Ivan and Barbara Miller (PX 26), Hubert Miller's mental health records (PX 33), medical records of Perry

L. Miller (PX 36), Ivan R Miller's criminal record (PX 39), Perry L. Miller's criminal record (PX 40), James E. Miller's criminal record (PX 41), and divorce records for Perry L. Miller (PX 43). PR 600-621. Trial Counsel had not gathered any of these records and, accordingly, had not supplied them to Dr. Scott.

176.   Dr. Boyer also interviewed a host of Miller family members. PR 592-593, 598, 684. She interviewed not only Alan's mother, brother, and half-sister, but also Mr. Miller's niece, Alicia Sanford, his cousin, Brian Miller, his uncle and aunt, George and Bonnie Carr, his uncle, Richard Carr, his aunt, Viola Trull, Perry Miller's first wife, Pamela Hand, and Perry Miller's current wife, Bobbie Florence Miller, none of whom had been interviewed by Trial Counsel. PR 598.

177.   Based on these records and interviews, Dr. Boyer learned a great deal about Mr. Miller that Trial Counsel had not told Dr. Scott because of Trial Counsel's deficient investigation. Dr. Boyer learned about the financial stress and frequent moves that affected Mr. Miller during his youth (PR 671); the abuse that Mr. Miller suffered from his father and the effects of this abuse on Mr. Miller (PR 670-673); Mr. Miller's exposure to drug use and other anti-social behavior by his father and his uncles, Perry and Jim (PR 679); Mr. Miller's loving and caring relationships with his mother, Barbara, his siblings, and his nieces and nephews (PR 673-675); his excellent employment history (PR 600, 669); and the limited resources available to Mr. Miller to deal with the stress he faced (PR 677-678).

178.   Dr. Boyer reviewed all of the materials that Trial Counsel failed to provide to Dr. Scott. She evaluated Mr. Miller using the results of tests designed to diagnose post-traumatic stress and dissociative disorders. Dissociation is a disconnection of the normally integrated functions of consciousness, memory, and perception. During a period of dissociation, a person can experience out of body experiences, amnesia, a lack of awareness of things going on around him, and a feeling as though he is in a dream. PR 685. A classic cause of dissociation is serious trauma in the person's background. Dr. Boyer concluded that the serious abuse Mr. Miller suffered from his father would constitute just such trauma. PR 760.

179.   Based on all of this information and evidence, Dr. Boyer concluded that Mr. Miller suffers from post-traumatic stress disorder with dissociative features. PR 714. She further opined that the ability of an individual to appreciate the nature and quality or wrongfulness of his acts may be impaired when the individual acts during the course of a dissociative episode. PR 717. She concluded Mr. Miller had experienced just such a dissociative episode during the shootings. PR 718.

180.   In addition to not supplying Dr. Scott with any additional materials or information, Trial Counsel did not discuss Mr. Miller's case with any other psychological experts after he got Dr. Scott's report, despite Dr. Scott's equivocal

conclusions. R2 30; PR 92, 94. Instead, on May 24, 2000, 19 days before the start of trial, Trial Counsel simply withdrew Mr. Miller's insanity plea. PR 91-92.

### iii. Trial Counsel denied Mr. Miller effective assistance by failing to investigate or develop mitigation evidence following the withdrawal of the insanity defense.

181. Following the receipt of Dr. Scott's report and the subsequent withdrawal of the insanity defense, Mr. Miller's Trial Counsel made no efforts to gather any mitigation evidence or develop any mitigating testimony from family members or others that could be presented during the penalty phase of trial.

182. Trial Counsel Bass performed no work on Mr. Miller's case after April 20, 2000. PX 4-0003. On June 1, 2000, the Court granted his oral motion to withdraw. Trial Counsel Bass withdrew because he had been retained to defend Bobby Frank Cherry, who had been indicted on May 17, 2000, for the 1963 bombing of the Sixteenth Street Baptist Church in Birmingham. PR 104-105.

183. Trial Counsel Johnson was Attorney Bass's co-counsel in the *Cherry* case, and he spent a considerable amount of time working on that case after Mr. Cherry's indictment. PR 106-107. Trial Counsel Johnson spent no time working on Mr. Miller's defense between May 12-30, 2000. PR 107; PX 3-0004. In particular, he spent no time gathering mitigating documents or contacting possible penalty-phase witnesses following his receipt of Dr. Scott's report or the withdrawal of Mr. Miller's insanity plea. PX 3-0004; PR 108.

184.    On June 1, 2000, less than two weeks before the start of trial, the Court appointed Ronnie H. Blackwood as Mr. Miller's new co-Trial Counsel in place of Attorney Bass. C 4. Trial Counsel Blackwood never spoke with former-Trial Counsel Bass or learned anything from him about the case. PR 867, 878. Thus, he, like lead-Trial Counsel Johnson, never learned any information that Attorney Bass may have gathered during the latter's few contacts with the Miller family. PR 867, 878 Although he was present during Mr. Miller's trial, Trial Counsel Blackwood took no active part in any of the proceedings. R2 13-14.

185.    Trial Counsel Johnson admitted publicly on the eve of trial to the *Birmingham News* that he did not know how he would defend Mr. Miller: "'How do you defend somebody who shot three people and left eyewitnesses who knew who they were looking at. . . . I wish you'd tell me." PX 35-0065.

### iv.    Trial Counsel denied Mr. Miller effective assistance during juror voir dire.

186.    Trial Counsel's failure to conduct an adequate juror voir dire violated Mr. Miller's constitutional rights. *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) ("[P]art of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors."). Trial Counsel made no effort to determine juror bias or improper influence as a result of the prejudicial media coverage of the case. Even when a juror's bias was apparent from the juror's answers to *voir dire* questions, Trial Counsel made no effort to strike the juror at

issue. Nor did Trial Counsel make any effort to educate the jury on defense theories of the case or condition them to the possibility of finding Mr. Miller guilty of a crime less than capital murder.

187.   On June 12, 2000, trial began in the Shelby County Circuit Court before Judge D. Al Crowson. Members of the venire completed comprehensive juror questionnaires, following which counsel conducted voir dire. Judge Crowson gave Trial Counsel Johnson the opportunity to ask any questions he wished of the prospective jurors. PR 126.

188.   From the time of the shootings up until the opening day of trial, the news media published stories about Mr. Miller, many of which contained speculative and erroneous information that was highly prejudicial to a fair defense.

189.   On August 6, 1999, the *Birmingham News* published an article in which neighbors of Mr. Miller described him as having "a short fuse" and stated that "[t]hey often heard him yelling at his family and sometimes at children who happened onto his property." One neighbor was quoted as saying, "The only time I ever talked to the man was when he was mad." PX 35-0006. Trial Counsel understood that these statements would have prejudiced Mr. Miller if read and remembered by any of the jurors. PR 120.

190.   Also on August 6, 1999, a *Birmingham Post-Herald* story reported that "authorities" were speculating that Mr. Miller "might have been trying to

emulate Mark Barton, the Atlanta day trader who killed nine people in an office shooting rampage just a week before." PX 35-0017.

191.   An August 7, 1999, *Birmingham News* story stated that Mr. Miller shot the three victims "with apparent method and vengeance." PX 35-0023.

192.   On August 8, 1999, the *Birmingham News*, in an article entitled "Work Spat Blamed in Killings," speculated that "Alan Eugene Miller's anger over truck-route assignments could have triggered a killing spree Thursday that left three dead." The story quoted a co-worker at Ferguson Enterprises and a close friend of victim Lee Holdbrooks as speculating, "That guy got mad because he wasn't getting the routes he wanted. . . . He was thinking Lee was getting better routes." The co-worker further stated, "I guess (Miller) felt Scott [Yancy] and Lee were in cahoots about (Holdbrooks) getting a better route." The article quoted the Shelby County District Attorney as confirming that the killings were caused by a work assignment dispute: "Owens said, 'That would be consistent with what was said in open court.'" PX 35-0028.

193.   An August 11, 1999, article in *The News Record* reported erroneously that Mr. Miller "was laid off from his job two days before going on a shooting spree Thursday, killing three former co-workers. Alan Eugene Miller, 34, of Billingsley, was laid off Tuesday from Ferguson Enterprises in Pelham, said Autauga County Sheriff Herbie Johnson." PX 35-0035.

194.  An August 15, 1999, article in *The Tuscaloosa News* repeated the speculation that the shootings had been caused by Mr. Miller's anger over route assignments: "A friend of Holdbrooks has said Miller was angry because he felt Holdbrooks, another driver, was receiving longer and better routes than he was." PX 35-0041. The same statement was reported in the *Montgomery Advertiser*. PX 35-0042.

195.  On September 14, 1999, the *Birmingham News* reported, "[I]t wasn't the first or even the second or third time the 34-year-old truck driver was violent or openly angry on the job. He had been fired from one job for fighting; an altercation at another workplace drew police; and a former supervisor reported a string of shouting matches over five years between Miller and one of the three men he killed Aug. 5." That same article quoted a former co-worker's opinions concerning Mr. Miller's mental state at the time of the shootings: "'Alan is not crazy,' said David Tinker, former purchasing manager at Post Airgas. 'He knew what he was doing, and he knew who he wanted to shoot. There ain't nothing wrong with Alan Miller, except he killed three people and he needs to die.'" PX 35-0050, 0051.

196.  *The Tuscaloosa News* headlined its September 15, 1999, story, "Man charged in shootings had history of fights on job." PX 35-0053.

197.  These pre-trial news articles were both inaccurate and prejudicial to Mr. Miller's defense. There was no evidence presented at trial that the shootings

were the result of jealousy over route assignments, much less that Mr. Miller had intended to emulate an Atlanta day-trader.

198.   The information in these stories also was inconsistent with the evidence on which Mr. Miller's limited penalty phase defense depended: that Mr. Miller shot his three co-workers solely because he was suffering from a mental illness and was acting under the influence of a paranoid delusion that they had been spreading rumors about his sexuality, not because of any rational workplace dispute.

199.   Equally as damaging to the defense was the published speculation by a co-worker that Miller wasn't "crazy," that there was "nothing wrong" with him, and that he "deserve[d] to die."

200.   Finally, the articles that reported on prior workplace altercations involving Mr. Miller (evidence that was never submitted to the jury during either the guilt or penalty phases of the trial) were prejudicial because they suggested that the shootings were merely the most recent example of Mr. Miller losing his temper when provoked at work, contrary to the evidence of mental illness on which the defense intended to rely during the sentencing phase of the trial.

201.   Even more damaging to Mr. Miller's defense were news stories that appeared before the trial in which Trial Counsel was quoted making statements

that were inconsistent with the theory of the defense subsequently presented during the sentencing phase.

202.   For example, on August 11, 1999, Trial Counsel told the *Shelby County Reporter*, "there seemed to be no psychological basis for this . . . ." PX 35-0036; PR 124-125. In fact, the sole mitigating evidence submitted by Trial Counsel during the sentencing phase was intended to prove that there was a clear, understandable "psychological basis" for Mr. Miller's actions: that he was acting under and as a result of a delusional disorder. PR 275.

203.   In addition, less than three weeks before the start of trial, Trial Counsel confessed to the *Birmingham News*, "How do you defend somebody who shot three people and left eye witnesses who knew who they were looking at? I wish you would tell me." PX 35-0065.

204.   During voir dire, Trial Counsel failed to ascertain whether the jurors were tainted by this extensive negative pre-trial publicity. Although Trial Counsel had the aid of questionnaire answers in which the prospective jurors indicated whether they had read news articles about the shootings, he asked virtually no follow-up questions of jurors whose answers indicated potential bias.

205.   Prospective juror E. H. answered in his questionnaire that he had read about the case in the newspapers and had seen stories about it on television. He also reported that the case had been discussed in his presence. PX 1-1670. Trial

Counsel did not ask E. H. a single question and did not learn what he remembered having heard in the newspapers or on television and whether what he had read or seen was prejudicial to Mr. Miller. R 340; PR 128-129. E. H. was selected as a juror. R 773.

206. Prospective juror F. H. answered in his questionnaire that he had read about the case in the newspapers, had heard about it on TV, and had discussed it with others. PX 1-1684. F. H. told Judge Crowson that he had read articles about the shootings immediately after they had happened and that "it was a major happening . . . ." R 345. Trial Counsel did not ask F. H. a single question or follow up on this remark in any way. He did not ask what F. H. had seen or heard or why he thought it was a "major happening" or make any effort to determine the effect of prejudicial publicity on this juror who, by his own admission, had extensive pre-trial exposure. The only two questions Trial Counsel asked F. H. were his wife's name and whether F. H. had triplets. R 348. F. H. was selected as a juror. R 773.

207. Prospective juror G. J. reported in his questionnaire that he had read about the case in the newspapers. PX 1-1712. Trial Counsel asked G. J. no questions concerning what he remembered having read. R 385-90. G. J. was selected as a juror. R 773.

208. Prospective juror J. M. reported in his questionnaire that he had read about the case in the newspapers and had heard about it on television. PX 1-1716.

Trial Counsel did not ask J. M. a single question concerning what he had read, heard, or remembered. R 448. J. M. was selected as a juror. R 773.

209.   Prospective juror G. M. reported in her questionnaire that she had read about the case in the newspapers, heard about it on television and radio, and discussed it with others. PX 1-1730. Trial Counsel did not ask G. M. a single question about what she had read, heard, or remembered. R 452. G. M. was selected as a juror. R 773.

210.   Prospective juror B. S. reported in her questionnaire that she had read about the case in the newspapers, heard about it on television, and discussed it with others. PX 1-1754. Trial Counsel did not ask B. S. a single question about what she remembered having read, heard, discussed, or remembered. R 628-629. B. S. was selected as a juror. R 773.

211.   Prospective juror O. T. reported in her questionnaire that she had read about the case in the newspapers. PX 1-1768. Trial Counsel did not ask her a single question about what she remembered having read. R 646. O. T. was selected as a juror. R 773.

212.   Prospective juror M. W. reported in her questionnaire that she had read about the case in the newspapers, had heard about it on television, and had discussed it with others. PX 1-1782. Trial Counsel did not ask M. W. a single

question about what she remembered having read, heard, or discussed. R 669-670.

M. W. was selected as a juror. R 773.

213.   Accordingly, even though the juror questionnaires showed that eight of the persons ultimately selected as jurors had prior exposure to the case through newspapers, TV, radio, and/or discussions with others, Trial Counsel did not ask a single one of them about it.  He did not ask about the extent of their exposure, what they had heard or saw or talked about, or whether that exposure caused them to be biased in some way. Trial Counsel never learned if the jurors had seen information harmful to Mr. Miller's defense because of his objectively unreasonable assumption that there wasn't an article that could have been written that would have been inconsistent with Mr. Miller's defense. PR 273-275. He did not even ask if any of the prospective jurors had seen his own comments to the media about the case, including his statement only weeks before that he didn't know how to defend the case.

214.   In addition, three of these jurors (E. H., PX 1-1671; B. S., PX 1-1755; and M. W., PX 1-1783) admitted in their questionnaire answers that they already had formed an opinion as to who was responsible for killing the three men. Trial Counsel did not ask any of them a single question about this response. *See* R 340 (E. H.), R 628-629 (B. S.), R 669-670 (M. W.). Trial Counsel failed to determine who these jurors thought responsible for the crime, how they arrived at this

conclusion, and the extent to which their prejudging of the case would affect their ability to serve impartially during both the guilt and sentencing phases of trial.

215.   Trial Counsel also did not conduct any voir dire regarding the jurors' willingness to consider lesser-included offenses or condition them to the possibility of finding Mr. Miller guilty of any crime less than capital murder, including non-capital murder or manslaughter. During voir dire, District Attorney Owens told the jurors that they might be asked to consider lesser-included offenses "which wouldn't include the death penalty or life without parole, what we refer to as straight murder . . . or perhaps manslaughter." R 356. Even when the prosecution told juror O. T. that "it could be a lesser offense or it could be even a lesser offense" (R 643), Trial Counsel failed to follow up or explore the issue with that juror or any others.

216.   Trial Counsel's own comments during voir dire suggested that capital murder was the jury's only option. For example, he stated to juror W. H. that "to get to the sentencing phase you would be convinced beyond a reasonable doubt that the accused here had shot and killed three people." R 330. The comment suggested that the killing of three people alone would establish capital murder and move the case into the capital sentencing phase, without regard to Mr. Miller's state of mind or the other elements of the offense.

217.  Other comments by Trial Counsel during voir dire further undercut any hope that the jurors might consider sentencing Mr. Miller to life imprisonment. The sole aggravating circumstance on which the State relied was that "[t]he capital offense was especially heinous, atrocious, or cruel compared to other capital offenses." Ala. Code § 13A-5-49(8). Trial Counsel conceded that this aggravating factor would be proven, describing this as a case "where three people are just *brutally murdered* . . . ." R 669; emphasis added.

218.  Finally, Trial Counsel failed to strike jurors who harbored explicit views that were antithetical to fairness and impartiality toward Mr. Miller. Juror G. J. stated that he was "strongly in favor" of the death penalty "in this situation" (R 378, 387) and that he would "definitely not" be able to look "solely" at the law and evidence to decide the case. R 380. Trial Counsel did not move to strike G. J., who became a member of the jury. R 773.

219.  During the Rule 32 hearing, Trial Counsel Johnson offered no explanation for his failure to question the prospective jurors about their exposure to prejudicial pre-trial statements. He acknowledged knowing that eight of the jurors had read about the case in the newspapers and that he didn't ask them what they had seen and what they remembered. PR 273. Although he initially testified that he could not imagine anything in the newspaper articles that could have harmed Mr. Miller (PR 240), he ultimately acknowledged that the statements that Mr. Miller

had a short fuse and yelled at members of his family and neighborhood children would have been damaging to his position during the penalty phase of the trial. PR 120, 276. He admitted that, had he known a prospective juror had read something harmful to Mr. Miller, he would have wanted to know what it was and would have asked about it. PR 135. Moreover, he agreed that he would have considered using a per-emptory challenge to remove a prospective juror who remembered reading in the newspapers something harmful to Mr. Miller. *Ibid*. He admitted he would have wanted to know if any of the jurors had read and remembered his statement that "there was nothing psychological about this" in light of the fact that the only witness he intended to call during the penalty phase of the case was the psychiatrist, Dr. Scott. PR 136. But he never inquired.

> **v.    Trial Counsel denied Mr. Miller effective assistance in his guilt-phase opening statement.**

220.    An inadequate opening statement during the guilt phase of trial can contribute to a finding of ineffective assistance of counsel. *See Fisher v. Gibson*, 282 F.3d 1283, 1288 (10th Cir. 2002); *Stouffer v. Reynolds,* 214 F.3d 1231, 1233 (10th Cir. 2000). Lack of an effective opening statement, in combination with other deficiencies by counsel, raises a reasonable doubt concerning the guilty verdict and is prejudicial. *Stouffer*, 214 F.3d at 1233-35.

221.    During his opening statement, Trial Counsel did little more than act as a second prosecutor. Having withdrawn the insanity defense, Trial Counsel offered

the jury no defense theory whatsoever. R2 35, 64. Instead, his opening statement bolstered the State's case by adopting the State's version of the facts and failing to challenge the State's prejudicial assertions about the evidence.

222. For example, the State asserted that victim Lee Holdbrooks, who had already been shot, could hear what was happening down the hall to his co-worker, Scott Yancy, and that the fatal shot to Mr. Yancy was administered at point-blank range, "looking him in the eye." R 807-808. The State had no evidence to support these assertions. In addition, the State repeatedly characterized the killings as "executions," not murders. R 808, 811.

223. Trial Counsel endorsed these and other prejudicial statements by telling the jury in his opening statement that the State got "most of it right." Trial Counsel also told the jury that the State's opening statement was a "pretty good recitation of what happened." R 814-815. Moreover, Trial Counsel told the jurors that they had no obligation to critically examine the State's presentation of the facts, noting that "some of it seemed to be a little embellished, *but so what*." R 815; emphasis added. Rather than holding the State to its burden of proof, Trial Counsel affirmatively stated that any exaggeration of the facts by the State was of no real concern.

224. Trial Counsel did not offer the jury any defense theory. R2 53. Rather, he strongly suggested to the jurors that he (and they) simply would be going

through the motions of trial because that is what the law required. Trial Counsel made no attempt to focus the jury on the State's burden to prove the elements of the offense of capital murder for which Mr. Miller was charged: the intentional killing of two or more persons by one act or pursuant to one scheme or course of conduct. PR 138. Nor did he highlight the facts that might permit the jurors to find Mr. Miller guilty of anything other than capital murder, such as intentional murder or manslaughter.

225.    Instead, Trial Counsel encouraged the jury to feel contempt for Mr. Miller by describing the shootings as "brutal" and "inhumane" (R 814) and telling the jurors that he did not expect they would feel "anything but ashamed of what happened that caused all of us to be here." R 816.

226.    Trial Counsel did not describe the killings as "brutal" and "inhumane" for any strategic reasons. As he later admitted at the hearing on the new trial motion, "I guess I really didn't think about the choice of words there." R2 61.

### vi.    Trial Counsel denied Mr. Miller effective assistance during the presentation of the State's guilt-phase evidence.

227.    Trial Counsel repeatedly failed to object to the State's introduction of inadmissible, irrelevant, and inflammatory evidence during the guilt phase of the trial.

228.    The State presented all of its evidence on the sole aggravating circumstance in the case – that the crimes were especially heinous, atrocious, or

cruel in comparison with other capital crimes – during the guilt phase of Mr. Miller's trial. In the penalty phase of the trial, Assistant District Attorney William Bostick acknowledged this: "We have already proven this offense was heinous, atrocious and cruel, we're not going to bring anyone in to tell you any more about it. You've seen the evidence, and you've seen everything we have got to present." R 1315. Trial Counsel recognized this as well, noting that the testimony of the State's experts, Angello Della Manna and Dr. Stephen Pustilnik, was primarily for the purpose of establishing that the crimes were egregious and atrocious. R2 43-45. Yet, Trial Counsel made no attempt to exclude this inadmissible, irrelevant, and highly prejudicial testimony during the guilt phase.

229.    Angello Della Manna, a forensic scientist with the DNA section of the Alabama Department of Forensic Sciences, was allowed to testify at length about blood splatter patterns at the crime scene. Mr. Della Manna's testimony provided the State with a vehicle through which to introduce gruesome testimony and photographs of the victims and the crime scenes. Mr. Della Manna walked the jury through multiple bloody photographs showing the victims as they were found, their bloody handprints, the trails of blood, and the drip and splash patterns of blood on the floors and the walls. R 1153-1184. The testimony and photographs had no relevance to the issues in the guilt phase of the trial and served no purpose other than to inflame the jury against Mr. Miller.

230. Rather than objecting to the State's inadmissible, irrelevant, cumulative, and highly prejudicial evidence at the time of Mr. Della Manna's testimony, Trial Counsel erroneously allowed the jury to absorb the testimony and the bloody photographs without comment.

231. Trial Counsel similarly erred in failing to challenge the admission of the testimony of Alabama State Medical Examiner, Dr. Steven Pustilnik. Dr. Pustilnik's testimony focused on analyzing graphic photographs of the gunshot wounds and speculating as to the pain that certain wounds would have caused the victims. R 1199, 1205-1206, 1209, 1210, 1216, 1219-1220, 1227, 1229. Once on the stand, Dr. Pustilnik was further allowed to speculate that Mr. Holdbrooks had been shot at extremely close range, even though there was no foundation for his ability to draw this conclusion. R 1213. In the process, the jury was shown gruesome photographs of gunshots to the face, head, neck, abdomen, and genital area. Trial Counsel raised no objections.

232. Gruesome photographs and testimony regarding blood splatter and pain of the victims had no legal relevance to the narrow issues in the guilt phase. To the contrary, the evidence could only have served to inflame the jury and prevent an objective assessment of whether the State had met its burden of showing that Mr. Miller was guilty of a capital offense. Despite this fact, Trial Counsel made no attempt to exclude or strike any of this evidence.

233.  Trial Counsel's error in failing to object to highly irrelevant and inflammatory evidence was compounded by his failure to effectively cross-examine Dr. Pustilnik, Mr. Della Manna, and other crucial State witnesses.

234.  Trial Counsel's cross-examination of the State's expert witnesses - Ed Moran, Angello Della Manna and Dr. Stephen Pustilnik - revealed that he had done little or nothing to prepare. Because of the highly technical nature of the testimony, Trial Counsel erred in failing to familiarize himself with the subject matter in order to conduct an effective cross-examination, in failing to obtain his own counter-experts who could have assisted him in identifying areas of weakness in the State's testimony, or in any other way familiarizing himself with and preparing for the State's case before trial.

235.  After Mr. Della Manna gave extensive testimony on direct regarding blood splatter patterns, his opinion about how events unfolded, and the victim's physical positions during the crime, Trial Counsel failed to ask a single question on cross. R 1185. As a result, Trial Counsel allowed certain highly damaging assumptions to be presented to the jury, which had no basis in the evidence.

236.  For example, at the end of the State's examination, Mr. Della Manna testified that the final gunshot to Mr. Holdbrooks was to the crown of his head and was sustained while he was on the floor looking slightly upwards. R 1185. What Mr. Della Manna did not add was that, because the shot was to the crown or top of

Mr. Holdbrooks' head (R 1183), Mr. Holdbrooks could not have been looking directly at his shooter at that time. R 1180-1185.

237. Trial Counsel never asked Mr. Della Manna to clarify that Mr. Holdbrooks was not facing Mr. Miller when this shot was fired. As a result, the State seized on this ambiguity and made it a centerpiece of its argument on the heinousness of the crime, repeating again and again that Mr. Holdbrooks was shot execution-style while he was looking Mr. Miller in the eye. R 1260. Trial Counsel did nothing to object to the State's inaccurate description of the shooting and, in fact, adopted that description of the shootings himself. R 1274.

238. Trial Counsel also failed to object to the inflammatory and irrelevant testimony of Alabama state medical examiner, Dr. Pustilnik, who made several unsupported statements to suggest that the shootings were especially torturous, heinous, and cruel. Trial Counsel raised no objections while Dr. Pustilnik's direct examination was conducted with the visual aid of multiple graphic photos depicting the various gunshot wounds. Without providing any foundation or establishing any basis for his opinion, Dr. Pustilnik testified multiple times that particular gun shots to the victims would have been extremely painful. R 1199, 1205-1206, 1210, 1216, 1219-1220, 1227, 1229.

239. Trial Counsel made no objection to this highly prejudicial testimony, notwithstanding the fact that Dr. Pustilnik provided no foundation or expertise for

his repeated assertions that the victims felt severe pain as a result of the gunshot wounds. Indeed, on re-direct, Dr. Pustilnik acknowledged that the level of pain from a gunshot may depend on a number of factors not in evidence, such as the victim's level of agitation and adrenaline. R 1248. Trial Counsel, however, made no independent attempt to press this point on cross-examination.

240.    Instead of challenging the weaknesses in Dr. Pustilnik's testimony, Trial Counsel succeeded in establishing the unhelpful presumption that *every* gunshot wound is painful and bleeds profusely:

> Q.     . . .   In that years' time [as an intern in general surgery], did any patient ever come to you and say, Doctor, I've been shot, but it didn't hurt and it didn't bleed?
>
> A.     I had – to me, no.
>
> Q.     Okay.
>
> A.     I have heard those stories, though, but no one has ever said it to me.
>
> Q.     I just didn't know that could happen. Thank you, sir.

R 1247.

241.    Trial Counsel performed no better with the percipient witnesses. Johnny Cobb, Vice President of Operations at Ferguson Enterprises, was one of two crucial eyewitnesses for the State. In his cross-examination of Mr. Cobb, Trial Counsel failed to elicit any helpful testimony that was readily available to him. He failed to establish that Mr. Cobb knew that neither Lee Holdbrooks nor Scott Yancy had been spreading rumors about, or were harassing, Mr. Miller, as Mr.

Miller delusionally believed. R 834-837. Mr. Cobb's testimony, had it been elicited, would have bolstered the defense that Mr. Miller was suffering from a delusional disorder at the time of the shootings and did not have the *mens rea* for capital or intentional murder.

242.  Nor did Trial Counsel have Mr. Cobb verify that Mr. Miller had spared his life and did not chase after him or threaten to shoot him, even though Mr. Miller knew that Mr. Cobb was an eyewitness to the two shootings at Ferguson. Trial Counsel also failed to elicit any positive testimony about Mr. Miller's work performance, even after Mr. Cobb testified that he had helped Mr. Miller obtain a pay raise. R 837-839.

243.  Trial Counsel only succeeded in eliciting more sympathy for Mr. Cobb and the victims. He asked Mr. Cobb to repeat that he had known both victims for 20 years, allowing Mr. Cobb to add that he had known them since they were young boys. R 834. In addition, Trial Counsel's questioning of Mr. Cobb suggested to the jury that there was no possible explanation for Mr. Miller's conduct, contrary to the mental health evidence that the defense would present during the penalty phase:

Q.     And still it just didn't make sense to you, did it?
A.     No, sir, sure hasn't.

R 837.

244.   Trial Counsel's cross-examination of David Andrew Adderhold, the second eyewitness, was similarly deficient. Trial Counsel made no attempt to elicit from this witness that Mr. Miller had spared his life, made no effort to establish that the witness knew that Terry Jarvis had not been spreading rumors about Mr. Miller, and did not ask Mr. Adderhold about Mr. Miller's good work performance at Post Airgas. Trial Counsel only asked Mr. Adderhold one question, which allowed the witness to speculate that Mr. Miller probably had intended to shoot him as well. R 861.

245.   Sergeant Stuart Davidson, one of the police officers who arrested Mr. Miller on the day of the crime, was also a key witness for the State. On cross-examination, Trial Counsel failed to elicit testimony that would have emphasized to the jury that Mr. Miller had not taken any evasive action or attempted to escape during the lengthy period that police cars trailed him down I-65, just moments after he had committed the killings. R 885-888.

> ### vii.   Trial Counsel denied Mr. Miller effective assistance by failing to present available mental health evidence during the trial's guilt phase.

246.   Trial Counsel presented no evidence during the trial's guilt-phase that would have permitted the jurors to find Mr. Miller guilty of anything other than capital murder. R2 14; PR 137-138. In particular, Trial Counsel did not present testimony from Dr. Scott concerning his opinion that Mr. Miller suffered from a

severe mental illness (Delusional Disorder) at the time of the shootings or any other mental health evidence that would have negated the *mens rea* required for conviction of capital murder. PR 94-95.

247. The capital murder offense with which Mr. Miller was charged required the jurors to find unanimously that Mr. Miller had had the specific intent to cause the death of at least two of his three victims. PR 97. *See* Ala. Code § 13A-3-1. Dr. Scott recognized in his report that there was substantial evidence calling into question whether Mr. Miller had the requisite intent to kill his first victim, Lee Holdbrooks: "It is also my opinion, that at the moment of the first shooting, Mr. Miller may not have appreciated the nature and quality of his actions as he expressed that he suddenly found himself shooting without the intention of doing so." PX 29-0022.

248. There was evidence from which one or more jurors could have found that Mr. Miller's delusional state carried over to the shooting of his second victim at Ferguson Enterprises, Scott Yancy – particularly the evidence from Dr. Scott that Mr. Miller experienced tunnel vision and heard "noises" at the time of both of the first two shootings (PX 29-0009 to 29-0010) and that he stated to another Ferguson employee, Johnny Mack Cobb, who witnessed the first two shootings, "I'm tired of people starting rumors on me!" but allowed Cobb to leave the premises unharmed. PX 29-0011; *see also* R 821. As Dr. Scott explained in his

penalty-phase testimony, it was only when Mr. Miller arrived at Post Airgas that he was thinking he was going to shoot someone, Terry Jarvis. R 1376. Trial Counsel presented no such evidence and made no such arguments. PR 97-98.

249.  Nor did Trial Counsel present mental health evidence through either Dr. Scott or Dr. McDermott in support of an argument that the State had failed to prove that the three deaths constituted "a single scheme or course of action." PR 100-101.

250.  Trial Counsel acknowledged at the Rule 32 Hearing that he did not present Dr. Scott's testimony during the guilt phase out of the defeatist view that "[t]hey are going to find him guilty whatever Dr. Scott says . . . ." PR 270.

251.  Trial Counsel's decision to withhold any mental health evidence from the jury during the guilt phase of the trial precluded him from asking the jury to find Mr. Miller guilty of manslaughter, rather than either capital murder or non-capital murder. During jury voir dire, District Attorney Owens repeatedly explained to the prospective jurors that they might acquit Mr. Miller of either capital murder or straight murder and, instead, find him guilty only of manslaughter. *See* R 356 (Owens: "And there would be more than one choice that a jury would have. In other words, they could consider our charge, which is capital murder, or a lesser charge which wouldn't include the death penalty or life without parole, what we refer to as straight murder. . . . Or perhaps manslaughter."); R 571

(Owens: "Now, a jury might consider murder or manslaughter or some lesser offense, the judge will tell them at the end.").

252. As Trial Counsel admitted to the court at the sentencing hearing, "[W]e pretty much conceded [guilt] from the start." R 1455-1456. *See also* PR 102-103 (Trial Counsel "essentially presented no defense for Mr. Miller during the guilt phase of this case" and conceded his guilt of capital murder).

> **viii. Trial Counsel denied Mr. Miller effective assistance by failing to object to improper statements in the State's guilt-phase closing argument.**

253. Trial Counsel Johnson failed to object to statements in the State's closing argument that were not supported by facts in evidence.

254. In its closing argument, the State repeated its assertions that Mr. Holdbrooks and Mr. Yancy were facing Mr. Miller and looking him in the eye when they were shot. R 1260.

255. Trial Counsel made no objection to these statements, even though they were not supported by the evidence. In failing to do so, Trial Counsel implicitly suggested that such statements were true.

> **ix. Trial Counsel denied Mr. Miller effective assistance during his guilt-phase closing argument.**

256. In his guilt-phase closing argument, Trial Counsel Johnson again effectively conceded that Mr. Miller was guilty of capital murder. PR 103. Trial

Counsel had no theory of defense to the charge of capital murder. R2 14. He offered the jury no explanation for Mr. Miller's actions. PR 137.

257.  In particular, Trial Counsel made no attempt to argue that Mr. Miller did not have the *mens rea* for capital murder or highlight the evidence that could have supported this defense, including that Mr. Miller was in a delusional state at the time of the crime, as reflected in his comments that these men were "talking about him," that at each location he had let eyewitnesses to the killings go unharmed, and that he had made no other effort to hide his involvement or escape. Nor did Trial Counsel even allude to the possibility, much less argue that the facts required, that the jury convict Mr. Miller of the lesser offenses of non-capital murder or manslaughter.

258.  Instead, Trial Counsel told the jury that Mr. Miller was clearly responsible for the killings and indicated that he might as well have pleaded guilty to capital murder:

> In a capital case, even if the defendant comes in the courtroom and pleads guilty, the state still has the burden. *We still have to go through this. We still have to impanel the jury and you still have to do the job that's ahead of you now.*

R 1263; emphasis added. By focusing the jury on Mr. Miller's responsibility for the crime, Trial Counsel further dispelled any notion that his actions were subject to any defense or that he could be found guilty of a lesser offense.

259. Finally, Trial Counsel further distanced himself from his client, confiding to the jurors that he was not proud to be serving as Mr. Miller's legal counsel:

> I at least am proud at this point that I have participated in this [trial].
>
> It does not remove to any degree the shame of what happened. *It does not make me proud that I'm representing someone who the evidence is fairly convincing, I must concede to you, did what he did. I'm not proud of that.*

R 1263-64; emphasis added.

260. Trial Counsel's statement to the jury that he was not proud to represent Mr. Miller was not a result of any strategic decision. He later admitted at the new trial motion hearing, "That must have been a brain cramp there. . . . If I said that, then yes, that would be wrong to say." R2 64-65. He acknowledged that making this statement to the jurors would not help Mr. Miller. PR 141. Instead, Trial Counsel told the jurors he was not proud to represent Mr. Miller so that the jurors would "like" him (Trial Counsel), even though doing so would not cause the jurors to think very highly of Mr. Miller. PR 143. He had never said anything like this to jurors in any other capital case he'd tried. PR 143-144.

### x. Trial Counsel denied Mr. Miller effective assistance by failing to request guilt-phase jury instructions necessary to protect Mr. Miller's rights

261. Trial Counsel failed to ensure the jury was properly instructed. Trial Counsel's failure in this regard left the jury with a collection of disjointed

instructions that strongly implied Mr. Miller's guilt of capital murder and made it impossible for the jury to return a verdict of a lesser offense.

262.   Trial Counsel requested the Court to instruct the jury that in a capital murder case, even if a defendant pleads guilty to capital murder under Ala. Code § 13A-5-42, the state must prove the defendant's guilt for the capital offense beyond a reasonable doubt. R 1252. This instruction, given shortly after Trial Counsel's closing argument, implicitly told the jury that Mr. Miller was not contesting his guilt of capital murder.

263.   This error was compounded by the fact that Trial Counsel also asked that the court *not* instruct the jury on the impermissibility of drawing an adverse inference from Mr. Miller's failure to take the stand. R 1252. Thus, the jury was left to speculate that Mr. Miller, in failing to offer testimony, was conceding his guilt to a capital crime.

264.   In addition, even if the jury had been inclined to find Mr. Miller guilty of a lesser offense, it was not provided with the tools to do so. Trial Counsel did not request a clarifying instruction on the heightened *mens rea* for the offense of capital murder with which he was charged: "the intentional murder of two or more people pursuant to one plan, scheme or course of conduct." As a result, the jury was provided no way to distinguish between the *mens rea* for capital murder versus non-capital intentional murder. Nor was the jury instructed on the lesser offense of

manslaughter, even though counsel for the State had invited such a charge by his comments during *voir dire*, because Trial Counsel did not request such an instruction. PR 102.

### xi. Trial Counsel denied Mr. Miller effective assistance during their last-minute penalty-phase "preparation."

265. On the night before the start of the trial's penalty phase, Trial Counsel Johnson and Blackwood met with Barbara Miller and other members of the Miller family in Johnson's office. PR 880-881. Trial Counsel did not suggest any topics to Mrs. Miller or the other family members on which they might give mitigating testimony. PR 884. They did not ask about Mr. Miller's upbringing, his educational or employment history, or the severe physical and emotional abuse he had suffered from his father, Ivan. PR 867, 884-885. Nor did they ask the family members to recount any positive things that they could say about Mr. Miller or about his relationships with his siblings, nieces, and nephews, which would have disclosed his positive, warm, and loving nature. PR 884-886.

266. Nor had Trial Counsel prepared any suggested questions to review with the family. Trial Counsel simply asked Mrs. Miller what she would say to the jury to spare Mr. Miller's life and didn't get a helpful response from this lay person. PR 864-865, 880-882, 888.

267. Trial Counsel decided not to call Mrs. Miller or any other Miller family members to testify during the penalty phase of trial. PR 232. He explained

at the Rule 32 Hearing that he did not call Mrs. Miller because he didn't think "she would have broken down on the stand and beg[ged] for her son's life." PR 178. Because of his deficient investigation, Trial Counsel didn't know whether Mrs. Miller had any background information about Mr. Miller's family, upbringing, character, or relationships with family members that wouldn't be presented to the jury by the sole witness Trial Counsel intended to call, Dr. Scott. PR 179.

268.    After deciding not to call Mrs. Miller during the penalty phase, Trial Counsel chose not to call any of the other available Miller family members. He never conducted a mock examination with any of the other family members to determine what information they might have that would have been valuable to Mr. Miller in the penalty phase. PR 282.

269.    Instead, Trial Counsel unreasonably assumed that Dr. Scott "had all that information." PR 180. As Trial Counsel explained at the Rule 32 Hearing:

> I was unaware of anything that in my judgment would have added to anything that Dr. Scott was able to tell the jury in a hearsay fashion. I felt like he was a good witness, he was a competent witness. *He had all that information.* He had done a background as a part of his workup and he was able to say all those things.
>
> Q.    When you say he had all that information how do you know he had all of the information?
>
> A.    Well, I mean he had all the information that's in his report.
>
> Q.    Well, that's right. But how do you know he had all of the relevant background information about Mr. Miller and his upbringing, the abuse he suffered and the like? How would you know that without doing a complete investigation yourself to ensure –

A.     *I can't know that*. But *I presume* that Dr. Miller did his job – I mean Dr. Scott did his job. I'm not sure what you are – he would have had all the information he would need to have drawn any conclusions that he needed to draw.

Q.     Right. He would have had all the information that he needed to draw conclusions on sanity, correct, because that was the only subject that you asked him to opine on, isn't that correct?

A.     That's the only opinion he was asked to draw, yes.

PR 180-181; emphasis added.

> ### xii.     Trial Counsel denied Mr. Miller effective assistance in his penalty-phase opening statement.

270.   Failure to present an effective opening statement during the penalty phase repeatedly has been held to contribute to a finding of ineffective assistance of counsel. *See Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003). A deficient opening statement during the penalty phase can be prejudicial as "[t]he sentencing stage is the most critical phase of a death penalty case." *Id.* at 1221

271.   In his penalty phase opening statement, Trial Counsel made no attempt to preview a coherent mitigation case, to humanize Mr. Miller to the jury, or to provide a context for the testimony to be given by Dr. Scott, Mr. Miller's only mitigation witness. Instead, Trial Counsel succeeded in doing quite the opposite: he vilified Mr. Miller, undermined the credibility of Dr. Scott in advance of his testimony, and effectively conceded the only aggravating circumstance in the case on which the State relied (that the crime was especially heinous, atrocious, and cruel).

272. Trial Counsel began his penalty-phase opening by responding to the State's query regarding what had been in Mr. Miller's heart at the time of the shootings: "I think I can answer what was in Mr. Miller's heart . . . *the overwhelming desire to take a life, that's what was in Alan Miller's heart*. I don't think we need any experts up here to tell us that." R 1323-1324; emphasis added. This statement undermined the testimony that Dr. Scott was to offer that Mr. Miller had been suffering from a serious mental illness at the time of the shootings that substantially impaired his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. PR 146.

273. Trial Counsel then told the jury and the court that, if executing Mr. Miller could bring back the lives of the victims, "[T]hat would be real justice." Trial Counsel said that if killing Mr. Miller would restore the three victims, "then *I would sit here and beg you to sign that and not even go back to the room before you did, that all twelve of you do that and if you needed [a] thirteenth [juror], I would sign it with you because that would be real justice.*" R 1324; emphasis added. Trial Counsel's expressed willingness to sign Mr. Miller's death verdict destroyed the value of what little mitigating evidence he planned to offer.

274. Trial Counsel repeatedly told the jury and the court that Mr. Miller "believed in the death penalty," even though no evidence had been presented to support this assertion. R 1330, 1331, 1333. In so doing, Trial Counsel not only

implied that Mr. Miller *intentionally* had committed the shootings in keeping with his beliefs on capital punishment, but also suggested that Mr. Miller himself deserved to be executed.

275. Trial Counsel described Mr. Miller as a "tortured soul." R 1329-1330. Then, with obvious reference to Mr. Miller (whom he had just described as a "tortured soul" who "believed in the death penalty"), he told the jurors:

> [Y]es, there are tortured souls out there that believe in the death penalty and they are willing everyday to administer that [to] somebody [who] does not satisfy their definition of a good person. *Once you cross that line of being violent, once you cross that line of being mean and cruel, then it's time to invoke the death penalty.*

R 1333; emphasis added. In doing so, Trial Counsel told the jurors that Mr. Miller had been willing to kill "everyday" and that he had killed each of his victims simply because he had not satisfied his "definition of a good person." Trial Counsel's description of Mr. Miller as "violent," "mean" and "cruel" denigrated him to the jurors, effectively conceded that the crime satisfied the "heinous, atrocious or cruel" aggravating factor on which the State solely relied, and, accordingly, told the jurors that Mr. Miller deserved to die.

276. Trial Counsel reminded the jurors and the Court that they were "on stage" and that the media would be interested in questioning them about their verdict. R 1333. Given the intense local interest in the shootings and the way the crime had been characterized in the media, any suggestion that the jury's verdict

and the Court's ultimate sentencing decision should "play well" in the media strongly implied that the verdict should be death.

277.   Finally, in closing Trial Counsel told the jurors that they might find Mr. Miller to be "atrocious and vial" [*sic*]. R 1332. A few moments later he repeated that description: "And I want you to be able to say . . . what my vote meant was no matter what anybody does, *no matter how vial [sic] they are*, they don't deserve to die." R 1333-1334; emphasis added. Trial Counsel's description of Mr. Miller as "atrocious" and "vile" not only alienated the jury and the court from Mr. Miller, but it further undercut any argument that the shootings were the product of a lifetime of abuse and mental illness that spanned four generations of the Miller family. Instead, Trial Counsel urged the jurors to find that the murders were the calculated acts of a cruel, mean, violent, vile, atrocious killer.

278.   At the Rule 32 Hearing, Trial Counsel Johnson admitted that there was no evidence that Mr. Miller was willing to kill "everyday," much less that he would kill whenever he crossed paths with someone who did not satisfy his definition of "a good person." PR 155. He admitted that his statements to the jurors that Mr. Miller "believed in the death penalty" (a statement completely unsupported by any evidence) and "would be an ideal pick for the foreman of a capital jury" were intended to convey to the jurors that "he did what he did *because he thought they deserved it.*" PR 150; emphasis added.

279. Trial Counsel explained in his Rule 32 Hearing testimony why he had used the words "atrocious" and "vile" in his opening statement:

> I was telling the jury that Alan Miller didn't deserve to die *whether they thought he was atrocious or not*.

PR 151; emphasis added. But, he acknowledged that he made no effort to convince the jurors that this description did not apply to Mr. Miller:

> Q. Wasn't it your responsibility as his representative to convince them that he was not atrocious and that he did not deserve to die?
>
> A. Yes, that would be my responsibility *if I felt like I could accept that burden, sure.*

*Ibid.*; emphasis added. Trial Counsel apparently felt he could not "accept that burden." Instead, he effectively told the jurors that they could achieve "real justice" only by sentencing Mr. Miller to death and that if they needed another juror to achieve this result, he would volunteer for that role.

280. Not only did Trial Counsel Johnson excoriate his client, he also undermined Dr. Scott's credibility in advance of his penalty-phase testimony, stating, "Dr. Scott enjoys a very good reputation of being thorough and being objective. And despite what I know of his efforts were to try to get there, he couldn't, *he just couldn't be objective about it*." R 1326; emphasis added. As a result, any testimony by Dr. Scott regarding Mr. Miller's mental condition was certain to be viewed by the jury and Judge Crowson with suspicion.

281. Finally, Trial Counsel conceded that the shootings satisfied the only aggravating circumstance on which the State relied to support the death penalty: "Now, [the prosecution] has challenged me to explain to you why this was not atrocious, especially atrocious, cruel, heinous and I really don't – I mean, I will accept that challenge by saying this, *I've never seen a murder that wasn't*." R 1327; emphasis added. This concession effectively directed the jurors to find that the State had establish the sole aggravating factor necessary to sentence Mr. Miller to death.

### xiii. Trial Counsel denied Mr. Miller effective assistance by failing to present readily available mitigating evidence during the trial's penalty-phase.

282. Trial Counsel called only a single witness on behalf of Mr. Miller during the trial's penalty phase: Dr. Scott, the psychiatrist who had been retained solely to evaluate Mr. Miller's sanity and not to serve as a mitigation expert. R 1341-1403. Dr. Scott was told by Trial Counsel that he would only be testifying in the penalty phase of the trial a couple of days before he arrived in Alabama. He was not told he would be expected to testify concerning any mitigating factors other than Mr. Miller's mental condition at the time of the shootings. PR 341-342. Dr. Scott was told that he would be the only mitigation witness and that Trial Counsel were relying on him to present the full range of evidence that a mitigation

expert would be expected to present only one minute before he took the stand. PR 342.

283.   Trial Counsel did not call any of the Miller family members to give mitigating evidence because he incorrectly assumed that anything they knew would be covered by Dr. Scott in his testimony, even though Dr. Scott had been retained only to express an opinion on sanity, not to do an in-depth investigation of Mr. Miller's family history, social history, character, background, or upbringing or to present the full panoply of potentially mitigating factors. In particular, Trial Counsel had not engaged Dr. Scott to develop positive character evidence concerning Mr. Miller. PR 159-160, 180-181, 188-189.

284.   Dr. Scott had been retained by Trial Counsel only to perform a sanity evaluation into Mr. Miller's mental state at the time of the shootings. In contrast, the focus of a psychological or psychiatric expert in the mitigation phase is much broader: to identify any and all factors that could mitigate or explain the defendant's behavior, starting from the beginning of his life. As Dr. Scott explained at the Rule 32 hearing, this is "a vastly different, much larger process because you are really trying to give the jury an educated guide to that person's life over time." PR 305. In conducting a mitigation evaluation, the expert "would want to know everything about that person's life, their family background and that includes all documents, information, mental health history, multiple extended

interviews." PR 306-307. A mitigation expert must review medical records, pediatric records, school records, family history medical records, family history psychiatric records, pregnancy records for the mother, and should spend hours with each family member and the defendant to identify mitigating factors. PR 307.

285. Since Dr. Scott had not been retained by Trial Counsel to serve as a mitigation expert, he explained in his Rule 32 testimony that he had done "not even a drop in the ocean of what was necessary." PR 342-343. He had not been provided by Trial Counsel with all of the documents and other materials that would have been required to serve adequately in that capacity. PR 343.

286. Nor had Trial Counsel provided Dr. Scott with access to family members and other persons with knowledge of Mr. Miller's background, character, or life history that would have been required to serve as a mitigation expert. *Ibid.* Although Dr. Scott had interviewed Mr. Miller's mother, brother, and sister in order to evaluate Mr. Miller's sanity, those interviews were focused on Mr. Miller's behavior and thinking at the time of the shootings and were manifestly inadequate for performing a competent mitigation analysis. PR 343-344. As a result, the limited information that Dr. Scott obtained about Mr. Miller's social history was "[a]bsolutely not" as comprehensive as the information needed by a mitigation expert. "Once again it would be one drop but in a large sea." PR 344.

287. In particular, in performing his sanity assessment, Dr. Scott was not responsible for gathering positive information about Mr. Miller. PR 346. Nor did Dr. Scott gather comprehensive information about Mr. Miller's relationships with family members (PR 347), the mental health or criminal histories of Mr. Miller's family members, or Mr. Miller's employment history, all of which would have been necessary for Dr. Scott to serve as a mitigation expert during the penalty phase of Mr. Miller's trial. PR 348-351.

288. Dr. Scott testified during the penalty phase that Mr. Miller had a mental disturbance, a delusional disorder, that he committed the offense under the influence of extreme mental and emotional disturbance, and that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. R 1388-1391.

289. Dr. Scott's testimony about Mr. Miller's social history, including the frequent Miller family moves and their dismal economic conditions, occupied less than one page in the transcript. R 1349-1350. He said nothing about the criminal environment Mr. Miller had endured during his formative years.

290. Dr. Scott's testimony concerning the emotional abuse Mr. Miller suffered at the hands of his father, Ivan, occupied less than five lines in the record: "[Mr. Miller] described [Ivan] as verbally abusive. . . . He would frequently, even

at a very young age, say things like you're no good, you'll never amount to nothing, you're a God damn son of a bitch." R 1350.

291. Dr. Scott's testimony about the physical abuse Mr. Miller had experienced consisted of only a single sentence: "[Ivan] was very physically abusive to him, hit him on various areas of his body and he was frequently bullied and left bruises on him." R 1350.

292. Dr. Scott did not testify about Mr. Miller's positive relationships with his family members, beyond the statement that his relationship with his mother was "great." R 1351-1352.

293. Dr. Scott offered no evidence concerning Mr. Miller's positive work record, just that he had held jobs that he left for financial reasons. R 1363.

294. The report prepared by the consulting psychologist, Dr. McDermott, contained a good deal of information about Mr. Miller's upbringing and family and contained "a detailed description of Mr. Miller's development and personal history." PR 192; PX 29-0018. Trial Counsel did not introduce the McDermott report or call Dr. McDermott to testify. PR 192-193. Accordingly, the jurors never learned of the detailed description of Mr. Miller's developmental and personal history contained in the report. PR 193.

295. Trial Counsel called no one from Mr. Miller's family to testify. Thus, he presented no evidence of Mr. Miller's positive relationships with his family

members. He presented no testimony from anyone who valued Mr. Miller's life or had a loving, caring relationship with him. PR 282-283.

296. Trial Counsel presented no evidence from Mr. Miller's brother, Richard, even though he knew Richard could have presented positive evidence concerning Mr. Miller's upbringing and character as well as his relationships with his family members. PR 159-160.

297. Mr. Miller's mother, Barbara Miller, half-sister, Cheryl Ellison, half-brother, Jeff Carr, Jeff's wife, Sandra Carr, Barbara's brother, George Carr, aunt Hazel Miller, and cousin, Cindy Carr, were present in the courtroom throughout the trial. PR 436. In addition, Mr. Miller's brother, Richard Miller, niece, Alicia Sanford, nephew, Jacob Connell, and cousin, Brian Miller, all were available and willing to testify on Mr. Miller's behalf had they been asked. *See* PR 495 (Alicia), 536 (Brian), 564 (Richard), 583 (Jacob).

298. Had she been called to testify, Barbara Miller would have told the jury about the repeated physical and emotional abuse Mr. Miller received from his father, Ivan. She would have told the jurors about the family's poverty and rootlessness during Mr. Miller's childhood. PR 175. She would have said that she loves her son and worries about him. She would have explained that Mr. Miller's execution would be devastating to the Miller family: "I don't know what we would do." PR 437-438. Mr. Miller's niece, Alicia, would have told the jurors, "I love my

Uncle Alan and I'm sorry the stuff happened but he's a good man." PR 496. Mr. Miller's half-sister, Cheryl Ellison, would have testified that she cares for her brother. PR 525. Jake Connell would have told the jurors that he loves his Uncle Alan. PR 585-586.

299. The State had presented just such moving testimony from a member of each victim's family. Lee Holdbrooks' father testified that, as a result of his son's death,

> [a] wife has lost her husband, someone she had hopes and plans for the future in. We will never see their children. I will never see grandchildren from Lee. A brother has lost his only brother. Cousins have lost an uncle, who was a great man and terrific role model. Grandparents have lost their grandson. My wife and I have lost our first born. We can continue on but we miss him. It hurts. There is not a day goes by, there's not hardly an hour goes by that I don't think about him.

R 1336.

300. Scott Yancy's father testified that

> our family has lost a son, a devoted husband and father, brother, uncle a grandson, a fishing partner, and last but not least our best friend. Throughout the rest of our lives we are left with this unfillable void clinging to our invaluable memories and living without Scott.

R 1338.

301. Terry Jarvis' sister told the jurors, "My heart is still broken into a million pieces and will probably never mend again." R 1340.

302. The jury and the Court heard no one give any such testimony on behalf of Mr. Miller. PR 282.

303. Trial Counsel presented no mitigating evidence about Mr. Miller's character or upbringing. He presented none of the available medical, educational, divorce, criminal, or social history records concerning Mr. Miller or the members of his family because he had gathered none of them and didn't know what they contained. PR 184-185.

304. In addition, Trial Counsel presented no evidence concerning Mr. Miller's excellent employment record, although there were stories in the newspapers in which co-workers had made positive statements about Mr. Miller (*see, e.g.*, PX 35-0051). PR 182. Nor did he introduce the laudatory co-worker statements contained in Mr. Miller's readily available employment records (PX 20-0002, 20-0050) or the police reports (PX 29-0056, 29-0117, 29-0119, 29-0126) that he had in his possession. PR 183-184.

### xiv. Trial Counsel denied Mr. Miller effective assistance in connection with his penalty-phase directed verdict motion.

305. The sole aggravating factor alleged by the State and on which Mr. Miller was tried was that "[t]he capital offense was especially heinous, atrocious, or cruel compared to other capital offenses." Ala. Code § 13A-5-49(8). Mr. Miller was eligible for the death penalty only if the jurors unanimously found that aggravating factor to exist at the conclusion of the penalty phase of the case. *See*

Ala. Code § 13A-5-45(f); *Ex parte Waldrop*, 859 So.2d 1181, 1187-88, 1190 (Ala. 2002) (Supreme Court decision in *Ring v. Arizona*, 536 U.S. 584 (2002), forecloses the trial court from imposing a death sentence unless the jury has unanimously found beyond a reasonable doubt the existence of at least one § 13A-5-49 aggravating circumstance); *Ex parte McNabb*, 887 So.2d 998, 1004-06 (Ala. 2004) (same); *Ex parte McGriff*, 908 So.2d 1024, 1037, 1038 (Ala. 2004) ("If the jury determines that no aggravating circumstance as defined in § 13A-5-49 exists, the jury must return a verdict, binding on the trial court, assessing the penalty of life imprisonment without parole.").

306. By its very terms, the "especially heinous, atrocious, or cruel" aggravating factor requires the jury to compare the heinousness, atrocity, and cruelty of the killings before it with the heinousness, atrocity, and cruelty of "other capital offenses." The jurors would have no way of performing such a comparison without receiving and evaluating evidence concerning the heinousness, atrocity, and cruelty of "other capital offenses." This aggravating factor, by its very terms, is not satisfied if the jurors simply conclude that the killings under consideration were heinous, atrocious, or cruel *in the abstract*. The factor requires a comparison, and such a comparison can be made only if adequate evidence concerning the facts and circumstances of other capital offenses is presented for the jury to consider. No such evidence was presented by the State in Mr. Miller's case.

307. The attorney for the State acknowledged the comparative nature of this aggravating factor in his closing argument to the jury but made no effort to suggest a basis on which the jury might make such a comparison, simply arguing:

> Justice requires the death penalty in this case. The Judge will tell you that the state's aggravator in this case is the fact that this case is heinous, atrocious and cruel *as compared to other capital cases*. And I don't think I need to argue that point with you, you know that's what this case is about.

R 1408; emphasis added.

308. Trial Counsel, too, recognized the necessity for the jury to make a comparison with other crimes in considering whether the aggravating circumstance had been established:

> I can't imagine any crime where a life is taken that wouldn't be cruel. I can't imagine any crime where victims don't suffer and their families don't suffer. But what you're dealing with here now is not whether a crime in and of itself is atrocious, heinous and cruel, it's whether this particular crime is extremely heinous, atrocious or cruel as compared to other capital murders.
>
> So already you've got a relative term there. If you find unanimously that yes, this one is, then you consider mitigating circumstances.

R 1411.

309. The Court's instructions to the jury on this aggravating factor similarly emphasized the necessity that the jury compare the circumstances of this case with those in other capital cases:

> Now, the state alleges that the statutory aggravating circumstance is that the capital offense was especially heinous,

atrocious or cruel *compared to other capital offenses*. The term heinous means extremely wicked or shockingly evil. The term atrocious means outrageously wicked and violent. The term cruel means designed to inflict a high degree of pain with [utter] indifference to or even enjoyment of the suffering of others.

What is intended to be included in this aggravating circumstance is those where the actual commission of the capital offense is accompanied by such additional acts as to set the crime apart from *the norm of capital offenses*.

For a capital offense to be especially cruel, it must be a conscious[less] or pitiless crime which is unnecessarily tortuous to the victim. All capital offenses are heinous, atrocious and cruel to some extent. *What is intended to be covered by this aggravating circumstance is only those cases in which the degree of heinous, atrociousness or cruelty exceeds that which will always exist when a capital offense is committed.*

R 1432-33; emphasis added.

310. The State's failure to present evidence of the level of heinousness, atrocity, and cruelty of other capital offenses precluded the jury from making the comparison that is at the heart of this aggravating factor. PR 194. Without such evidence, the jurors had no way to compare the facts and circumstances of the Miller case with the "norm of capital offenses" or to determine whether this was a case "in which the degree of heinous, atrociousness or cruelty exceeds that which will always exist when a capital offense is committed." In the absence of such evidence, the State failed to prove the necessary predicate for the finding of an aggravating factor, as a matter of law. And, because the State failed to prove the

sole aggravating factor on which Mr. Miller was tried, Mr. Miller was entitled to a directed verdict and a sentence of life imprisonment, not death.

311.  Trial Counsel made a simple directed verdict motion at the conclusion of the penalty-phase evidence: "The basis for that motion is the state has failed to prove an aggravating statutory circumstance." R 1404. Trial Counsel failed to provide any additional explanation of  the basis for his motion and never directed Judge Crowson to the fact that the State had failed to present the necessary comparative evidence that the jury was required to consider in order to determine whether the sole aggravating factor had been proved. PR 194. Trial Counsel's ineffectiveness in articulating the specific way in which the State had failed to prove its case allowed the court to deny the motion out of hand (R 1405) and, as a result, prejudiced Mr. Miller. Had Trial Counsel effectively explained that the State's failure to present comparative evidence entitled Mr. Miller to a directed verdict as a matter of law, there is every reason to believe the motion for a directed verdict would have been granted and, as a result, the court would have had to sentence him to life imprisonment.

> **xv.   Trial Counsel denied Mr. Miller effective assistance in his penalty-phase closing argument.**

312.  Counsel for the State, in his opening summation, identified no evidence supporting the sole aggravating factor on which the State relied. Instead, counsel simply stated, "The Judge will tell you that the state's aggravator in this

case is the fact that this case is heinous, atrocious and cruel as compared to other capital cases. And I don't think I need to argue that point with you, you know that's what this case is about." R 1408.

313.   Trial Counsel began his closing argument by, once again, effectively admitting the existence of the sole aggravating factor in this case:

> [T]here is only one possible aggravating circumstance in this case and that is that this is an extremely heinous, atrocious or cruel crime as compared to other capital murders.... *I can't imagine any crime where a life is taken that wouldn't be cruel.  I can't imagine any crime where victims don't suffer and their families don't suffer*.

R 1410-11; emphasis added. Trial Counsel made no attempt to explain why the jurors or Judge Crowson should not find the existence of the aggravating factor.

314.   Nor did Trial Counsel point out that the State had failed to present any evidence showing how the killings in this case compared to those in other capital offenses. In the absence of such evidence and coupled with Trial Counsel's admission, the jury essentially was invited to find the existence of the aggravating factor and was provided with no basis to do otherwise.

315.   In addition, Trial Counsel made no argument that mitigating factors outweighed the single aggravating factor. He made no argument based on the limited evidence Dr. Scott had presented about Mr. Miller's family life and his mental illness. He made no argument based on the facts of the crime itself (*e.g.*,

that Mr. Miller had spared the lives of two eye witnesses and had made no effort to evade capture or cover up the crime).

316. Instead, Trial Counsel's only argument why Mr. Miller should not be executed was that the death penalty should be banned all together and that even the worst of the worst don't deserve to die. "[I]t really doesn't matter what you do, you deserve to live." R 1413-1414; PR 195. He suggested to the jurors that, even if they were to conclude that Mr. Miller deserved to die as much as a person who killed his parents, blowed up a school, or "mow[ed] down people because they might belong into a particular group," the jurors should spare his life simply because "no matter what someone does, they don't deserve to die." R 1414.

317. Trial Counsel made his "no person deserves to die" argument even though 10 out of 14 jurors and alternates had stated during *voir dire* that they were in favor of the death penalty (*see* R 199 (juror B. B.); 298 (juror B. G.); 330 (juror W. H.); 339 (juror E. H.); 347 (juror F. H.); 378 (juror G. J.); 448 (juror J. M.); 627 (juror B. S.); 641-42 (juror O. T.); 684 (juror J. W.)), and nearly all prospective jurors who had expressed opposition to the death penalty had been excluded from service. *See, e.g.*, R 349-362 (prospective juror J. H.); 488-492 (prospective juror M. P.); 576-575 (prospective juror W. S.); 584-589 (prospective juror A. S.).

318.   Finally, Trial Counsel reminded the jurors that the crowd outside the courthouse was calling for Mr. Miller's death: "There's a crowd out here and the crowd is screaming for you to kill him." R 1416.

319.   In rebuttal, counsel for the State offered no basis for the jury to find that the killings in Mr. Miller's case were "especially heinous, atrocious, or cruel *compared to other capital offenses*." State's Attorney Owens made no attempt to compare the level of heinousness, atrocity, or cruelty in the killings before the jury with those in any other capital offenses. Instead, he argued, "[T]hat aggravator is going to come with three people who died and a bunch of families who gave up a loved one and some children who will never see their daddy and you give that ever how much weight you want." R 1424.

320.   Following the close of argument, Trial Counsel did not renew his directed verdict motion or otherwise explain to the Court that the State had failed to present evidence from which the jury could make the comparison required by the sole aggravating factor.

### xvi.   Trial Counsel denied Mr. Miller effective assistance by failing to object to improper penalty-phase jury instructions.

321.   Throughout the trial, the Court repeatedly informed the jurors that their sentencing verdict was merely a "recommendation" to the Court, which would make the final determination whether Mr. Miller would live or die.

322.   The Court began emphasizing that the jurors would only be making a recommendation to the Court on a death sentence during jury selection. In addressing prospective juror S. B., for example, the Court stated:

> And if there was a second part of this trial that involved a *recommendation* from the jury as to the appropriate sentence and that the options to jury would have would either be *recommending* the death sentence or life without parole, then could you follow the Court's instructions on the law and listen to the evidence and *recommend* either life without parole or the death sentence depending upon each individual circumstance involved in the case?

R 132; emphasis added. The Court emphasized that the jury's role would be simply to "recommend" the death penalty in addressing every prospective juror who was ultimately seated to decide Mr. Miller's fate, as well as the two alternates. *See*, *e.g.*, R 188 (juror W. B.); 199, 201 (juror B. B.); 297 (juror B. G.); 329 (juror W. H.); 338  (juror E. H.); 346 (juror F. H.); 372 (juror D. J.); 377 (juror G. J.); 447 (juror J. M.); 450 (juror G. M.); 626 (juror B. S.); 641 (juror O. T.); 667 (juror M. W.); and 683 (juror J. W.). *See* R 773 (names of selected jurors).

323.   The Court returned to this theme in instructing the jury at the conclusion of the penalty phase of the trial:

> Members of the jury, at this time it's my duty to relate to you the instructions and the *recommendation* of the sentencing.
>
> I'll state to you at the outset that your *recommendation* will take the form that you do *recommend to the Court* and that is one form that you *recommend that the Court sentence the defendant to death by electrocution*.

The second one or the other one would be that you *recommend to the Court* that the Court sentence this man, the defendant, to life without parole or without the possibility of parole for the remainder of his natural life.

R 1427; emphasis added. The jury was reminded repeatedly that it was only making a "recommendation" concerning the death penalty throughout the remainder of the instructions. *See*, *e.g.*, R 1430 ("In making a *recommendation* concerning what punishment should be ...."); 1433 ("[I]n determining what punishment is to be *recommended* in this case"); 1435 ("[T]hen you must return a verdict *recommending* the defendant's punishment be life imprisonment without the possibility of parole."); 1439 ("[I]n determining what to *recommend* as punishment in a case"); *ibid.* ("It is your sole responsibility to determine what the facts are and *recommend* the punishment in this case."); 1441 ("In order to bring back a verdict *recommending* the punishment of death ...."); *ibid.* ("Any number less than ten cannot *recommend* the death penalty."); *ibid.* ("In order to bring back a verdict *recommending* a sentence of a lesser included offense ...."); 1442 ("Any number less than seven cannot *recommend* life without parole."); 1443 ("In addition to the *recommendation* of either death or life without parole ...."); and 1444 ("[Y]our verdict would be to *recommend* life imprisonment without parole.").

324. Consequently, the *Miller* jurors were never advised that any aspect of their decision was binding on the trial court, let alone that they were responsible for making a final decision on the existence of an aggravating factor, without

which Mr. Miller could not be sentenced to death. The jurors simply had no way to know of their determinative role. To the contrary, they were led to believe just the opposite. By so diminishing the jury's sense of sentencing responsibility, the instructions and other judicial comments in Mr. Miller's case violated Miller's Eighth Amendment rights under *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985).

325. Trial Counsel never objected to the Court's description of the jury's role and/or to the Court's instructions on this basis. R 1405, 1445-1446; PR 197. Trial Counsel admitted he simply was unaware of *Caldwell*'s holding. PR 197-198.

326. After three hours of deliberation the jury recommended Mr. Miller be sentenced to death by the minimum-required vote of 10-2, the minimum number required by Alabama law. R 1441-1442, 1448; C 74; PR 195. If there had been only one more vote for life, the jury would have been hung and would have continued its deliberations. PR 196.

### xvii. Trial Counsel failed to request a special verdict form that was necessary to protect Mr. Miller's rights.

327. Trial Counsel were ineffective in failing to request a special verdict form that would have required the jurors to memorialize that they had made a unanimous finding of the existence of the sole alleged aggravating circumstance. The general verdict form used in this case merely stated that 10 jurors voted for death and 2 jurors voted for life imprisonment without parole. *See* PX 1-0078.

From the general verdict form, it is impossible to determine whether the jury unanimously made the predicate finding of an aggravating factor, let alone that the jury concluded that the aggravator outweighed the mitigating circumstances. The ambiguity is particularly troubling because the non-unanimous verdict indicates disagreement among the jurors. Thus, the 10-2 verdict may indicate that only ten jurors found an aggravating circumstance, and that two jurors did not.

328.  Trial Counsel should have requested the Court to give the jury a special verdict form on which the jury would have been required to record the vote on whether the State had proved the sole aggravating factor beyond a reasonable doubt. Only with such a verdict form could Trial Counsel and the Court be certain that the jury had made this essential finding unanimously.

329.  These concerns led the Alabama Supreme Court in *Ex Parte McGriff* to require such a verdict form in all capital cases:

> All of these considerations and potential issues militate in favor of a prospective direction by this Court that the count of the jurors' votes on the issue of the existence of an aggravating circumstance be expressly recorded on the verdict form.

908 So. 2d at 1039.

330.  Mr. Miller's trial occurred before the Supreme Court's decision in *Ex Parte McGriff*; accordingly, the failure of the Court to use such a special verdict form with the *Miller* jury was not a violation of the Alabama Supreme Court's direction. However, Trial Counsel's failure to request such a verdict form in order

to protect Mr. Miller from the possibility that the jury was not unanimous with respect to the proof of the sole aggravating factor was a further manifestation of Trial Counsel's ineffectiveness, which prejudiced Mr. Miller in violation of his constitutional rights.

### xviii.  Trial Counsel denied Mr. Miller effective assistance in connection with the sentencing hearing.

331.   In a capital proceeding, the defendant has a right to present mitigating evidence to the sentencer. *Lockett*, 438 U.S. at 604; Ala. Code § 13A-5-45(g). Trial Counsel had the opportunity to present mitigating evidence at the sentencing hearing. As set forth above, there was a wealth of mitigation evidence readily available to Trial Counsel had he conducted an adequate investigation, including records and witnesses demonstrating Mr. Miller's abusive and traumatic upbringing, the mental health issues affecting Mr. Miller and many other members of his family, and Mr. Miller's hard-working and caring nature and excellent employment record.

332.   Trial Counsel offered no evidence, called no witnesses, and failed to arrange for anyone to appear on behalf of Mr. Miller. R 1454. Had Trial Counsel called available witnesses to testify at the sentencing hearing, their testimony would have provided the trial judge with critical mitigating evidence not otherwise available to the judge and provided a substantial basis for sentencing Mr. Miller to life imprisonment.

333.   As a result of Trial Counsel's deficient performance at the sentencing hearing, Mr. Miller was severely prejudiced. The pre-sentencing Report of Investigation prepared by the Alabama Board of Pardons and Paroles, on which Judge Crowson relied, woefully understated the horrible abuse Mr. Miller had suffered at the hands of his father. The Report indicated that Barbara Miller had described Mr. Miller "as having an estranged relationship with his father, Ivan R. Miller, Sr." and had described Ivan as "a bully toward his sons." Otherwise, however, the Report stated that Barbara described Mr. Miller "as having a normal childhood." PX 1-0090. Trial Counsel reviewed the Report prior to the sentencing hearing but submitted no additional evidence. PR 200.

334.   The pre-sentencing Report also indicated that it was unclear whether Dr. McDermott's report of her evaluation of Mr. Miller was part of the court record. *See* PX 1-0091. The pre-sentence Report made no reference at all to Dr. Scott's written evaluation. *Ibid.* Neither had been introduced into evidence by Trial Counsel before the jury. PR 200. Trial Counsel failed to present either the Scott or McDermott reports and their detailed summaries of Mr. Miller's family and developmental backgrounds to Judge Crowson for his consideration at sentencing. PR 201.

335.   The prejudice suffered by Mr. Miller as a result of Trial Counsel's ineffectiveness is underscored by the fact that, at the sentencing hearing, Judge

Crowson described this case as presenting "probably the most difficult sentence that I've ever had to consider," and noted that "I've been wrestling with it for a long time." R 1471, 1472. Thus, had Trial Counsel presented the compelling mitigation case found in the readily-available records and witnesses, there is a reasonable probability that the trial judge would not have sentenced Mr. Miller to death.

336. On June 26, 2000, the Supreme Court decided *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), in which it ruled that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Trial Counsel did not cite *Apprendi* to the court prior to or at the sentencing hearing and did not argue that *Apprendi* entitled Mr. Miller to a new penalty-phase trial before a jury that was not told that its decision with respect to the aggravating factor would be merely a "recommendation" to the court.

337. In his argument to the Court at sentencing, Trial Counsel once more conceded the sole aggravating factor on which the state relied, even though the State had presented no evidence from which the jurors could determine that Mr. Miller's killings were excessively heinous, atrocious, and cruel *compared to other capital offenses*. Trial Counsel argued, "I just don't – frankly, I don't even know

how you would kill someone without being – showing some extreme cruelty. . . .
[T]here were a lot of shots fired here." R 1458-1459.

338.   The trial judge accepted the jury's recommendation and sentenced Mr.
Miller to death. C 89.

339.   In all of these respects, Trial Counsel's performance fell below "an
objective standard of reasonableness" and failed "to make the adversarial testing
process work." *Strickland*, 466 U.S. at 688, 690. If Mr. Miller had received the
effective assistance of counsel at his criminal trial to which he was entitled under
the United States Constitution, there is a reasonable probability that, but for
counsel's errors, he would have been found not guilty by reason of insanity or,
alternatively, would have been sentenced to life without parole rather than death.
*Id.* at 694. The cumulative effect of Trial Counsel's objectively unreasonable errors
and omissions "undermine confidence in the outcome" of the case. *Ibid.*

**B.     MR. MILLER WAS DENIED EFFECTIVE ASSISTANCE OF
COUNSEL BY HIS APPELLATE COUNSEL IN VIOLATION
OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH
AMENDMENTS TO THE U. S. CONSTITUTION.**

340.   The Sixth Amendment right to effective assistance of counsel on a
first direct appeal is well-established. *See Evitts v. Lucey*, 469 U.S. 387 (1985);
*Smith v. Robbins*, 528 U.S. 259 (2000). Appellate counsel's performance is
reviewed under the *Strickland* standard and is deficient where appellate counsel
fails to raise a potentially meritorious claim, such as ineffective assistance of trial

counsel, or does so ineffectively, to the prejudice of the defendant. Prejudice is established when there is a reasonable probability that the result of the appeal would have been different.

341. The representation Mr. Miller received from his appointed Appellate Counsel was objectively unreasonable, manifestly ineffective, and prejudicial in the following respects:

**i. Appellate Counsel denied Mr. Miller effective assistance by raising the issue of Trial Counsel ineffectiveness in the Motion for New Trial, thereby precluding Mr. Miller from raising this issue in his Rule 32 proceedings.**

342. On August 2, 2000, shortly after Mr. Miller was convicted of a capital offense, William R. Hill Jr. and J. Haran Lowe, Jr., were appointed as his Appellate Counsel. C 90. On August 3, 2000, they filed a perfunctory Motion for New Trial under Ala. Rule Crim. Proc. 24.1, in which they raised only a single ground: "The verdict is contrary to law and the weight of the evidence." C 93.

343. Subsequently, on August 25, 2000, within the 30-day period for the filing of a new trial motion (*see* Ala. Rule Crim. Proc. 24.1(b)), Appellate Counsel filed an Amendment to Motion for New Trial, in which they raised 25 grounds for a new trial. C 95. Ground 24 read: "The Defendants [*sic*] due process rights under the United States and Alabama Constitution were denied because his trial counsel was ineffective." C 96.

344. At the time Appellate Counsel raised the issue of Trial Counsel ineffectiveness in their August 25 Amendment, the transcript of Mr. Miller's jury trial had not been prepared. As lead Appellate Counsel Hill explained, "We did not have the trial transcript at that time so we were pretty much shooting from the dark based on what we had learned from Mr. Miller as well as reading about the case in the newspaper." PR2 18. The trial transcript was not competed until October 20, 2000, nearly two months after a motion for new trial was due under Rule 24.1(b) and little more than one month before the scheduled December 7, 2000, hearing on the motion for new trial. Appellate Counsel's decision to raise the issue of Trial Counsel's ineffectiveness in the new trial motion was objectively unreasonable and highly prejudicial to Mr. Miller.

345. The law was well-settled in Alabama following the Alabama Supreme Court's 1996 decision in *Ex parte Ingram*, 675 So. 2d 863 (Ala. 1996), that "the proper method for presenting claims of ineffective assistance of counsel for appellate review is through a post-conviction petition pursuant to Rule 32, Ala.R.Crim.P." *Nicks v. State*, 783 So. 2d 895, 918 (Ala. Crim. App. 1999). In particular, when the trial transcript is not available until "well beyond the 30-day deadline for filing a motion for a new trial," it is not reasonable to require the defendant to raise the issue of trial counsel ineffectiveness in such a motion. *Rash v. State*, 968 So.2d 552, 554 & n.2 (Ala. Crim. App. 2006); *Holloway v. State*, 848

So. 2d 1017, 1020 & n.2 (Ala. Crim. App. 2002) (same); *Payne v. Allen*, 539 F.3d 1297, 1305 n. 2 (11th Cir. 2008) ("Under Alabama's procedure, new appellate counsel must obtain the trial transcript in order to be able to raise ineffective-trial-counsel claims on direct appeal.").

346.    Appellate Counsel were familiar with the Alabama Supreme Court's 1996 *Ingram* decision at the time of their representation of Mr. Miller in 2000. PR2 24. Under *Ingram*, they were under no obligation to raise the issue of Trial Counsel ineffectiveness in the Motion for New Trial because the lack of the trial transcript made it unreasonable to do so. Appellate Counsel raised the issue in the Amendment to Motion to New Trial anyway.

347.    Appellate Counsel raised the issue of Trial Counsel ineffectiveness, *Ingram* notwithstanding, because they allegedly were concerned that "the case law might change" and because they didn't want the issue to be precluded "later down the line." PR2 24, 62-63. Appellate Counsel's decision, based solely on baseless speculation that the Alabama Supreme Court might in the future change the rule it had announced in *Ingram* retroactively to deny Mr. Miller the right to raise Trial Counsel's ineffectiveness in Rule 32 proceedings, was objectively unreasonable.

348.    Moreover, Appellate Counsel made the decision to raise this issue without any awareness of the adverse consequences that Mr. Miller would suffer. Appellate Counsel's ill-informed decision to raise the issue of Trial Counsel

ineffectiveness meant that Mr. Miller would be barred from raising that issue in Rule 32 proceedings as a result of Ala. R. Crim. P. 32.2(a)(2) and (a)(4). Appellate Counsel Hill had no recollection of being aware of these provisions at the time they elected to raise the ineffectiveness issue. PR2 25. Thus, Appellate Counsel chose to raise this issue without regard for the adverse consequences to Mr. Miller.

349. New trial motion proceedings under Rule 24.1 are expedited. The motion itself must be filed within 30 days of sentencing, a time period the Alabama Supreme Court had declared in *Ingram* in 1996 to be jurisdictional and not subject to suspension or extension. Such motions generally are to be resolved within 60 days of sentencing. Rule 24.4. Indeed, this rule provides that "[a] failure by the trial court to rule on such a motion within the sixty (60) days allowed by this section shall constitute a denial of the motion as of the sixtieth day," absent agreement by both the prosecutor and defense counsel to carry the motion past that point to a date certain. Thus, on August 25, 2000, when Appellate Counsel filed the Amendment to Motion for New Trial, raising Trial Counsel ineffectiveness for the first time, nearly half of the 60-day period allowed for the court's consideration of the motion had passed, the trial court transcript had not yet been prepared, and there was no guarantee that the Shelby County District Attorney would agree to any extension.

350. Appellate Counsel knew it would not be possible to conduct a full-blown investigation concerning Trial Counsel's effectiveness during the underlying trial in the limited time available under Rule 24.1. PR2 70-71. Under *Ingram*, it was not necessary to raise this issue in these expedited proceedings. Yet Appellate Counsel chose to do so anyway, without regard to the fact that doing so precluded Mr. Miller from raising the issue in Rule 32 proceedings that would not be subject to such intensive time pressures and that would not be commenced until after new counsel had had both the time and the opportunity to study the trial transcript. In doing so, Appellate Counsel violated Mr. Miller's constitutional right to effective representation.

### ii. Appellate Counsel denied Mr. Miller effective assistance when they failed to conduct an adequate investigation concerning the ineffective assistance Mr. Miller had received from Trial Counsel.

351. Having erroneously chosen to raise the issue of Trial Counsel ineffectiveness in the motion for a new trial, Appellate Counsel were obligated to evaluate thoroughly Trial Counsel's representation, to identify each and every way in which Trial Counsel had ineffectively defended Mr. Miller, and to present evidence of the prejudice he had suffered thereby at the new trial motion hearing. Appellate Counsel failed in each of these tasks.

352.   Appellate Counsel Hill spent virtually no time preparing for the motion hearing. PX 6-0002. Co-counsel Lowe's records similarly show virtually no preparation. PX 7-0002.

353.   After filing the initial new trial motion, Appellate Counsel met with Mr. Miller for only one hour for the purpose of introducing himself. Mr. Miller provided counsel with contact information for his mother and brother. He otherwise was not helpful to Appellate Counsel in identifying issues to be raised in connection with the motion for new trial. PR2 14-15. Appellate Counsel did not meet with Mr. Miller thereafter until just before the hearing on the new trial motion in early December, 2000. PR2 16.

354.   Appellate Counsel filed the Amendment to Motion for New Trial on August 25, 2000, raising for the first time the issue of Trial Counsel ineffectiveness. PX 1-0099. Appellate Counsel Hill did nothing between August 3 and August 25, other than some basic research to aid in the preparation of the amendment. PX 6-0002. Appellate Counsel Lowe also did no memorable work on the case during this time.

355.   Appellate Counsel did not interview Trial Counsel prior to filing the amendment nor review Trial Counsels' files. PR2 19-20. Nor did they contact or otherwise interview any of the trial witnesses or any members of the Miller family. PR2 20.

356.    Appellate Counsel began reviewing the transcript from Mr. Miller's trial in early November, 2000. PX 6-0002; PX 7-0002. Appellate Counsel Hill did no work on Mr. Miller's case between November 7 and December 3, just four days before the hearing on the new trial motion was scheduled to begin. PX 6-0002. Co-counsel Lowe performed only four hours of legal research during that period but engaged in no other activity. Petitioner's Ex. 7-0002.

357.    Appellate Counsel Hill had no memory of speaking with Mr. Miller's mother, Barbara, prior to the December 7 hearing. PR2 30. His time records reflect no such meeting. PX 6-0002. Nor did he meet with Mr. Miller's brother, Richard, or his half-sister, Cheryl, or any other Miller family members prior to the denial of the new trial motion. PR2 32-33. Appellate Counsel never met with or interviewed any of Mr. Miller's neighbors, friends, or coworkers in connection with the new trial motion. PR2 34.

358.    Although Appellate Counsel was aware that Dr. Scott had testified during the penalty phase of Mr. Miller's trial, Appellate Counsel never had any contact with him. PR2 21, 37. Appellate Counsels' failure to speak with Dr. Scott meant that they were not aware of Trial Counsels' ineffectiveness in working with their expert witness. They never learned that Trial Counsel had withheld crucial information and documents from Dr. Scott and the effect this had on his ability to evaluate Mr. Miller's sanity at the time of the shootings. They never learned that

Trial Counsel had only retained Dr. Scott to evaluate Mr. Miller's sanity, not to perform a complete, comprehensive mitigation analysis or to testify as a mitigation expert.

359.   Appellate Counsels' failure to interview the Miller family members meant that they were not aware of the nature or the extent of the substantial mitigating evidence that had been available and could have been presented during the sentencing phase of trial, but was not because of Trial Counsels' ineffectiveness. They were not aware of evidence concerning Mr. Miller's upbringing, his educational and employment records, the history of mental health issues in the Miller family, or the extent of the physical and emotional abuse he suffered from his father, none of which had been presented by Trial Counsel to the sentencing jury. PR2 51.

360.   Appellate Counsel also failed to gather and evaluate Mr. Miller's medical, educational, and employment records, DHR records, Miller family mental health and criminal records, as well as the files and reports of the State's psychological experts. PR2 34-35, 39-40. They did not gather any mitigating information or materials concerning Mr. Miller that had not been gathered by trial counsel. PR2 35-36.

361.   Having not obtained and reviewed any of the documentary materials and other evidence that Trial Counsel had not gathered, Appellate Counsel had no

way of knowing what those materials contained or showed. As a result, they were unable to evaluate Trial Counsels' ineffectiveness in failing to gather and review such materials and/or the prejudice Mr. Miller suffered thereby.

362. Appellate Counsel failed to gather any of the missing mitigation evidence solely because of the lack of time inherent in the expedited new trial proceedings, not for any objectively reasonable reasons: "I don't think we were – we would have felt comfortable having to be prepared to put on a whole mitigation case in that short period of time, the three or four months." PR2 61. "We were not prepared to put on a mitigation case in chief." PR2 71; PR2 74-75.

### iii. Appellate Counsel denied Mr. Miller effective assistance when they failed to present evidence at the hearing on the motion for new trial establishing the prejudice Mr. Miller had received as a result of Trial Counsel's ineffectiveness.

363. On December 7, 2000, and January 31, 2001, Appellate Counsel presented evidence on the new trial motion. R2 1-176. Trial Counsel Johnson was called to testify. R2 4-108.

364. Appellate Counsel knew that, in order to establish that Mr. Miller was entitled to a new trial based on Trial Counsel ineffectiveness, they would have to show that Mr. Miller had been prejudiced by that ineffectiveness. PR2 28-29. However, because of their deficient investigation, Appellate Counsel did not gather any mitigating information or materials that had not been gathered by Trial Counsel. PR2 35-36, 101. Thus, at the new trial hearing Appellate Counsel did not

present the court with the mitigation case that Trial Counsel should have presented at trial in order to demonstrate the prejudice Mr. Miller suffered as a result of Trial Counsel's ineffectiveness in this regard. PR2 36.

365. Instead, Appellate Counsel called Aaron McCall of the Alabama Prison Project to explain what would have been involved in a comprehensive mitigation presentation. PR2 49. But, Appellate Counsel did not ask Mr. McCall to conduct a mitigation evaluation or to gather missing mitigating evidence for Mr. Miller. PR2 49-50, 100. Thus, Appellate Counsel presented the court with no mitigating evidence that had not been presented to the jury by Trial Counsel. PR2 51-52, 77.

366. Appellate Counsel also presented testimony from a psychologist who had never met Mr. Miller or performed an evaluation of his mental state. R2 111-156. Rather than developing the evidence of Trial Counsel's ineffectiveness in connection with the exploration of Mr. Miller's mental health and the insanity defense by Dr. Scott and then demonstrating the prejudice Mr. Miller had suffered as a result, Appellate Counsel presented the testimony of psychologist Bob Wendorf at the New Trial Hearing. Appellate Counsel's reliance on Dr. Wendorf's testimony was doomed from the outset by the fact that he never met with Mr. Miller or any Miller family members, never administered any psychological tests

to him, and never performed an evaluation with respect to his mental state at the time of the shootings. PR2 45.

367.    Appellate Counsel did not ask Dr. Wendorf to perform an independent assessment of Mr. Miller; his only role had been to review Dr. Scott's report and to suggest possible additional areas for investigation or inquiry. PR2 47. But, Appellate Counsel did not present any evidence at the new trial hearing through Dr. Wendorf or any other witness to show what the results of those investigations or inquiries would have been. *Ibid.* Appellate Counsel Hill acknowledged at the Rule 32 Hearing that "it probably would have been a lot better practice" to have Dr. Wendorf actually perform an assessment of Mr. Miller. PR2 47.

> iv.    **Appellate Counsel denied Mr. Miller effective assistance in the arguments they presented to the Circuit Court in support of the few aspects of Trial Counsel ineffectiveness they had identified.**

368.    As summarized by the trial court in its order following remand from the Alabama Court of Criminal Appeals (PX 14-0001), Appellate Counsel argued during the new trial hearing that Trial Counsel had ineffectively represented Mr. Miller in five respects, *inter alia*:

369.    *First*, Appellate Counsel argued that Trial Counsel had admitted Mr. Miller's guilt during his guilt phase opening remarks. PX 14-0011.

370.    Trial Counsel's opening statement during the guilt phase of Mr. Miller's trial was woefully ineffective, for the reasons set forth in paragraphs 222-

228, above. In particular, Trial Counsel violated Mr. Miller's rights by vouching for the accuracy of the State's opening statement, offering no theory of defense on which the jury might find Mr. Miller guilty of a lesser-included offense, and describing the shootings as "brutal" and "inhumane" and telling the jurors that they would not feel "anything but ashamed of what happened." R 814, 816.

371. Appellate Counsel made none of these arguments in their post-hearing Brief in Support of Motion for New Trial. Petitioner's Ex. 10-0001 *et seq.* They failed to argue the prejudice Mr. Miller suffered as a result of Trial Counsel's statement that the jurors would be "ashamed" as a result of having to serve in Mr. Miller's case. Nor did they point out to the Court that Trial Counsel made no effort to suggest to the jurors reasons why the jurors might convict Mr. Miller of straight murder, rather than capital murder. Appellate Counsel failed to explain the true ineffectiveness of Trial Counsel's opening statement and, hence, were ineffective themselves in representing Mr. Miller.

372. As a result of Appellate Counsel's deficient argument, the trial court rejected this basis for a new trial, to Mr. Miller's prejudice. PX 14-0011 to 14-0013.

373. *Second*, Appellate Counsel argued that Trial Counsel violated Mr. Miller's rights by failing to present an insanity defense during the guilt phase of the trial. PX 14-0013.

374.   As shown in paragraphs 131-181 and 248-254 , above, Trial Counsel had violated Mr. Miller's rights by withdrawing the insanity defense and then failing to present any of the available mental health evidence they possessed to the jury during the guilt phase of the trial. Appellate Counsel made none of these arguments in their post-hearing Brief in Support of New Trial. *See* Petitioner's Ex. 10-0001 *et seq.*

375.   In particular, Appellate Counsel failed to argue that Trial Counsel had ineffectively represented Mr. Miller as a result of the failure to provide Dr. Scott, Trial Counsel's mental health expert, with crucial documents and other information necessary to permit him to provide an accurate evaluation of Mr. Miller's sanity at the time of the shootings. Thus, Appellate Counsel did not present evidence at the hearing on the new trial motion or subsequently explain in their briefs that Trial Counsel had withheld from Dr. Scott the Taylor Hardin files, Dr. McClaren's report and files, the audio/video tape of Mr. Miller's post-arrest interrogation, comprehensive information on the extreme physical and emotional abuse Mr. Miller had received from his father, and comprehensive information about the remarkable history of mental illness in the Miller family. Appellate Counsel's failure in this regard was a direct result of their unreasonable failure to conduct an adequate investigation into Trial Counsel's performance, including their failure to

speak with Dr. Scott or to obtain documents and other materials not gathered by Trial Counsel.

376. Rather than developing the evidence of Trial Counsel's ineffectiveness in connection with the exploration of Mr. Miller's mental health and the insanity defense by Dr. Scott and then demonstrating the prejudice Mr. Miller had suffered as a result, Appellate Counsel presented the testimony of psychologist Bob Wendorf at the New Trial Hearing. Dr. Wendorf never met with Mr. Miller or any Miller family members, never reviewed the Taylor Hardin records, did not read any police reports or talk to any law enforcement officers, and did not read Dr. Scott's trial testimony. PX 14-0022. He never administered any psychological tests to Mr. Miller, and never performed an evaluation with respect to his mental state at the time of the shootings. PR2 45.

377. Appellate Counsel did not ask Dr. Wendorf to perform an independent assessment of Mr. Miller; his only role had been to review Dr. Scott's report and to suggest possible additional areas for investigation or inquiry. PR2 47. But, Appellate Counsel did not present any evidence at the new trial hearing through Dr. Wendorf or any other witness to show what the results of those investigations or inquiries would have been. *Ibid.* Appellate Counsel's strategy "was simply to show the Court that those investigations could have been made and they were not made." PR2 47. Appellate Counsel presented no evidence showing that Mr. Miller

had suffered any prejudice as a result of Trial Counsel's ineffectiveness with respect to the mental health evidence.

378.   As a result of Appellate Counsel's ineffectiveness in this regard, the trial court did not credit Dr. Wendorf's testimony and denied Mr. Miller's request for a new trial on this basis, to Mr. Miller's prejudice. PX 14-0022, 14-0013 to 14-0015.

379.   *Third*, Appellate Counsel argued that Trial Counsel had failed to present a defense during the guilt phase of the trial. PX 14-0016. Appellate Counsel did not address this argument, either, in the post-hearing brief. Accordingly, Appellate Counsel made no effort to develop the argument or to explain to the court how Mr. Miller had been prejudiced by Trial Counsel's ill-informed and unreasonable decision in this regard.

380.   As a result of Appellate Counsel's deficient performance in this regard, the trial court denied the motion for a new trial on this ground. PX 14-0017.

381.   *Fourth*, Appellate Counsel argued that Trial Counsel had undermined the mitigation case during his penalty phase opening argument. PX 14-0017. As described in paragraphs 272-283, above, Trial Counsel made no attempt to present a coherent mitigation case, to humanize Mr. Miller to the jury, or to provide a context for the testimony of Dr. Scott. Instead, Trial Counsel vilified Mr. Miller,

undercut Dr. Scott's credibility, effectively begged the jurors to sentence Mr. Miller to death, and conceded the only aggravating circumstance in the case on which the State relied.

382. Appellate Counsel's attack on Trial Counsel's opening consisted of less than one page of argument in their post-hearing brief. PX 10-0005 to 10-0006. They failed to highlight or explain the significance of Trial Counsel's denigration of Mr. Miller, including the statements that referred to him as "violent," "mean," "cruel," "atrocious," and "vile" and someone who was willing to kill "everyday." They ignored the fact that Trial Counsel admitted the State's sole aggravating circumstance.

383. As a result of Appellate Counsel's deficient performance in this regard, the trial court denied Mr. Miller a new trial, to his prejudice. PX 14-0008. The trial court's conclusion, that Trial Counsel's penalty phase opening statement was "an impassioned plea" to save Mr. Miller's life (*ibid.*) is understandable only as a response to the remarkably ineffective argument made by Appellate Counsel.

384. *Fifth*, Appellate Counsel argued that that Trial Counsel had failed to adequately investigate and present a penalty phase defense. PX 14-0019.

385. As explained above, there was a veritable mountain of mitigating evidence available to Trial Counsel that was not presented during the penalty phase hearing. In particular, Trial Counsel was ineffective in failing to present the

testimony of any of the Miller family members or evidence from a mitigation expert. As a result, the Miller jury heard little or nothing about the circumstances of Mr. Miller's upbringing, the nature and extent of physical and emotional abuse he suffered, or his exposure to criminal and anti-social behavior. Equally importantly, the jury heard nothing positive about Mr. Miller's life and his relationships with his family members as well as his good work record. The jury heard no one say they valued Mr. Miller's life in any way.

386. In their post-hearing brief, Appellate Counsel criticized Trial Counsel's performance in not conducting a more thorough investigation and in failing to call additional witnesses, including a mitigation expert, during the penalty phase of trial. *See* PX 10-0007. But, Appellate Counsel failed to present the testimony of any the missing witnesses or introduce any of the mitigating evidence Trial Counsel had not supplied

387. This was an unreasonable decision and a fatal error. Appellate Counsel were aware of the fact that, in order to establish that Trial Counsel's ineffectiveness had violated Mr. Miller's rights, it would be necessary to prove that Mr. Miller had been prejudiced by Trial Counsel's deficient performance. PR2 28-29. Yet, Appellate Counsel presented no evidence demonstrating that Mr. Miller had in any way been prejudiced by Trial Counsel's inadequate performance.

388. This was not a "strategic" decision by Appellate Counsel, who knew that proof of prejudice was an essential element of his case on behalf of Mr. Miller and that without it his request for a new trial and subsequent appeal would be doomed. It was well-settled law that, in order to establish prejudice, Appellate Counsel was required to "proffer the type of mitigating evidence that would have been found had trial counsel conducted further investigation." *Lawhorn v. State*, 756 So. 2d 971, 984 (Ala. Crim. App. 1999) (citing *Singleton v. Thigpen*, 847 F.2d 668 (11th Cir. 1988)).

389. Appellate Counsel's only explanation for the failure to produce the missing mitigation evidence was the lack of time inherent in the expedited new trial proceedings: "I don't think we were – we would have felt comfortable having to be prepared to put on a whole mitigation case in that short period of time, the three or four months." PR2 61. Having chosen to raise the issue of Trial Counsel ineffectiveness under circumstances where they were not required to do so, as explained in paragraphs 344-352, above, Appellate Counsel were objectively ineffective in their representation of Mr. Miller when they failed to present any evidence supporting an essential element of this claim.

390. As a result of Appellate Counsels' failure to present the mitigation evidence, both testimonial and documentary, that Trial Counsel had missed, the

trial court was able to reject Mr. Miller's ineffective assistance of counsel claim out of hand. As Judge Crowson stated in his Order denying the new trial motion:

> Mr. Miller has not offered what further mitigating evidence his attorney should have investigated and presented during the penalty phase. Counsel cannot be ineffective for failing to conduct a further investigation when there is no showing that additional investigation would have developed useful information.

PX 14-0020.

391. Appellate Counsels' ineffective representation caused Mr. Miller to suffer manifest prejudice. Counsels' deficient performance in arguing and supporting with evidence those aspects of Trial Counsels' inadequacies that Appellate Counsel identified prevented Mr. Miller from receiving the new trial he deserved. Had Appellate Counsel done an objectively reasonable job in raising and proving Trial Counsels' ineffectiveness, there is a substantial probability that the outcome of Mr. Miller's new trial motion would have been quite different. In particular, had Appellate Counsel presented at the new trial hearing the readily available mitigating evidence that Trial Counsel failed to gather or present at trial, the trial court's decision on that issue surely would have been different.

### iv. Appellate Counsel denied Mr. Miller effective assistance when they failed to raise the many other ways in which Trial Counsel had ineffectively represented Mr. Miller.

392. Appellate Counsel failed to identify and thus failed to argue the many other ways in which Trial Counsel had ineffectively represented Mr. Miller and the

resulting prejudice he had suffered as a result of Trial Counsel's ineffectiveness. There was no justification for Appellate Counsel's failing in this regard. There were no Trial Counsel errors that Appellate Counsel elected not to raise in the new trial hearing for any "strategic" reasons. PR2 43.

393.　　Among the aspects of Trial Counsel ineffectiveness that Appellate Counsel failed to raise in support of their Motion for New Trial were the following:

(a)　　Trial Counsel's ineffective performance during the jury voir dire, including the failure to determine whether the jurors had read and remembered prejudicial statements concerning Mr. Miller in the media (*see* paras. 187-221, *supra*).

(b)　　Trial Counsel's ineffective performance in failing to object to the admission of irrelevant and prejudicial testimony and photographs during the guilt phase of trial (*see* paras. 229-234, *supra*).

(c)　　Trial Counsel's ineffective cross-examination of crucial prosecution witnesses (*see* paras. 235-247, *supra*).

(d)　　Trial Counsel's ineffective failure to object to misleading portions of the State's guilt phase closing argument (*see* paras. 255-257, *supra*).

(e)　　Trial Counsel's ineffective guilt phase closing argument (*see* paras. 258-262, *supra*).

(f)     Trial Counsel's ineffective failure to request guilt phase jury instructions necessary to protect Mr. Miller's rights (*see* paras. 263-266, *supra*).

(g)     Trial Counsel's ineffective reliance on Dr. Scott as the sole mitigation witness during the penalty phase of trial (*see* paras. 284-306, *supra*).

(h)     Trial Counsel's ineffectiveness in failing to move for a directed verdict based on the State's failure to present comparative evidence necessary for the jury to determine that the killings were "especially heinous, atrocious, or cruel compared to other capital crimes" (*see* paras. 307-313, *supra*).

(i)     Trial Counsel's ineffective penalty phase closing argument (*see* paras. 314-322, *supra*).

(j)     Trial Counsel's failure to object to the court's penalty-phase jury instructions that falsely told the jurors they were only making a "recommendation" to the court on whether Mr. Miller should live or die and that failed to inform the jurors that they were required to find that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt (*see* paras. 323-328, *supra*).

(k)     Trial Counsel's ineffectiveness in failing to request a special verdict form to establish that the jury had unanimously found the sole alleged aggravating circumstance (*see* paras. 329-332, *supra*).

(l)    Trial Counsel's ineffectiveness at the sentencing hearing, including Trial Counsel's ineffectiveness in failing to present further mitigating evidence (*see* paras. 333-337, *supra*).

(m)    Trial Counsel's ineffectiveness in failing to bring the Supreme Court's decision in *Apprendi v. New Jersey* to the attention of the Court in order to obtain a new sentencing hearing at which the jury would not be told that their determination of an aggravating factor was merely a "recommendation" to the sentencing judge (*see* paras. 338-340, *supra*).

394.   Mr. Miller was severely prejudiced by the inadequate performance of Appellate Counsel in failing to identify and raise in support of the new trial motion these additional aspects of Trial Counsel's ineffectiveness. Trial Counsels' performance in these respects was both unreasonably deficient and highly prejudicial to Mr. Miller and violated his constitutional rights. Appellate Counsels' failure to effectively raise and present those meritorious issues denied Mr. Miller the new trial and/or new sentencing proceeding he deserved and violated his constitutional rights as well.

### vi.    Appellate Counsel denied Mr. Miller effective assistance in their appeal to the Alabama Court of Criminal Appeals.

395.   Appellate Counsel appealed to the Alabama Court of Criminal Appeals, arguing that Trial Counsel had been ineffective. Appellate Counsel argued, *inter alia*, that Trial Counsel (a) prejudiced Mr. Miller during his guilt

phase opening remarks; (b) failed to present an insanity or any other defense during the guilt phase; (c) failed to adequately investigate and present a penalty-phase defense; and (d) undermined the mitigation case during the penalty-phase opening statement. PX 12-0023 to 12-0032. However, Appellate Counsel's own ineffectiveness prevented Mr. Miller from obtaining the new trial and/or new sentencing hearing he deserved.

396. Appellate Counsel made only a cursory challenge to Trial Counsel's guilt-phase opening at pp. 19-20 of their brief to the Court of Criminal Appeals. PX 12-0028 to 12-0029. They failed to explain the prejudice Mr. Miller suffered as a result of Trial Counsel's statement that the jurors would be "ashamed" as a result of having to serve in Mr. Miller's case. Nor did they point out to the Court that Trial Counsel made no effort to suggest to the jurors reasons why the jurors might convict Mr. Miller of non-capital murder or manslaughter, rather than capital murder. Appellate Counsel failed to explain the true ineffectiveness of Trial Counsel's opening statement and, hence, were ineffective themselves in representing Mr. Miller.

397. Appellate Counsel's argument concerning Trial Counsel's failure to present an insanity or any other defense for Mr. Miller during the guilt phase of trial occupied only one page in their appellate brief. PX 12-0029 to 12-0030. Having ineffectively investigated and developed a record concerning Trial

Counsel's actions in this regard, Appellate Counsel said nothing to the Court of Criminal Appeals about Trial Counsel's failure to provide Dr. Scott with essential information and materials that would have enabled him to make an informed insanity assessment. As a result of Appellate Counsel's ineffectiveness in presenting evidence and argument concerning Trial Counsel's guilt-phase ineffectiveness, the Court of Criminal Appeals rejected each of Mr. Miller's guilt-phase claims, finding solely as a result of the inadequate record created by Appellate counsel that "those decisions were made [by Trial Counsel] after a thorough investigation of the relevant law and facts of Miller's case." *Miller v. State*, 913 So. 2d at 1161.

398. Appellate Counsel's arguments concerning Trial Counsel's ineffectiveness in investigating and presenting a penalty phase defense (PX 12-0023 to 12-0025) were doomed in the Court of Criminal Appeals for the same reason they were rejected out of hand by the trial court: Appellate Counsel's objectively unreasonable failure to identify any available mitigating evidence that Trial Counsel had failed to present to the jury. The Appellate Court ruled:

> Based on our review of the record, we fail to see what other mitigating evidence counsel could have offered. Moreover, despite Miller's allegations, he offers no additional mitigating evidence that counsel did not discover during his investigation or that counsel failed to consider in formulating his defense strategy. Accordingly, we are unable to say that counsel was ineffective as to this claim.

*Miller v. State*, 913 So. 2d at 1163.

399.    Finally, Appellate Counsel's one-page criticism of Trial Counsel's remarkable penalty-phase opening statement in their appellate brief was itself woefully inadequate. PX 12-0025 to 12-0026. Appellate Counsel simply ignored the fact that Trial Counsel effectively had begged the jury to sentence Mr. Miller to death and had volunteered to serve as a thirteenth jury if one were needed to do so in order to achieve "true justice." Similarly, Appellate Counsel ignored the fact that Trial Counsel described Mr. Miller to the jurors as being "atrocious" and "vile" and the fact that Trial Counsel admitted the sole aggravating factor on which the State relied.

400.    As a result of Appellate Counsel's ineffectiveness in this regard, the Alabama Court of Criminal Appeals adopted the rationale of the trial court and concluded, incredibly, that Trial Counsel's argument was "an impassioned plea that the jury spare Miller's life." *Miller v. State*, 913 So. 2d at 1163.

401.    Appellate Counsel also denied Mr. Miller effective representation by failing to raise on appeal all of the other ways in which Trial Counsel had ineffectively represented him at trial, set forth above in paragraph 394.

402.    Accordingly, Appellate Counsel provided Mr. Miller with ineffective assistance in numerous respects. Had Appellate Counsel provided objectively reasonable representation, there is a reasonable probability that Mr. Miller would

have been granted either a new trial or a new sentencing hearing either from the trial court or from the Court of Criminal Appeals.

## II. MR. MILLER'S DEATH SENTENCE VIOLATES THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

403.   In *Ring v. Arizona*, 536 U.S. 584 (2002), the Supreme Court squarely held that juries - not judges - are required to make all factual findings necessary to support a death sentence: "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact – no matter how the State labels it – must be found by a jury beyond a reasonable doubt." *Id.* at 602. This constitutional requirement, originally formulated in *Apprendi v. New Jersey*, 530 U.S. 499 (2000), requires the jury to make any finding of fact that is "necessary for imposition of the death penalty." *Ring,* 536 U.S. at 609.

404.   As illustrated by the penalty-phase errors in Mr. Miller's trial, Alabama's advisory capital sentencing scheme violates *Ring*'s central command and effectively eliminated the jury's role and responsibility for sentencing Miller to death in three ways.

405.   *First*, *Ring*'s fundamental principle is that the jury occupies a determinative role in capital sentencing. The trial court's instructions in Mr. Miller's case misled the jurors into believing their sentencing role is purely advisory, notwithstanding *Ring*.

406.   The jurors were told no fewer than 20 times that their sentencing decision was merely a recommendation to the court. The jurors were never advised that any aspect of their decision was binding on the trial court, let alone that they had final responsibility for making the necessary predicate finding of the existence of an aggravating factor, without which Miller could not be sentenced to death. The jurors simply had no way to know of their determinative role. To the contrary, they were led to believe just the opposite. By so diminishing the jury's sense of sentencing responsibility, the instructions in Miller's case violated Miller's Eighth Amendment rights under *Caldwell v. Mississippi*, 472 U.S. 320 (1985) (holding it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere).

407.   *Second*, under *Ring* a jury must find beyond a reasonable doubt "all facts essential to imposition of the level of punishment that the defendant receives." *Ring*, 536 U.S. at 610 (Scalia, J., concurring); *id*. at 602 (maj. opinion) (defendant has a Sixth Amendment right to "a jury determination that [he] is guilty of every element of a crime with which he is charged, beyond a reasonable doubt"). "[A]ny fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531 (2004) (citing

*Apprendi,* 530 U.S. at 490). The "statutory maximum" means "the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Id.* at 2537 (citing *Ring*, 536 U.S. at 602) (emphasis in original).

408. Under *Ring* the determination whether aggravating circumstances outweigh mitigating ones, a necessary prerequisite to imposing the death penalty in Alabama (*see* Ala. Code §§ 13A-5-45(f), -46(e), -47(e)), is required to be made by the jury beyond a reasonable doubt. Alabama courts, however, have held that the jury is not required to conduct this critical weighing analysis, much less that such a finding be made by the jurors beyond a reasonable doubt. *See Ex Parte Waldrop*, 859 So.2d 1181, 1190 (Ala. 2002), *cert. denied*, 540 U.S. 968 (2002).

409. This conclusion finds no support in *Ring* or *Apprendi*. "The relevant inquiry is one not of form, but of effect – does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" *Apprendi,* 530 U.S. at 494. Indisputably, the substantive elements of capital murder in Alabama are (i) the finding of an aggravating circumstance and (ii) the finding that aggravators outweigh mitigators. It is the latter finding that ultimately authorizes the appropriate decision-maker to consider and then to impose a death sentence. It is the latter finding that exposes the defendant to an increased potential range of punishment beyond the statutory maximum. Ala. Code

§13A-5-46(e)(2). Thus, this is precisely the kind of factual finding that must be made by jury beyond a reasonable doubt under *Ring* and *Apprendi*.

410. The jury in Mr. Miller's case was not instructed that it had to find that the sole aggravating factor outweighed the mitigating circumstances by a reasonable doubt in order to return a verdict for death. R. 1443. The court's instructions made it clear to the jurors that they were required to apply a "beyond reasonable doubt" standard only in determining the existence of the aggravating factor, not in the weighing of aggravating and mitigating factors:

> [I]f after a fair and full consideration of all the evidence in this case you determine that the mitigating circumstances outweigh the aggravating circumstance that exists *or* that you are not convinced beyond a reasonable doubt that at least one aggravating circumstance does in fact exist, your verdict would be to recommend life imprisonment without parole.

R 1443-1444; emphasis added.

411. *Finally*, Mr. Miller's death sentence is unsupported by any verifiable jury findings as required by *Ring*. The jury's 10-2 vote, as reflected in the general verdict form used in Mr. Miller's case, failed to indicate what findings, if any, the jury made in support of Mr. Miller's death sentence.

412. There is strong reason to doubt that the *Miller* jurors were unanimous in finding the necessary aggravating circumstance. During the course of deliberations, the jury sent the court a note that read, "[C]an we have a sentence if we have the appropriate number of required votes but *we have one juror*

*undecided*?" The court told the jury, "Everyone must vote one way or the other." R 1446; emphasis added. Ultimately, the jury recommended the death sentence by 10 votes to 2, the minimum number required under Alabama law. But the jury's question strongly suggests that one of the jurors, although concluding that the evidence of an aggravating circumstance outweighed the evidence of mitigating circumstances, may have concluded that the State had failed to prove the sole aggravator beyond a reasonable doubt. The court's failure to require each juror to record his/her vote on whether the State had carried this burden violated Mr. Miller's constitutional rights.

413. On direct appeal the Alabama Court of Criminal Appeals simply presumed that each member of Mr. Miller's jury had found the existence of an aggravating circumstance beyond a reasonable doubt, even though there was no indication of this fact:

> [T]he jury's 10-2 recommendation of death during the sentencing phase indicated that it must have found the existence of the aggravating circumstance that the offense was "especially heinous, atrocious, or cruel compared to other capital offenses." § 13A-5-49(8), Ala. Code 1975. This was the only aggravating circumstance the court instructed the jury on. Indeed, during the court's penalty-phase instructions, the court clearly instructed the jury that it could not proceed to vote on whether to impose the death penalty unless it first found beyond a reasonable doubt the existence of at least one aggravating circumstance. (R. 1433-35.) Thus, the jury's 10-2 vote recommending death established that the jury unanimously found the existence of the "especially heinous, atrocious, or cruel" aggravating circumstance.

15-0043 to 15-0044.

414.   Such guesswork is impermissible under the Eighth Amendment, as it is impossible to rationally distinguish between the cases in which the death penalty is imposed and those in which it is not. *See Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion); *Mills v. Maryland*, 486 U.S. 367, 376-77 (1988); *Gardner v. Florida*, 430 U.S. 349, 361 (1977).

415.   The lack of reviewable findings, compounded by the fact that the jury (A) was told its verdict was only a recommendation and (B) was never told of its constitutional role in weighing aggravating and mitigating factors, renders Mr. Miller's death sentence wholly unreliable under the Sixth and Eighth Amendments of the United States Constitution.

## IV.   PRAYER FOR RELIEF

416.   For all of the above reasons and other such reasons as may be made upon amendment of this petition and a full evidentiary hearing, Mr. Alan Eugene Miller respectfully asks this Honorable Court to grant him the following relief:

(a)   Grant Petitioner's accompanying motion to proceed in this matter *in forma pauperis* and appoint undersigned as counsel for Petitioner;

(b)   Afford Petitioner an opportunity to reply to any responsive pleading filed by Respondent;

(c)    Grant petitioner an evidentiary hearing at which additional proof may be offered supporting the allegations set forth in this petition;

(d)    Permit Petitioner after additional factual development an opportunity brief and argues the issues presented in this petition;

(e)    Issue a writ of habeas corpus granting Mr. Miller relief from his unconstitutionally obtained conviction and sentence of death; and

(f)    Grant such further and other relief as may be appropriate.

Respectfully submitted,

s/Audrey Y. Dupont
Audrey Y. Dupont
(Local Counsel)
Maynard Cooper & Gale P.C.
1901 Sixth Avenue North
2400 AmSouth/Harbert Plaza
Birmingham, AL  35203
Phone: (205) 254-1105
Fax: (205) 254-1999

James S. Whitehead (*pro hac*)
(Lead Counsel)
Marah Stith McLeod (*pro hac*)
Catharine B. DeJulio (*pro hac*)
Sidley Austin LLP
One South Dearborn Street
Chicago, IL  60603
Phone: (312) 853-7000
Fax: (312) 853-7036

Counsel for Petitioner
Alan Eugene Miller

## ATTORNEY'S VERIFICATION

I affirm under penalty of perjury that, upon information and belief, this

Petition for Writ of Habeas Corpus is true and correct.

Executed on January 17, 2013.

s/James S. Whitehead
James S. Whitehead

# CERTIFICATE OF SERVICE

I certify that on January 23, 2013, a copy of the attached was mailed by first-class mail, postage prepaid, to:

Thomas R. Govan
Office of the Attorney General
500 Dexter Ave.
Montgomery, AL  36130

s/ Audrey Y. Dupont

Audrey Y. Dupont

CH1 7006660v.1