FILED

2017 Mar-29  AM 11:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **ALAN EUGENE MILLER,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:13-00154-KOB** |
| **JEFFERSON S. DUNN,** | ) | |
| **Commissioner of the Alabama** | ) | |
| **Department of Corrections,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

This case is again before the court upon the petitioner Alan Eugene Miller's "Petition for Writ of Habeas Corpus By Prisoner In State Custody Under Sentence of Death," pursuant to 28 U.S.C. § 2254.[1] (Doc. 1). Miller alleges that he was denied effective assistance of counsel both at trial and on appeal, and that his death sentence violates the United States Constitution.

---

[1] The court's original Memorandum Opinion and Final Judgment, entered August 4, 2015, were withdrawn on September 4, 2015, upon Miller's unopposed motion to supplement the record with exhibits from the Rule 32 proceedings in state court, that were not previously made part of the record in this case. This Memorandum Opinion considers those exhibits. Additionally, it addresses the arguments made by the parties subsequent to the original Memorandum Opinion, pertaining to *Hardwick v. Sec'y, Fla. Dep't of Corr.*, 803 F.3d 541 (11th Cir. 2015); *Hurst v. Florida*, 136 S. Ct. 616 (2016); *Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F.3d 1248, 1255 (11th Cir. 2016); and *In re Bohannon v. State*, No. 1150640, 2016 WL 5817692, at *5 (Ala. Sept. 30, 2016).

1

## Table of Contents

I.      The Offense Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

II.     Trial: Guilt and Penalty Phases. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

III.    Sentencing Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

IV.     Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        A.      Motion for a New Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        B.      Direct Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        C.      Rule 32 Proceedings in Shelby County Circuit Court. . . . . . . . . . . 21

V.      Legal Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        A.      Exhaustion of State Court Remedies:  The First Condition Precedent to
                Federal Habeas Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        B.      The Procedural Default Doctrine: The Second Condition Precedent to
                Federal Habeas Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        C.      Overcoming Procedural Default: The Cause and Prejudice Analysis 27

        D.      The Statutory Overlay:  The Effect of "the Antiterrorism and Effective
                Death Penalty Act of 1996" on Habeas Review . . . . . . . . . . . . . . . . 28

                1.      Title 28 U.S.C. § 2254(e)(1). . . . . . . . . . . . . . . . . . . . . . . . . . 29

                2.      28 U.S.C. § 2254(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        E.      An Introduction to Ineffective Assistance of Counsel Claims. . . . . . 32

                1.      The performance prong. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

        2.     The prejudice prong. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

        3.     Deference accorded state court findings of historical fact, and decisions on the merits, when evaluating ineffective assistance of counsel claims.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

VI.   Miller's Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

    A.    Miller's Ineffective Assistance of Trial Counsel Claims. . . . . . . . . 41

        1.     Claims Raised and Exhausted On Direct Appeal.. . . . . . . . . 41

            a)     Claim A(ii): Miller's Claim That Trial Counsel Was Ineffective For Sabotaging the Work of the Defense Psychiatric Expert and For Withdrawing the Plea of Not Guilty by Reason of Mental Disease or Defect. . . . . . . 43

            b)     Claim A(v): Miller's Claim That Trial Counsel Was Ineffective In His Guilt phase Opening Statement. . . . 46

            c)     Claim A(vi): Miller's Claim That Trial Counsel Was Ineffective During The Presentation of The State's Guilt phase Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

            d)     Claim A(vii): Miller's Claim That Trial Counsel was Ineffective for Failing to Present Mental Health Evidence During the Guilt Phase . . .. . . . . . . . . . . . . . . . . . . . 53

            e)     Claim A(xii): Miller's Claim That Trial Counsel Denied Miller Effective Assistance in His Penalty phase Opening Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

        2.     Claims Raised For the First Time On Collateral Appeal.. . . . 64

        3.     Claims Raised For the First Time Before This Court. . . . . . . 67

    B.    Miller's Ineffective Assistance of Appellate Counsel Claims. . . . . . 68

1.    Claim B(i): Miller's Claim That Miller's Claim That Appellate
      Counsel was Ineffective for Raising the Issue of Ineffective
      Assistance of Trial Counsel In the Motion for New Trial. . . . 71

      a)    No Procedural Default. . . . . . . . . . . . . . . . . . . . . . . . . 72

      b)    Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

2.    Claim B(ii & iii): Miller's Claim That Appellate Counsel Was
      Ineffective for Failing to Conduct an Adequate Investigation
      Concerning the Ineffective Assistance Miller Received from Trial
      Counsel AND Failing to Present Sufficient Evidence During the
      Hearing on the Motion for New Trial to Establish That Miller
      Suffered Prejudice as a Result of Trial Counsel's Performance. .
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

      a)    No Procedural Default. . . . . . . . . . . . . . . . . . . . . . . . . 75

      b)    Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

3.    Claim B(iv): Miller's Claim That Appellate Counsel was
      Ineffective for Failing to Adequately Present the Claims of
      Ineffective Assistance of Trial Counsel That Were Raised in
      Miller's Motion for New Trial. . . . . . . . . . . . . . . . . . . . . . . 79

      a)    Miller's claim that trial counsel's opening statement during
            the guilt phase was ineffective. . . . . . . . . . . . . . . . . . . 80

            (1)    No Procedural Default. . . . . . . . . . . . . . . . . . 81

            (2)    Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

      b)    Miller's claim that trial counsel was ineffective for
            withdrawing the insanity defense. . . . . . . . . . . . . . . . 83

            (1)    No Procedural Default. . . . . . . . . . . . . . . . . . 84

4

(2)    Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

c)    Miller's claim that trial counsel was ineffective for failing to present mental health evidence during the guilt phase of trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

    (1)    No Procedural Default. . . . . . . . . . . . . . . . . . . . 94

    (2)    Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

d)    Miller's claim that trial counsel's penalty phase opening statement was ineffective. . . . . . . . . . . . . . . . . . . . . . . . 98

    (1)    No Procedural Default. . . . . . . . . . . . . . . . . . . . 98

    (2)    Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

e)    Miller's claim that trial counsel failed to adequately investigate and present mitigation evidence during the penalty phase. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

    (1)    No Procedural Default. . . . . . . . . . . . . . . . . . . 102

    (2)    Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

        (a)    The abuse Miller suffered at the hands of his father. . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

        (b)    Miller's impoverished childhood and exposure to the criminal behavior of his family members. . . . . . . . . . . . . . . . . . . . 105

        (c)    The Miller family history of mental illness. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

        (d)    Miller's good employment history and relationship with his family. . . . . . . . . . . 108

(e)     Miller's behavior prior to the shootings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

(f)     Miller's behavior on the day of the shootings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

(3)     Prejudice analysis. . . . . . . . . . . . . . . . . . . . . 109

4.      Claim B(v): Miller's Claim That Appellate Counsel was Ineffective for Failing to Raise Other Claims of Ineffective Assistance of Trial Counsel . . . . . . . . . . . . . . . . . . . . . . . 118

a)      Trial Counsel's performance during jury voir dire. . . 119

(1)     No Procedural Default. . . . . . . . . . . . . . . . . . . 120

(2)     Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

b)      Failure to object to the admission of testimony and photographs during the guilt phase of trial . . . . . . . . 127

(1)     Procedural Default. . . . . . . . . . . . . . . . . . . . . . 128

(2)     Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

c)      Ineffective cross-examination of crucial prosecution witnesses.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

(1)     Procedural Default. . . . . . . . . . . . . . . . . . . . . . 132

(2)     Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

d)      Failure to object to portions of the state's guilt phase closing argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

(1)     Procedural Default. . . . . . . . . . . . . . . . . . . . . . 135

(2)   Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

e)   Ineffective guilt phase closing argument. . . . . . . . . . 136

(1)   No Procedural Default. . . . . . . . . . . . . . . . . . . 136

(2)   Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

f)   Failure to request jury instructions to protect Miller's rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

(1)   Procedural Default. . . . . . . . . . . . . . . . . . . . . . 141

(2)   Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

g)   Relying on Dr. Scott as the sole mitigation witness during the penalty phase of trial. . . . . . . . . . . . . . . . . . . . . . 144

(1)   No Procedural Default. . . . . . . . . . . . . . . . . . . 145

(2)   Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

h)   Failure to move for a directed verdict during the penalty phase. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

(1)   Procedural Default. . . . . . . . . . . . . . . . . . . . . . 147

(2)   Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

i)   Inadequate penalty phase closing argument. . . . . . . . 151

(1)   Procedural Default. . . . . . . . . . . . . . . . . . . . . . 152

(2)   Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

j)   Failure to object to the court's penalty phase jury instructions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

(1)    Procedural Default. . . . . . . . . . . . . . . . . . . . . . . 160

(2)    Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

k)    Failure to request a special verdict form. . . . . . . . . . 164

(1)    Procedural Default. . . . . . . . . . . . . . . . . . . . . . . 165

(2)    Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

l)    Inadequate representation at the sentencing hearing. . 168

(1)    No Procedural Default. . . . . . . . . . . . . . . . . . . . 169

(2)    Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

m)    Failure to bring the Supreme Court's decision in *Apprendi v. New Jersey* to the trial court's attention. . . . . . . . . . 173

(1)    Procedural Default. . . . . . . . . . . . . . . . . . . . . . . 174

(2)    Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

5.    Claim B(vi): Miller's Claim That Appellate Counsel was Ineffective in the Appeal to the Alabama Court of Criminal Appeals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

a)    Procedural Default. . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

b)    Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

C.    Validity of the Death Sentence. . . . . . . . . . . . . . . . . . . . . . . . . . . 178

VII.    Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

## I.  THE OFFENSE CONDUCT

The Alabama Court of Criminal Appeals provided the following summary of the evidence of the offense when it considered Miller's direct appeal.  The state has adopted this summary for the purpose of answering Miller's petition.  (Doc. 15, at 2).

> The evidence presented at trial tended to establish the following. Around 7:00 a.m. on August 5, 1999, Johnny Cobb arrived at his place of employment, Ferguson Enterprises in Pelham. Cobb, the vice president of operations, recognized several other vehicles in the company's parking lot as belonging to sales manager Scott Yancy and delivery truck drivers Lee Holdbrooks and Alan Miller. As Cobb prepared to enter the building, he heard some loud noises and what sounded like someone screaming. Cobb opened the front door and saw Miller walking toward him. Miller, who was armed with a pistol, pointed the pistol in the general direction of Cobb and stated, "I'm tired of people starting rumors on me." Cobb tried to get Miller to put the pistol down, but Miller told him to get out of his way. Cobb ran out the front door and around the side of the building. Miller then left the building, walked over to his personal truck, and drove away.

> After Cobb heard Miller drive away, he went back inside the building. He saw Christopher Yancy on the floor in the sales office and Lee Holdbrooks on the floor in the hallway. Both men were covered in blood and showed no signs of life. They appeared to have been shot multiple times. Cobb used his cellular telephone to summon the police, who were dispatched at 7:04 a.m. Minutes later, officers from the Pelham Police Department arrived to investigate the shooting.

> After Cobb told the police officers what he had seen, the officers entered the building. There, they found the body of Christopher Yancy slumped to the floor, underneath a desk in the sales office. Lee Holdbrooks was lying face down in the hallway at the end of a bloody "crawl trail," indicating that he had crawled 20-25 feet down the hall in an attempt to escape his assailant. The officers secured the scene and

waited for evidence technicians to arrive. Cobb provided a description of Miller's clothing and the truck he was driving. This description was transmitted to police headquarters and sent out over the police radio by the police dispatcher. Evidence technicians recovered nine .40-caliber shell casings from the scene.

While officers began investigating the crime scene at Ferguson Enterprises, Andy Adderhold was arriving for work at Post Airgas in Pelham. Adderhold, the manager of the Pelham store, arrived shortly after 7:00 a.m. Adderhold entered the office and talked with Terry Jarvis, another employee, for a few minutes before continuing to another office. At this point, Adderhold noticed Miller—a former employee of Post Airgas—enter the building. Miller walked toward the sales counter and called out to Jarvis: "Hey, I hear you've been spreading rumors about me." As Jarvis walked out of his office and walked into the area behind the sales counter, he replied, "I have not." Miller fired several shots at Jarvis. As Jarvis fell to the floor, Adderhold crouched behind the counter. Miller then walked behind the counter and pointed the pistol at Adderhold's face. Adderhold begged for his life. Miller paused, then pointed to a door, and told him to get out. Adderhold stood up and, as he began to move toward the door, heard a sound from Jarvis. When Adderhold paused and looked back at Jarvis, Miller repeated his order to "get out-right now." At this Adderhold left the sales area. As Adderhold was leaving the building, he heard another gunshot. Adderhold proceeded out of the back of the building, climbed over a fence to a neighboring building, where he used someone's cellular telephone to summon the police.

The second emergency call came in to the Pelham Police Department at approximately 7:18 a.m. Upon arrival, officers entered the building housing Post Airgas and found Jarvis's body on the floor behind the sales counter. Jarvis had sustained several gunshot wounds to his chest and abdomen. After securing the scene, officers recovered six .40-caliber spent shell casings from the floor of the sales area. Adderhold was interviewed, and he recounted the events surrounding Jarvis's murder.

After a description of Miller and the vehicle he was driving was transmitted over the police radio, law-enforcement officers combed the area in search of Miller. Pelham police sergeant Stuart Davidson and his partner were patrolling Interstate 65 near Alabaster when word of the second shooting was broadcast. Upon hearing that Miller was still in the vicinity of Pelham, Davidson exited I-65 to head back to Pelham. As Davidson turned back toward Pelham, he spotted a truck matching the description of Miller's entering I-65 from Highway 31 in Alabaster. Davidson radioed for backup and followed the truck south on I-65 into Chilton County. Once additional officers were in place as backup, law-enforcement officers initiated a traffic stop of the truck. Following the traffic stop, officers were able to positively identify the driver as Miller. Miller was ordered to get out of the truck, and he was forcibly subdued and handcuffed after resisting efforts to place him in custody. After placing Miller in the back of a patrol car, officers secured his truck. Inside the truck, they found a Glock brand pistol lying on the driver's seat. The pistol contained 1 round in the chamber and 11 rounds in the magazine. An empty Glock ammunition magazine was found on the passenger seat. Miller was transported to the Pelham Police Department where he was charged with murder.

At trial, the State called various witnesses who testified concerning the events of August 5, 1999. Evidence was also introduced regarding ballistics testing of the spent shell casings found at both murder sites; the testing matched all of the shell casings to the .40-caliber Glock pistol found on Miller. Dr. Stephen Pustilnik, a state medical examiner with the Alabama Department of Forensic Sciences, testified that the cause of death for all three victims was multiple gunshot wounds. Lee Holdbrooks - whose body was found in the hallway - was shot six times in the head and chest; although several of the wounds were nonfatal, one of the head wounds was fired at very close range and would have been immediately incapacitating and fatal. Based on "blood splatter" analysis and the positioning of the body, Dr. Pustilnik concluded that Holdbrooks was turning his head and looking up when the fatal shot was fired.

Scott Yancy was shot three times; one of the shots struck the aorta, which would have caused Yancy to "bleed out" within 15-20 minutes, while another wound would have caused paralysis. At the time he was shot, Yancy was underneath a metal desk; there was no indication that he ever moved from this position.

Terry Jarvis was shot five times; one of the shots struck Jarvis's liver and another his heart. Jarvis had already fallen to the floor when he was shot in the heart. Based on "blood splatter" analysis, Dr. Pustilnik concluded that Miller was standing over Jarvis as he shot him in the heart. Despite the nature of this wound, Jarvis could have lived anywhere from several minutes to 15 minutes after being shot.

*Miller v. State*, 913 So. 2d 1148, 1154-56 (Ala. Crim. App. 2004).

## II. TRIAL: GUILT AND PENALTY PHASES

In August, 1999, a Shelby County Grand Jury indicted Miller on one count of capital murder under § 13A-5-40(a)(10) of the Code of Alabama, for murdering two or more persons by one act or pursuant to one scheme or course of conduct. (C.R. Vol. 1, Tab 1, at 18).[2]  The Circuit Court of Shelby County appointed Mickey L. Johnson and Rodger D. Bass to represent Miller. (C.R. Vol. 1, Tab 1, at 1).

On August 17, 1999, Miller entered pleas of not guilty and not guilty by reason of mental disease or defect. (C.R. Vol. 1, Tab 1, at 1).  Accordingly, the court ordered Miller to undergo a mental evaluation.  (C.R. Vol. 1, Tab 1, at 19).  Miller was

---

[2] References to the record appear as follows: "C.R" refers to the Miller's trial and Motion for New Trial. "R." refers to Miller's direct appeal.  "Rule 32 C.R." refers to the Rule 32 collateral proceedings.  "Rule 32 R." refers to the Appeal of the Rule 32 collateral proceedings.

evaluated by Dr. James Hooper at the Taylor Hardin Secure Medical Facility on October 4, 1999, for the purpose of assessing his competence to stand trial and his mental state at the time of the murders. *Miller v. State*, 99 So. 3d at 379. Dr. Hooper reportedly spent approximately thirty minutes with Miller in conducting his evaluation (Rule 32 C.R. Vol. 33, Tab 59, at 681), ultimately concluding that Miller was competent to stand trial and that he did not meet the legal standard for insanity. (*See* Doc. 47-33 at 47-52). The state subsequently hired Dr. Harry McClaren, a forensic psychologist, to evaluate Miller's competency to stand trial and his mental state at the time of the shooting. *Miller*, 99 So. 3d at 379. In late 1999, Dr. McClaren conducted a three-day evaluation of Miller, concluding that he was competent to stand trial and that he was sane at the time of the crime. (*See* Doc. 47-25 at 29-33; Rule 32 C.R. Vol. 33, Tab 59, at 774-82).

On March 16, 2000, Miller's trial counsel applied for funds to hire an expert psychiatrist and an expert psychologist to assist in Miller's defense. (C.R. Vol. 1, Tab 1, at 50-55). On April 4, 2000, the trial court granted Miller's request. (*Id.* at 57). Trial counsel hired Dr. Charles Scott, a forensic psychiatrist from the University of California Davis, to evaluate Miller's sanity at the time of the shooting. (Doc. 47-31 at 1; R. Vol. 8, Tab 22, at 1343). Dr. Scott began his three-day psychiatric evaluation of Miller in late April of 2000, approximately eight-and-a-half months after the

August 5, 1999 shooting. (*See* Doc. 47-31, at 1-23; R. Vol. 8, Tab 22, at 1347). In conducting his evaluation, Dr. Scott consulted with Dr. Barbara McDermott, a psychologist, who conducted psychological testing on Miller and prepared a report dated May 11, 2000. (Doc. 47-31, at 1-2; R. Vol. 8, Tab 22, at 1346; Rule 32 C.R. Vol. 31, Tab 59, at 316-18). Dr. Scott asked Dr. McDermott to conduct psychological tests focusing on assessing Miller's IQ and to assist Dr. Scott in determining whether Miller was malingering when recollecting what happened on the day of the shooting. (Doc. 47-28, at 15; R. Vol. 8, Tab 22, at 1357-58; Rule 32 C.R. Vol. 31, Tab 59, at 317)[3]. Based on the information provided to Dr. Scott and his independent evaluation of Miller, Dr. Scott determined that Miller was not insane at the time of the shooting. (Doc. 47-31, at 23; R. Vol. 8, Tab 22, at 1383-88; Rule 32 C.R. Vol. 31, Tab 59, at 380).

After receiving the report of Dr. Scott's evaluation, Miller withdrew his insanity plea and entered a simple plea of not guilty on May 24, 2000, less than a month before the scheduled trial. (C.R. Vol. 1, Tab 6, at 66-67). On June 1, 2000, less than two weeks before trial, the court granted Mr. Bass's oral motion to withdraw

---

[3] Dr. McDermott concluded that Miller was not malingering, but was, at the time, suffering from a "Major Depressive Disorder," and throughout his life, had suffered from a "Schizoid Personality Disorder." (Doc. 47-28 at 16).

as defense counsel, and appointed Ronnie Blackwood as co-counsel to Mr. Johnson.[4] (C.R. Vol. 1, Tab 1, at 4).

Miller's trial began as scheduled on June 12, 2000. (C.R. Vol. 1, Tab 7, at 69). Five days later, on June 17, 2000, the jury returned its verdict finding Miller guilty of capital murder as charged in the indictment. (C.R. Vol. 1, Tab 1, at 4, 73). Immediately after the jury returned its guilty verdict, the trial transitioned to the penalty phase. The only aggravating circumstance argued by the state was that the capital offense was "especially heinous, atrocious, or cruel compared to other capital offenses." Ala. Code. § 13A-5-49(8). The state relied largely on the evidence presented during the guilt phase and only introduced victim impact testimony from one survivor of each victim. (R. Vol. 8, Tab 21, at 1335-41).

Trial counsel's penalty phase defense was limited to a single witness, Dr. Scott. (R. Vol. 8, Tab 21, at 1341-1403). Dr. Scott's testimony, although addressing Miller's background, focused on establishing the existence of two mitigating factors. First, Dr. Scott testified that despite his conclusion that Miller was sane at the time of the shootings, he believed Miller's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially

---

[4] Because Mr. Bass withdrew before trial and Mr. Blackwood did not play an active role in the trial, (Rule 32 C.R., Vol. 30, Tab 59, at 111-12), when the court refers to "trial counsel," it refers to Mr. Johnson, unless otherwise specified.

impaired.  (R. Vol. 8, Tab 22, at 1383-91).  Second, Dr. Scott testified that Miller committed the offense while "under the influence of an extreme mental or emotional disturbance."  (R. Vol. 8, Tab 22, at 1391).  The state stipulated to the existence of a third mitigating circumstance – that Miller had no significant prior criminal history.  (R. Vol. 8, Tab 19, at 1317).

At the end of penalty phase, the jury rendered a 10-2 verdict, with ten jurors voting for the death penalty and two voting for life imprisonment without the possibility of parole.  (C.R. Vol. 1, Tab 1, at 73-74).  The verdict form only allowed the jurors to indicate the number of votes for the death sentence and the number of votes for a life sentence.  (C.R. Vol. 1, Tab 1, at 74-75).  The form did not require the jury to indicate the number of jurors who found that the state met its burden of proving an aggravating factor beyond a reasonable doubt, as is now required under *Ex Parte McGriff*, 908 So. 2d 1024, 1039 (Ala. 2004).

## III.  SENTENCING HEARING

At the July 31, 2000 sentencing hearing, the trial court accepted the jury's recommendation and sentenced Miller to death.  (R. Vol 8, Tab 28, at 1453-75).  On August 24, 2000, the court issued its sentencing order.  (C.R. Vol. 43, Tab 71 at 105-

07).[5]  The court determined that three mitigating factors applied in Miller's case: (1) Miller had no significant history of prior criminal activity; (2) Miller committed the crime while "under the influence of extreme mental or emotional disturbance"; and (3) Miller's capacity to "appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired." (*Id*. at 106-07).

Although the only aggravating factor the court found applicable was that the offense was especially heinous, atrocious, or cruel, the court ultimately determined that the defendant "should suffer the punishment of death by electrocution as provided for by law." (*Id*. at 106-07).  The court stated that prior to rendering a decision, it examined the presentence report, Dr. Scott's testimony, and the mental evaluation performed, as well as "a non-statutory mitigating circumstance, Defendant's background and family history . . . includ[ing] but . . . not limited to, that as a child, Defendant moved to a number of locations and had an estranged and difficult relationship with his father." (*Id*. at 107).

## IV. PROCEDURAL HISTORY

On July 31, 2000, the same day Miller was sentenced to death, the trial court appointed William R. Hill to represent Miller on direct appeal.  (C.R. Vol. 1, Tab 1,

---

[5] The court also issued separate written findings of fact from the evidence and testimony presented during the trial phase and the punishment phase of the trial.  (*Id*. at 98-104).

17

at 90).  Later, on August, 2, 2000, the court appointed Haran Lowe as co-counsel for Miller.

## A.      Motion for a New Trial

Appellate counsel immediately filed a motion for the state to provide a transcript of the trial record because appellate counsel did not witness the trial proceedings and could not "adequately represent the Defendant in his Motion for New Trial or on appeal without a transcription of the trial record." (*Id*. at 91).  On August 3, 2000, Miller moved for a new trial based solely on the ground that the verdict was "contrary to law and the weight of the evidence." (*Id*. at 93).  On August 25, 2000, Miller filed an amendment to the motion for new trial, outlining twenty-five new grounds for relief.  (*Id*. at 95-97).  Although appellate counsel did not yet have the trial transcript, ground 24 of the amended motion for new trial alleged that Miller's "due process rights under the United States and Alabama Constitution were denied because his trial counsel was ineffective." (*Id*. at 96).

The hearing on the motion for a new trial was originally scheduled to take place on September 5, 2000.  (*Id*. at 108).  However, because the trial transcript was not yet available, appellate counsel moved on August 30, 2000, to continue the hearing until after the transcript had been prepared.  (*Id*. at 108-09).  The court

granted the motion, ultimately holding a two-day hearing on the motion for new trial on December 7, 2000, and January 31, 2001. (C.R. Vol. 1, Tab 1, at 7A-7B).

Miller's trial counsel, Mickey Johnson, was the sole witness on December 7, 2000. (C.R. Vol. 9, Tab 30, at 1-110). On January 31, 2001, Miller elicited testimony from Dr. Bob Wendorf, a clinical psychologist, and Aaron McCall from the Alabama Prison Project. (C.R. Vol. 9, Tab 31, at 111-176). Dr. Wendorf testified regarding the sufficiency of Dr. Scott's testimony during Miller's penalty phase. (*Id*. at 111-56). Mr. McCall testified to the role and availability of mitigation expert assistance in capital cases. (*Id*. at 157-74). After the hearing, the court gave the parties the opportunity to brief the issues discussed at the hearing. (*Id*. at 175-76). On February 13, 2001, Miller filed a brief supporting his motion for new trial, arguing in support of his ineffective assistance of counsel claims. (C.R. Vol. 1, Tab 1, at 114-25). The state filed a reply brief on February 20, 2001. (*Id*. at 126-31). On February 21, 2001, the court summarily denied the motion for new trial without entering a written order or making specific findings of fact regarding the evidence presented during the hearing. (*Id*. at 7B).

## B.    Direct Appeal

On May 7, 2001, Miller filed his appellate brief in the Alabama Court of Criminal Appeals. (R. Vol. 16, Tab 32). The state filed its brief on June 26, 2001.

(R. Vol. 16, Tab 33).  On June 24, 2002, while Miller's direct appeal was pending, the United States Supreme Court issued its decision in *Ring v. Arizona*, 536 U.S. 584 (2002).  In *Ring*, the Court held that an Arizona statute allowing a trial judge – acting alone – to determine the presence or absence of an aggravating factor required to impose the death penalty, violated a defendant's Sixth Amendment right to a jury trial.  Miller and the state each filed supplemental briefs on August 15, 2002, addressing the impact of *Ring* on Miller's death sentence.  (R. Vol. 16, Tabs 34 and 35).

On January 6, 2004, the Alabama Court of Criminal Appeals remanded the case for the trial court to "make specific written findings of fact as to the claims that Miller raised during the hearing on his motion for a new trial," and to "correct its sentencing order and make specific findings of fact regarding the existence of the aggravating circumstance that this offense was especially heinous, atrocious, or cruel when compared to other capital offenses."  *Miller v. State*, 913 So. 2d 1148, 1153 (Ala. Crim. App. 2004).  The trial court made the required findings and denied the

ineffective assistance of trial counsel claims as meritless.[6]  (R. Vol. 43, Tab 72, at 1-23).

On October 29, 2004, on return to remand, the Alabama Court of Criminal Appeals affirmed the trial court's sentencing decision. *Miller*, 913 So. 2d at 1154-71. Miller's application for rehearing (R. Vol. 16, Tab 37) was denied by the Alabama Court of Criminal Appeals on January 7, 2005, and his petition for writ of certiorari (R. Vol. 17, Tab 38) was denied by the Alabama Supreme Court on May 27, 2005. *Miller*, 913 So. 3d 1148.  The United States Supreme Court likewise denied certiorari on January 9, 2006.  *Miller v. Alabama*, 546 U.S. 1097 (2006).

## C.     Rule 32 Proceedings in Shelby County Circuit Court

Having exhausted his appeals and obtained a final conviction, Miller obtained new counsel and timely filed a petition under Rule 32 of the Alabama Rules of Criminal Procedure on May 19, 2006.  (Rule 32 C.R. Vol. 19, Tab 44, at 1-93). Miller's Rule 32 petition alleged ineffective assistance of trial counsel, ineffective assistance of appellate counsel, and various violations of Miller's constitutional

---

[6] The trial court addressed each of the eight ineffective assistance of counsel claims Miller alleged individually: that trial counsel (1) admitted Miller's guilt during his guilt phase opening remarks; (2) failed to present an insanity defense during the guilt phase of trial; (3) failed to move for a change of venue; (4) failed to present a defense during the guilt phase of trial; (5) undermined the mitigation case during his penalty phase opening argument; (6) failed to object to victim impact testimony during the penalty phase; (7) failed to adequately investigate and present a penalty phase defense; and (8) failed to challenge the constitutionality of the heinous, atrocious, or cruel aggravating circumstance.  (C.R. Vol. 43, Tab 72, at 9-10).

rights. (*Id*.).  The state answered Miller's petition on August 18, 2006, arguing that

the ineffective assistance of trial counsel claims were barred from review and all of

Miller's claims should be rejected on the merits.  (Rule 32 C.R. Vol. 19, Tab 45, at

1-34, Rule 32 C.R. Vol. 20, at 35-59).  On April 4, 2007, Miller filed his First

Amended Petition, responding to some of the state's criticisms of his original petition.

(Rule 32 C.R. Vol. 20, Tab 46, at 1-100).  On April 18, 2007, the state answered

Miller's amended petition and moved to dismiss his claims.  (Rule 32 C.R. Vol. 23,

Tab 49, at 1-75).  On June 25, 2007, the trial court held a hearing on the state's

motion to dismiss and some outstanding discovery disputes.  (Rule 32. C.R. Vol. 36,

Tab 62, at 1-83, Rule 32 C.R. Vol. 37, at 84-104).

On July 31, 2007, the court issued a preliminary ruling on Miller's Rule 32

petition, summarily dismissing his ineffective assistance of trial counsel claim, his

claim that his death sentence violated *Ring v. Arizona*, 536 U.S. 584 (2002), and his

claim that lethal injection is unconstitutional.  (Rule 32 C.R. Vol. 25, Tab 55, at 1327-

28).  In its order, the trial court also held that Miller's *Brady* and juror misconduct

claims had not been pleaded with specificity, and ordered that they be summarily

dismissed unless Miller amended the claims with sufficient specificity, within sixty

days.  (*Id*. at 1328). The parties were allowed to conduct discovery prior to an

evidentiary hearing on Miller's claim of ineffective assistance of appellate counsel. (*Id*. at 1328-29).

The trial court held the evidentiary hearing on February 11-14, 2008, then continued and completed the hearing on August 6, 2008. (Rule 32 C.R. Vols. 29-34, Tab 59, at 1-892; Rule 32 C.R. Vol. 34, Tab 60, at 1-107). Following the hearing, both parties submitted extensive briefing to the court.[7] On May 5, 2009, the trial court issued its final order denying Miller's Amended 32 Petition and summarily dismissing all of Miller's claims with the exception of his claim that he was denied effective assistance of appellate counsel. (Rule 32 C.R. Vols. 28-29, Tab 58, at 1951-2107). As to the ineffective assistance of appellate counsel claim, the court considered the evidence presented at the evidentiary hearing and denied relief on the merits. (*Id*. at 1973-2107).

The court adopted the state's proposed order, which was itself almost a verbatim copy of the state's post Rule 32 hearing response brief. (*Compare* Rule 32 C.R. Vols. 27-28, Tab 57, at 1702-1800 (state's post Rule 32 hearing response brief), *and* Rule 32 C.R. Vol. 35, at 29-185 (state's proposed order), *with* Rule 32 C.R. Vols.

---

[7] On October 9, 2008, Miller filed a post-hearing brief in support of his First Amended Petition for Relief from Judgment pursuant to Rule 32 of the Alabama Rules of Criminal Procedure. (Rule 32 C.R. Vols. 26-27, Tab 56, at 1520-1695). The state filed its response to Miller's brief on December 8, 2008. (Rule 32 C.R. Vols. 27-28, Tab 57, at 1702-1800). On February 10, 2009, Miller filed his reply brief. (Rule 32 C.R. Vol. 28, Tab 58, at 1895-1950).

28–29, Tab 58, at 1951–2107 (Rule 32 court's Final Judgment)).  On May 18, 2009,

Miller objected to the court's adoption of the state's proposed final order denying

Rule 32 relief.  (Rule 32 C.R. Vol. 29, at 2108).  On June 4, 2009, the court denied

the objection, pointing out that it had authority to adopt a proposed order in whole.

(*Id*. at 2117).

Miller appealed both the final order denying Rule 32 relief, and the order

denying his objection to adopting the proposed order nearly verbatim.  (*Id*. at 2119;

Rule 32 R. Vol. 38, Tab 63).  The Alabama Court of Criminal Appeals denied his

appeal on July 8, 2011. *Miller v. State*, 99 So. 3d 349 (Ala. Crim. App. 2011). Miller

subsequently filed an application for rehearing on August 17, 2011 (Rule 32 R. Vol.

40, Tab 66), which was denied by the Alabama Court of Criminal Appeals on October

21, 2011. *Miller*, 99 So. 3d 349.

On November 30, 2011, Miller filed a petition for a writ of certiorari in the

Alabama Supreme Court, challenging the appellate court's rejection of his claim

regarding the verbatim adoption of the state's proposed order, and his claim that he

was denied effective assistance of counsel on direct appeal. (Rule 32 R. Vols. 40-42,

Tab 67). After initially granting review on Miller's first claim, the Alabama Supreme

Court quashed the writ and denied certiorari on his second claim on June 22, 2012.

*Miller*, 99 So. 3d 349; *see also* Rule 32 R. Vol. 43, Tab 77.

# V. LEGAL STANDARD

"The habeas statute unambiguously provides that a federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or law or treaties of the United States.'" *Wilson v. Corcoran*, 526 U.S. 1, 5 (2010) (quoting 28 U.S.C. § 2254(a)).  As such, this court's review of claims seeking habeas relief is limited to questions of federal constitutional and statutory law.  Claims that turn solely upon state law principles fall outside the ambit of this court's authority to provide relief under § 2254.  *See Alston v. Dep't of Corr.*, 610 F. 3d 1318, 1326 (11th Cir. 2010).

## A.   Exhaustion of State Court Remedies:  The First Condition Precedent to Federal Habeas Review

A habeas petitioner must present his federal claims to the state court, and exhaust all of the procedures available in the state court system, before seeking relief in federal court.  28 U.S.C. § 2254(b)(1);  *Medellin v. Dretke*, 544 U.S. 660, 666 (2005) (holding that a petitioner "can seek federal habeas relief only on claims that have been exhausted in state court").  This requirement serves the purpose of ensuring that state courts are afforded the first opportunity to address federal questions affecting the validity of state court convictions and, if necessary, correct violations

of a state prisoner's federal constitutional rights.  *Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998).

In determining whether a claim is properly exhausted, the Supreme Court has stated that "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 5-6 (1982) (citations omitted).  Instead, "an issue is exhausted if 'the reasonable reader would understand [the] claim's particular legal basis and specific factual foundation' to be the same as it was presented in state court."  *Pope v. Sec'y for Dep't Of Corr.*, 680 F.3d 1271, 1286-87 (11th Cir. 2012) (quoting *Kelley v. Sec'y, Dep't of Corr.*, 377 F.3d 1317, 1344-45 (11th Cir. 2004)).

## B.  The Procedural Default Doctrine: The Second Condition Precedent to Federal Habeas Review

Under the procedural default doctrine, federal review of a habeas petitioner's claim is barred if the last state court to examine the claim states clearly and explicitly that the claim is barred because the petitioner failed to follow state procedural rules, *and* that procedural bar provides an adequate and independent state ground for denying relief.  *See Cone v. Bell,* 556 U.S. 449, 465 (2009); *Coleman v. Thompson*, 501 U.S. 722, 731 (1991).   The Supreme Court defines an "adequate and independent" state court decision as one that "rests on a state law ground that is

26

*independent* of the federal question and *adequate* to support the judgment." *Lee v. Kemna,* 534 U.S. 362, 375 (2002) (quoting *Coleman v. Thompson,* 501 U.S. 722, 729 (1991)).

To be considered "independent," the state court's decision "must rest solidly on state law grounds, and may not be 'intertwined with an interpretation of federal law.'" *Judd v. Haley,* 250 F.3d 1308, 1313 (11th Cir. 2001) (quoting *Card v. Dugger*, 911 F.2d 1494, 1516 (11th Cir. 1990)). To be considered "adequate" to support the state court's judgment, the state procedural rule must be both "firmly established and regularly followed." *Lee v. Kemna,* 534 U.S. at 375 (quoting *James v. Kentucky*, 466 U.S. 341, 348 (1984)).

## C.   Overcoming procedural default: The Cause and Prejudice Analysis

"A federal court may still address the merits of a procedurally defaulted claim if the petitioner can show cause for the default *and* actual prejudice resulting from the alleged constitutional violation." *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010) (citing *Wainwright v. Sykes*, 433 U.S. 72, 84-85 (1977)) (emphasis added). The Supreme Court has recognized that constitutionally ineffective assistance of counsel on direct appeal can constitute "cause" to excuse procedural default. *McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991). However, any attorney error short of

27

constitutionally ineffective assistance of counsel does not constitute cause, and will not excuse a procedural default.  *Id.*

In addition to proving the existence of "cause" for a procedural default, a habeas petitioner must show that he was actually "prejudiced" by the alleged constitutional violation.  To show prejudice, a petitioner must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and *substantial* disadvantage, infecting his entire trial with error of constitutional dimensions."  *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis added); *see also McCoy v. Newsome*, 953 F.2d 1252, 1261 (11th Cir. 1992) (*per curiam*).  In the context of a defaulted ineffective assistance of trial counsel claim, a petitioner must show not only "cause," but also "that the underlying ineffective assistance of trial counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit."  *Martinez v. Ryan*, 132 S. Ct. 1309, 1318-19 (2012).

**D.    The Statutory Overlay:  The Effect of "the Antiterrorism and Effective Death Penalty Act of 1996" on Habeas Review**

Miller's case is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  To "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to

the extent possible under the law," the AEDPA establishes a deferential standard of review of state habeas judgments. *Bell v. Cone*, 535 U.S. 685, 693 (2002).

**1.    Title 28 U.S.C. § 2254(e)(1)**

Section 2254(e)(1) requires district courts to *presume* that a state court's factual determinations are correct, unless the habeas petitioner rebuts the presumption of correctness with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *see also*, *e.g., Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001) (observing that § 2254(e)(1) provides "a highly deferential standard of review for factual determinations made by a state court"). The deference that attends state court findings of fact pursuant to § 2254(e)(1) applies to all habeas claims, regardless of their procedural stance. Thus, a presumption of correctness must be afforded to a state court's factual findings, even when the habeas claim is being examined *de novo*. *See Mansfield v. Secretary, Department of Corrections*, 679 F.3d 1301, 1313 (11th Cir. 2012).

**2.    28 U.S.C. § 2254(d)**

The presumption of correctness also applies to habeas claims that were adjudicated on the merits by the state court and, therefore, are claims subject to the standards of review set out in 28 U.S.C. § 2254(d)(1) or (d)(2). "By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court,

subject only to the exceptions in §§ 2254(d)(1) and (d)(2)."  *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

The provisions of 28 U.S.C. § 2254(d)(1) and (d)(2) provide that when a state court has made a decision on a petitioner's constitutional claim, habeas relief cannot be granted, unless the federal court determines that the state court's adjudication of the claim *either*:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; *or*
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added).

The Supreme Court has explained the deferential review of a state court's findings:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

The court should remember that "an *unreasonable* application of federal law is different from an *incorrect* application." *Id.* at 410. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law *erroneously* or *incorrectly*. Rather, that application must also be *unreasonable*." *Id.* at 411 (emphasis added).[8] To demonstrate that a state court's application of clearly established federal law was "objectively unreasonable," the habeas petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law *beyond any possibility for fairminded disagreement*." *Harrington v. Richter*, 562 U.S. at 786-87 (emphasis added).

---

[8] The Eleventh Circuit has observed that § 2254(d)(1)'s "unreasonable application" provision is the proper statutory lens for viewing the "run-of-the-mill state-court decision applying the correct legal rule." *Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006).

> In other words, if the state court identified the correct legal principle but unreasonably applied it to the facts of a petitioner's case, then the federal court should look to § 2254(d)(1)'s "unreasonable application" clause for guidance. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was *objectively* unreasonable."

*Id.* (quoting *Williams*, 529 U.S. at 409).

### E.    An Introduction to Ineffective Assistance of Counsel Claims

An introduction to ineffective assistance of counsel claims is included here because of the relationship between such claims – which are governed by a highly deferential standard of constitutional law – and 28 U.S.C. § 2254(d), which is itself an extremely deferential standard of review.  Additionally, because the majority of Miller's petition is based on allegations of ineffective assistance of counsel, a general discussion also provides a central reference point.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-pronged analysis for determining whether counsel's performance was ineffective.  "First, the defendant must show that counsel's performance was deficient. . . .   Second, the defendant must show that the deficient performance prejudiced the defense." *Id*. at 687.  Both parts of the *Strickland* standard must be satisfied: that is, a habeas petitioner bears the burden of proving, by "a preponderance of competent evidence," that the performance of his trial or appellate attorney was *deficient*; *and*, that the deficient performance *prejudiced his defense. Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (*en banc*).  Thus, a federal court is not required to address both parts of the *Strickland* standard when the habeas petitioner makes an insufficient showing on either one of the prongs.  *See*, *e.g*., *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the

32

test must be satisfied to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.") (citation to *Strickland* omitted).

### 1.    The performance prong

To satisfy the performance prong, the petitioner must "prove by a preponderance of the evidence that counsel's performance was unreasonable." *Stewart v. Secretary, Department of Corrections*, 476 F.3d 1193, 1209 (11th Cir. 2007) (citing *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000)).  The Sixth Amendment does not guarantee a defendant the very best counsel or the most skilled attorney, but only an attorney who performed reasonably well within the broad range of professional norms.  *Stewart*, 476 F.3d at 1209.  "The test has nothing to do with what the best lawyers would have done.  Nor is the test even what most good lawyers would have done.  We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial."  *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992).  Judicial scrutiny of counsel's performance must be highly deferential, because "[r]epresentation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another."  *Strickland*, 466 U.S. at 693.

Indeed, reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689. "Based on this strong presumption of competent assistance, the petitioner's burden of persuasion is a heavy one: '*petitioner must establish that no competent counsel would have taken the action that his counsel did take*.'" *Stewart*, 476 F.3d at 1209 (quoting *Chandler*, 218 F.3d at 1315) (emphasis added). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds *unless it is shown that no reasonable lawyer*, *in the circumstances*, *would have done so*." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994) (emphasis added).

## 2.    The prejudice prong

"A petitioner's burden of establishing that his lawyer's deficient performance prejudiced his case is also high." *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1322 (11th Cir. 2002). "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. (quoting *Strickland*, 466 U.S. at 693) (alteration in original). Instead, to prove prejudice, the habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine

34

confidence in the outcome." *Strickland*, 466 U.S. at 694. "[W]hen a petitioner

challenges a death sentence, 'the question is whether there is a reasonable probability

that, absent the errors, the sentencer . . . would have concluded that the balance of

aggravating and mitigating circumstances did not warrant death.'" *Stewart*, 476 F.3d

1193, 1209 (11th Cir. 2007) (quoting *Strickland*, 466 U.S. at 695). The standard is

high, and to satisfy it, a petitioner must present "proof of '"unprofessional errors" so

egregious "that the trial was rendered unfair and the verdict rendered suspect."'"

*Johnson v. Alabama*, 256 F.3d 1156, 1177 (11th Cir. 2001) (quoting *Eddmonds v.*

*Peters*, 93 F.3d 1307, 1313 (7th Cir. 1996)).

**3**.    **Deference accorded state court findings of historical fact, and decisions on the merits, when evaluating ineffective assistance of counsel claims**

A reviewing court must give state court findings of historical fact made in the

course of evaluating a claim of ineffective assistance of counsel a presumption of

correctness under 28 U.S.C. §§ 2254(d)(2) and (e)(1). *See, e.g.*, *Thompson v. Haley*,

255 F.3d 1292, 1297 (11th Cir. 2001). To overcome a state court finding of fact, the

petitioner bears a burden of proving contrary facts by clear and convincing evidence.

Additionally, under the AEDPA, a federal habeas court may grant relief based

on a claim of ineffective assistance of counsel *only if* the state court determination

involved an "unreasonable application" of the *Strickland* standard to the facts of the

case. *Strickland* itself, of course, also requires an assessment of whether counsel's conduct was professionally unreasonable. Those two assessments cannot be conflated into one. *See Harrington v. Richter,* 562 U.S. 86, 101-02. Thus, habeas relief on a claim of ineffective assistance of counsel can be granted with respect to a claim actually decided by the state courts *only if* the habeas court determines that it was "objectively unreasonable" for the state courts to find that counsel's conduct was not "professionally unreasonable." "The standards created by *Strickland* and § 2254(d) are 'highly deferential,' . . . and when the two apply in tandem, review is 'doubly' so." *Id*. at 105.

## VI. MILLER'S CLAIMS

Miller's habeas petition alleges the following grounds for relief:

A.    Ineffective Assistance of Trial Counsel

       i.    Failure to Conduct an Adequate Investigation and Failure to Uncover Mitigating Evidence

          a.    Impoverished and Unstable Upbringing

          b.    Miller Family History of Mental Illnesses

          c.    Physical and Emotional Abuse by Miller's Father

          d.    Exposure to Criminal and Antisocial Behavior of Family Members

36

      e.      Miller's Good Employment History

      f.       Loving Relationships with Family Members

      g.      Changes in Miller's Behavior Prior to the Shootings

      h.      Behavior in Connection with Shootings at Ferguson Enterprises and Post Airgas

ii.      Counsel Sabotaged the Work of the Defense Psychiatric Expert, Dr. Scott, then withdrew Miller's Insanity Defense

iii.      Failure to Investigate or Develop Mitigating Evidence Following the Withdrawal of the Insanity Defense

iv.      Failure to Conduct Adequate Voir Dire

v.      Failure to Give an Effective Opening Statement

vi.      Deficient Performance During the Presentation of the State's Guilt Phase Evidence

vii.      Failure to Present Available Mental Health Evidence During the Guilt Phase

viii.      Failure to Object to Improper Statements in the State's Guilt Phase Closing Argument

ix.      Effectively Conceding Miller's Guilt During the Guilt Phase Closing Argument

      x.     Failure to Request Appropriate Guilt Phase Jury Instructions

      xi.    Failure to Prepare for the Penalty Phase until the Last Minute

      xii.   Failure to Present an Effective Opening Statement During the Penalty Phase

      xiii.  Failure to Present Readily Available Mitigating Evidence during the Penalty Phase

      iv.    Failure to Adequately Argue the Directed Verdict Motion at the End of the Penalty Phase

      xv.    Ineffective Closing Argument in the Penalty Phase

      xvi.   Failure to Object to Improper Penalty Phase Jury Instructions

      xvii.  Failure to Request a Special Verdict Form to Establish that the Jury had Unanimously Found the Sole Alleged Aggravating Circumstance

      xviii. Deficient Performance at the Sentencing Hearing

B.    Ineffective Assistance of Appellate Counsel

      i.     Presentation of the Issue of Trial Counsel's Ineffectiveness in the Motion for New Trial, Precluded Miller from Raising the Issue in His Rule 32 Proceedings

      ii.    Failure to Conduct an Adequate Investigation into the Ineffective Assistance of Counsel at Trial

iii.   Failure to Present Evidence at the Hearing on the Motion for New Trial Establishing the Prejudice He Suffered as a Result of Trial Counsel's Ineffectiveness

iv.   Deficient Arguments to the Trial Court in Support of the Few Aspects of Trial Counsel Ineffectiveness Counsel Had Identified

v.[9]   Failure to Raise and Argue in the Motion for New Trial, the Many Other Ways Trial Counsel Ineffectively Represented Miller

    a.   Failure to Conduct Adequate Voir Dire (Claim A(iv))

    b.   Failure to Object to the Admission of Irrelevant and Prejudicial Testimony and Photographs During the Guilt Phase (Claim A(vi))

    c.   Failure to Effectively Cross-examine Crucial Prosecution Witnesses (Claim A(vi))

    d.   Failure to Object to Misleading Portions of the State's Guilt Phase Closing Argument (Claim A(viii))

    e.   Failure to Make an Effective Guilt Phase Closing Argument (Claim A(ix))

    f.   Failure to Request Appropriate Guilt Phase Jury Instructions (Claim A(x))

---

[9] The petitioner incorrectly numbered this claim in the petition as claim B(iv).

39

g.    Ineffective Reliance on Dr. Scott as the Sole Mitigation Witness During the Penalty Phase (Claim A(xiii))

h.    Failure to Adequately Argue the Directed Verdict Motion at the End of the Penalty Phase (Claim A(xiv))

i.    Ineffective Closing Argument in the Penalty Phase (Claim A(xv))

j.    Failure to Object to Improper Penalty Phase Jury Instructions (Claim A(xvi))

k.    Failure to Request a Special Verdict Form to Establish that the Jury had Unanimously Found the Sole Alleged Aggravating Circumstance (Claim A(xvii))

l.    Failure to Offer Evidence, Call Witnesses or Arrange for Anyone to Appear on Miller's Behalf at the Sentencing Hearing (Claim A(xviii))

m.    Failure to Argue at the Sentencing Hearing That Pursuant to *Apprendi v. New Jersey*, 530 U.S. 466 (2000), Miller Was Entitled to a New Penalty Phase Trial Before a Jury That Was Not Advised That its Decision with Respect to the Aggravating Factor Was Merely a "Recommendation" (Claim A(xviii))

vi.    Ineffective Assistance of Counsel on Appeal to the Alabama Court of Criminal Appeals

C.[10]   Miller's Death Sentence Violates the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution

## A.   MILLER'S INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL CLAIMS

Miller's ineffective assistance of trial counsel claims can be divided into three distinct categories.  First, Miller presents claims that were properly exhausted before the Alabama state courts on direct appeal.  Second, Miller presents claims that he raised for the first time on collateral appeal.  Finally, Miller presents claims that he failed to raise before the state courts on either direct appeal or collateral appeal.  This court will address each group of claims in turn.

### 1.   Claims Raised and Exhausted On Direct Appeal

Five of Miller's ineffective assistance of trial counsel claims are properly before this court because he fully exhausted the claims on direct appeal.  Miller asserted these claims before the trial court in his motion for new trial.  The court conducted a hearing on these claims and subsequently denied all of the claims on the merits.  (C.R. Vol. 43, Tab 72).  Miller then appealed to the Alabama Court of Criminal Appeals, which upheld the lower court's determination. *Miller*, 913 So. 2d 1148.  Finally, Miller sought review of these claims before the Alabama Supreme Court, which denied certiorari.  *Id.*  Because these claims were fully exhausted on

---

[10]   The petitioner numbered this claim in the petition as claim II.

direct appeal, this court will review the state court's determination under AEDPA deference. *See Wilwording v. Swenson*, 404 U.S. 249, 250 (1971) (recognizing that a petitioner need only present a claim through a single state proceeding to properly exhaust it).

In reviewing the state court's decision, this court is limited to consideration of the record as it was before the state court on direct review. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1400 (2011) ("If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court."). Miller presented a large amount of evidence at the Rule 32 hearings, and Miller's habeas petition relies heavily on this evidence. Nevertheless, this court must limit its review of Miller's fully exhausted ineffective assistance of *trial* counsel claims to the record before the state court on *direct appeal*.[11]

---

[11] For Miller to prevail on an ineffective assistance of *appellate* counsel claim, he must demonstrate that his underlying ineffective assistance of trial counsel claims have merit. Because the state court reviewed Miller's ineffective assistance of *appellate* counsel claims on *collateral appeal*, this court will consider the fully developed record that was before the Rule 32 court in reviewing Mr. Miller's ineffective assistance of *appellate* counsel claims. Further, because review of Mr. Miller's ineffective assistance of *appellate* counsel claims will require this court to review his underlying ineffective assistance of *trial* counsel claims, the court will then review Miller's ineffective assistance of *trial* counsel claims in light of the record before the Rule 32 court.

a)   **Claim A(ii):  Miller's  Claim  That  Trial  Counsel  Was
Ineffective  For  Sabotaging  the  Work  of  the  Defense
Psychiatric  Expert  and  For  Withdrawing  the  Plea  of  Not
Guilty by Reason of Mental Disease or Defect**

Within this claim, Miller combines two different instances in which he alleges

trial counsel was ineffective.  First, Miller alleges that trial counsel was ineffective

for failing to provide sufficient evidence to the defense psychiatric expert, Dr. Scott,

to allow Dr. Scott to determine whether Miller was sane at the time of the shootings.

(Doc. 1, at 48-66).  Second, Miller alleges that trial counsel was ineffective for

subsequently withdrawing Miller's insanity defense.  (*Id*. at 66).

On direct appeal, Miller only asserted that trial counsel, Mickey Johnson, was

ineffective for withdrawing Miller's insanity defense and did not allege that trial

counsel was ineffective for failing to provide specific documents to defense expert,

Dr. Scott.  (C.R. Vol. 16, Tab 32, at 20-21).  Not until collateral appeal did Miller add

within this claim, the argument that trial counsel should have provided additional

information to Dr. Scott.  (Rule 32 C.R. Vol. 19, Tab 44, at 38-41).  Because Miller

failed to argue on direct appeal that trial counsel was ineffective for failing to provide

documents to Dr. Scott, this portion of the claim is procedurally defaulted.[12]  *See*

---

[12] Alternatively, this court finds this claim due to be denied on the merits.  This court will
address the underlying merits of the claim in connection with Miller's ineffective assistance of
appellate counsel claims.  *See* Part VI(B).

*Baldwin v. Johnson*, 152 F.3d 1304, 1311 (11th Cir. 1998) ("A habeas corpus petitioner may not present instances of ineffective assistance of counsel in his federal petition that the state court has not evaluated previously."); *Hunt v. Commissioner, Ala. Dep't of Corr.*, 666 F.3d 708, 730–31 (11th Cir.2012) (holding that "[t]o satisfy the exhaustion requirement, petitioners must present their claims to the state courts such that the reasonable reader would understand each claim's particular legal basis and specific factual foundation"); *Johnson v. Alabama*, 256 F.3d 1156, 1170 (11th Cir. 2001).

To the extent that Miller did raise this claim on direct appeal, this court finds that the state court's rejection of the claim was reasonable under *Strickland*. In addressing this claim, the Alabama Court of Criminal Appeals found that:

> Johnson met with Miller on a number of occasions before trial. Before forming a strategy for Miller's case, Johnson reviewed all of the investigative reports, diagrams, statements, photographs, videotapes, and scientific reports; he also talked with his client. Johnson filed a motion requesting funds for an independent psychological evaluation of Miller. The trial court granted his motion, and Johnson retained Dr. Charles Scott from the University of California to evaluate Miller. After talking with Dr. Scott and reviewing Dr. Scott's written report, Johnson determined that there was insufficient evidence to raise an insanity defense during the guilt phase. In his opinion, it was better to present Dr. Scott's testimony at the penalty phase because presenting his testimony during the guilt phase would have negated Dr. Scott's credibility and lessened the impact of the evidence during the penalty phase. Johnson made this decision after reviewing the reports from other

44

mental-health evaluations of Miller, which were consistent with Dr. Scott's findings.

After reviewing the evidence, Johnson made a strategic decision to concentrate his efforts and defense on the penalty phase of the trial. In his opinion, the State's evidence of Miller's guilt "was too overwhelming to seriously contest," given that he had no valid legal defense for the guilt phase. Accordingly, Johnson decided to concentrate on saving Miller's life.

Johnson focused his efforts during the guilt phase on maintaining credibility with the jury. In accordance with this strategy, he admitted to the jury early on in the proceedings that the evidence of Miller's guilt was strong because he wanted to lessen the impact of the evidence against Miller. Johnson felt that his duty during the guilt phase was to make the State meet its burden of proof.

*Miller*, 913 So. 2d at 1159-60.  The court determined that trial counsel's decision to withdraw the insanity defense was a "well-reasoned decision," part of a strategy to spare Miller's life, made after a "thorough investigation of the relevant law and facts of Miller's case." *Id*. at 1161.

Miller fails to meet his heavy burden of proving that his trial counsel performed unreasonably by pursuing this strategy.  On the record before the state court, the strategic choices made by trial counsel were reasonable and constitutionally adequate in the circumstances.  In preparation for Miller's trial, counsel hired Dr. Scott to conduct an evaluation of Miller to determine whether Miller was legally insane at the time of the murders.  (C.R. Vol. 9, Tab 30, at  17-18).  After evaluating

Miller, Dr. Scott concluded that Miller did not meet the definition of insanity under Alabama law. (C.R. Vol. 9, Tab 30, at 28-29). Trial counsel also reviewed the reports of a state psychologist and state psychiatrist, both of which were consistent with Dr. Scott's determination. (C.R. Vol. 9, Tab 30, at 93-94). Given that no mental health expert determined Miller to meet the definition of insanity, trial counsel's decision to withdraw the insanity defense was reasonable. *See Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) ("[T]his court has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success."). Likewise, the state court's determination that trial counsel was not ineffective for withdrawing the insanity defense was also reasonable.

### b)   Claim A(v): Miller's Claim That Trial Counsel Was Ineffective In His Guilt phase Opening Statement

Miller alleges that trial counsel was ineffective in his opening statement and "did little more than act as a second prosecutor." (Doc. 1, at 78). Specifically, Miller alleges that trial counsel was ineffective because he failed to challenge the facts as presented by the state and failed to present any defense theory to the jury. (*Id*. at 78-80; Doc 22, at 152-53). Miller also claims that trial counsel encouraged the jury to feel contempt for Miller by describing the killings as "brutal" and "inhumane." (Doc. 1, at 80).

In his opening statement, trial counsel said:

We are at a part of a process here that the law says is necessary. We all, at this point, have been assigned responsibilities. My responsibility and Mr. Blackwood's responsibility is to make sure that in this case, as in any other case, that we keep the burdens where the law says the burdens belong, that we challenge any evidence or any statement that is made that we think is wrong.

Our responsibility, however, is not – and is not ever the responsibility of a lawyer to do things frivolous. And we will not do that in this case.

Since August the 5th of 1999, I have probably had dozens, if not hundreds, of cameras and microphones and tape recorders stuck in my face asking me what happened here, I guess presumably on the theory that I would disclose something that would make all of this seem logical.

I have not said anything that makes this seem logical and reasonable because I don't know anything. You won't hear anything coming from the defense that makes this seem logical and reasonable. To present anything in that regard would be frivolous. We will not engage in frivolity.

The responsibility that Mr. Blackwood and I have we accept and we will do what our responsibility is, but we will not do anything frivolous. That would be irresponsible.

I will not offer you any evidence in this case that would make this act seem any less brutal and any less inhumane than it was. If you want to know what happened in this case, I think you just got a pretty good recitation of what happened in this case. I think [the prosecutor] got most of it right. Some of it seems to me to be a little embellished, but so what. Fundamentally, you heard what happened.

47

Now, the most serious responsibility in this case is placed on you. And you have gone through the process of jury selection and you are the ones who survived the process of jury selection.

And you did not survive because you don't have opinions about this case. You would be – it would be unnatural, from what most of you have seen and heard, not to have an opinion in this case. You survived because you have said we will not let our opinions affect the responsibility that is placed on us in this case.

The responsibility that is placed on you in this case will be an awesome one, but I suggest this to you, at the end of this case – you will have to make at least two decisions in this case that places more responsibility on you than I will ever have in any case I will ever stand for in a courtroom.

But at the end, if you accept your responsibility in the same way I – that everyone else, not just me, that everyone else in this courtroom is accepting theirs, then at the end of this, when this is all over, you will be proud. You won't be ashamed, you will be proud of at least what you have done.

I don't expect that at any point in this case you will ever be anything but ashamed of what happened that caused us to be here.  I'm not going to ask – for me to suggest anything to the contrary would be frivolous.  You won't see anything frivolous done in this case.

You will see a lot of meaningful things, though, presented to you. There will be a lot of meaningful evidence and a lot of meaningful arguments made to you. The only thing I ask at this point is that you accept your responsibility as jurors and then we will all be proud that we participated in this.  Thank you.

(R. Vol. 5, Tab 10, at 813-16).

In reviewing trial counsel's opening statement, the Alabama Court of Criminal Appeals found that trial counsel "focused his efforts during the guilt phase on maintaining credibility with the jury," strategically "admitt[ing] to the jury early on in the proceedings that the evidence of Miller's guilt was strong because he wanted to lessen the impact of the evidence against Miller." *Miller*, 913 So. 3d at 1159.  The court described this strategy as "well-reasoned." *Id.* at 1161.

After reviewing the record, this court finds the state court's determination reasonable under *Strickland*.  Trial counsel faced the significant challenge of defending a client who had murdered three individuals at two different locations, was observed by eye-witnesses at both locations, and was determined to be sane by every expert who examined him.  Under the circumstances, trial counsel's decision to acknowledge the evidence against his client to save credibility for the penalty phase does not constitute deficient performance.  *See Parker v. Head*, 244 F.3d 831, 840 (11th Cir. 2001) (recognizing that counsel's strategic decision to concede the defendant's guilt during opening statement to maintain credibility with the jury was reasonable in light of the substantial evidence against the defendant); *Florida v. Nixon*, 543 U.S. 175, 191-92 (2004) (recognizing that in light of substantial evidence of guilt in a capital trial, "counsel cannot be deemed ineffective for attempting to

49

impress the jury with his candor and his unwillingness to engage in 'a useless charade'").

Additionally, even if trial counsel's opening statement was unreasonable, Miller cannot show prejudice. In view of the entire record, Miller has not shown a reasonable probability that trial counsel's opening statement affected the jury's guilty verdict. *See United States v. Hatcher*, 541 F. App'x 951, 953 (11th Cir. 2013) (holding that a petitioner's ineffective assistance claim failed because petitioner failed to prove prejudice in light of overwhelming evidence of guilt). The evidence of Miller's guilt is simply overwhelming. One eye-witness saw Miller with a pistol at the location where the bodies of the first two victims were discovered. At the second location, an eye-witness saw Miller shoot the third victim. Finally, police found a firearm in Miller's truck that matched the spent shell casings found at the crime scenes. In light of the strong evidence of his guilt, Miller cannot establish any prejudice resulting from trial counsel's opening statement.

Miller fails to demonstrate that the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law *or* that it resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in the state

court proceedings.  *See* 28 U.S.C. § 2254(d).  Thus, Miller is not entitled to habeas relief on this claim.

> **c)  Claim A(vi): Miller's Claim That Trial Counsel Was Ineffective During The Presentation of The State's Guilt phase Evidence**

Within this claim, Miller asserts two different instances in which he alleges trial counsel was ineffective.  First, Miller alleges that counsel was ineffective for failing to object to the admission of crime scene photographs as well as to  testimony from state experts Dr. Stephen Pustilnik and Dr. Angello Della Manna.  (Doc. 1, at 81).  Miller alleges that such evidence was irrelevant, inadmissible and "served no purpose other than to inflame the jury against Mr. Miller." (*Id*. at 81).  Second, Miller alleges that his trial attorney failed to adequately cross-examine numerous state witnesses.  (*Id*. at 80-87)

In his motion for new trial and on direct appeal, Miller raised only the claim that trial counsel was ineffective for failing to effectively cross-examine the state's witnesses.  (R. Vol. 16, Tab 32, at 22-23).  Miller's direct appeal briefs contain no mention of trial counsel's failure to object to any of the state's evidence.  Therefore,

to the extent that Miller asserts that his trial counsel was ineffective for failing to object to the state's evidence, this court finds the claim procedurally barred.[13]  *See Johnson v. Alabama*, 256 F.3d 1156, 1170 (11th Cir. 2001).

Turning then to Miller's contention that trial counsel was ineffective for failing to adequately cross-examine the state's witnesses, this court finds that the state court's rejection of this claim was reasonable under *Strickland*.  In rejecting the claim, the Alabama Court of Criminal Appeals stated that trial counsel realized that the evidence of guilt in Miller's case was "too overwhelming to seriously contest,"  and therefore, trial counsel made the strategic decision to concede guilt early on and focus on the penalty phase of trial. *Miller*, 913 So. 3d at 1159-61.   The court's determinations are supported by the record.  Additionally, even assuming that trial counsel was ineffective in his cross-examination of the State's witnesses, the claim is due to be denied because he has not shown a reasonable probability that the outcome of the proceeding would have been different if trial counsel had conducted a more thorough cross-examination.  The evidence leaves no doubt of Miller's guilt in the case.  *See United States v. Hatcher*, 541 Fed. App'x 951, 953 (11th Cir. 2013).

---

[13] Alternatively, this court finds this claim due to be denied on the merits.  This court will address the underlying merits of the claim in connection with Miller's ineffective assistance of appellate counsel claims.  *See* Part VI(B).

Therefore, the state court's rejection of this claim was reasonable, and Miller is not entitled to habeas relief on this claim.

> **d)   Claim A(vii): Miller's Claim That Trial Counsel was Ineffective for Failing to Present Mental Health Evidence During the Guilt Phase**

Miller claims that trial counsel was ineffective for failing to present evidence during the guilt phase to allow the jury to convict Miller of anything less than capital murder.  (Doc. 1, at 87-90).  The capital murder offense with which Miller was charged required the jury to find that Miller had the specific intent to cause the death of at least two of his three victims pursuant to one scheme or course of conduct.  Ala. Code § 13A-3-1.  Miller contends that his trial counsel should have called Dr. Scott to testify that Miller suffered from a severe mental illness that prevented him from appreciating the nature and quality of his actions during the first two shootings.[14] (Doc. 1, at 87-88).  Miller argues that Dr. Scott's testimony could have shown that Miller lacked the specific intent to cause the death of at least two of his three victims. (*Id*. at 88).

---

[14] Dr. Scott stated in his report that, "It is also my opinion that at the moment of the first shooting, Mr. Miller may not have appreciated the nature and quality of his actions as he expressed that he suddenly found himself shooting without the intention of doing so." (Doc. 47-31, at 22).  Dr. Scott's report also stated that Miller heard "noises" and experienced tunnel vision at the time of the first two shootings.  (*Id*. at 9-10).

The Alabama Court of Criminal Appeals rejected this claim, finding that Miller failed to show that trial counsel was ineffective for failing to present a guilt phase defense, and finding that Miller suffered no resulting prejudice. *Miller*, 913 So. 3d at 1161. For the reasons discussed below, the state court's rejection of this claim is reasonable.

A review of the record shows that trial counsel chose not to present the testimony of Dr. Scott or challenge the *mens rea* element of the murders for sound strategic reasons. During the hearing on the motion for new trial, Miller asked trial counsel why he did not present Dr. Scott's testimony during the guilt phase of trial:

Q.   Let me ask you this. Was there a particular reason why you decided to introduce Dr. Scott's testimony only in the mitigation phase and not in the trial in chief?

A.   Yes, sir.

Q.   Why is that?

A.   Actually I discussed it with Dr. Scott as to what my thinking was. What my thinking was was that I did not want him to lose his credibility in the guilt phase when I did not think that that testimony would have any particular bearing at that point in time. If the jury heard it in the guilt phase at a time when I believed that the evidence would have been pretty much conclusory at that point, then I thought it would have lost its impact for whatever benefit I could get out of it in the sentencing phase.

(C.R. Vol. 9, at 21).

Based on these concerns, as well as the strong evidence that the shootings were part of a single course of conduct, Miller's trial counsel chose to forego a guilt phase defense to focus on saving Miller's life during the penalty phase. As recognized by the Alabama Court of Criminal Appeals, this decision was "made only after a thorough investigation of the relevant law and facts of Miller's case." *Miller*, 913 So. 3d at 1161. The Supreme Court has recognized this exact type of strategic trial decision to be "virtually unchallengeable." *Strickland*, 466 U.S. at 690-91. Because Miller has failed to show that no reasonable attorney would have chosen to defer Dr. Scott's testimony to the penalty phase of trial, Miller cannot show that his trial counsel's performance was deficient in this regard.

Miller also fails to show that he suffered prejudice as a result of trial counsel's decision to not present mental health evidence during the guilt phase. Significant evidence shows that Miller intended to commit at least two of the three murders pursuant to a single course of conduct. Miller specifically sought out Christopher Yancy and Lee Holdbrooks and shot them multiple times. He then drove to a second location where he specifically sought out Terry Jarvis and shot him multiple times. A reasonable jurist could conclude that a different outcome of the trial was not a reasonable probability had trial counsel argued that Miller lacked the *mens rea* for

capital murder.   Therefore, the state court's rejection of this claim was not an unreasonable application of *Strickland*.

      e)     **Claim A(xii): Miller's Claim that Trial Counsel Denied Miller Effective Assistance in His Penalty phase Opening Statement**

Miller next alleges that trial counsel failed to present an effective penalty phase opening statement by failing to present a coherent preview of the mitigation case, undermining Dr. Scott's credibility, and effectively conceding the aggravating circumstance required for Miller to be eligible for the death penalty.  (Doc. 1, at 96). In support of his argument, Miller points to trial counsel's statement made in response to the state's query regarding what was in Miller's heart at the time of the shooting: "I think I can answer what was in Mr. Miller's heart . . . the overwhelming desire to take a life, that's what was in Alan Miller's heart. R 1232." (Doc. 22, at 158).  Miller also faults trial counsel for stating that Miller "believed in the death penalty," despite the lack of evidence to support this assertion.  (*Id*. at 159).  Finally, Miller argues that trial counsel described Miller as "atrocious" and "vile" by telling the jurors he wanted them to "be able to say . . . what my vote meant was no matter what anybody does, no matter how vial [sic] they are, they don't deserve to die. R 1332." (Doc. 22, at 160).

Trial counsel offered the following opening statement in the penalty phase:

Ladies and gentlemen, let me see if I can help the state in one respect and that is I think I can answer what was in Mr. Miller's heart. Same thing that this kind of impassion the argument was designed to put in your heart and that is the desire, the overwhelming desire to take a life, that's what was in Alan Miller's heart.

I don't think we need any experts up here to tell us that, I think every one of you will come to that conclusion and it would be a very logical one.

But there are a couple of words that have been used here too that I just want to talk about briefly. First one being, first question that was posed is what is justice?

Well, I really think that there is only one way to get real justice out of this and that would be the taking Alan Miller's life would restore those other three, that would be real justice. And if you had - - if there was some option, some verdict form that could be given to you that would bring that back, make that happen, then I would sit here and beg you to sign that and not even go back to the room before you did, that all twelve of you do that and if you needed thirteen, I would sign it with you because that would be real justice. Anything else that comes out of this case is going to be imperfect justice.

Mr. Bostick talked about mercy. Now, there is no secret to you that the State of Alabama is asking you to recommend that the state take the life of Alan Miller.

I am asking you to recommend that the state not take his life, that is not mercy because I will never stand here and define merciful with locking someone up in a cage for the rest of their life. I see nothing merciful about that. This is not about mercy. It's about some form of imperfect justice that we have in our - - in the wisdom of those minds that we have elected to send to our legislatures, they have decided that this is our system of justice.

Now, it is no great surprise to me what your verdict was going to be in this case, but still when I hear it it hurts me, shocks me because your verdict is already decided, you have already decided by your verdict that Mr. Miller will die in prison.  It's just a question now of whose hands will it be at, will it be at your hands or at the hands of someone who I think wants to withhold - - to keep those decisions for themselves.

So that's the decision that you have to make now, not whether Mr. Miller dies in prison because he will, you've already - - you've dictated that by your verdict.

What we have now, though, is that part of the trial that has been what this trial has been about from the start, and that is what do we do about this man, what do we do in our service here for an imperfect justice.

And at this point we will be a little more active than we have been until now.  We will put on a witness, Dr. Scott, who is a psychiatrist.  Dr. Scott was employed to be perfectly frank with you in the hope that he would find that Alan Miller met the legal definition of being insane, because had he done that, and had we been able to prevail, none of this would have happened, he wouldn't be dying in prison, that's why he was brought here.

But Dr. Scott enjoys a very good reputation of being thorough and being objective.  And despite what I know his efforts were to try to get there, he couldn't, he just couldn't be objective about it.

Because of that - - but he did learn a lot of things and this is where this case rests at this point and that is, why did all of this happen and what meaning can we make of any of this?

And Alan Miller has shared with Dr. Scott and he will share with you what was on his mind that day and he will tell you that despite all of these things that were on his mind and despite the rather significant emotional and psychological problems that disturb Alan Miller, he

wasn't insane but he was suffering from a personality disorder and that personality disorder is one that the law recognizes not as a defense to doing what Alan Miller did, there is no defense to that, but as a mitigating circumstance.

Now, Mr. Bostick challenged me to explain to you why this was not atrocious, especially atrocious, cruel, heinous and I really don't - - I mean, I will accept that challenge by saying this, I've never seen a murder that wasn't.  And I don't think that Mr. Bostick or any prosecutor that I have ever known has ever stood up in a trial where their job was to prosecute someone who murdered someone and say, well, this one is not too bad; as murders go, this one is on the light side. You're not going to see that in any case.  Murder is just not that way.

What you have been failed - - or what you have failed to be informed of at this point is, that in a capital sentence, the type of exceptional cruelty, heinousness, atrocity that we're talking about is something that goes above and beyond those facts which simply amount to capital murder.  Because we continue here to strain in trying to reach some balance, we continue to strain, we're trying to quantify which type of murder is heinous, which type - - I guess contrary that, well, which type is just okay, as if there is such a thing.  I don't even know how you explain all of that.  I don't know how the law explains that in all honesty.

Nonetheless, we sit here with this to face in our system of justice. If anyone, Alan Miller or anyone else, had shot one of these victims on Monday, come back the next day and for a completely different reason shot another one, and come back the next day and for a completely different reason shot another one, we wouldn't be in this part of the trial because that wouldn't be capital murder.

Now, somebody explain to me what sense that makes.  Somebody explain to me you leave the same number of victims out there, the same number of victims' families out there but by some definition of justice those victims and those families don't deserve the same treatment.

So I am saying that any effort we make to quantify what is atrocious and cruel and heinous is a folie, it all leaves.

What Dr. Scott will tell you, though, is that on August the 5th and probably for many years prior to August the 5th that Alan Miller was just a tortured soul. You've heard the testimony about Alan Miller's belief, and I think Dr. Scott's opinion will be that to a great extent Alan Miller's belief was on perceived events and probably not even real events, but you will hear him talk about how Alan believed and you've heard the testimony that people were spreading rumors about him, people were picking on him, that type of thing. Because of that belief, whether it's a fact or not, it was a belief, and based on that belief his tortured soul took the lives of three people that day.

And this is - - this is where - - I don't know any other fact that demonstrates the falling [sic] of this part of the law in this, if Alan Miller were not sitting at that table right there, it's been stated that Alan Miller had been called here like he might have been on August the 4th of last year to be a juror because he would have been the state's ideal pick. He would have been the foreman of a capital murder jury because he believed in the death penalty. He just decided that he couldn't impose it.

And we can labor all we want to in this courtroom, he'd be ideal, because that's the right that is reserved to the state and I will reject that today, I reject it out, I will reject if for the rest of my life. I don't believe that that is a decision that can be made by anyone and still justify a value system that we want everybody out there to have. We want our children to have it. But more than that, we want everybody else's children to have it because if all children had that, we wouldn't see children killing other children, it would just make no sense.

Because a couple of years ago I would have been - - I know how all of you feel about the death penalty because we asked questions about it and you answered the questions about it.

60

A couple of years ago I would have been one of those that said I was strongly in favor of that and I would not be sitting here today saying things that I'm saying. But today I am opposed to it and not because I'm representing Alan Miller, it wasn't that at all, it hasn't been this event that caused me to change my mind. It is because I come to the realization of something when I watched children killing children because they were tortured souls.

And there is one fundamental notion that is necessary to explain what all of this is about and that is that we all, there are always going to be people out there, always going to be tortured souls out there who agree with the notion that the death penalty is appropriate. And we can sit here and try to make - - define that to a sophisticated system, if we want to, but we won't. Unless we live in a world where everyone has one value in their value system and that is no matter how atrocious, no matter how vial [sic] a person is, they don't deserve to die, they deserve to live.

As long as we attempt to try to quantify the way that you will have to try to quantify in your deliberations whether this is a person who deserves to live, then we will always have that. We can't eliminate that idea from our system of values. We can't eliminate it from our national conscience, it seems to me. And we can believe that, well, it might work out fine if we could confine it to a courtroom but we can't.

So we will put on one witness. We'll put on Dr. Scott who will take you through, and I think you will find his testimony most interesting because of the openness of which Alan talked to him about what was on his mind, about why. And I just know you've got to be sitting here in puzzlement like I am, how can something like this happen.

Well, explanation is not a justification, is not an excuse, it's not to arouse sympathy for Alan Miller. It is to try to explain to you that yes, there are tortured souls out there that believe in the death penalty and they are willing everyday to administer that somebody does not satisfy their definition of a good person. Once you cross that line of

61

being violent, once you cross that line of being mean and cruel, then it's time to invoke the death penalty.

And at the end I will ask you to consider that your verdict would be most meaningful in this case. And you're on stage, you know that. The media is out here. When you get through, they will probably want to ask you questions and you can answer their questions, if you want to, of whatever your verdict is.

But the question that you will have - - in my heart of hearts I believe the only question that really matters that you will have to answer is to your children or your grandchildren what did you do, what did your vote say, not what you selectively do as a jury but what you, every one of you, what your vote meant.

And I want you to be able to say and this is what I'm asking you to say, to go home and you say, what my vote meant was no matter what anybody does, no matter how vial [sic] they are, they don't deserve to die. And that I suggest to you is what this part of the case is about and what this case have been about from the start.

Thank you very much.

(R. Vol. 8, Tab 20, at 1323-34).

In denying this claim, the Alabama Court of Criminal Appeals stated:

We have reviewed trial counsel's opening statement in its entirety. Consistent with counsel's trial strategy - as testified to during the hearing on Miller's new-trial motion - counsel elected to acknowledge Dr. Scott's conclusion that there was no basis under Alabama law to support an insanity defense in an effort to retain his credibility before the jury and to secure an advisory verdict of life imprisonment without parole, rather than the death sentence. Given the overwhelming evidence of Miller's guilt-including eyewitness testimony identifying Miller as the shooter - counsel had little choice but to acknowledge Miller's guilt. Accordingly, counsel attempted to gain the jury's sympathy by using Dr.

Scott's testimony to portray Miller as a "tortured soul" whose delusions drove him to commit a series of horrific acts. Indeed, our review of counsel's argument reveals it to be an impassioned plea that the jury spare Miller's life.

*Miller*, 913 So. 3d at 1162-63.

This court finds that, although trial counsel's opening statement may not have been perfect, a reasonable jurist could conclude that trial counsel's statement was not professionally unreasonable.   In his opening statement, trial counsel argued the absence of any good reason for the jury to recommend the death penalty in Miller's case.   Trial counsel pointed out that taking Miller's life could not bring back the lives of any of the three victims and that the jury, by finding Miller guilty, had already sentenced Miller to life in prison.   (R. Vol. 8, Tab 20, at 1323-26).   Trial counsel then argued that, regardless of what the jury might think of Miller personally, he did not deserve the death penalty.   (R. Vol. 8, Tab 20, at 1327-32).   Finally, trial counsel previewed Dr. Scott's testimony and stated that, although Dr. Scott was hired by the defense to determine whether Miller was sane, Dr. Scott ultimately concluded that Miller did not meet the definition of insanity under Alabama law.   (*Id*. at 1332-33). Although some of trial counsel's statements seem odd when viewed individually, the statements are reasonable when placed in the context of trial counsel's entire statement.   *See Harvey v. Warden*, *Union Corr. Inst.*, 629 F.3d 1228, 1253 (11th Cir.

2011) (holding that counsel's individual statements were not unreasonable when placed in context).

Having reviewed the transcript, this court finds that a reasonable jurist could conclude that trial counsel's penalty phase opening statement was not unreasonable. Additionally, this court concludes that given the brutal nature of this crime, a reasonable jurist could conclude that the outcome of the penalty phase would not have been different but for trial counsel's statement. Therefore, Miller fails to demonstrate that the state court's adjudication of this claim was unreasonable.

### 2.    Claims Raised For the First Time On Collateral Appeal

Miller raised eleven of his ineffective assistance of trial counsel claims for the first time on collateral review. In reviewing these claims, the Rule 32 court determined that the claims were procedurally barred under Rule 32.2(a) of the Alabama Rules of Criminal Procedure because Miller could have raised the claims on direct appeal but failed to do so. (C.R. Vol. 43, Tab 75, at 1968-70). Miller abandoned the claims on appeal from the denial of his Rule 32 petition, never raising them in the appellate courts.

Federal review of a habeas petitioner's claim is barred by the procedural default doctrine if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar. *Harris v. Reed*, 489 U.S. 255, 263 (1989).

Because the Rule 32 court was the last state court to address these claims and because it determined that the claims were procedurally barred under Rule 32.2(a), this court finds the claims are barred from federal habeas review.[15]  *See Brownlee v. Haley*, 306 F.3d 1043, 1065–66 (11th Cir. 2002) (holding that Rule 32.2(a) of the Alabama Rules of Criminal Procedure is an independent and adequate state law ground); *Borden v. Allen*, 646 F.3d 785, 814 (11th Cir. 2011).

With this backdrop, the court finds the following of Miller's ineffective assistance of trial counsel claims are procedurally barred:

1.    Claim A(i): Miller's Claim That Trial Counsel Failed to Conduct an Adequate Investigation and Failed to Uncover Evidence That Would Have Led the Jury to Find Him not Guilty of Capital Murder or Would Have led the Trial Court to Sentence Him to Life Without Parole

2.    Claim A(iv): Miller's Claim That Trial Counsel Was Ineffective During Jury Voir Dire.

---

[15] Miller argues in his reply brief that the Alabama Court of Criminal Appeals addressed Miller's ineffective assistance of trial counsel claims on the merits, and, therefore, the claims are not procedurally barred. (Doc. 22, at 100-01). However, this argument lacks merit. The Alabama Court of Criminal Appeals examined Miller's ineffective assistance of trial counsel claims, but did so for the limited purpose of reviewing Miller's ineffective assistance of appellate counsel claims. (Rule 32 C.R. Vol. 38, Tab 63, at 1-148). The Alabama Court of Criminal Appeals never addressed Miller's trial counsel claims independently because Miller abandoned his ineffective assistance of trial counsel claims following the Rule 32 court's determination that the claims were procedurally barred. Miller only raised claims of ineffective assistance of *appellate* counsel in his brief to the Alabama Court of Criminal Appeals. (Rule 32 C.R. Vol. 38, Tab 63, at 1-148). Therefore, the Rule 32 court was the last court to address these claims, and that court's express invocation of a state procedural bar is sufficient to preclude habeas review. *See Johnson v. Singletary*, 938 F.2d 1166, 1173 (11th Cir. 1991). Additionally, as will be discussed in connection with Miller's ineffective assistance of appellate counsel claims, these ineffective assistance of trial counsel claims would be due to be denied on the merits even if they were not procedurally barred.

3.      Claim A(viii): Miller's Claim That Trial Counsel was Ineffective for Failing to Object to Improper Statements Made in the State's Guilt phase Closing Argument

4.      Claim A(ix): Miller's Claim That Trial Counsel was Ineffective During the Guilt phase Closing Arguments

5.      Claim A(x): Miller's Claim That Trial Counsel was Ineffective During the Guilt phase Closing Arguments

6.      Claim A(xi): Miller's Claim That Trial Counsel was Ineffective in Preparing for the Penalty Phase

7.      Claim A(xiii): Miller's Claim that Trial Counsel Failed to Present Readily Available Evidence During the Penalty Phase

8.      Claim A(xv): Miller's Claim that Trial Counsel was Ineffective during Penalty phase Closing Arguments

9.      Claim A(xvi): Miller's Claim that Trial Counsel was Ineffective for Failing to Object to Improper Penalty phase Jury Instructions

10.     Claim A(xvii): Miller's Claim that Trial Counsel was Ineffective for Failing to Request a Special Verdict Form

11.     Claim A(xviii): Miller's Claim that Trial Counsel was Ineffective in Connection with the Sentencing Hearing

Miller argues in his reply brief that the procedural default is excused because his appellate counsel's performance constitutes cause and prejudice.  (Doc. 22, at 101–04); *see Fortenberry v. Haley*, 297 F.3d 1213, 1222 (11th Cir. 2002) ("A petitioner can establish cause by showing that a procedural default was caused by constitutionally ineffective assistance of counsel under *Strickland v. Washington*, 466

U.S. 668, 690 . . . (1984).").  However, as will be discussed in Part VI(B), Miller does

not have any meritorious ineffective assistance of appellate counsel claims.

Therefore, he cannot show cause and prejudice to excuse the procedural default.[16]

Alternatively, these ineffective assistance of trial counsel claims would be due to be

denied, notwithstanding the procedural bar, because the claims lack merit.[17]

### 3.    Claims Raised For the First Time Before This Court

Miller asserts two ineffective assistance of trial counsel claims in his petition

that he failed to raise either on direct or collateral appeal.  Miller's failure to present

these claims to the state courts precludes Miller from now raising these claims for the

first time before this court.  *See Footman v. Singletary*, 978 F.2d 1207, 1211 (11th

Cir. 1992) ("[A] habeas petitioner may not present instances of ineffective assistance

of counsel in his federal petition that the state court has not evaluated previously.").

---

[16] Analysis of Miller's ineffective assistance of appellate counsel claims will be identical to the cause and prejudice analysis.  To determine whether Miller is correct that cause and prejudice exists, this court must determine whether appellate counsel's performance was ineffective.  *Payne v. Allen*, 539 F.3d 1297, 1314 (11th Cir. 2008).  To determine whether appellate counsel was ineffective in raising issues concerning trial counsel's performance, this court must determine whether Miller's ineffective assistance of trial counsel claims are meritorious.  *Id.*  Thus, this court's review, whether for the purposes of establishing cause and prejudice or for the purpose of analyzing Miller's independent ineffective assistance of appellate counsel claims, ultimately turns on whether Miller's underlying ineffective assistance of trial counsel claims are meritorious.  *Id.*  Because the review will be the same, this court will not address the cause and prejudice analysis at this time but, instead, will do so in connection with Miller's ineffective assistance of appellate counsel claims. *See* Part VI(B).

[17] *See* Part VI(B).

This court finds the following of Miller's claims to be procedurally barred for failure to exhaust them:

1.    Claim A(iii): Miller's Claim That Trial Counsel Was Ineffective For Failing to Investigate or Develop Mitigation Evidence Following the Withdrawal of the Insanity Defense

2.    Claim A(xiv): Miller's Claim that Trial Counsel was Ineffective in Connection with His Penalty phase Directed Verdict Motion[18]

Although these claims are procedurally barred, this court will nevertheless address the underlying merits of these claims below, in connection with Miller's ineffective assistance of appellate counsel claims.

## B.    MILLER'S INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL CLAIMS

Before reviewing Miller's ineffective assistance of appellate counsel claims, this court will address Miller's contention that the determinations of the Alabama Court of Criminal Appeals in the Rule 32 proceeding do not deserve deference under the AEDPA because the decision does not constitute an adjudication on the merits. (Doc. 22, at 104-05). Miller asserts that the decision of the Alabama Court of Appeals was not an adjudication on the merits because the court adopted large

---

[18] In his brief to the Alabama Court of Criminal Appeals on collateral appeal, Miller argued that *appellate counsel* was ineffective for failing to raise this claim. (Rule 32 R. Vol. 38, Tab 63, at 139-42). However, Miller never presented this claim as an independent ineffective assistance of trial counsel claim before any of the state courts. Thus, the claim is not exhausted.

portions of the Rule 32 court's opinion, which was itself, almost a verbatim adoption of the state's proposed order. (*Id.* at 104). However, the Eleventh Circuit has held that a state court's verbatim adoption of a state's proposed order is an "adjudication on the merits" and is entitled to AEDPA deference when both the petitioner and the State had an opportunity to present their version of facts to the court. *See Jones v. GDCP Warden,* 746 F.3d 1170, 1183–84 (11th Cir. 2014) ("Considering that a summary disposition of a *Strickland* claim qualifies as an adjudication on the merits, . . . , we can discern no basis for saying that a state court's fuller explanation of its reasons – albeit reasons drafted for the court by the State – is not entitled to AEDPA deference."); *Brownlee v. Haley*, 306 F.3d 1043, 1067 n.19 (11th Cir. 2002) (upholding the use of proposed orders adopted verbatim by trial judges "as long as they were adopted after adequate evidentiary proceedings and are fully supported by the evidence") (citations omitted); *Rhodes v. Hall*, 582 F.3d 1273, 1281-82 (11th Cir. 2009).

In the case at hand, the determinations of the Rule 32 court were made after conducting multiple days of hearings and allowing the parties to submit extensive briefing on all of Miller's claims. Likewise, the determinations of the Alabama Court of Criminal Appeals were made after each party submitted extensive briefing. Therefore, the Alabama Court of Criminal Appeals' determinations are entitled to

AEDPA deference.  Having concluded that the determinations of the state court are entitled to deference, this court turns to the applicable standard of review for Miller's ineffective assistance of appellate counsel claims.

Claims of ineffective assistance of appellate counsel are analyzed under the same *Strickland* standard that is applicable to ineffective assistance of trial counsel claims. *Johnson v. Alabama*, 256 F.3d 1156, 1188 (11th Cir. 2001).  To show entitlement to relief for his ineffective assistance of appellate counsel claims, Miller must demonstrate both that appellate counsel performed deficiently and that the deficient performance resulted in prejudice.  *Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991).  To demonstrate prejudice, Miller must show a reasonable probability that, but for his appellate counsel's performance, Miller would have prevailed on appeal.  *See Smith v. Robbins*, 528 U.S. 259, 285 (2000).  To demonstrate a reasonable probability that Miller would have prevailed on appeal, he must demonstrate that at least one of his ineffective assistance of trial counsel claims is meritorious.  *See Payne v. Allen*, 539 F.3d 1297, 1314-15 (11th Cir. 2008) ("[T]o determine whether [petitioner] has shown ineffective appellate counsel, we must determine whether [petitioner] has shown underlying meritorious ineffective-trial-counsel claims.").  Because Miller's ineffective assistance of appellate counsel claims require this court to determine whether Miller's ineffective assistance of trial counsel

claims are meritorious, much of this court's review will focus on Miller's ineffective assistance of trial counsel claims.  With this introduction, the court turns to Miller's ineffective assistance of appellate counsel claims.

1. **Claim B(i): Miller's Claim that Appellate Counsel was Ineffective for Raising the Issue of Ineffective Assistance of Trial Counsel In the Motion for New Trial**

Miller claims that appellate counsel acted unreasonably by presenting Miller's ineffective assistance of trial counsel claims in motion for new trial, thereby precluding counsel from raising those ineffective assistance of trial counsel claims before the Rule 32 court.  (Doc. 1, at 124-28).  Miller argues that under the Alabama Supreme Court decision in *Ex parte Ingram*, 675 So. 2d 863 (Ala. 1996), the proper procedure for presenting claims of ineffective assistance of trial counsel for review was to present the claims on collateral review.  Miller alleges that as a result of appellate counsel's decision to raise the ineffective assistance of trial counsel claims at the motion for new trial stage, the claims were found to be procedurally barred under Ala. R. Crim. P. 32.2(a)(2) and (a)(4) at the Rule 32 proceeding.  (Doc. 1, at 126-27).  Miller contends that appellate counsel's decision was especially egregious given the fact that appellate counsel did not have a copy of the trial transcript when they raised the issue of trial counsel's ineffectiveness.  (*Id*. at 125).

### a)    No Procedural Default

Respondent contends that this claim is procedurally defaulted because Miller did not raise the claim in his Rule 32 petition. (Doc. 16, at 63). However, as Respondent concedes, the Alabama Court of Criminal Appeals addressed the merits of the claim because the "claim was addressed in the evidentiary hearing and in the circuit court's order denying the petition." *Miller v. State*, 99 So. 3d 349, 362-66 (Ala. Crim. App. 2011). Because the Alabama Court of Criminal Appeals did not rely on a state procedural bar in addressing this claim, but addressed this claim on the underlying merits, the claim is not procedurally defaulted. This court will review the Alabama Court of Criminal Appeals' decision under AEDPA deference. *See Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001).

### b)    Merits

The last state court to issue a reasoned opinion on this claim was the Alabama Court of Criminal Appeals, which found that appellate counsel could properly assert the ineffective assistance of trial counsel claims on direct appeal. *Miller v. State*, 99 So. 3d 349, 362-66 (Ala. Crim. App. 2011). The court pointed to Rule 32.2(d) of the Alabama Rules of Criminal Procedure, which states that "[a]ny claim that counsel was ineffective must be raised as soon as practicable, either at trial, on direct appeal, or in the first Rule 32 petition, whichever is applicable." *Id*. at 363. The court also

concluded that regardless of whether appellate counsel's performance was defective, Miller suffered no prejudice because none of his ineffective assistance of trial counsel claims was meritorious. *Id*. at 365. Because this court finds that Miller did not suffer any prejudice, this court will not address whether appellate counsel performed unreasonably by raising the ineffective assistance of trial counsel claims at the motion for new trial stage. *See Duren v. Hopper*, 161 F.3d 655, 660 (11th Cir. 1998) ("[I]f a defendant cannot satisfy the prejudice prong, the court need not address the performance prong.").

Although the Rule 32 court found that Miller's claims of ineffective assistance of trial counsel were procedurally barred, the court nevertheless heard evidence regarding trial counsel's performance because Miller incorporated all of his ineffective assistance of trial counsel claims into his ineffective assistance of appellate counsel claims. Indeed, the majority of the evidence presented at the Rule 32 hearing was related to trial counsel's performance. After hearing evidence regarding the trial counsel claims, the court reviewed and denied all of Miller's trial counsel claims for the purpose of establishing that Miller was not prejudiced by his appellate counsel's performance.

Because Miller had the opportunity to present evidence related to the ineffective assistance of trial counsel claims, and because the Rule 32 court reviewed

Miller's ineffective assistance of trial counsel claims and found the claims to be without merit, Miller suffered no prejudice. Whether the Rule 32 court denied the trial counsel claims in connection with Miller's appellate counsel claims or denied the trial counsel claims outright, the result of the proceeding would have been the same – Miller's appeal would have been denied. Thus, Miller suffered no prejudice and is not entitled to *habeas* relief on this claim.

2.    **Claim B(ii & iii): Miller's Claim That Appellate Counsel Was Ineffective for Failing to Conduct an Adequate Investigation Concerning the Ineffective Assistance Miller Received from Trial Counsel AND Failing to Present Sufficient Evidence During the Hearing on the Motion for New Trial to Establish That Miller Suffered Prejudice as a Result of Trial Counsel's Performance**[19]

Miller contends that appellate counsel, having raised the issue of ineffective assistance of trial counsel during the motion for new trial, was ineffective in investigating and presenting the ineffective assistance of trial counsel claims.[20] (Doc.

---

[19] Miller's brief to the Alabama Court of Criminal Appeals did not discuss appellate counsel's presentation at the hearing, but the court nevertheless addressed the issue because it was raised before the Rule 32 Circuit Court. (C.R. Vol 43, Tab. 76, at 21–22). Miller now separates appellate counsel's investigation and presentation into two separate claims, Claim (B)(ii) and Claim (B)(iii). Because the state court's decision does not lend itself to piecemeal review and the analysis of the claims is similar, this court will address the two claims together.

[20] Miller alleges that appellate counsel was deficient in the following ways: (1) appellate counsel only spent one hour with Miller prior to the hearing on the motion for new trial; (2) appellate counsel did not conduct sufficient legal research to prepare for the case; (3) appellate counsel did not interview trial counsel or any of Miller's family or friends and thus did not learn of possible mitigating evidence that trial counsel failed to present at trial; (4) appellate counsel failed to speak with Dr. Scott and thus did not learn that trial counsel had retained Dr. Scott only to evaluate Mr. Miller's sanity; (5) appellate counsel failed to gather any records, mitigation information, or

1, at 128).  Specifically, Miller contends that appellate counsel was ineffective for failing to adequately investigate and present evidence related to any prejudice that Miller suffered as a result of trial counsel's performance.  Miller contends that but for these deficiencies, appellate counsel would have been able to show that trial counsel was ineffective under *Strickland*.  (Doc. 1, at 131-32).

### a)  No Procedural Default

Miller properly raised this claim on collateral appeal, and the Alabama Court of Criminal Appeals denied the claim on the merits. *Miller*, 99 So. 3d at 366-71. Therefore, this court will review the determinations of the state court under AEDPA deference.

### b)  Merits

The Rule 32 court rejected this claim, holding that Miller failed to demonstrate that appellate counsel's performance was deficient or that Miller suffered any prejudice.  (C.R. Vol. 43, Tab 75, at 2740). The Alabama Court of Criminal Appeals affirmed the Rule 32 court, finding both that appellate counsel was not ineffective and that, even if appellate counsel were ineffective, Miller suffered no prejudice. *Miller*, 99 So. 3d at 366-71.

---

materials that trial counsel should have gathered but did not; (6) appellate counsel did not effectively evaluate trial counsel's performance; and (7) appellate counsel failed to present evidence at the hearing to demonstrate that trial counsel's performance prejudiced Miller.  (Doc. 1, at 128-32).

Although the state court found that appellate counsel reasonably investigated and presented Miller's ineffective assistance of trial counsel claims on appeal, serious questions remain regarding appellate counsel's performance.   One of the main arguments that appellate counsel presented on appeal was that trial counsel was ineffective for failing to adequately investigate and present mitigating evidence. (*See* R. Vol. 16, Tab 32, at 22).   However, appellate counsel did not attempt to investigate or present evidence demonstrating any prejudice Miller might have suffered as a result of trial counsel's performance.   Miller contends that appellate counsel's failure to "investigate thoroughly the various ways in which his Trial Counsel had performed ineffectively and to gather and present evidence of the prejudice Miller had suffered as a result – solely because of a lack of time and not for any strategic reasons – violated his Constitutional rights."   (Doc. 24 at 5).

Miller argues that the "Eleventh Circuit's ruling in *DeBruce* [*v. Commissioner*, 758 F.3d 1263 (11th Cir. 2014)[21]] strongly supports" this argument.    (*Id.*). Specifically, he claims that:

> The Eleventh Circuit's rulings in *DeBruce* that trial counsel had unreasonably and ineffectively investigated available mitigating evidence and that DeBruce had been prejudiced thereby strongly support [his] arguments that his Trial Counsel's inexcusably inadequate investigation and presentation of mitigating evidence – in particular evidence of the horrific physical and emotional abuse he had suffered from his father, which the sentencing jury never heard – violated his Constitutional rights. *See* pp. 40, 43-44, 56-62, and 114-134 of Miller's Reply Brief.

(*Id.* at 4).[22]

---

[21] In *DeBruce*, the petitioner alleged that trial counsel was ineffective for failing to investigate several issues that would have led counsel to uncover mitigating evidence that was not presented at his sentencing, "including that DeBruce experienced violence in his neighborhood and severe abuse at the hands of his sister, that he dropped out of school in the seventh grade, suffer[ed] from mental impairments and low intellectual functioning, and ha[d] a painful intestinal disorder." *DeBruce*, 758 F.3d at 1270. DeBruce argued that a pretrial report created for the defense by a social worker, noting that he had attempted suicide several times, had refused special education, dropped out of school at the age of sixteen, had a history of drug and alcohol abuse, and was in the low average range on intelligence, should have alerted counsel to the need to make further investigation into his mental health and background. *Id.* at 1271. The Eleventh Circuit Court of Appeals found that counsel's failure to "develop the troubling leads in DeBruce's competency report" was deficient. *Id.* at 1275. Further, the Court found that DeBruce suffered prejudice because the omitted mitigation evidence, when compared to the little evidence actually introduced at trial, undermined confidence in the sentencing phase of the trial. *Id.* at 1275-79.

[22] The court acknowledges that *DeBruce* does support Miller's claim that appellate counsel's performance in this regard was deficient. However, as discussed below, Miller is unable to establish that he was prejudiced by appellate counsel's deficient performance because his underlying ineffective assistance of trial counsel claims lack merit.

At the hearing on the motion for new trial, appellate counsel called Aaron McCall of the Alabama Prison Project to testify that he had been available to conduct a mitigating investigation for Miller's case and had offered his services to trial counsel.  (Rule 32 C.R. Vol. 34, Tab 60, at 36-37).  Appellate counsel, however, never requested that McCall conduct an investigation into what mitigating evidence could have been presented.  (Rule 32 C.R. Vol. 34, Tab 60, at 48-49).  Appellate counsel also called clinical psychologist Dr. Bob Wendorf, who reviewed Dr. Scott's report and testified about a "distinct possibility" that Miller and his father suffered from schizophrenia.  (C.R. Vol. 9, Tab 31, at 122).  Dr. Wendorf also testified that Miller *might* have had some other mental illnesses.  (*Id*. at 114-21).  However, appellate counsel never asked Dr. Wendorf to perform an independent assessment of Miller to diagnose whether he did in fact have a mental illness.  (Rule 32 C.R. Vol. 34, Tab 60, at 48-50).  When asked about his strategy, appellate counsel Hill testified that, "[i]n retrospect[,] . . . it would have probably been a better practice" to have had Dr. Wendorf actually perform an assessment of Miller.  (Rule 32 C.R. Vol. 34, Tab 60, at 48).  This court agrees.

Because appellate counsel failed to investigate any of the mitigating evidence they argued should have been presented, appellate counsel could not show that Miller suffered any prejudice – one of the two prongs required to demonstrate ineffective

assistance of counsel.  The court questions whether any reasonable jurist could conclude that appellate counsel's failure in this regard would constitute reasonable performance under *Strickland*.  *See DeBruce,* 758 F.3d at 1269-75.  *See also Ferrell v. Hall*, 640 F.3d 1199, 1236-39 (holding appellate counsel's performance unreasonable when counsel failed to sufficiently investigate the petitioner's background and mental health).  However, this claim is still due to be denied because, as discussed below, none of Miller's ineffective assistance of trial counsel claims is meritorious.  Therefore, Miller cannot demonstrate any resulting prejudice.

### 3.   Claim B(iv): Miller's Claim that Appellate Counsel was Ineffective for Failing to Adequately Present the Claims of Ineffective Assistance of Trial Counsel That Were Raised in Miller's Motion for New Trial

Miller alleges that appellate counsel ineffectively presented and argued the following claims in his motion for new trial: (a) trial counsel was ineffective in his guilt phase opening statement; (b) trial counsel was ineffective for withdrawing the insanity defense; (c) trial counsel was ineffective for failing to present mental health evidence during the guilt phase; (d) trial counsel was ineffective in his penalty phase opening statement; and (e) trial counsel was ineffective in failing to adequately investigate and present mitigation evidence during the penalty phase. (Doc. 1, at 134-42).  Miller presented this same claim before the state court; therefore, this court must

determine whether the state court's rejection of this claim was reasonable under AEDPA deference.

In reviewing this claim, the Alabama Court of Criminal Appeals recognized that "[i]n order to establish that his appellate counsel were ineffective in the manner in which they presented the claims of ineffective assistance of trial counsel in the new-trial proceedings and on appeal, Miller had to first establish that his underlying claims of ineffective assistance of trial counsel had merit." *Miller*, 99 So. 3d at 373 (citation omitted).  Thus, the Alabama Court of Criminal Appeals turned its attention to Miller's ineffective assistance of trial counsel claims.  This court will do the same, giving AEDPA deference to the appellate court's determinations.

> **a)** **Miller's claim that trial counsel's opening statement during the guilt phase was ineffective**

Miller alleges that trial counsel was ineffective in his opening statement and "did little more than act as a second prosecutor." (Doc. 1, at 78).  Miller contends that trial counsel was ineffective because he failed to challenge the facts as presented by the state, and failed to present any defense theory to the jury. (*Id*. at 78-80; Doc 22, at 152-53).  Miller also asserts that trial counsel encouraged the jury to feel contempt for Miller by describing the killings as "brutal" and "inhumane," and telling

the jurors he did not believe they would feel "anything but ashamed of what happened that caused all of us to be here." (Doc. 1, at 80).[23]

### (1)  No Procedural Default

Miller properly raised this claim on collateral appeal, and the Alabama Court of Criminal Appeals addressed the claim on the merits. *Miller*, 99 So. 2d at 392-95. Therefore, this court will review the determinations of the state court under AEDPA deference.

### (2)  Merits

The Rule 32 court denied this claim, holding that trial counsel's opening statement was "the product of a reasonable, strategic decision to win favor with the jury by not presenting frivolous arguments in order to spare Miller's life." (C.R. Vol. 43, Tab 75, at 98). The trial court also held that Miller failed to establish prejudice because he did not point to any evidence that the outcome of the trial would have been different but for trial counsel's opening statements. (*Id.*) The Alabama Court of Criminal Appeals affirmed the determinations of the Rule 32 court, emphasizing the difficult task trial counsel faced in defending a case in which the evidence clearly established Miller's guilt. *Miller*, 99 So. 3d at 392-95.

---

[23] For the full text of trial counsel's guilt phase opening statement, *see supra* Part VI(A)(1)(b).

After reviewing trial counsel's opening statement, this court cannot say that the state court's decision was unreasonable.  At the Rule 32 hearing, trial counsel explained that his trial strategy throughout the trial was to focus on the penalty phase of trial and to avoid presenting to the jury frivolous arguments that would diminish his credibility.  (Rule 32 C.R. Vol. 30, Tab 59, at 220-21).  This strategy was based in part on the fact that a veniremember told the trial court that he had overheard another veniremember expressing his opinion that the trial was a waste of time because the evidence in the case was overwhelming.  (Rule 32 C.R. Vol. 30, Tab 59, at 236).  Trial counsel stated that his purpose in making his opening statement was to emphasize to the jury that although the evidence of Miller's guilt was "largely uncontradicted," the jury process was not a waste of time.  (C.R. Vol. 9, Tab 30, at 63).

Trial counsel's opening statement followed this strategy.  He emphasized  the important role the jury played in the trial, and reassured the jury that he would not present any "frivolous" arguments.  (C.R. Vol. 5, Tab 9, at 813-16).  Trial counsel's decision not to contest guilt to maintain credibility with the jury and focus on the penalty phase of trial was not unreasonable.  *See Harvey. v. Warden, Union Corr. Inst.*, 629 F.3d 1228, 1243 (11th Cir. 2011) (holding that "conceding guilt and focusing on the penalty phase is a valid trial strategy for *Strickland* analysis").

To the extent that Miller faults trial counsel for stating that, "I will not offer you any evidence in this case that would make this act seem any less brutal and any less inhumane than it was," this court finds trial counsel's statement not to be unreasonable when viewed in context of trial counsel's full opening statement.  At the hearing on the motion for new trial, trial counsel testified that his purpose in making this statement was to communicate to the jury that he was not contesting the terrible nature of the crime.  (C.R. Vol. 9, at 60).  This theme was in keeping with that of trial counsel's opening statement as a whole.

Additionally, even if trial counsel's performance in connection with his guilt phase opening statement was defective, Miller cannot show that the outcome of the guilt phase would have been different but for trial counsel's statements.  As this court has stated repeatedly, the evidence of Miller's guilt was overwhelming.  Therefore, this claim lacks merit.

> **b)   Miller's claim that trial counsel was ineffective for withdrawing the insanity defense**

Miler next alleges that trial counsel was ineffective for failing to present an insanity defense during the guilt phase of trial.  (Doc. 1, at 135).

83

### (1)    No Procedural Default

Miller properly raised this claim on collateral appeal, and the Alabama Court of Criminal Appeals addressed the claim on the merits. *Miller*, 99 So. 3d at 373-92. Therefore, this court will review the determinations of the state court under AEDPA deference.

### (2)    Merits

The Rule 32 court denied this claim, finding that Miller failed to show that trial counsel's withdrawal of the insanity defense was unreasonable or that withdrawal of the insanity defense prejudiced Miller.  (C.R. Vol. 43, Tab 75, at 97-99).   In determining that trial counsel was not ineffective for withdrawing the insanity defense, the Rule 32 court stated:

> Miller's trial counsel could not be deficient for withdrawing the insanity defense because none of the psychological or psychiatric experts who evaluated Miller before trial concluded that Miller met the legal definition for insanity.
>
> Miller, through counsel, originally pled not guilty by reason of mental disease or defect. (C. 1) To qualify under the legal definition of insanity, Miller bore the burden [of] demonstrating that he "was unable to appreciate the nature and quality or wrongfulness of his acts." Ala. Code § 13A-3-1. However, as demonstrated during trial and the evidentiary hearing, none of the four mental health experts who examined Miller concluded that he was unable to appreciate the nature and quality of his actions. (R. 1384, R2. 72-74, Rule 32 R. 248)
>
> . . . .

Thus, trial counsel could not have provided any expert opinion testimony to credibly argue to the jury that Miller was legally insane. Any argument that Miller was legally insane could have been effectively rebutted from Miller's own expert's conclusion that he was not insane. (R. 1384) Johnson testified that he was aware of each of these reports and that neither Dr. Hooper's, nor Dr. McClaren's, nor Dr. Scott's reports conflicted on the issue of Miller's sanity at the time of the offense. (R2. 73-74, Rule 32 R. 251) Johnson testified that after receiving Dr. Scott's report, he discussed the findings with Dr. Scott and ultimately decided to withdraw the insanity defense on May 24, 2000. (Rule 32 R. 91-92) Johnson stated during the evidentiary hearing that if any of the four doctors who evaluated Miller had declared that Miller was insane at the time of the offense, such a finding would have altered his strategy and that he would have used that opinion as part of his defense. (Rule 32 R. 248)

(C.R. Vol. 43, Tab 75, at 80-82).

The Rule 32 court also found that Miller failed to establish any resulting prejudice:

Although Miller now claims that his trial counsel should have presented more information to Dr. Scott or obtained additional expert opinion regarding Miller's sanity, the record indicates that even if such additional measures were taken, the result would be the same: that Miller does not meet the requirements for insanity under Alabama law. At the evidentiary hearing, Dr. [Catherine] Boyer [Miller's Rule 32 psychologist] testified that in her opinion, Miller experienced a dissociative episode at the time of the shootings and that this opinion would be important as a mental health professional in determining whether Miller was sane or insane at the time of the shootings. (Rule 32 R. 719-20)

However, incredibly, Dr. Boyer never testified that in her opinion, Miller was legally insane at the time of the shootings. When pressed on this crucial question by counsel for the State, Dr. Boyer stated "I really

85

don't know if I can answer it." (Rule 32 R. 757)  Most importantly, Dr. Boyer testified that after her complete investigation, if she had been called to testify as to Miller's sanity at the time of trial, she would have had no opinion. (Rule 32 R. 758)  Therefore, Miller has failed to present any evidence that a mental health expert would have been available to testify at trial that Miller was insane at the time of the shootings.

Miller also failed to present any evidence during the evidentiary hearing that conflicts with the evidence and expert opinion regarding Miller's sanity at the time of trial. Dr. Scott never testified that his opinion at the time of trial that Miller was not unable to appreciate the nature and quality or wrongfulness of his actions had changed. Although Dr. Scott stated that it was "possible" that had he obtained additional information and conducted additional testing relating to a dissociated disorder his diagnosis could have changed, he failed to testify that such information did in fact change his opinion. (Rule 32 R. 364)  Like Dr. Boyer, Dr. Scott never testified that in his opinion, Miller met the requirements for insanity under Alabama law.

Equally as important in determining that Miller was not prejudiced by the withdrawal of the insanity plea was the testimony of Dr. McClaren during the evidentiary hearing. Before trial in the fall of 1999, Dr. McClaren was hired to conduct a forensic psychological evaluation of Miller. (Rule 32 R. 773)  After conducting his evaluation, Dr. McClaren concluded that Miller was a "non psychotic man of average intelligence." (Rule 32 R. 778)  Dr. McClaren also concluded that Miller was not insane under Alabama law at the time of the offense. (Rule 32 R. 780)

After becoming involved in the case again for purposes of this Rule 32 proceeding, Dr. McClaren testified that he reviewed additional testimony, the reports of Dr. Scott and Dr. McDermott, additional psychological testing, school records as well as the testimony during the evidentiary hearing. (Rule 32 R. 783-84)  Dr. McClaren then testified that after his review of this new information, nothing had changed his opinion that Miller was not legally insane at the time of the shootings.

(Rule 32 R. 784)  In Dr. McLaren's opinion, Miller functioned as a non
psychotic man at the time of the shootings.  (Rule 32 R. 792)

> The testimony of all three mental health experts during the
> evidentiary hearing as well as the evidence contained in the mental
> health reports issued during the trial and the trial record itself are
> consistent: all indicate that Miller was not unable to appreciate the
> nature and quality or wrongfulness of his actions. No testimony has even
> been presented during trial or in this Rule 32 proceeding that Miller was
> insane at the time of the shootings under Alabama law. Therefore, Miller
> has failed to demonstrate a reasonable probability that the outcome of
> his proceeding would have been different had trial counsel not
> withdrawn the insanity plea because the record resoundingly evidences
> that Miller was in fact not insane at the time of the shootings.
> Accordingly, because Miller has failed to demonstrate prejudice under
> *Strickland*, this claim is denied.

(C.R. Vol. 43, Tab 75, at 84-87).  The Alabama Court of Criminal Appeals affirmed

the Rule 32 court's determinations:

> The record supports the circuit court's conclusion that trial
> counsel made a strategic decision to withdraw the plea of not guilty by
> reason of mental disease or defect after consulting with a psychiatrist
> who evaluated Miller for the express purpose of determining whether
> Miller suffered from a mental disease or defect at the time of the
> shootings and after also considering the results of evaluations by three
> other mental-health experts, each of whom concluded that Miller did not
> meet Alabama's definition of "insanity" at the time of the shootings.
> "This is precisely the type of strategic choice, based on counsel's
> examination of the relevant facts and legal principles, that our cases
> have deemed to be virtually unchallengeable." *Key v. State*, 891 So.2d
> 353, 376 (Ala. Crim. App. 2002). As the circuit court in *Key* aptly noted:

>> [T]he day a lawyer is supposed to come in here and make
>> motions and enter pleas for which he or she has no basis
>> and in fact their education, training, experience, and their

87

> life's experience and their discussions with their [expert]
> provide them with no basis and you can say that that's
> incompetency[,] that's going to be a dark day in our legal
> system.

891 So.2d at 376.

*Miller*, 99 So. 3d at 377 (alterations in original).

After reviewing the record, this court finds that the state court's determination was reasonable under *Strickland*. The record reflects that trial counsel considered presenting an insanity defense and retained Dr. Scott for the express purpose of determining whether Miller met the legal definition of insanity at the time of the shootings. However, Dr. Scott determined that Miller did not meet the legal definition of insanity under Alabama law. Dr. Scott's determinations were the same as those of the three other mental health experts who examined Miller prior to the trial. Trial counsel's decision to withdraw the insanity defense after reviewing the opinions of four experts is by no means an unreasonable decision. *See Brownlee v. Haley*, 306 F.3d 1043, 1061 (11th Cir. 2002) (finding that a defense attorney's decision not to pursue an alibi defense he deemed to be implausible and unlikely to succeed to be the type of strategic decision on which a court should defer to the judgment of counsel); *Williams v. Head*, 185 F.3d 1223, 1237 (11th Cir. 1999) ("[T]o

be effective a lawyer is not required to pursue every path until it bears fruit or until all hope withers.")(internal quotations omitted).

Further, as highlighted by the court, Miller cannot demonstrate any prejudice resulting from trial counsel's decision to withdraw the insanity defense. Miller failed to produce a single expert willing to testify that he was legally insane at the time of the shootings. No evidence was ever presented that would demonstrate that Miller met the legal definition of insanity at the time of the murders. Thus, the court finds no reasonable probability that the jury would have found Miller to be legally insane, and he cannot show a reasonable probability that the outcome of the proceeding would have been different but for trial counsel's decision to withdraw the insanity defense.

Within Miller's claim that trial counsel was ineffective for failing to present an insanity defense, Miller alleges that trial counsel was ineffective for failing to provide Dr. Scott with various documents that Miller claims were necessary to determine Miller's sanity. Miller contends that trial counsel should have provided Dr. Scott with the following: (1) a file created by Dr. Hooper following his evaluation of Miller; (2) Dr. McClaren's report of his evaluation of Miller; (3) the recording of Miller's post-arrest police interrogation; (4) records of Miller's medical/psychological

records and those of his family; and (5) information concerning the abuse Miller

suffered at the hands of his father.  (Doc. 1, 48-66).

The Rule 32 court rejected this argument and found that Miller failed to show

that trial counsel was deficient or that Miller suffered any prejudice as a result.  (C.R.

Vol. 43, Tab 75, at 59–73).  Although the Rule 32 court and the Alabama Court of

Criminal Appeals discussed the performance prong of *Strickland* at length in relation

to this ineffective assistance of trial counsel claim, this court will limit its discussion

of the claim to the prejudice prong, since Miller clearly failed to meet this prong.  *See*

*Duren v. Hopper*, 161 F.3d 655, 660 (11th Cir. 1998) ("[I]f a defendant cannot satisfy

the prejudice prong, the court need not address the performance prong.").

In discussing the prejudice prong, the Rule 32 court stated:

> Miller has failed to demonstrate a reasonable probability that the
> outcome of his proceeding would have been different had his trial
> counsel investigated more mental health evidence because he has failed
> to prove that he met the legal definition of insanity under Ala. Code §
> 15-16-1. None of the five psychological and psychiatric experts who
> evaluated Miller during the course of his trial or his Rule 32
> proceedings, including Drs. Hooper, Scott, McDermott, McClaren, and
> Boyer concluded that Miller was legally insane. Therefore, even if trial
> counsel had conducted a more thorough mental health investigation, the
> result would be the same: Miller could not have proven that he did not
> appreciate the wrongfulness of his actions and thus could not have
> sustained a not-guilty by reason of insanity defense.
>
> Miller's failure to demonstrate prejudice is highlighted by the
> testimony of Miller's own expert, Dr. Boyer, during the evidentiary

90

hearing. Despite her opinion that Miller suffered from post-traumatic stress disorder, incredibly, Dr. Boyer failed to testify that Miller was legally insane. (Rule 32 R. 757–58)  Notably, Dr. Boyer failed to even provide an opinion. Clearly evading the issue of Miller's sanity, in response to a question regarding whether she disagreed with Dr. Scott's testimony during trial that Miller was not insane, Dr. Boyer testified "I really don't know if I can answer it." (Rule 32 R. 757)

As Dr. Boyer stated in response to a question from counsel for the State, if she had been called to testify on Miller's behalf during trial, she would have had no opinion as to whether he could appreciate the wrongfulness of his conduct at the time of the shootings:

> Q: So in this case it's fair to say that had you been there you would have said I have no opinion [as to Miller's sanity] one way or the other?
>
> A: Yes.

(Rule 32 R. 758)  Without offering an opinion, let alone an opinion that conflicted with the evaluations performed during trial, even if a mental health investigation was performed in the manner in which Miller now alleges it should have been conducted, Miller has failed to demonstrate a reasonable probability that additional mental health evidence would have been uncovered that would have affected the outcome of his trial. It is also significant that Dr. Scott failed to state during the evidentiary hearing that his opinion that Miller was not insane at the time of the shootings had changed. No evidence has been presented that Miller was legally insane and ample mental health evidence was already available for trial counsel to effectively argue during the penalty phase that Miller satisfied the requirements for the statutory mitigating circumstances under Ala.Code §§ 13A–5–51(2), (6).

Three psychologists and one psychiatrist evaluated Miller at the time of trial; none of these four doctors, whether hired by the defense or appointed by the trial court, found that Miller was insane. (Rule 32 R. 248)  Miller has offered nothing in the testimony of either Dr. Boyer or

Dr. Scott to call these evaluations into question. There is no evidence that Dr. Boyer's testimony would have benefitted Miller's defense, nor would it have impacted the outcome of the proceedings. Miller has failed to meet his burden of proof of demonstrating how he was prejudiced under *Strickland* by his trial counsel's investigation into his mental health. Therefore, Miller cannot demonstrate that his trial counsel's performance in this regard was constitutionally ineffective and thus, this claim is denied.

(C.R. Vol. 43, Tab 75, at 73-76).  The Alabama Court of Criminal Appeals affirmed the Rule 32 court's determination:

> The circuit court's findings are supported by the record. As noted above, to have been entitled to relief, Miller not only had to show that his trial counsel rendered deficient performance by not providing the additional information to Dr. Scott for his consideration in assessing Miller's sanity at the time of the offenses, but also had to prove that he was prejudiced as a result of his trial counsel's failure to provide the information to Dr. Scott. The fact that Dr. Scott *might* have changed his conclusion regarding Miller's sanity at the time of the offenses had he received the information is not sufficient to establish the requisite prejudice.

*Miller*, 99 So. 3d at 385-86.

This court agrees with the state court's conclusion.  As noted previously, Miller fails to point to a single expert who determined that he was unable to appreciate the nature and quality or wrongfulness of his acts at the time of the shootings.  Dr. Boyer conducted an extensive review of Miller's record, including the items that Miller alleges trial counsel should have provided to Dr. Scott.  (Rule 32 R. Vol. 32, Tab 59, at 599-630).  Based on her investigation, Dr. Boyer concluded that Miller suffered

92

from a post-traumatic stress disorder.  (*Id*. at 757-58).  However, Dr. Boyer refused to testify that Miller was unable to appreciate the nature and quality or wrongfulness of his acts at the time of the shootings.  (*Id*. at 757-58).  Miller also called Dr. Scott at the Rule 32 hearing, and he likewise, failed to state that he believed Miller was unable to appreciate the nature and quality or wrongfulness of his acts at the time of the shootings.  In total, Miller was examined by five different mental health experts in the course of his trial and the Rule 32 proceedings.  None of these experts testified that Miller was unable to appreciate the nature and quality or wrongfulness of his acts at the time of the shootings.

Because Miller fails to point to any evidence that he met the legal definition of insanity, he has failed to establish a reasonable probability that the outcome of his trial would have been different had trial counsel provided Dr. Scott with additional evidence and decided not to withdraw the insanity defense.  Therefore, Miller has failed to show that his trial counsel was ineffective and cannot show that his appellate counsel was ineffective in presenting this claim on direct appeal.

### c)   Miller's claim that trial counsel was ineffective for failing to present mental health evidence during the guilt phase of trial

Miller alleges that trial counsel was ineffective for failing to present mental health evidence to the jury that would have allowed them to find that Miller lacked

the *mens rea* required for a conviction of capital murder.  (Doc. 1, at 87-90, 138).

Miller maintains that trial counsel should have presented Dr. Scott's finding that

Miller, although not legally insane, suffered from a mental illness, experienced tunnel

vision, and heard "noises" at the time of the first two shootings.  Miller argues that

had this testimony been presented at the guilt phase of trial, trial counsel could have

argued that Miller lacked the necessary *mens rea* to be found guilty of capital murder.

### (1)   No Procedural Default

Miller properly raised this claim on collateral appeal, and the Alabama Court

of Criminal Appeals addressed the claim on the merits.  *Miller*, 99 So. 3d at 386-92.

Therefore, this court will review the determinations of the state court under AEDPA

deference.

### (2)   Merits

The Rule 32 court rejected Miller's argument that trial counsel should have

presented a defense during the guilt phase.  The court stated:

> Trial counsel Johnson had reasonable strategic reasons for not
> presenting evidence during the guilt phase of trial. Johnson testified that
> his trial strategy focused on presenting the best evidence and testimony
> that would save Miller's life. (R2. 80.) Based on the facts and
> circumstances of his case, Johnson determined that his best opportunity
> and most effective method of presenting such testimony would be during
> the penalty phase. (R2. 80; Rule 32 R. 219)  Part of this strategy also
> involved gaining credibility and favor with the jury by not presenting

frivolous arguments during the guilt phase such as challenging the blood spatter expert's testimony.  (Rule 32 R. 219–26)

       . . . .

    As the Court of Criminal Appeals noted, this decision was made "after a thorough investigation of the relevant law and facts of Miller's case' and Johnson's focus on the penalty phase 'was part of his strategy to spare Miller's life." *Miller*, 913 So.2d at 1161 (holding that "[u]nder the circumstances of this case, defense counsel made a well-reasoned decision to focus his efforts on that part of the trial that he believed offered the greatest chance of success. We see no reason to second-guess defense counsel's decisions regarding this strategy."). Miller has failed to offer any proof that this trial strategy was not the product of a reasonably competent attorney.

(C.R. Vol. 43, Tab 75, at 99-102).

The Rule 32 court also held that Miller suffered no prejudice as a result of trial counsel's decision to not present a defense during the guilt phase, reasoning that any argument that Miller lacked the intent to commit capital murder "would have run contrary to the overwhelming evidence indicating Miller's intent to commit murder." (*Id*. at 104-05).  In support of this conclusion, the Rule 32 court noted that Miller "specifically sought out two victims, shot them multiple times, proceeded to another location, specifically sought out another victim, and shot him multiple times."  (*Id*. at 105-06).  Based on the significant amount of evidence supporting Miller's conviction of capital murder, the Rule 32 court found that Miller failed to demonstrate a reasonable probability that the jury would have found him not guilty

of capital murder. (*Id*. at 106). The court, therefore, concluded that Miller failed to establish prejudice under *Strickland*. (*Id*.). The Alabama Court of Criminal Appeals affirmed the lower court's rejection of this claim. *Miller*, 99 So. 3d at 386-92.

This court cannot say that the determination of the Alabama Court of Criminal Appeals as to either prong of the *Strickland* analysis is unreasonable. In this case, trial counsel made a strategic decision not to contest Miller's guilt and to limit Dr. Scott's testimony to the penalty phase portion of the trial. Trial counsel had sound reasoning for adopting this approach. At the Rule 32 hearing, trial counsel Johnson testified that he decided not to present mental health evidence during the guilt phase because he believed it would have had less of an impact on the jury than if it was presented during the penalty phase. (Rule 32 C.R. Vol. 30, at 225). He also testified that he was concerned that contesting Miller's guilt could have appeared to be frivolous to the jury in light of the great weight of the evidence establishing Miller's guilt. (*Id*. at 220). Finally, trial counsel Johnson testified that he believed Dr. Scott's testimony was more valuable at the penalty phase because Dr. Scott would have been allowed to testify more freely and would be subject to a less rigorous cross-examination, and that he chose to limit Dr. Scott's testimony to the penalty phase because much of Dr. Scott's testimony was based on hearsay, which was only admissible during the penalty phase. (Rule 32 C.R. Vol. 31, at 285). Additionally,

trial counsel Blackwood testified that he did not want to raise mental health evidence during the guilt phase because "Shelby County jurors are very tough, they are very solid people, hard working, that don't believe a lot of hullabaloo about these things they can't see. . . . we thought that it would be best presented at the penalty phase." (Rule 32 C.R. Vol 34, at 892-93).

These concerns are all valid. Recognizing that the evidence of his client's guilt was significant, trial counsel made a strategic decision not to pursue the ill-supported argument that Miller was not guilty of capital murder. This strategy was by no means unreasonable. *See Bell v. Cone*, 535 U.S. 685, 702 (2002) (holding that a "tactical decision about which competent lawyers might disagree" does not qualify as objectively unreasonable).

Miller also fails to prove that he was prejudiced as a result of trial counsel's decision to not present any mental health evidence at the guilt phase. Even looking to Dr. Scott's testimony that Miller experienced tunnel vision and heard "noises" during the first two shootings, the evidence fails to establish a reasonable probability that the jury would not have found Miller guilty of capital murder. The evidence in this case establishes that Miller entered Ferguson Enterprises and shot Christopher Yancy and Lee Holdbrooks multiple times at close range. Miller then got into his vehicle, drove to another location, sought out Terry Jarvis and shot Mr. Jarvis

97

multiple times.  Given the factual circumstances of this case, Miller has not shown a reasonable probability that the outcome of the guilt phase would have been different if trial counsel had  presented Dr. Scott's testimony during the guilt phase.

Therefore, because Miller's ineffective assistance of trial counsel claim is without merit, he cannot show that his appellate counsel was ineffective in the manner in which they presented this claim in the post-sentencing proceedings.

### d)   Miller's claim that trial counsel's penalty phase opening statement was ineffective

Miller alleges that trial counsel rendered ineffective assistance during his penalty phase opening statement.  (Doc. 1, at 96-101, 138-39).  Miller contends that trial counsel "vilified Mr. Miller, undermined the credibility of Dr. Scott, and effectively conceded the only aggravating factor on which the State relied."  (*Id*. at 138-39).[24]

### (1)   No Procedural Default

Miller properly raised this claim on collateral appeal, and the Alabama Court of Criminal Appeals denied the claim on the merits.  *Miller*, 99 So. 3d at 415-16. Therefore, this court will review the determinations of the state court under AEDPA deference.

---

[24] For the full text of trial counsel's opening statement, *see* Section VI(A)(1)(b).

### (2)    Merits

The Rule 32 court rejected this claim, finding that trial counsel's penalty phase opening statement was an "impassioned plea that the jury spare Miller's life." (C.R. Vol 43, Tab 75, at 120).  The Rule 32 court noted that the purpose of trial counsel's opening statement was to convey to the jury that Miller did not deserve the death penalty regardless of whether they thought he was atrocious or not, and that Miller did not deserve death regardless of how the jurors might feel about him. (*Id*. at 118). The court also found that trial counsel attempted to portray Miller as a "'tortured soul' whose delusions drove him to commit a series of horrific acts." (*Id*. at 120). The court concluded that Miller failed to meet his burden of establishing that no reasonable attorney would have pursued this course of action, and that Miller failed to show that the outcome of the penalty phase would have been different but for trial counsel's opening penalty phase statement. (*Id*. at 122).

The Alabama Court of Criminal Appeals affirmed the Rule 32 court's determination:

> Miller contends that had his appellate counsel properly presented and argued this claim in the motion-for-new-trial proceedings and on appeal, he would have been entitled to relief. In arguing this claim, Miller merely rehashes his argument that his trial counsel rendered ineffective assistance in his opening statement at the penalty phase of the trial. The circuit court thoroughly addressed the rationale behind Miller's trial counsel's opening statement, which "was to convey that no

99

matter what Miller had done, 'whether [the jury] thought he was atrocious or not' and 'whatever their feelings [were] about Mr. Miller' that Miller did not deserve the death penalty." (C. 2068, citing February 2008 Rule 32 Hearing, R. 151, 156.) The circuit court concluded that Miller failed to prove that his trial counsel's strategy was deficient or that he was prejudiced by his counsel's opening statement. (C. 2067-73.) The circuit court's findings are supported by the record.

Accordingly, it follows that Miller has also failed to prove by a preponderance of the evidence that his appellate counsel were ineffective in the manner in which they presented this claim of ineffective assistance of trial counsel in the post-sentencing proceedings. *Payne*, 791 So.2d at 401.

*Miller*, 99 So. 3d at 416 (alterations in original).

After reviewing the record, this court finds the state court's determination to be reasonable under *Strickland*.  The record reflects that trial counsel argued in his opening statement that Miller should not be put to death regardless of the jurors' personal feelings about Miller.  Trial counsel pointed out that Miller's execution could not bring back the lives of his three victims, and that Miller would already receive punishment for his actions by spending the remainder of his life in prison.  Contrary to Miller's contentions, trial counsel did not undermine Dr. Scott's credibility, but presented him as a competent, neutral expert.  Trial counsel stated that, although Dr. Scott had been hired to determine whether Miller was insane, he ultimately concluded that Miller did not meet the legal definition of insanity.  Trial

counsel then previewed to the jury Dr. Scott's testimony that Miller suffered from a mental and emotional disturbance on the day of the shootings.

After reviewing the entirety of trial counsel's opening statement, this court finds that the Alabama Court of Criminal Appeals' determination that Miller failed to establish that trial counsel was ineffective was a reasonable application of *Strickland*. Thus, appellate counsel could not have been ineffective in the manner in which they presented this ineffective assistance of trial counsel claim.

### e)   Miller's claim that trial counsel failed to adequately investigate and present mitigation evidence during the penalty phase

Miller alleges that trial counsel should have investigated and presented a "veritable mountain of mitigating evidence" during the penalty phase of the trial. (Doc. 1, at 139).  In particular, Miller alleges that trial counsel's investigation was ineffective because counsel failed to: 1) adequately interview Miller and his close relatives, and 2) collect Miller's "employment, education, and medical records, and medical records of his numerous family members with documented serious mental illness." (*Id*. at 17).  Miller alleges that as a result of this inadequate investigation, trial counsel did not learn about the following evidence:

> (i) the extent of instability, poverty and hardship Mr. Miller suffered in childhood as a result of his father's constant uprooting of the family and erratic employment history; (ii) the well-documented history of mental

illness that traced back through at least four generations of the Miller family; (iii) the extreme physical and psychological abuse Ivan [Miller's father] inflicted on the family, including the particular wrath he reserved for Mr. Miller; (iv) the criminal behaviors to which Mr. Miller was exposed during his formative years; (v) notwithstanding this adversity, Mr. Miller's strong work ethic and good employment history; (vi) the financial support he provided his family and the loving relationships he had with his brothers, sisters, nieces and nephews; (vii) the radical changes in Mr. Miller's behavior in the days leading up to the shootings; and (viii) Mr. Miller's bizarre behavior at the time of the shootings.

(*Id*. at 24) (alteration added).  According to Miller, he would not have been sentenced to death if trial counsel had presented this mitigating evidence during the penalty phase.  (*Id*. at 101-08).

### (1)   No Procedural Default

Miller properly raised this claim on collateral appeal, and the Alabama Court of Criminal Appeals addressed the claim on the merits.  *Miller*, 99 So. 3d at 395-415. Therefore, this court will review the determinations of the state court under AEDPA deference.

### (2)   Merits

This court begins and ends its analysis of this claim with the prejudice prong of *Strickland*.  Both Miller's contention that trial counsel failed to conduct an adequate investigation and his contention that trial counsel failed to adequately present mitigating evidence require this court to reweigh the aggravating and

mitigating evidence to determine whether Miller suffered prejudice.  *See Brooks v. Comm'r, Ala. Dep't of Corr.*, 719 F.3d 1292, 1301 (11th Cir. 2013).  Therefore, this court will address these claims together.  Since Miller fails to establish prejudice, this court need not determine whether trial counsel's performance in connection with his investigation and presentation of mitigating evidence was deficient.  *See Holladay v. Haley*, 209 F.3d 1242, 1248 (11th Cir. 2000).

"When a [petitioner] challenges a death sentence. . ., the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." *Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1326 (11th Cir. 2013) (alteration in original) (quoting *Strickland*, 466 U.S. at 695).  The Alabama Court of Criminal Appeals held that even if Miller had presented all of the additional mitigating evidence he alleges should have been presented, "there would be no change in the result in this case." *Miller*, 99 So. 3d at 415.  In reviewing the opinion of the Alabama Court of Criminal Appeals, this court must determine whether a reasonable jurist could conclude that no reasonable probability existed that the totality of Miller's mitigating evidence would have altered the outcome of the penalty phase. *See Cummings v. Sec'y of Dep't of Corr.*, 588 F.3d 1331, 1367 (11th Cir. 2009) ("Given the strength of the . . . aggravating circumstances, the proposed

103

mitigation evidence must be strong enough to outweigh them, and therefore to raise a reasonable probability that the balance of aggravating and mitigating circumstances did not warrant death."). Thus, this court will compare the evidence elicited during the Rule 32 hearings that Miller alleges should have been presented at trial with the evidence that was actually presented at trial.

**(a)    The abuse Miller suffered at the hands of his father**

Testimony from the Rule 32 hearings showed that Miller suffered extensive abuse at the hands of his father, Ivan. Ivan frequently hit his wife and children for no reason and was especially abusive towards Miller. (Rule 32 C.R. Vol. 32, at 546). Ivan also threatened his children with guns and knives; on one occasion he threatened Miller and his siblings with a gun, telling them that he did not know which of them he wanted to kill. (Rule 32 C.R. Vol. 31, at 405). Ivan was also verbally abusive, calling Miller a "little bastard" and a "little son of a bitch." (*Id*. at 406). He also abused Miller's mother, Barbara, frequently calling her a "fucking whore, a fucking slut, tramp, anything." (*Id*. at 394).

During the penalty phase of the trial, Dr. Scott presented the following testimony to the jury regarding the abuse Miller suffered:

> To try to understand a little bit more about his relationship with his father, I asked [Miller] to describe his dad, what was it like growing

104

up with his father.  And rather kind of quietly, reluctantly but in a straight forward manner he described him as verbally abusive.  I said, give me an example.  He would frequently, even at a very young age, say things like you're no good, you'll never amount to nothing, you're a God damn son of a bitch.  He was very physically abusive to him, hit him on various areas of his body and he was frequently bullied and left bruises on him.

. . . .

. . . [Miller] described that when he was a junior in high school one time his father came home and had a large butcher knife from the kitchen and began lounging [sic] at him and he would say things like, it's only God's will that is keeping me from cutting you now.

. . . .

His father was also described as very verbally abusive to his mom, frequently called her a whore.  And he witnessed his father physically abusing his mom and hitting her very hard.

(R. Vol. 8, Tab 22, at 1350-51).

> **(b)**     **Miller's impoverished childhood and exposure to the criminal behavior of his family members**

Testimony from the Rule 32 hearings showed that Miller grew up in an impoverished environment and the family lived in a rent-controlled community. (Rule 32 C.R. Vol. 31, at 398-99).  Barbara Miller and her children were on welfare, received food stamps, and Barbara's father and brother had to provide necessities to the family.  (*Id*. at 415, 460-62).  Barbara Miller described the family homes as "junky, rat infested, roach infested, just falling in." (*Id*. at 416).  Ivan provided little

support to the family, moving from job to job with periods of unemployment.  (*Id*. at

413).  He also pawned valuables from the house to pay for drugs.  (*Id*. at 414-15).

Ivan had a criminal record, was charged with crimes such as murder, grand larceny,

robbery, and unlawful flight to avoid prosecution, and was often in and out of jail for

"drunken disorderly conduct."  (*Id*. at 420-21).  As a child, Miller observed his father

and uncles using marijuana, cocaine, and intravenous drugs.  (*Id*. at 419-20).

At the penalty phase of trial, Dr. Scott presented testimony relating to the

poverty Miller suffered as a child.  Dr. Scott testified that Ivan frequently quit jobs

and that the family was often on the "edge of poverty."  (R. Vol. 8, Tab 22, at 1349).

He also stated that at one point, Miller "actually quit the eleventh grade" to support

the family since his father was not working at the time and the family needed to pay

the bills.  (*Id*. at 1349-50).  Additionally, Dr. Scott testified that Ivan "abused

marijuana quite heavily," and that on one occasion, Miller witnessed his father inject

a substance into his arm intravenously.  (*Id*. at 1350).

### (c)  The Miller family history of mental illness

During the Rule 32 hearings, Miller presented evidence that numerous

members of his family suffered from mental illness, including his great-grandmother,

his grandfather, and two of Miller's uncles.  (Rule 32 C.R. Vol. 32, Tab 59, at 644-

54).  Ivan Miller, although not diagnosed with a mental illness, was often suspicious

that people were plotting again him.  (Rule 32 C.R. Vol. 31, Tab 59, at 403).  Ivan accused his wife of having extra-marital affairs, and believed that she had tried to poison him.  (*Id*. at 392-93, 403).  He also believed that he had the power to heal, often trying to "heal" his children's illnesses.  (*Id*. at 410-11; C.R. Vol. 32, at 549). Ivan Miller also told his children that God had told him to kill them, but he hoped God would tell him to stop.  (C.R. Vol. 32, at 550-51).

At the penalty phase of trial, Dr. Scott presented testimony regarding the history of mental illness present in Miller's family.  Dr. Scott testified that, although Ivan had "never had a psychiatric evaluation or diagnosis," he had some "unusual behaviors," including the belief that Miller's mother had tried to poison him, and the suspicion that "people around the neighborhood were spying on him."  (R. Vol. 8, Tab 22, at 1362).  Additionally, Dr. Scott testified that Miller's grandfather was committed to a psychiatric institution and that Miller's younger brother, Richard, was "slow."  (*Id*. at 1363).  Dr. Scott also told the jury that Ivan Miller had an "interesting" take on religion:

> In some ways [Miller's] father was a preacher of sorts and he would say that he had the power to heal, for example.  [Miller] described his – one of his brothers had psoriasis and his father would go and lay hands on him and when the brother didn't heal, [Ivan] would tell the brother he was the devil.  And oftentimes [Ivan] would walk around the home sort of spraying holy water around the house.

(*Id*. at 1350-51).

### (d) Miller's good employment history and relationship with his family

The evidence presented during the Rule 32 hearings showed that Miller was a hard worker who went to work at an early age to support his family, and typically only left a job when he found a better paying position. (Rule 32 C.R. Vol. 31, at 424; Rule 32 C.R. Vol. 32, at 560). The evidence also showed that Miller had a close relationship with his siblings and provided financial assistance when a family member was in need. (Rule 32 C.R. Vol. 32, at 511, 560). Miller had a strong relationship with his niece, Alicia Sanford, and his nephew, Jake Connell. Alicia Sanford testified that she considered Miller to be like a father to her, and felt that he had raised her. (*Id*. at 474-75). Jake Connell testified that he spent a great deal of time around Miller, who was like an older brother to him. (*Id*. at 579).

Regarding Miller's employment history, Dr. Scott testified that "prior to this episode," Miller had been fired from a couple of jobs for fighting at work, but he usually left jobs to take a better paying position elsewhere. (R. Vol. 8, Tab 22, at 1363). Dr. Scott's testimony relating to Miller's relationship with his family members was limited to discussing Miller's strong relationship with his mother. (*Id*. at 1351-52).

### (e)   Miller's behavior prior to the shootings

At the Rule 32 hearing, Miller's niece, Alicia Sanford, testified that in the weeks leading up to the shooting, Miller let his beard grow long, complained of ringing in his ears, and often seemed to be daydreaming.  (Rule 32 C.R. Vol. 32, at 511-13, 562).  She further testified that during this time he was "taking Goody Powders like something crazy" for his more frequent headaches.  (*Id.*).

Dr. Scott did not present testimony at trial related to any of these specific facts.

### (f)   Miller's behavior on the day of the shootings

Although Miller alleges that trial counsel should have presented additional evidence related to Miller's behavior on the day of the shootings, he does not point to any new information in his petition that was not addressed by Dr. Scott in his penalty phase testimony.

### (3)   Prejudice analysis

After comparing the evidence that was presented at the Rule 32 hearings with the evidence actually presented at trial, this court finds that a reasonable jurist could conclude that no reasonable probability suggested the outcome of the penalty phase would have been different if the additional mitigating evidence had been presented. The only additional information that could have been presented at trial was additional instances of abuse Miller suffered, additional information relating to the history of

109

mental illness present in some of Miller's extended family members, additional evidence relating to Miller's employment history (including that he had been fired numerous times), and additional information relating to Miller's close relationship with his family. Because Dr. Scott, in his penalty phase testimony, presented similar information regarding Miller's background, those additional accounts would have been merely cumulative of the testimony already presented, and insufficient to establish prejudice. *See, e.g., Rose v. McNeil*, 634 F.3d 1224, 1243 (11th Cir. 2011) ("Obviously, a petitioner cannot satisfy the prejudice prong of the *Strickland* test with evidence that is merely cumulative of evidence already presented at trial."); *Holsey v. Warden, Georgia Diagnostic Prison*, 694 F.3d 1230, 1260-61 (11th Cir. 2012) (recognizing that "evidence presented in postconviction proceedings is 'cumulative' or 'largely cumulative' to or 'duplicative' of that presented at trial when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes presented to the jury"); *Boyd v. Allen*, 592 F.3d 1274, 1297-98 (11th Cir. 2010) (finding that much of the evidence presented by the petitioner during postconviction proceedings "was in some measure cumulative" of the trial evidence because "much (although not all) of the 'new' testimony introduced at the post-conviction hearing would *simply have amplified the themes already raised at trial*") (emphasis added).

Furthermore, the value of the additional mitigating evidence Miller alleges should have been presented at trial is minimal when weighed against the brutal nature of Miller's crime.  In its order denying Miller's motion for new trial, the trial court provided the following description of the crime in support of its determination that the murders were "especially heinous, atrocious, or cruel":

On the morning of August 5, 1999, [Miller] shot and killed three men, namely, Christopher Yancy ("Yancy"), age 28 years; Lee Holdbrooks ("Holdbrooks"), age 32; and Terry Jarvis ("Jarvis"), age 39 years. Yancy and Holdbrooks were both shot at one location and thereafter Jarvis was shot at another location. Each of those victims sustained multiple wounds.

Yancy suffered three wounds to his body. It appears the first shot entered his leg and traveled through his groin and into his spine, paralyzing him. He was unable to move, unable to defend himself and was trying to hide from [Miller] under a desk. Yancy had a cell phone an inch or two from his hand, but because of his paralysis was unable to reach it and call for help. Yancy had to have been afraid his life was about to be taken. Moments elapsed. [Miller] appeared to have then stooped under the desk and have made eye contact with Yancy before shooting him twice more causing his death.

Holdbrooks suffered six wounds to his body. [Miller] shot Holdbrooks several times. Holdbrooks crawled down a hallway for about twenty-five feet. Holdbrooks was uncertain whether he would live or die as he crawled down the hallway and quite possibly his life was flashing by in his mind. [Miller] took his gun and within two inches of Holdbrooks' head, pulled the trigger for the sixth and final time, the bullet entering Holdbrooks' head causing him to die in a pool of blood.

Jarvis was shot five times, the last shot being no more than 46 inches away from his body. Before Jarvis was shot, [Miller] had pointed

111

a gun at him in the presence of a witness. [Miller] had accused Jarvis of spreading rumors about him which Jarvis had denied. [Miller] shot Jarvis four times in the chest. [Miller] allowed the witness to leave. No one knows at that point what went through Jarvis' mind. Having denied he spread any rumors, he must have wondered why [Miller] had not believed him and as the witness was allowed to leave that maybe there would be no more shooting and his life would be spared. [Miller] then shot Jarvis through his heart ending Jarvis' life.

It appears all three of [Miller's] victims suffered for a while not only physically, but psychologically. In each instance, there appeared to have been hope for life while they were hurting, only to have their fate sealed by a final shot, execution style.

Based upon the facts presented at this trial, these murders were calculated, premeditated and callous, with utter disregard of human life. The taking of these lives was among the worst in the memory of this Court and was well beyond the level of being especially heinous, atrocious or cruel.

(Rule 32 C.R. Vol. 43, Tab 72, at 1-3) (alterations added).

In light of the extensive evidence presented regarding the brutal nature of this crime, the Alabama Court of Criminal Appeals reasonably concluded that no reasonable probability existed that the outcome of the penalty phase would have been different if trial counsel had presented additional mitigating evidence. *See, e.g., Brooks v. Comm'r Ala. Dep't of Corr.*, 719 F.3d 1292, 1302–03) (finding no prejudice from counsel's failure to present evidence showing that defendant was nice, good natured, and nonviolent, in light of the heinousness of the defendant's crime); *Boyd v. Allen*, 592 F.3d 1274, 1303 (11th Cir. 2010) (finding no showing of prejudice

"given the overwhelming power of the aggravating evidence," when compared to the totality of mitigating evidence); *Dill v. Allen*, 488 F.3d 1344, 1360 (11th Cir. 2007) (finding that testimony that defendant was a "good person until he began to use drugs" would not have changed the balance of mitigating and aggravating circumstances or the outcome of the sentencing proceeding).  Thus, this ineffective assistance of trial counsel claim lacks merit, and appellate counsel could not be ineffective in the manner in which they presented this claim.

Miller adds that *Daniel v. Comm'r, Ala. Dep't of Corr.*,  822 F.3d 1248, 1255 (11th Cir. 2016) strongly supports his arguments "because the ineffective assistance he received from his Trial Counsel in connection with the penalty phase of his trial is strikingly similar to the ineffective assistance outlined in *Daniel*."  (Doc. 44, at 2). In *Daniel*, the petitioner argued that he received ineffective assistance of counsel because of trial counsel's failure to investigate and present mitigation evidence during the penalty phase of his trial.  *Daniel*, 822 F.3d at 1254.

Daniel's mother, Carolyn Daniel, the sole witness called by the defense, briefly testified as to "some of the low points" in Daniel's life:

> She told the jury that Mr. Daniel had Attention Deficit Hyperactivity Disorder (ADHD) and dyslexia; that he dropped out of school in the tenth grade; and that Mr. Daniel's biological father died when Mr. Daniel was three. Mrs. Daniel also testified that Mr. Daniel's stepfather, Earnest Western, "abused [him] and I didn't know about it for a long

time." She described only one specific instance of abuse. When Mr. Daniel was about twelve years old Mrs. Daniel said she left him "[o]ne night" with his stepfather and, when she got home, Mr. Daniel told her "that he had gotten a beating by his stepdad" and that he had blood in his urine. When she took Mr. Daniel to the hospital, "[i]t was discovered that one of his kidneys had been damaged from the beating." As a result, protective services removed Mr. Daniel and his two sisters from the home for about ten months, and Mr. Daniel was placed in a group home. When the family reunited, Mrs. Daniel says Mr. Daniel was "withdrawn" and "always seem[ed] like he was hurting on the inside." Mr. Daniel started drinking beer at about age sixteen, and "on one occasion" Mrs. Daniel found marijuana in his room. Finally, Mrs. Daniel pleaded to the jury for her son's life.

*Id*. at 1256 (alterations in original). Less than three hours after the penalty phase began, the jury returned a 10-2 verdict for death. *Id*. Following a sentencing hearing, Daniel was sentenced to death by the trial court.[25] *Id*. Daniel's convictions and death sentence were ultimately upheld in the appellate courts. *Daniel v. State*, 906 So. 2d 991 (Ala. Crim. App. 2004), *cert. denied*, *Id*. (Ala. 2005), *cert. denied*, *sub nom. Daniel v. Alabama*, 546 U.S. 405 (2005).

Through new counsel, Daniel timely filed a Rule 32 petition in the trial court. Daniel's second amended petition was accompanied by twenty-one exhibits, "including school, mental health, and social service records, along with other documentary evidence, all in support of Mr. Daniel's allegations that if trial counsel

---

[25] Daniel's mother and sister testified at the sentencing hearing, asking the court to spare Daniel's life. *Id*.

had conducted even a cursory investigation of his background, they would have discovered compelling mitigating evidence." *Id*. at 1257.  The trial court summarily dismissed the petition without allowing any discovery or conducting an evidentiary hearing.[26]  *Id*.  The Alabama Court of Criminal Appeals affirmed the trial court's summary dismissal of the petition at the pleading stage because Daniel failed to sufficiently and specifically plead his claims under Alabama law.  *Id.* at 1258.  The Alabama Supreme Court denied certiorari in a summary fashion.  *Id*.

Daniel timely filed a petition for a writ of habeas corpus in federal court.  *Id*.  The petition was accompanied by motions for discovery and an evidentiary hearing.  *Id*.  The district court denied relief without an evidentiary hearing or discovery, finding that Daniel's claim was properly dismissed for failure to plead the claim with sufficient specificity or failure to state a claim.  *Id*. at 1258, 1260.

On appeal, the Eleventh Circuit Court of Appeals first found that Daniel's "second amended Rule 32 petition pleaded more than sufficient specific facts about

---

[26] The trial court's order denying the petition stated:

> This Court finds that Petitioner's allegations of ineffective assistance of trial counsel either do not meet the specificity requirements of Rule 32.6(b), raise grounds that were raised at trial in violation of Rule 32.2(a)(3), raise grounds that were raised by Petitioner on direct appeal in violation of Rule 32.2(a)(4), raise grounds which could have been but were not raised on direct appeal in violation of Rule 32.2(a)(5), are without merit, or fail to state an issue of fact or law.

*Id*. at 1257 n.3.

trial counsel's acts and omissions to show their penalty phase investigation 'fell below an objective standard of reasonableness.'" *Id*. at 1263 (quoting *Strickland*, 466 U.S. at 688).[27]   Daniel had alleged that trial counsel had "almost no meaningful contact with him or his family prior to trial," despite Daniel's repeated attempts to contact counsel, including Daniel's bar complaint regarding counsel's lack of contact with him, and that trial counsel also ignored efforts by Daniel's mother and sister to provide counsel with relevant background information. *Id*. at 1263-65.  Daniel had also specifically detailed the chronic physical, emotional, and sexual abuse that the jury never heard and that trial counsel could have obtained from Daniel's family. *Id*. at 1265-66.  The Court also noted that the information uncovered by counsel during their "cursory investigation" should have alerted counsel to the need for more investigation into Daniel's school records. *Id*. at 1266-67.

Second, the Court found that the second amended Rule 32 petition pleaded sufficient facts to show prejudice under *Strickland*. *Id*. at 1274-77.  The Court explained that allegations of Daniel's excruciating life history, that were never presented to the jury, were sufficient to establish a reasonable probability that but for

---

[27] The Court noted that "'at the pleading stage of Rule 32 proceedings [in Alabama], a Rule 32 petitioner does not have the burden of proving his claims,' *Ford v. State*, 831 So.2d 641, 644 (Ala.Crim.App. 2001), and that facts Mr. Daniel alleged in his Amended Rule 32 petition and supporting exhibits are assumed to be true under Alabama law, *see Ex parte Williams*, 651 So.2d 569, 572-73 (Ala. 1992)." *Id*. at 1261.

counsel's failure to present the evidence to the jury, he would have been sentenced to life without parole instead of death. *Id.*

The Eleventh Circuit Court of Appeals concluded that the Alabama Court of Criminal Appeals' adjudication of the merits of Daniel's ineffective assistance of counsel claim was unreasonable and that the claim should be reviewed *de novo*. *Id.* at 1280. The Court remanded the case to the district court to reconsider Daniel's discovery motion, to conduct an evidentiary hearing on his claim, and to reconsider the merits of the claim *de novo*. *Id.* at 1281-82.

Miller claims that the "ineffective assistance Mr. Miller received from his Trial Counsel in connection with the investigation and presentation of mitigating evidence during the penalty phase of his trial is strikingly similar to the ineffective representation alleged by Mr. Daniel that the Eleventh Circuit found to violate his Constitutional rights." (Doc. 44 at 7). However, as explained above, Miller's case differs from *Daniel* in that Miller's claims were addressed and denied on the merits by the Rule 32 court following a thorough evidentiary hearing at which Miller's witnesses' testimony closely mirrored the testimony the jury heard from Dr. Scott in the penalty phase of Miller's trial. Because the evidence Miller alleges should have

been presented at trial was basically the same evidence the jury heard from Dr. Scott, Miller simply did not suffer the prejudice suffered by the petitioner in *Daniel*.[28]

### 4.    Claim B(v): Miller's Claim that Appellate Counsel was Ineffective for Failing to Raise Other Claims of Ineffective Assistance of Trial Counsel

Miller alleges that appellate counsel were ineffective for failing to raise the following claims of ineffective assistance of trial counsel: (a) trial counsel's ineffective performance during the jury voir dire; (b) trial counsel's ineffective performance in failing to object to the admission of irrelevant and prejudicial testimony and photographs during the guilt phase of trial; (c) trial counsel's ineffective cross-examination of crucial prosecution witnesses; (d) trial counsel's failure to object to misleading portions of the State's guilt phase closing argument; (e) trial counsel's ineffective guilt phase closing argument; (f) trial counsel's failure to request guilt phase jury instructions necessary to protect Miller's rights; (g) trial counsel's reliance on Dr. Scott as the sole mitigation witness during the penalty phase

---

[28] Miller also contends that *Hardwick v. Sec'y, Fla. Dep't of Corr.*, 803 F.3d 541 (11th Cir. 2015) supports this claim.  (Doc. 38).  In *Hardwick*, The Eleventh Circuit Court of Appeals held that the petitioner made a showing of ineffective assistance of counsel regarding counsel's investigation in a capital case, when counsel, who presented no mitigating evidence, "was aware of a number of red flags" concerning the defendant's life circumstances yet "did not conduct a life-history investigation or follow up on any leads" or attempt to undertake "even a rudimentary mitigation investigation."  803 F.3d 541, 552-54 (11th Cir. 2015).  Unlike the petitioner in *Hardwick*, Miller's jury heard basically the same evidence from Dr. Scott that he contends should have been provided by other witnesses.  Thus, as previously discussed, Miller did not suffer the prejudice suffered by the petitioner in *Hardwick*.

of trial; (h) trial counsel's failure to move for a directed verdict based on the state's failure to present comparative evidence necessary for the jury to determine that the killings were "especially heinous, atrocious, or cruel compared to other crimes;" (i) trial counsel's penalty phase closing argument; (j) trial counsel's failure to object to the court's penalty phase jury instructions; (k) trial counsel's failure to request a special verdict form to establish that the jury had unanimously found the sole alleged aggravating circumstance; (l) trial counsel's ineffectiveness at the sentencing hearing; and (m) trial counsel's failure to bring the Supreme Court's decision in *Apprendi v. New Jersey* to the attention of the court prior to the sentencing phase.

The Alabama Court of Criminal Appeals rejected this claim, holding that appellate counsel could not have been deficient for failing to raise these claims because none of Miller's claims of ineffective assistance of trial counsel was meritorious. This court, therefore, will examine the state court's determinations regarding each of Miller's ineffective assistance of trial counsel claims with deference.

### (a)    Trial Counsel's performance during jury voir dire

Miller claims that appellate counsel should have argued that trial counsel's voir dire was inadequate and that trial counsel was ineffective for failing to ask questions related to the jurors' exposure to media coverage of the trial. Miller also contends

119

that trial counsel did not effectively ask questions designed to uncover potential bias against Miller.

### (1)    No Procedural Default

This claim was properly raised on collateral appeal and fully exhausted. Therefore, this court will review the determinations of the state court under AEDPA deference.

### (2)    Merits

In addressing the underlying ineffective assistance of trial counsel claim, the Rule 32 Court held:

> This Court denies Miller's claim because he has failed to meet his burden of proof of demonstrating that his trial counsel's performance was deficient under *Strickland,* 466 U.S. at 687. Ala. R. Crim. P., 32.7(d). Because of the extensive publicity in this case, Johnson, along with the District Attorney's office, developed a written questionnaire that was provided to the entire jury panel. (Rule 32 R. 236) Within the questionnaire, question # 68 specifically asked the jurors to answer whether they had seen anything about the case in any newspaper. (Rule 32 R. 237) Additional questions were included in the questionnaire to determine whether a particular juror had such strong fixed opinions about the case or could not be fair or impartial as a juror. (Rule 32 R. 238)

> Johnson testified that he had an opportunity to review the responses to the questionnaires for all members of the jury panel and that he knew the jurors' responses identifying what they saw in the newspapers about the case. (Rule 32 R. 237-38)  During trial, the trial court and counsel for both parties conducted an extensive individual voir dire of the jury panel. (R. 130-763)

As the record indicates, Johnson strategically conducted voir dire to determine whether any juror had a fixed opinion, for any reason, of the case. Johnson alerted the trial court to questions # 68, # 69 and # 70 of the juror questionnaire that pertained to the juror's opinions of the case and implored the trial court to focus its questions on whether the jurors had 'fixed opinions' of the case. (R. 146-47)  As a result, the trial court determined that it would examine each juror's response to question # 68 and if the juror indicated they had heard something about the case, the trial court would inquire what the juror heard and whether the juror could set aside what they had heard. (R. 148)

During the evidentiary hearing, Miller's counsel questioned Johnson about specific newspaper articles and then questioned Johnson on whether he asked eight jurors about what they had read about the case in the newspaper. (Rule 32 R. 127–34) However, as the record indicates, as a result of Johnson's effort, during individual voir dire, the trial court noted each of the eight juror's responses to question # 68 indicating that the juror had seen or read something about the case and then asked each juror whether they could set what they had learned aside and base their verdict solely on the evidence presented. (R. 337-38, 345-46, 376-77, 446-47, 449-50, 625-26, 638-39, 666-67) All eight jurors indicated that they could set aside what they had learned and sit as a fair and impartial juror. *Id*.

Therefore, information about the jurors' opinions about the case was brought out during the voir dire and Miller has failed to demonstrate that Johnson's method of conducting voir dire was deficient. Miller has failed to present any evidence that a reasonable attorney would have asked these eight jurors about specific newspaper articles. Furthermore, Miller failed to ask Johnson why he did not strike these eight jurors from the panel, nor did Miller ask any specific question regarding Johnson's strategy for using the defense's peremptory strikes. Therefore, because the record is silent, trial counsel's questioning of the jury panel and the subsequent peremptory strikes is presumed to be reasonable. *See Chandler*, 218 F.3d 1305, 1315 n. 15.

121

In paragraph 162 of his amended petition, Miller claims that his trial counsel failed to question and remove Juror Gregory Johnson who Miller alleges was biased because Juror Johnson favored the death penalty. (Pet. at 47) However, trial counsel's questioning of Juror Johnson was not deficient and the record directly refutes Miller's claim that Juror Johnson was biased. Juror Johnson stated during voir dire that he could follow the trial court's instructions and listen to the evidence in recommending a sentence in Miller's case. (R. 377-78) Juror Johnson also stated that where it was appropriate under the law and evidence he could vote for either life imprisonment or the death penalty. (R. 378) Furthermore, trial counsel Johnson specifically questioned Juror Johnson about his views on the death penalty and elicited from Juror Johnson that he had no fixed opinions about what an appropriate punishment should be. (R. 387–90) Accordingly, Miller's claim is directly refuted by the record and is denied. *See Gaddy v. State*, 952 So.2d 1149, 1161 (Ala. Crim. App. 2006).

. . . .

This claim is also denied because Miller has utterly failed to meet his burden or proof of demonstrating that he was prejudiced by his trial counsel's performance during voir dire. *See Strickland*, 466 U.S. at 695; Ala. R. Crim. P., 32.7(d). Although Miller claims that trial counsel was ineffective for failing to ask eight of the fourteen jurors seated in his case about what they read or remembered about Miller's case, Miller has failed to present any evidence whatsoever about what these eight jurors actually read or remembered about Miller's case prior to trial. (Rule 32 R. 134) None of the jurors who sat at Miller's trial testified during the evidentiary hearing. Therefore, no evidence was presented that the eight jurors actually read or were exposed to the newspaper articles introduced into evidence by Miller during the evidentiary hearing. (Rule 32 R. 127–34, 289–95) Even if the eight jurors had read these newspaper articles, no evidence was presented that the jurors considered these articles harmful to Miller or that they had fixed opinions about Miller because of these articles.

There is nothing in the record regarding what the jurors read about Miller's case; accordingly, "[t]he mere fact that some of the jurors that sat for [Miller's] trial had pretrial knowledge of his case is not enough to establish they were biased against him." *Duncan v. State*, 925 So.2d 245, 267 (Ala. Crim. App. 2005). Therefore, because there is no evidence about what the jurors read and whether they were actually biased against Miller because of what they read, Miller has failed to demonstrate that he was prejudiced by this trial counsel's performance during voir dire. Miller's claim is denied.

(C.R. Vol. 43, Tab 75, at 2040-45) (alterations in original).

The Alabama Court of Criminal Appeals affirmed the Rule 32 court's determination that trial counsel was not ineffective:

The circuit court's findings are supported by the record and Alabama law. As we stated on direct appeal:

[T]he potential for actual juror prejudice was addressed through voir dire during the selection of the jury. Through the use of juror questionnaires and individual voir dire, any potential jurors who may have had fixed opinions regarding Miller's guilt were excused from service. Nor was there any showing that media coverage created a presumption of actual prejudice. *See Ex parte Travis*, 776 So.2d 874, 879 (Ala. 2000).

*Miller*, 913 So.2d at 1162.

Accordingly, "[b]ecause [Miller] failed to establish that his claim of ineffective assistance of trial counsel is meritorious, he has failed to prove by a preponderance of the evidence that his appellate counsel was ineffective for failing to present this claim." *Payne*, 791 So.2d at 401-02.

*Miller*, 99 So. 3d at 419 (alterations in original).

The record supports the determinations of the Alabama Court of Criminal Appeals.  In examining an attorney's performance during jury selection, this court must begin with the strong presumption that trial counsel acted properly and that his jury selection decisions were sound trial strategy.  *See, e.g., Harvey v. Warden, Union Corr. Inst.*, 629 F.3d 1228, 1245 (11th Cir. 2011) (recognizing that trial counsel's actions during voir dire are presumed to be reasonable); *Manning v. State*, 373 F. App'x 933, 935 (11th Cir. 2010) (affirming dismissal of ineffective assistance of counsel claim when counsel failed to strike juror who did in fact express a bias on ground that petition failed to establish prejudice).  To overcome this presumption, Miller bears the burden of demonstrating that trial counsel's actions were so unreasonable that no competent attorney would have taken the actions that trial counsel took.  *See Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000). Miller cannot meet this burden.

The record reflects that trial counsel took steps to insure that the jurors selected could be fair and impartial.  Each potential juror was first required to fill out an extensive juror questionnaire created by trial counsel and the District Attorney's Office.  (Rule 32 C.R. Vol. 30, at 236-37).  Trial counsel reviewed the jurors' completed questionnaires prior to individual juror voir dire and considered the

information that he learned from the questionnaire in making his decision to strike jurors.  (*Id*. at 239-40).

After reviewing the jury questionnaire, trial counsel engaged in the voir dire process.  Counsel understood that many of the jurors likely had been exposed to some media coverage.  Because of this concern, trial counsel asked the court to focus on whether the specific juror had developed a "fixed opinion" about the case.  (C.R. Vol. 2, at 146-48).  The court agreed to do so, and stated that it would specifically examine each potential juror on whether the juror had heard anything regarding Miller's case, and if so, whether the juror had formed any opinion as a result.  (*Id*. at 148-49).

Although Miller alleges that trial counsel should have asked the jurors additional questions, *Strickland* does not ask whether an attorney could have done more, but only whether the attorney's performance was so unreasonable that no competent attorney would have performed as trial counsel did.  *See Chandler*, 218 F.3d 1305, 1313 (11th Cir. 2000) ("To state the obvious: the trial lawyers, in every case, could have done something more or something different. . . . But, the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'") (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)).  After reviewing the record, this court concludes that no evidence shows that trial

125

counsel's performance during voir dire was such that no reasonable attorney would have approached voir dire in this manner.

Further, Miller fails to establish the prejudice prong of *Strickland*.  To establish prejudice resulting from counsel's performance during voir dire, a petitioner "must show that at least one juror was biased" because "if no juror were biased, then there is no 'reasonable probability that . . . the result of the proceeding would have been different.'"  *Owen v. Florida Dep't of Corr.*, 686 F.3d 1181, 1201 (11th Cir. 2012) (quoting *Strickland*, 466 U.S. at 694).  All eight of the jurors who were exposed to pretrial publicity were questioned regarding whether they could put aside anything they had learned from the publicity the case received, and all eight jurors responded that they could be impartial.[29]  (C.R. Vol. 3, at 337-38, 345-46, 376-77, 446-47, 449-50; C.R. Vol. 4, at 625-26, 638-39, 666-67).  Miller fails to offer any evidence that any juror was biased against him.  Instead, he simply points out that some of the jurors were exposed to pretrial publicity about the case.  However, the mere fact that some jurors were exposed to pretrial publicity about Miller's case does not establish

---

[29] Juror E.H. indicated in his juror questionnaire that he had formed an opinion as to who was responsible for the deaths of Holdbrooks, Yancy, and Jarvis.  (C.R. Vol. 3, at 337).  When asked by the court whether he could put aside any pre-existing opinions or impressions and base his decision solely on the evidence presented in court, Juror E.H. responded that he could do so.  The Eleventh Circuit has held that "'the mere existence of any preconceived notion [by a juror] as to . . . guilt or innocence, *without more*' is insufficient to establish a claim of prejudicial pretrial publicity." *Devier v. Zant*, 3 F.3d 1445, 1462 (11th Cir. 1993) (alterations in original) (quoting *Irvin v. Dowd*, 366 U.S. 717, 723 (1961).

that any juror was actually *biased* again him.  *See Bertolotti v. Dugger*, 883 F.2d 1503, 1521 (11th Cir. 1989) (holding that "if jurors can lay aside preconceptions and base their verdict on the evidence adduced at trial, they need not be completely unaware of the facts of a given case") (citing *Murphy v. Florida*, 421 U.S. 794, 799-800 (1975)).

Based on the lack of evidence demonstrating bias, this court concludes that the state court reasonably determined that trial counsel's performance during voir dire did not prejudice Miller.  *See, e.g., Brown v. Jones*, 255 F.3d 1273, 1280 (11th Cir. 2001) (holding that petitioner did not establish prejudice when he failed to adduce any evidence that a juror was biased in favor of the death penalty); *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1328–29 (11th Cir. 2002) (finding no prejudice when each juror unequivocally stated that he or she could render a verdict based solely on the evidence and instructions given by the trial judge).  Likewise, the state court reasonably determined that appellate counsel was not ineffective for failing to present this claim.

> **b)** **Miller's claim that trial counsel was ineffective in failing to object to the admission of testimony and photographs during the guilt phase of trial**

Miller alleges that appellate counsel should have argued that trial counsel was ineffective for failing to object to gruesome testimony and photographs of the victims

introduced during the testimony of the state's forensic scientists, Dr. Angello Della

Manna and Dr. Stephen Pustilnik.  (Doc. 1, at 80-87, 143).  During the guilt phase of

the trial, Dr. Della Manna presented testimony concerning blood patterns at the crime

scene.  (*Id*. at 81).  The state used Dr. Della Manna's testimony to introduce graphic

photographs of the victims and the crime scenes.  (*Id*.).  Similarly, Dr. Pustilnik

analyzed photos of the gunshot wounds and testified as to the pain the victims would

have suffered prior to death.  (*Id*. at 82).  Miller argues that the evidence admitted

through the testimony of Dr. Della Manna and Dr. Pustilnik was irrelevant to the

issue of Miller's guilt and only served to inflame the jury against Miller.  (*Id*.).

### (1)   Procedural Default

The respondent correctly contends that this claim is procedurally defaulted

from habeas review because the last state court to review the claim determined that

Miller failed to comply with state procedural rules by abandoning the claim in his

Rule 32 petition.[30]  The Rule 32 court observed:

> Miller failed to present any evidence whatsoever during the evidentiary
> hearing in pursuit of this claim.  In fact, Miller failed to ask trial counsel
> a single question regarding why trial counsel did not object to certain
> testimony or allegedly prejudicial photographs.  Nor did Miller offer any
> evidence that would establish that the testimony and photographs of the
> victims and crime scene were actually irrelevant and inflammatory in

---

[30] Additionally, the claim is procedurally defaulted because Miller did not raise the claim on
appeal from the denial of his Rule 32 petition.

this case.  Therefore, this Court denies this claim because Miller has abandoned the claim.

(C.R. Vol. 43, Tab 75, at 2057) (citing *Brooks v. State*, 929 So. 2d 491, 498 (Ala. Crim. App. 2008) (holding that a Rule 32 petitioner's failure to ask counsel "any questions concerning her reasons for not pursuing any of the claims" in the Rule 32 petition constituted an abandonment of those issues)).  *See also, e.g.*, *Hooks v. State*, 21 So. 3d 772, 788 (Ala. Crim. App. 2008) (holding that when an appellant does not present evidence addressing certain claims at an evidentiary hearing on a Rule 32 petition, the state court can conclude that he has abandoned the claims, and is not required to review them).  Because the Rule 32 court determined that Miller abandoned this claim, the claim is procedurally defaulted from habeas review.  *See Brownlee v. Haley*, 306 F.3d 1043, 1066–67 (11th Cir. 2002) (finding that state court's determination that a claim was abandoned barred federal habeas review).

### (2)    Merits

Alternatively, even if the claim were properly before this court, it would be due to be denied because it is without merit.  Although finding the claim to be procedurally barred, the Rule 32 court went on to find that the claim lacked merit because the testimony and photographs relating to the crime scene were properly

admissible under Alabama law" (C.R. Vol. 43, Tab 75, at 2058-59). The court

pointed out that under Alabama law:

> photographs which show external wounds in the body of a deceased
> victim, even though they are cumulative and based on undisputed
> matters, are admissible. The fact that they are gruesome is not grounds
> to exclude them so long as they shed some light on the issues being
> tried. The fact that a photograph is gruesome and ghastly is no reason
> to exclude it form evidence, so long as the photograph has some
> relevancy to the proceedings, even if the photograph may tend to
> inflame the jury.

(*Id*. at 2058) (quoting *Sneed v. State*, 1 So. 3d 104, 132 (Ala. Crim. App. 2007)). The

court found that the "testimony and photographs of both the crime scene as well as

the gunshot wounds of the victims were relevant and necessary to prove that Miller

intended to kill each victim in this case. (R. 1271-75)." (*Id*.). Therefore, the court

concluded that because the evidence would have been admissible notwithstanding an

objection by trial counsel, counsel could not be ineffective for failing to make such

an objection. (*Id*. at 2058-59).

This court agrees with the state court's reasoning. Because counsel had no

basis for objecting to the admission of the photographs and testimony under Alabama

law, trial counsel could not have been ineffective for failing to object. *See Chandler

v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001) (holding that counsel was not

ineffective for failing to raise a non-meritorious objection). Because an objection

would not have succeeded, Miller was not prejudiced by trial counsel's failure to object. Therefore, this ineffective assistance of trial counsel claim is without merit, and appellate counsel was not ineffective for failing to raise it.

### c)   Miller's claim that trial counsel conducted an ineffective cross-examination of crucial prosecution witnesses

Miller alleges that appellate counsel should have argued that trial counsel was ineffective for failing to effectively cross-examine crucial prosecution witnesses. (Doc. 1, at 83-87, 144). Specifically, Miller argues that trial counsel should have cross-examined: (1) Dr. Angello Della Manna; (2) Dr. Steven Pustilnik regarding his foundation for asserting that the victims felt severe pain as result of the gunshot wounds they suffered; (3) Johnny Cobb regarding the fact that neither Holdbrooks nor Yancy had been spreading rumors about Miller; (4) David Andrew Adderhold regarding, the fact that Miller allowed Adderhold to leave the scene of the shootings unharmed, and Miller's good work performance at Post Airgas prior to the shootings; and (5) Sergeant Stuart Davidson regarding the fact that Miller did not attempt to escape during the lengthy time period that police pursued him down the interstate after he committed the shootings. (*Id.*).

131

### (1)    Procedural Default

Respondent correctly contends that this claim is procedurally defaulted because the state court determined that Miller abandoned the claim.  (Doc. 16, at 96-100). The Rule 32 court observed that Miller failed to present any evidence whatsoever in pursuit of this claim during the evidentiary hearing.  (C.R. Vol. 43, Tab 75, at 2059). The court noted that Miller failed to ask trial counsel a single question regarding his strategy in cross-examining the prosecution's witnesses, failed to identify any specific questions trial counsel could have asked each witness or elicited during cross-examination, and failed to offer any evidence as to how he was prejudiced by trial counsel's lack of a cross-examination of the state's witnesses.  (*Id*.).  The court concluded that Miller had abandoned the claim.  (*Id*. at 2059-60).  The Alabama Court of Criminal Appeals followed suit, declining to review the claim because Miller had abandoned it.  *Miller*, 99 So. 3d at 425.

As discussed previously, the state court's determination that a petitioner abandoned a claim on appeal bars habeas review.  *See Brownlee v. Haley*, 306 F.3d 1043, 1066-67 (11th Cir. 2002).  Thus, to the extent that Miller alleges that appellate counsel was ineffective for failing to assert that trial counsel was ineffective in the manner in which he cross-examined the state's witnesses, the claim is procedurally barred from review in this court.

132

### (2)   Merits

Additionally, even if the claim were not procedurally barred, it would be due to be denied on the merits.  The record reflects that during the hearing on the motion for new trial, Miller questioned trial counsel regarding his performance in cross-examining the state's witnesses. (C.R. Vol. 9, Tab 30, at 40-46).  However, Miller only asked trial counsel about his decision not to cross-examine Dr. Della Manna, and his decision not to question Dr. Pustilnik about Dr. Pustilnik's testimony that Miller shot Holdbrooks at close range.  (*Id.*).

When asked about his decision to not cross-examine Dr. Della Manna, trial counsel stated that he believed Dr. Della Manna's testimony was frivolous, and that the best approach to countering Dr. Della Manna's testimony was to "mock" his testimony before the jury in trial counsel's closing statement.  (*Id.* at 41).  When asked about his decision not to challenge Dr. Pustilnik's testimony regarding the distance from which Miller shot Holdbrooks, trial counsel stated that he believed the important thing to the jury was that Miller shot Holdbrooks a second time while Holdbrooks was struggling for his life, not the distance from which Miller fired the final shot.[31]  (*Id.* at 43-45).

---

[31] Appellate counsel could not remember Holdbrooks' name during his questioning of trial counsel, instead referring to him as "the gentleman that was crawling up the hall." (C.R. Vol. 9, Tab 30, at 42).

Thus, to the extent that Miller questioned trial counsel about his performance in connection with cross-examination, the record reflects that trial counsel made a strategic decision to limit his cross-examination of the state's witnesses. Additionally, because the record is silent as to trial counsel's strategy in not questioning the remainder of the state's witnesses, this court must assume that trial counsel had sound reasons for limiting his cross-examination of them. *See Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) ("An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption [of effective representation.]").

Finally, the claim is due to be denied because Miller cannot show any resulting prejudice. Considering the overwhelming evidence of Miller's guilt, it is unlikely that cross-examination of these witnesses could have overcome that evidence. *See Waters v. Thomas*, 46 F.3d 1506, 1510 (11th Cir. 1995). Because this ineffective assistance of trial counsel claim is without merit, appellate counsel cannot be ineffective for failing to raise it.

> **d)   Miller's claim that trial counsel was ineffective for failing to object to portions of the state's guilt phase closing argument**

Miller alleges that his appellate counsel should have argued that trial counsel was ineffective for failing to object to the prosecution's statements in the guilt phase

closing argument, that Miller made eye contact with Yancy and Holdbrooks at the time that he fatally shot each of them.  (Doc. 1, at 90).

### (1)     Procedural Default

Respondent again contends that this claim is procedurally barred because the Rule 32 court found the claim to be abandoned.  (Doc. 16, at 96-100).  Respondent is again correct.  The Rule 32 court observed that Miller failed to present any evidence regarding this claim at the Rule 32 hearings:

> Miller failed to ask trial counsel a single question regarding why [trial counsel] did not object to the prosecution's closing argument.  During the evidentiary hearing, Miller did not identify any specific statement made by the prosecutor in closing arguments to which Miller should have objected.  Miller did not ask what trial counsel's strategy was during the prosecution's closing arguments.  Nor did Miller offer any evidence that would establish how he was prejudiced by his trial counsel's decision not to object.

(C.R. Vol. 43, Tab 75, at 2064-65).  The Rule 32 court found that Miller had abandoned the claim.  (*Id*. at 2065).  Therefore, habeas review of this claim is barred.[32]

### (2)     Merits

Alternatively, this claim would also be due to be dismissed on the merits because, even assuming that the state's guilt phase argument was improper, Miller

---

[32] Additionally, the claim is procedurally defaulted because Miller did not raise the claim on appeal from the denial of his Rule 32 petition.

fails to allege any prejudice stemming from trial counsel's decision not to object. Indeed, Miller cannot establish any resulting prejudice as the outcome of the guilt phase would not have been different even if trial counsel had objected to the state's closing argument. Because Miller cannot show the requisite prejudice to establish his underlying ineffective assistance of trial counsel claim, he cannot show prejudice resulting from appellate counsel's failure to present this claim.

### e) Miller's claim that trial counsel was ineffective in his guilt phase closing argument

Miller alleges that his appellate counsel should have argued that his trial counsel was ineffective in his guilt phase closing argument. (Doc. 1, at 143). Specifically, Miller contends that his trial counsel was ineffective for failing to argue that Miller lacked the *mens rea* to commit capital murder, for essentially conceding that Miller was responsible for the killings, and for distancing himself from Miller by stating that he was not proud to represent Miller. (*Id*. at 91-92).

### (1)    No Procedural Default

This claim was properly raised on collateral appeal and fully exhausted. Therefore, this court will review the state court's decision under AEDPA deference.

### (2)    Merits

In denying this claim, the Rule 32 court held:

This Court denies Miller's claim because he has failed to meet his burden of proof of demonstrating that his trial counsel's performance was deficient under *Strickland*, 466 U.S. at 687. Ala. R. Crim. P., 32.7(d). Johnson's closing argument was reasonable based both on the tactical decision to focus on the penalty phase of trial and his overall strategy of not presenting frivolous arguments in order to win credibility with the jury. (R. 1261-64) As noted above, Johnson continually testified that he strategically chose to focus on the penalty phase of Miller's trial in order to save Miller's life. (R2. 80, Rule 32 R. 219)  In an attempt to bolster his chances of success during the penalty phase, Johnson made a tactical decision to emphasize to the jury that he would not be presenting frivolous evidence or arguments during the guilt phase. (Rule 32 R. 143, 219)

Similar to his comments during opening statements, Johnson echoed to the jury during closing arguments that he was not going to present a frivolous defense such as arguing a second gunman existed or challenging the fact that the prosecution could not match the bullets taken from the victims to Miller's gun. (R. 1261–62) Johnson reminded the jury of the State's burden and implored the jury to listen to the judge's instructions on the law and render a verdict based on the facts and consistent with their oath. (R. 1263) Miller has failed to present any evidence which would establish that [Johnson's] continual effort during closing arguments to gain credibility with the jury in order to make an effective penalty phase argument was unreasonable.

Johnson's decision to not argue that Miller did not have intent to commit capital murder during closing arguments was consistent with his overall trial strategy of focusing on the penalty phase of the trial. (Rule 32 R. 219)  Moreover, Johnson's comments about his representation of Miller were consistent with this strategy as well. Johnson told the jury that he was proud of his representation of Miller, but in an effort to win favor with the jury, also stated he was still not proud of what happened during the shootings:

> And I at least am proud at this point that I have participated in this. It does not remove any degree the shame of what

> happened. It does not make me proud that I'm representing
> someone who the evidence is fairly convincing, I must
> concede to you, did what he did.

(R. 1263-64)  During the evidentiary hearing, Johnson explained that
this statement could not be viewed in isolation, but as part of a larger
goal of not alienating the jury during the guilt phase to attempt to win
favor with the jury. (Rule 32 R. 142-43)

When viewed in the context of Johnson's entire trial strategy,
Johnson's closing argument was reasonable attempt to gain credibility
with the jury during the guilt phase in order to attempt to get a favorable
result in the penalty phase – the focus of Johnson's strategy. Based on
this approach, Miller has failed to demonstrate that trial counsel's
decision was unreasonable or that his performance during closing
arguments was deficient under *Strickland*. Therefore, this claim is
denied.

This claim is also denied because Miller failed to meet his burden
of proof of demonstrating that he was prejudiced by his trial counsel's
closing argument. *See Strickland*, 466 U.S. at 695; Ala. R. Crim. P;
32.7(d). Miller has presented no evidence concerning the impact of
Johnson's statements on the jury, nor has Miller demonstrated a
reasonable probability that the outcome of the guilt phase of his trial
would have been different had Johnson not conducted his closing
argument in this manner. In general, statements of counsel "are usually
valued by the jury at their true worth and are not expected to become
factors in the formation of the verdict." *Minor*, 914 So.2d at 417. Miller
offered nothing more in support of his claim of ineffectiveness than the
bare, conclusory allegation that Johnson's closing argument was
improper and that it prejudiced the jury, without proving specific facts
that demonstrate prejudice. Accordingly, Miller has not met his burden
of demonstrating prejudice under *Strickland* and therefore, this claim is
denied.

(C.R. Vol. 43, Tab 75, at 2061-2064).

138

The Alabama Court of Criminal Appeals affirmed the Rule 32 court's ruling, holding that "[b]ecause [Miller] failed to establish that his ineffective-assistance-of-trial-counsel claim is meritorious, he has failed to prove by a preponderance of the evidence that his appellate counsel was ineffective for failing to present this claim." *Miller*, 99 So. 3d at 421 (alterations in original)(internal citation omitted).

After reviewing the record, this court concludes that the state court's determination was reasonable.  Trial counsel's guilt phase closing argument was consistent with trial counsel's overall strategy of maintaining credibility with the jury for the penalty phase of trial.  This court has already stated that this approach to trying the case was not unreasonable, and Miller fails to demonstrate that trial counsel's performance was a professionally unreasonable error under *Strickland*.

Moreover, as the Rule 32 court found, Miller failed to demonstrate that the outcome of the proceeding would have been different but for trial counsel's closing statement.  The evidence of Miller's guilt is overwhelming, and he has offered nothing to establish a reasonable probability that the outcome of the proceeding would have been different but for trial counsel's statement.

Because the underlying ineffective assistance of trial counsel claim is not meritorious, appellate counsel could not have been ineffective for failing to raise the

claim.  Therefore, the state court's determination was reasonable, and Miller is not entitled to habeas relief.

> **f)** **Miller's claim that trial counsel was ineffective for failing to request jury instructions to protect Miller's rights**

Miller claims that appellate counsel should have argued that trial counsel was ineffective for requesting certain jury instructions and failing to request others. (Doc. 1, 92-94, 144).  First, Miller faults trial counsel for requesting that the court instruct the jury that even if a defendant pleads guilty to capital murder, the state must prove the defendant's guilt beyond a reasonable doubt. (*Id*. at 93).  Miller contends that this instruction implied that Miller was not contesting his guilt of capital murder. (*Id*.). Next, Miller argues that trial counsel was ineffective for asking the court not to instruct the jury on the impermissibility of drawing an adverse inference from Miller's decision not to take the stand.  (*Id*.).  Miller argues that the court's failure to provide this instruction would also have misled the jury into believing that Miller was not contesting his guilt.  (*Id*.).  Finally, Miller argues that trial counsel was ineffective for failing to request a clarifying instruction on the heightened *mens rea* requirement for the offense of capital murder, which Miller argues was necessary for the court to distinguish between capital and non-capital intentional murder.  (*Id*.).

### (1)   Procedural Default

The Rule 32 court denied this claim, holding that Miller had abandoned this claim because he failed to present any evidence relating to this claim during the Rule 32 hearings.  (C.R. Vol. 43, Tab 75, at 2066-67).  The Alabama Court of Criminal Appeals also denied the claim because Miller failed to comply with state procedural rules.  *Miller*, 99 So. 3d at 425.  Therefore, this court finds that this claim is barred from habeas review.  *See Brownlee v. Haley*, 306 F.3d 1043, 1066-67 (11th Cir. 2002).

### (2)   Merits

Even assuming this claim is not procedurally defaulted, and reviewing the claims *de novo*, Miller still has failed to demonstrate that he is entitled to habeas relief because he has failed to produce evidence sufficient to meet either prong of *Strickland*.  As the Rule 32 court pointed out, Miller failed to present any evidence at the Rule 32 hearing regarding trial counsel's strategy in requesting or failing to request specific jury instructions, and did not identify any specific instructions he believes counsel should have requested.  (C.R. Vol. 43, Tab 75, at 2066).  A silent record as to an attorney's motives for taking a particular action is insufficient to overcome the presumption that the attorney had good reasons for acting as he did. *See Massaro v. United States*, 538 U.S. 500, 505 (2003) ("The appellate court may

have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive or was taken because the counsel's alternatives were even worse."). Thus, this court must assume that trial counsel pursued a reasonable strategy in the absence of any evidence to the contrary.

Additionally, Miller fails to demonstrate a reasonable probability that the outcome of the proceeding would have been different but for trial counsel's strategy in proposing jury instructions. The jury instructions clearly stated that Miller was not pleading guilty to the charged offenses and that the jury was required to determine Miller's guilt beyond a reasonable doubt. The court provided the following instruction:

> *Now, to the charge of capital murder, the defendant has entered a plea of not guilty. And, of course, that applies to the charge of capital murder and any lesser included offenses.*
>
> *The plea of not guilty* casts the burden of proof on the State of Alabama to convince you, the jury, beyond a reasonable doubt . . . that the defendant is guilty as charged in the indictment.
>
> The defendant does not have a burden of proof whatsoever. He does not have to prove that he's innocent. He comes in to court with the presumption of innocence which surrounds him throughout the trial in this case and attends him or goes with him into the jury room until the jury and each and every member of the jury, after considering all the evidence, are convinced beyond a reasonable doubt that the defendant is guilty as charged in the indictment. And then at that time, and at that time only, does eh shed that presumption of innocence, sometimes called a cloak of innocence.

(C.R. Vol. 7, Tab 16, at 1287-88) (emphasis added).

The court also distinguished between the elements of capital murder and the elements of the lesser offense of intentional murder:

> Now, in order to find the defendant guilty of this lesser included offense of intentional murder, you must find the defendant committed an intentional murder of only one person or that, should you find an intentional murder or two or more persons, that the state failed to prove beyond a reasonable doubt that the murders of two or more persons were not - - were pursuant to one scheme or course of conduct.
>
> Now, if you find from the evidence the state has proved beyond a reasonable doubt each of the above elements of the offense of murder as charged, then you shall find the defendant guilty of murder, a lesser included offense of capital murder.
>
> If you find the state has failed to prove beyond a reasonable doubt any one or more of the elements of the offense of intentional murder, then you cannot find the defendant guilty of intentional murder.
>
> Now, to the charge of capital murder, the defendant has entered a plea of not guilty.  And, of course, that applies to the charge of capital murder and any lesser included offenses.

(*Id*. at 1286-87).  Thus, the court's guilt phase jury instructions sufficiently informed the jury that Miller was not pleading guilty and provided the jury with the necessary information to differentiate between capital and non-capital murder.  Because the court correctly instructed the jury, and the jury still found Miller guilty, this court finds that Miller would not be entitled to habeas relief even if his claim were not procedurally defaulted.

143

### g)    Miller's claim that trial counsel was ineffective for relying on Dr. Scott as the sole mitigation witness during the penalty phase of trial

Miller contends that appellate counsel should have argued that trial counsel was ineffective for relying solely on Dr. Scott during the penalty phase. (Doc. 1, at 144). Miller first argues that Dr. Scott's testimony was insufficient because he was not hired as a mitigation expert and had not conducted a sufficient investigation to present the full range of evidence that a mitigation expert would be expected to present at trial.[33] (*Id.* at 101). Next, Miller argues that trial counsel was deficient for failing to call several members of Miller's family, including "Mr. Miller's mother, Barbara Miller, half-sister, Cheryl Ellison, half-brother, Jeff Carr, Jeff's wife, Sandra Carr, Barbara's brother, George Carr, aunt Hazel Miller, and cousin, Cindy Carr . . . Mr. Miller's brother, Richard Miller, niece, Alicia Sanford, nephew, Jacob Connell, and cousin Brian Miller." (*Id.* at 106). Miller contends that as a result of trial counsel's decision to present only Dr. Scott's testimony during the penalty phase, the jury never heard evidence of Miller's character and upbringing, the extent of physical

---

[33] Trial counsel did not employ Dr. Scott to put on a mitigation case. Instead, Dr. Scott was hired for the purpose of establishing two mitigating factors under Alabama law – first, that Miller was under the influence of an extreme mental or emotional disturbance at the time of the shootings, and second, that Miller's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. (R. Vol. 9, Tab 30, at 18).

abuse he suffered, his positive work history, his good character, and his positive relationships with family members.

### (1)    No Procedural Default

Respondent contends that this claim is not properly exhausted because Miller never argued that trial counsel was ineffective for relying on Dr. Scott as the sole mitigation witness. (Doc. 16). However, after reviewing the record, this court finds that Miller did raise this claim in his Rule 32 petition, as well as on appeal to the Alabama Court of Criminal Appeals. (Rule 32 C.R. Vol. 21, at 443-51; Rule 32 R. Vol. 38, Tab 63, at 82-104). Thus, this court will review the state court's rejection of this claim under AEDPA deference.

### (2)    Merits

In discussing this claim, the Rule 32 court addressed both the prejudice and performance prongs of *Strickland*, and the Alabama Court of Criminal Appeals affirmed the trial court's reasoning as to both prongs. However, because lack of prejudice is clear, this court will limit its analysis to the prejudice prong. The Rule 32 court found that Miller failed to establish prejudice because the evidence that Miller alleges should have been presented through Miller's family members or through a mitigation expert would simply be cumulative of the evidence presented by Dr. Scott and would have been insufficient to establish any other mitigating factor.

(C.R. Vol. 43, Tab 75, at 2085-95).  The court concluded by stating that Miller failed to show that the admission of additional mitigating evidence would have altered the outcome of the proceeding in light of "the brutal nature of the crime, the overwhelming and convincing evidence of guilt, and the strength of the aggravating circumstance that [the murders were] heinous, atrocious, and cruel."  (*Id*. at 2096).

As discussed by this court in Part VI(B)(3)(e), Miller cannot show a reasonable probability that the admission of additional mitigating evidence would have altered the court's decision to sentence Miller to death.  Therefore, regardless of whether trial counsel acted unreasonably in only calling Dr. Scott to testify during the penalty phase, Miller cannot establish prejudice.  *See Crawford v. Head*, 311 F.3d 1288, 1322 (11th Cir. 2002) (holding that even if trial counsel acted unreasonably, petitioner was not entitled to habeas relief because no reasonable probability existed that additional mitigating evidence would have led the jury to sentence the petitioner to life rather than  death).  Accordingly, the state court reasonably determined that Miller's trial counsel was not ineffective, and, therefore, the state court reasonably determined that Miller's ineffective assistance of appellate counsel claim was also without merit.

### h)     Miller's claim that trial counsel was ineffective in failing to move for a directed verdict during the penalty phase

Miller alleges that appellate counsel should have argued that trial counsel was ineffective for failing to move for a directed verdict based on the state's failure to

146

present comparative evidence necessary for the jury to determine that the killings

were "especially heinous, atrocious, or cruel compared to other capital crimes." (Doc.

1, at 144).  Miller argues that by its very terms, the "especially heinous, atrocious or

cruel" aggravating factor requires the jury to compare the heinousness of the crime

with the heinousness of "other capital offenses."  (*Id*. at 109).  He explains that:

> The jurors would have no way of performing such a comparison without
> receiving and evaluating evidence concerning the heinousness, atrocity,
> and cruelty of "other capital offenses." This aggravating factor, by its
> very terms, is not satisfied if the jurors simply conclude that the killings
> under consideration were heinous, atrocious, or cruel in the abstract. The
> factor requires a comparison, and such a comparison can be made only
> if adequate evidence concerning the facts and circumstances of other
> capital offenses is presented for the jury to consider. No such evidence
> was presented by the State in Mr. Miller's case.

(*Id*.).  Miller argues that counsel should have made it clear to the judge that the state

had failed to present the necessary comparative evidence that the jury was require to

consider in order to determine if the sole aggravating factor had been proved."  (*Id*.

at 112).

### (1)     Procedural Default

Respondent contends that this claim is procedurally defaulted from habeas

review based on Miller's failure to comply with state rules.  (Doc. 16, at 96-97).  This

court agrees.  When Miller raised this claim on appeal from the denial of his Rule 32

petition, he "suggest[ed] that because this particular claim was not addressed in the

circuit court's order denying the Rule 32 petition, that the court's 'silence is a candid admission that trial counsel's failure to make this argument deprived Mr. Miller of the effective assistance of counsel.'" *Miller*, 99 So. 3d at 421.  The state, on the other hand, argued that the claim was not properly before the appellate court because it was not presented in Miller's amended Rule 32 petition.  *Id*.  The Alabama Court of Criminal Appeals agreed, holding that "this claim was not properly presented to the circuit court and, thus, is not properly before this Court for appellate review."  *Id*. The fact that the appellate court went on the address the merits of the claim in an alternative holding has no effect on the court's finding that the claim was procedurally barred.  *See Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999). Thus, this claim is procedurally barred from review in this court.

### (2)   Merits

Even assuming that this claim were not barred from review in this court, the claim would be due to be denied on the merits.  In addressing the claim in an alternative holding, the Alabama Court of Criminal Appeals pointed out that in *Ex Parte Bankhead*, 585 So. 2d 112, 125 (Ala. 1991), the Alabama Supreme Court had previously rejected a defendant's argument that the "especially heinous, atrocious or cruel" aggravating factor required a comparative case.  *Miller*, 99 So. 3d at 422-23. In *Bankhead*, the Alabama Supreme Court stated that "[a]lthough a very narrow and

148

literal reading of the statute may suggest that such a comparison is required, it would be virtually impossible for [trial courts] to implement." *Bankhead*, 585 So. 2d at 125. Instead, the Alabama Supreme Court instructed that the question under the "especially heinous, atrocious or cruel" aggravating factor is whether the murder was "conscienceless or pitiless" and "unnecessarily torturous to the victim," *and* that the statute did not require the state to present comparator cases to establish the aggravating factor. *Id.* Relying on *Bankhead*, the Alabama Court of Criminal Appeals concluded that trial counsel could not have been ineffective for failing to move for a directed verdict on this ground because the state was not required to present other capital cases for comparison under Alabama law.

In his reply brief, Miller argues that, although *Bankhead* recognized that Alabama law did not require a comparative case to establish the aggravating factor, subsequent cases have reached the opposite conclusion.   (Doc. 22, at 170). Specifically, Miller points to *Smith v. State*, 756 So. 2d 892, 912-13 (Ala. Crim. App. 1998), *aff'd*, 756 So. 2d 957 (Ala. 2000).

The issue in *Smith* was whether the state *improperly solicited* testimony from a police officer comparing the murder in that case with murders in other capital crimes in terms of heinousness, atrociousness, and cruelty. *Id.* at 912.  The Alabama Court of Criminal Appeals determined that the police officer's testimony was

149

properly admissible because "[i]n determining whether a capital crime is especially heinous, atrocious, or cruel, the fact finder *can* compare the murder at issue with other capital crimes." *Id*. at 912 (emphasis added).   However, contrary to Miller's contention, *Smith* does not stand for the proposition that Alabama law *requires* a comparative case to establish the "especially heinous, atrocious, and cruel" aggravating factor.  Instead, *Smith* stands for exactly what it says it stands for – that "the factfinder *can* compare the murder at issue with other capital crimes." *Id*. Indeed, subsequent to the Alabama Court of Criminal Appeals' decision in *Smith*, the Alabama Supreme Court affirmed its decision in *Bankhead* that the "especially heinous, atrocious, and cruel" aggravating factor did not require that the state to present comparative criteria for the jury to find the aggravating factor. *See Ex parte Key*, 891 So. 2d 384, 389 (Ala. 2004).

Because Alabama law does not require the state to present a comparative case to establish the "especially heinous, atrocious, and cruel" aggravating factor, Miller was not entitled to a directed verdict based on the lack of a comparative case.  *See Hallford v. Culliver*, 379 F. Supp. 2d 1232, 1268-69 (M.D. Ala. 2004) (rejecting argument that Alabama law requires a comparative case to determine whether a crime was "especially heinous, atrocious, or cruel").  Trial counsel was not ineffective for failing to argue that Miller was entitled to a directed verdict on this ground, and

appellate counsel could not be ineffective for failing to present this ineffective assistance of trial counsel claim on appeal. Thus, the state court reasonably determined this claim to be without merit.

Furthermore, even if the court were to review the merits of this claim *de novo*, it would still be due to be denied because it is without merit for the reasons discussed above.

### i)   Miller's claim that trial counsel was ineffective in connection with his penalty phase closing argument

Miller next contends that appellate counsel should have argued that trial counsel was ineffective in his penalty phase closing argument for failing to focus on Miller's good character and his diminished capacity at the time of the offense. (Doc. 1, at 144). Miller contends that trial counsel made numerous unreasonable statements in his penalty phase closing argument. (*Id.* at 113-15).

First, Miller argues that trial counsel conceded the existence of the "especially heinous, atrocious or cruel" aggravating factor when he stated:

> [T]here is only one possible aggravating circumstance in this case and that is that this is an extremely heinous, atrocious or cruel crime as compared to other capital murders . . . . *I can't imagine any crime where a life is taken that wouldn't be cruel. I can't imagine any crime where victims don't suffer and their families don't suffer.*

(*Id.* at 113). He contends that counsel made no attempt to explain why the judge or jury should not find the existence of the sole aggravating factor. (*Id.*).

Next, Miller alleges that trial counsel was ineffective for failing to point out that the state had failed to produce any evidence showing how Miller's case compared to other capital offenses. (*Id*.). He explains that in the absence of such evidence, and coupled with trial counsel's admission of the sole aggravating factor, the jury was essentially "invited to find the existence of the aggravating factor and was provided with no basis to do otherwise." (*Id*.).

Additionally, Miller faults trial counsel for failing to make arguments that the mitigating factors outweighed the only aggravating factor, making no argument based on the limited evidence Dr. Scott had presented about Miller's family and his mental illness, and making no argument based on the fact that Miller spared the lives of two eyewitnesses and made no attempt to evade capture or cover up his crimes. (*Id*. at 113-14).

Finally, Miller argues that the theme of trial counsel's argument – that "no matter what someone does, they don't deserve to die" – was unreasonable given the fact that ten out of the fourteen jurors and alternates had stated during voir dire that they were not opposed to the death penalty. (*Id*. at 114).

### (1)   Procedural Default

Respondent contends that this claim is procedurally barred because Miller failed to comply with state procedural rules. (Doc. 16, at 96-97). The record supports

Respondent's contention. The Rule 32 court held that Miller had abandoned this claim because he failed to ask trial counsel a single question regarding why trial counsel adopted this particular approach to his closing argument. (C.R. Vol. 43, Tab 75, at 2098-99). The court also pointed out that Miller failed to present any evidence showing what a reasonable attorney would have argued during closing arguments or how Miller suffered prejudice as a result of trial counsel's actions. (*Id*. at 2099). The Alabama Court of Criminal Appeals likewise found that this claim was procedurally barred from review because Miller had abandoned the claim. *Miller*, 99 So. 3d at 425. Thus, this court finds that this claim is procedurally barred from habeas review. *See Brownlee v. Haley*, 306 F.3d 1043, 1066–67 (11th Cir. 2002).

### (2)    Merits

Even without the procedural bar, this claim would still be due to be dismissed on the merits under *de novo* review. Miller's argument is essentially that trial counsel should have presented different arguments to the jury. However, because Miller failed to question trial counsel about his strategy regarding his closing statement, there is no evidence regarding why trial counsel adopted this particular approach to his closing argument. This silent record cannot overcome the presumption that trial counsel acted reasonably in choosing this approach to his closing argument. *See Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) ("Counsel's competence . . . is

153

presumed and the defendant must rebut this presumption by *proving* that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy.").

Additionally, a review of Miller's closing statement demonstrates that it was not so poor as to be objectively unreasonable.  The following is the entirety of trial counsel's penalty phase closing argument:

> May it please the court, ladies and gentlemen.
>
> I know by now you have been sitting for a long time, a long number of days and you don't want anybody else to be long winded; however, please grant me whatever time it takes, and I will be just as brief as I can, to say what I've got to say and what I'm feeling about this at this point.
>
> We are at that stage where it is - - something of a balancing act here and - - but there is a very mechanical part of this and it almost seems to me to be obscene to talk about the mechanics of doing this, but here are the mechanics and the judge will tell you what they are after we get through here, but here are the mechanics.
>
> You first have got to make a decision as a group and it has to be a unanimous decision, the same way your verdict was unanimous, but there is an aggravating circumstance in this case.  The judge will tell you if you cannot first unanimously agree that there is an aggravating circumstance in this case, then you must simply say life, we recommend life without parole.
>
> If you unanimously agree that there is an aggravating circumstance, then at that point the team effort is over, everything you've done up until this point has been something of a team effort, you had to have a unanimous verdict of guilt, you have to have a unanimous verdict on the aggravating circumstance, but at that point you are one on

one with Alan Miller because at that point you are deciding what you in your conscience to do with him.

And if it was humanly possible to make eye contact with twelve people at once, that's what I would be doing at this point because I want to talk to you now about that decision if you get that far.

Remember to get that far you've got to unanimously decide that there is an aggravating circumstance and there is only one possible aggravating circumstance in this case and that is that this is an extremely heinous, atrocious or cruel crime as compared to other capital murders.

There again, it seems obscene to me to talk about the atrocity of crimes of the heinousness of the crime.

I can't imagine any crime where a life is taken that wouldn't be cruel. I can't imagine any crime where victims don't suffer and their families don't suffer. But what you're dealing with here now is not whether a crime in and of itself is atrocious, heinous and cruel, it's whether this particular crime is extremely heinous, atrocious or cruel as compared to other capital murders.

So already you've got a relative term there. If you find unanimously that yes, this one is, then you consider mitigating circumstances. Some of them are set out in the law. I have read to Dr. Scott two of them. There is a third one, the judge will charge you that there are three mitigating circumstances that have been presented to you for your consideration. One of them has been - - at least one has been agreed upon and that is that Alan Miller has no prior criminal history. The law considers that a mitigating circumstance.

Another one has to do - - I will have to read them because I just can't recall them. Second one if it was committed while the defendant was under the influence of extreme mental or emotional disturbance; that is a mitigating circumstance.

The rational [sic] I don't need to sit here and tell you. Greatest injustice of all is the equal treatment of unequals. If you think that you

are dealing with an unequal here, don't treat them equally, the same way you would to me.

The third one of the statutory mitigating circumstances is whether capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to requirements of law which was substantially impaired.

For reasons that Dr. Scott stated to you and he can present those to you much more eloquently than I can and did. Those are three that at this point I suggest to you are unrebutted.

Now, it's not a mathematical test anyway. The fact that we have three to possibly their one doesn't mean that this - - that you can't impose the death penalty. But actually Mr. Ladner - - what I suggest to you is the most mitigating of all circumstance is that we're on the same page on one thing, what Mr. Ladner said was the reason that you impose this death penalty is to prevent Mr. Miller and others like him from doing these kinds of things.

Now, think about that a minute. Is that going to prevent what Mr. Miller did? Is it going to prevent anyone else from doing it? It has nothing to do with prevention. But perhaps we can do something here that might and wouldn't that be the most mitigating circumstance of all because the only way it seems to me that you can prevent an offense from being committed is to impose the penalty before the crime and surely we haven't become that blood thirsty.

But there perhaps may be a way to use this to prevent something and that would be somewhere we have to start, we have to work into our national character, this notion that it really doesn't matter what you do, you deserve to live. That is not a sympathetic approach. That, I suggest to you, is the only approach that keeps anyone from going out and doing what we see and hear and read about in the papers day after day and we keep pulling our hair out and we keep sitting around and saying, how in the world, what is wrong. Because in all my young life, I grew up like all of you did, I'm sure, around all types of people, some of them pretty doggone mean, I wouldn't fool with them.

156

But not one person in my young life do I ever remember suggesting that they wanted to kill their parents, that they wanted to blow up a school, that they wanted to just go in and mow down people because they might belong into a particular group.

And that mentality, however, has become pervasive in our society. And when I struggle, like I'm sure you must, with how do we stop this stuff, I can only come to one answer and that is we have to set as our number one priority when we define values for ourselves and our children that no matter what someone does, they don't deserve to die because any other - - by any other definition, we get down to quantifying this stuff which seems to me just not to make good sense.

Because if we believe, if we continue to believe that we can refine our system here and we can sit here and use terms like I've used, I can't even remember the terms that I've already said here, and say, okay, this is death, this is life, this is death, this is life, depends on whether these words mean what they mean or this particular situation fits into these words.  As long as we're willing to do that, and as long as we can confine that analysis to the sophistication of a courtroom, then we're going to continue to see what we see every day.  And we're going to struggle with children when we try to explain or understand how in the world could you kill a classmate, well, they deserved to die.

Just like I said to you before, the only way to have prevented this crime - - and I know everyone of you right now just like - - all of your hearts have got to hurt, wishing that you could have prevented this crime.  Just like I wish I could have prevented this crime.

But I suggest to you that the only way this crime could have been prevented was on the morning of August the 5th, I believe that if Alan Miller, if I had known what was going to go on, and I'm sure everybody in here would do the same thing, if you had known that this was about to happen, you would have done what you could to prevent it.

So ask yourself this, if you had seen Alan Miller that morning and had a clue that this was going to go on and you could have told him one

of two things, you could have said, Alan, if you go in there and do this, you may lose your own life or you could have said, Alan, no matter what anyone has done to you, they don't deserve to die for it.

Now, which one of those two ideas would have prevented this from happening. I will reiterate what I said earlier and that is that you're on a stage, there's a crowd out here and the crowd is screaming for you to kill him, but you have got to think long and hard, please, about what I have said.

Now, you may have noticed that every time I have spoken here the state has come up right behind me, they will do it again. That's because that's the mechanics of a trial. And then I will sit there and I will bite my tongue while they talk to you and bite my lip and I won't get a chance to stand back up, it won't be because that I agree with what they're saying, it won't be because I do not believe I have a better answer for anything they might say, it will be because there has to be a stopping point and that is it.

Please, all I ask of you is to consider those things that you have heard in this courtroom in this phase of the hearing, consider those things that I have suggested to you might not just mitigate this offense but that might mitigate any future victims. Let's think about those people, okay.

Thank you very much.

(C.R. Vol 8, Tab 24, at 1409-17).

Trial counsel's theme in his penalty phase closing argument echoed that of his penalty phase opening statement – that no one deserves to die regardless of what he has done or what the jurors might think about him. Although Miller contends that this approach was unreasonable given that ten of the fourteen jurors and alternates had stated they favored the death penalty, this court finds that such an approach falls

158

within the broad range of reasonable professional conduct.  Additionally, given the strength of the state's case showing the brutal nature of Miller's crimes, the court finds that a different closing argument would not have resulted in a lesser sentence or that the closing argument in any way undermined the reliability of the outcome of the penalty phase.  *See Windom v. Sec'y, Dep't of Corrs*, 578 F.3d 1227, 1251-52 (11th Cir. 2009).  Therefore, the ineffective assistance of trial counsel claim would be due to be denied on the merits even if it were not procedurally barred.

> **j)    Miller's claim that trial counsel was ineffective for failing to object to the court's penalty phase jury instructions**

Miller alleges that appellate counsel should have argued that trial counsel was ineffective for failing to object to the court's instruction that the jury was making a "recommendation." (Doc. 1, at 144).  Miller alleges that the trial court diminished the jury's sense of sentencing responsibility by repeatedly emphasizing that the jury would be making only a recommendation to the court regarding the death sentence and failing to advise the jurors that any aspect of their decision was binding on the court.  (*Id*. at 115-17).  According to Miller, the

> jurors were never advised that any aspect of their decision was binding on the trial court, let alone that they were responsible for making a final decision on the existence of an aggravating factor, without which Mr. Miller could not be sentenced to death. The jurors simply had no way to know of their determinative role. To the contrary, they were led to believe just the opposite. By so diminishing the jury's sense of sentencing responsibility, the instructions and other judicial comments

in Mr. Miller's case violated Miller's Eighth Amendment rights under *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985).

(*Id.* at 117-18).

### (1)  Procedural Default

This claim is procedurally defaulted.  Miller raised this claim in his Rule 32 petition, and that court found the claim to be "completely without merit."  (C.R. Vol. 43, Tab 75, at 2101).  However, Miller did not raise the claim on appeal from the denial of his Rule 32 petition.  (*See* Rule 32 R. Vol. 38, Tab 63).  Thus, this claim is barred from habeas review.  *See Woodford v. Ngo*, 548 U.S. 81, 92 (2006) ("A state prisoner is generally barred from obtaining federal habeas relief unless the prisoner has properly presented his or her claim through one 'complete round of the State's established appellate review process.'") (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)).

### (2)  Merits

Alternatively, this claim is due to be dismissed because the Rule 32 court, the last state court to review the claim, denied the claim on the merits.  In denying the claim, the Rule 32 court stated:

> This Court denies Miller's claim because he has failed to meet his burden of proof that his trial counsel were deficient for not objecting to the trial court's instructions and has failed to demonstrate how he was prejudiced.  Miller's contention is completely without merit.  Under Alabama law, the jury's sentencing determination in capital cases is

160

advisory only.  Ala. Code § 13A-5-47(a).  During the penalty phase instructions, the trial court properly referred to the jury's determination as a recommendation.  (R. 1427, 1428, 1441)  Alabama courts have routinely rejected claims that such an instruction is improper.  *See Harris v. State*, CR-04-2363, 2007 WL 4463947 at *20 (Ala. Crim. App. December 21, 2007)("Alabama courts have repeatedly held that a prosecutor's comments and a trial court's instructions accurately informing a jury that its sentencing verdict is advisory or is a recommendation do not violate *Caldwell v. Mississippi*, 472 U.S. 320 (1985)"); *Brown v. State*, CR-04-0293, 2007 WL 1865383, at *46 (Ala. Crim. App. June 29, 2007) (same).

Miller has presented no evidence that the jury in his case was "led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."  *Caldwell*, 472 U.S. at 328.  To the contrary, the trial court instructed the jury that "[i]t is your sole responsibility to determine what the facts are and recommend the punishment in this case."  (R. 1439)  Therefore, trial counsel could not be ineffective for failing to make an objection to the trial court's references to the sentencing recommendation of the jury because the trial court's instructions were proper and did not violate *Caldwell*.  *See McNabb v. State*, 991 So. 2d 313, 327 (Ala. Crim. App. 2007) ("[C]ounsel could not be ineffective for failing to raise a baseless objection.")  Accordingly, Miller has failed to meet his burden of proof and his claim is denied.

(C.R. Vol. 43, Tab 75, at 2101-03).

In *Caldwell v. Mississippi*, 472 U.S. 320 (1985), the prosecutor "urged the jury

not to view itself as determining whether the defendant would die, because a death

sentence would be reviewed for correctness by the State Supreme Court." 472 U.S.

at 323. The Court held that the comment sought to minimize the jury's sense of

responsibility for determining the appropriateness of a death sentence, thereby

violating the Eighth Amendment.  *Id*. at 341.  The Court found that the prosecutor's argument was "inaccurate, both because it was misleading as to the nature of the appellate court's review and because it depicted the jury's role in a way fundamentally at odds with the role that a capital sentencer must perform," and because it was "not linked to any arguably valid sentencing consideration." *Id*. at 336.

Miller claims that throughout the trial, the court "repeatedly informed the jurors that their sentencing verdict was merely a 'recommendation' to the Court, which would make the final determination whether Mr. Miller would live or die," but never advised the jury that "any aspect of their decision was binding on the trial court, let alone that they were responsible for making a final decision on the existence of an aggravating factor, without which Mr. Miller could not be sentenced to death." (Doc. 1, at 115, 117-18).  However, Miller has not cited a single instance in the trial transcript where the judge instructed the jury that it was the court, and not the jury, who would make the final determination as to Miller's fate.  Rather, a review of the court's instructions in both phases of the trial  reveals that while the court made several references to the fact that the jury would "recommend" the punishment in the case, he never specifically stated that the penalty phase verdict would be merely advisory, or gave the jury the impression that their verdict not final, would be reviewed, or that the moral obligation of determining the sentence rested elsewhere.

(*See* C.R. Vol 7, Tab 16 and Vol. 8, Tab 26).  Nonetheless, Alabama law provides that

a jury's role in the penalty phase is "advisory." *Ala. Code* § 13A-5-46 (1975). Thus,

any "instruction" to the jury that their verdict was advisory, or a recommendation,

was entirely consistent with Alabama Law. As the Eleventh Circuit Court of Appeals

stated in *Duren v. Hopper*, 161 F.3d 655 (11th Cir. 1998):

> In outlining the jury's proper sphere, the court did not mislead the
> jury, diminish its importance, or absolve it of responsibility for its
> decision. *See   Harich v. Dugger*, 844 F.2d 1464, 1473 (11th
> Cir.1988)(holding that informing jury of its "advisory" function does not
> violate *Caldwell*). FN.
>
> > FN. This court in *Harich* held that "a *Caldwell* violation
> > should include some affirmative misstatement or
> > misconduct that misleads the jury as to its role in the
> > sentencing process." *Harich v. Dugger*, 844 F.2d 1464,
> > 1473 (11th Cir.1988). There was no such affirmative
> > misinformation in this case.
>
> Rather, unlike the prosecutor's comments in *Caldwell*, the instruction
> given by the trial court in this court was accurate and in accordance with
> Alabama law. Thus, Duren cannot satisfy the prejudice prong of
> *Strickland*, and his ineffective assistance of counsel claim must fail.

*Duren*, 161 F.3d at 664.

Because the court's instructions were proper, trial counsel could not have been

ineffective for failing to raise an objection.  *See Bearden v. State*, 825 So. 2d 868, 872

(Ala. Crim. App. 2001) ("[C]ounsel could not be ineffective for failing to raise a

baseless objection."); *Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001)

(counsel is not ineffective for failing to raise a non-meritorious objection).  It follows that Miller cannot demonstrate that appellate counsel was ineffective based on his failure to raise this claim.  Accordingly, Miller fails to show that the state court's rejection of this claim was unreasonable, and he would not entitled to habeas relief on this ground, even if the claim were not procedurally barred.

> **k)   Miller's claim that trial counsel was ineffective in failing to request a special verdict form**

Miller next alleges that appellate counsel were ineffective for failing to argue that trial counsel was ineffective regarding the verdict form the trial court provided to the jurors.  (Doc. 1, at 118-20, 144).  At the close of the penalty phase, the court provided the jurors a general verdict form that asked only the number of votes for life imprisonment and the number of votes for the death penalty.  (*Id*. at 118-19).

Miller alleges that trial counsel should have requested a special verdict form that would have required the jurors to first explicitly indicate whether they had unanimously found the existence of the aggravating circumstance – a prerequisite finding necessary for Miller to be eligible for the death sentence – before determining whether to recommend life or death.  (*Id*. at 119).  Miller highlights the fact that only ten out of the twelve jurors voted for death, and argues that because of trial counsel's failure to request a special verdict form, the record is unclear whether all twelve jurors found the existence of an aggravating factor.  (*Id*.).

### (1)    Procedural Default

Respondent correctly asserts that this claim is procedurally barred from review because Miller failed to raise the claim in compliance with state procedural rules. (Doc. 16, at 96).  The Rule 32 court determined that Miller had abandoned this claim by failing to ask trial counsel any questions regarding his decision not to request a special verdict form and failing to ask any questions that would establish how he was prejudiced by his trial counsel's decision.  (C.R. Vol. 43, Tab 75, at 2100-01).  The Alabama Court of Appeals also found that this claim was procedurally barred from review because Miller abandoned the claim.  *Miller*, 99 So. 3d at 425.  Thus, the claim is barred from habeas review.  *See Brownlee v. Haley*, 306 F.3d 1043, 1066-67 (11th Cir. 2002).

### (2)    Merits

Absent a procedural bar, this claim would still be due to be dismissed because the ineffective assistance of trial counsel claim lacks merit.  The trial court adequately instructed the jurors that they must first unanimously find the existence of an aggravating factor before determining whether to recommend the death penalty.  The court instructed the jury:

> Now, as I stated to you before, the burden of proof is on the State of Alabama to convince each of you beyond a reasonable doubt as to the existence of any aggravating circumstance considered by you in determining what punishment is to be recommended in this case. *This*

*means that before you can even consider recommending the defendant's punishment to be death, each and every one of you must be convinced beyond a reasonable doubt based on the evidence that an aggravating circumstance exists.*

. . . .

*In order to consider an aggravating circumstance, it is necessary that the jury unanimously agree upon its existence.  All twelve of you must be convinced beyond a reasonable doubt that an aggravating circumstance exists in order for any of you to consider that aggravating circumstance in determining what the sentence should be.*

However, it's not necessary for there to be a unanimous agreement upon the existence of a mitigating circumstance before you can consider it in setting punishment.

. . . .

*There must be a unanimous agreement on the existence of a particular aggravating circumstance before it can be considered by any juror.*  There need not be a unanimous agreement on the existence of any particular mitigating circumstance before it can be considered.

(R. Vol. 8, Tab 26, at 1433, 1438)(emphasis added).

Thus, the court adequately informed the jurors that they must first unanimously find the existence of an aggravating circumstance before recommending death. Additionally, the state's penalty phase opening statement as well as Miller's penalty phase closing argument reminded the jurors that the existence of an aggravating factor was a prerequisite to recommending a death sentence.  (R. Vol. 8, Tab 19, at 1314-15; R. Vol. 8, Tab 24, at 1409-10).   In the state's opening statement, the

prosecutor stated that the state bore the burden of establishing beyond a reasonable doubt the existence of the aggravating circumstance and that the jurors must first find the "existence of an aggravating factor to even consider the imposition or the recommendation of the death penalty in this case."  (R. Vol. 8, Tab 19, at 1315).  Miller's trial counsel reiterated this rule in his closing argument when he stated, "[t]he judge will tell you if you cannot first unanimously agree that there is an aggravating circumstance in this case, then you must simply say life, we recommend life without parole."  (R. Vol. 8, Tab 24, at 1410).

In the face of the instructions of the court, as well as the repeated reminders of both the prosecution and defense, Miller has offered nothing to raise even a doubt that the jurors understood the determinations they had to make during the penalty phase deliberations.  *See Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1260 (11th Cir. 2012) ("The jury's verdict necessarily contained [findings than an aggravating circumstance existed] because the jury was instructed that it could not recommend a death sentence unless it found beyond a reasonable doubt that one or more aggravating circumstances existed.").  The jury's recommendation of death, although not unanimous, proves that the jury must have unanimously found the existence of the aggravating circumstance.  Thus, regardless of whether a special verdict form had been provided to the jury, the outcome of the proceeding would have

been the same.  Because Miller suffered no prejudice under *Strickland*, the ineffective assistance of trial counsel claim is without merit and appellate counsel cannot be ineffective for failing to raise it.  Therefore, the court concludes that this claim is due to be dismissed.

### l)    Miller's claim that trial counsel was ineffective at the sentencing hearing

Miller alleges that appellate counsel was ineffective for failing to argue that trial counsel was ineffective for failing to present mitigating evidence at the sentencing hearing.  (Doc. 1, at 120-23, 145; Doc. 22, 172-78).  He alleges that trial counsel could have presented a wealth of readily available mitigating evidence, including records and witnesses demonstrating Miller's abusive and traumatic childhood, mental health issues affecting Miller and members of his family, his hard-working and caring nature, and his excellent employment record.  (Doc. 1, at 120).  He adds that trial counsel offered no evidence, called no witnesses, and failed to arrange for anyone to appear on Miller's behalf.  (*Id*.).  He contends that had counsel called available witnesses to testify at the sentencing hearing, their testimony would have provided the court with critical mitigating evidence not otherwise available to the judge, providing a substantial basis for sentencing Miller to life imprisonment rather than death.  (*Id*.).

Miller asserts that he was severely prejudiced by counsel's deficient performance. (*Id*. at 121). Specifically, he points out that the pre-sentencing investigative report prepared by the Alabama Board of Pardons and Paroles "woefully understated the horrible abuse Mr. Miller had suffered at the hands of his father." (*Id*.). Miller also points out that trial counsel failed to introduce either Dr. Scott's or Dr. McDermott's reports that contained detailed summaries of Miller's family history and background. (*Id*.). Miller argues that the prejudice he suffered as a result of trial counsel's failure to present additional mitigating evidence is apparent from Judge Crowson's statement at sentencing that his decision was "probably the most difficult sentence that I've ever had to consider" and that "I've been wrestling with it for a long time." (*Id*. at 121-22).

### (1)    No Procedural Default

Miller properly raised this claim on collateral appeal, and the Alabama Court of Criminal Appeals addressed the claim on the merits. *Miller*, 99 So. 3d at 423-24. Therefore, the court reviews the determinations of the state court under AEDPA deference.

### (2)    Merits

The Rule 32 court denied this claim, making the following determinations:

> This Court denies Miller's claim because he has failed to meet his
> burden of proof of demonstrating that his trial counsels' performance

169

was deficient under *Strickland*, 466 U.S. at 687. Ala. R. Crim. P., 32.7(d). Alabama courts have held that "counsel does not necessarily render ineffective assistance simply because he does not present all possible mitigating evidence." *McGahee v. State*, 885 So.2d 191, 221 (Ala. Crim. App. 2003). However, as noted above, trial counsel presented a competent mitigating case concerning Miller's mental health and background during the penalty phase of the trial. The trial court presided over Miller's trial and heard all of the mitigating evidence presented. Simply the fact that Miller's trial counsel could have presented more mitigation evidence during the sentencing hearing does not establish deficient performance under *Strickland*. *See McGahee*, 885 So.2d at 221 ("Trial counsel could have called more witnesses at the penalty-phase hearing before the trial judge, with the hope that the additional information would have convinced the trial judge to agree with the jury's recommendation and to sentence McGahee to life imprisonment without parole. The same can be said after any sentencing hearing in a capital case in which a death sentence is imposed after the jury recommended a sentence of life imprisonment without parole.") (emphasis in original).

Miller failed to ask trial counsel any questions regarding the reasons why he did not call any witnesses or present evidence during the sentencing hearing. (Rule 32 R. 200–01) Therefore, trial counsel's performance must be presumed to be reasonable. . . .

This claim is also denied because Miller has failed to meet his burden of proof of demonstrating that he was prejudiced. *See Strickland*, 466 U.S. at 695; Ala. R. Crim. P., 32.7(d). Miller failed to establish what additional evidence could have been submitted during the sentencing hearing. Miller asked trial counsel whether he submitted Dr. Scott or Dr. McDermott's report during the sentencing hearing before the trial court; however, the substance of both reports had been already presented during the penalty phase. Furthermore, the trial court found three statutory mitigating circumstances to exist. *Miller*, 913 So.2d at 1169. Miller has failed to demonstrate what additional mitigating circumstances could have been proven during the sentencing hearing. Accordingly, Miller has failed to establish proof that he was prejudiced, and this claim is denied.

170

(C.R. Vol. 43, Tab 75, at 2103-05).

The Alabama Court of Criminal Appeals found that the Rule 32 court's findings of fact and conclusions of law were supported by the evidence; it concluded that "[b]ecause [Miller] failed to establish that his ineffective-assistance-of-trial-counsel claim is meritorious, he has failed to prove by a preponderance of the evidence that his appellate counsel was ineffective for failing to present this claim." *Miller*, 99 So. 3d at 424 (quoting *Payne v. State*, 791 So. 2d at 401-02)).

Although the state court addressed both the performance and prejudice prong of *Strickland*, this court will limit its analysis to determining whether Miller suffered any prejudice as a result of trial counsel's performance. *See Jones v. GDCP Warden,* 815 F.3d 689, 715-16 (2016)(quoting *Waters v. Thomas*, 46 F.3d 1506, 1510 (11th Cir. 1995) ("Notably, a court 'may decline to reach the performance prong of the ineffective assistance test if convinced that the prejudice prong cannot be satisfied.'")

To establish prejudice under *Strickland*, Miller bears the burden of demonstrating a "reasonable probability" that he would not have received a death sentence if trial counsel had presented the mitigating evidence that was presented during the Rule 32 hearings. This burden becomes even greater in the context of the AEDPA, where Miller must demonstrate that no reasonable jurist could determine that there was not a reasonable probability that the outcome of the proceeding would

have been different but for trial counsel's performance.  *See Brooks v. Comm'r, Ala. Dep't of Corrs*, 719 F.3d 1292, 1300 (11th Cir. 2013).  Although the prejudice question in this case may be close given the trial court's statements about its struggle in deciding to sentence Miller to death,[34] this court is persuaded that a reasonable jurist could conclude that Miller did not suffer any prejudice.

As this court discussed previously, the additional evidence Miller presented during the Rule 32 hearings was largely cumulative of the evidence trial counsel presented through the testimony of Dr. Scott in the penalty phase.  Although the pre-sentencing report did not accurately portray the abuse that Miller suffered at the hands of his father, the trial judge heard Dr. Scott's penalty phase testimony during which he testified about the physical and emotional abuse that Miller suffered.  Although the court might not have heard of all of the specific examples of abuse that Miller suffered, the court was aware that his father frequently hit Miller and had even threatened him with a knife. (*See* R. Vol. 8, Tab 22, at 1350-51).  The court was also aware that Miller had observed his father using intravenous drugs and that Miller was raised in poverty.  (*See Id*. at 1350; *see also* Rule 32 C.R. Vol. 31, at 415-16).

---

[34] The undersigned judge notes from personal experience that imposing a harsh sentence frequently results from a "struggle."  Imposing the ultimate sentence of death should never be an easy decision.

Given the largely cumulative nature of the mitigating evidence Miller presented at the Rule 32 hearings, this court concludes a reasonable jurist could determine that the "new" mitigating evidence – evidence of Miller's loving relationships with his family members, his strong work history, and his family's history of mental illness – would have been insufficient to sway the sentencing judge to recommend a different sentence. Thus, a reasonable jurist could conclude that Miller's trial counsel was not ineffective, and, likewise, that appellate counsel was not ineffective for failing to raise this claim.

Accordingly, Miller fails to show that the state court's rejection of this claim was unreasonable, and Miller is not entitled to habeas relief on this ground.

> **m)**   **Miller's claim that trial counsel was ineffective in failing to bring the Supreme Court's decision in *Apprendi v. New Jersey* to the trial court's attention**

Miller alleges that appellate counsel should have argued that trial counsel was ineffective for failing to notify the trial court of the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000). (Doc. 1, at 145). In *Apprendi*, the Supreme Court held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 492. Miller argues that if trial counsel had presented this argument at the sentencing hearing, he would have been able to obtain

a new penalty phase trial before a jury that had been informed that their determination regarding the aggravating factor was not merely a "recommendation." (Doc. 1, at 122).

### (1)    Procedural Default

Respondent correctly contends that this claim is procedurally defaulted because Miller failed to comply with state procedural rules. (Doc. 16, at 96). In addressing this claim, the Alabama Court of Criminal Appeals held that the claim was not properly before that court, because the "assertion was neither presented in Miller's amended Rule 32 petition, nor was it addressed in the evidentiary hearing." *Miller*, 99 So. 3d at 425 (citing *Arrington v. State*, 716 So .2d 237, 239 (Ala. Crim. App. 1997) ("An appellant cannot raise an issue on appeal from the denial of a Rule 32 which was not raised in the Rule 32 petition."). Because the Alabama Court of Criminal Appeals stated clearly that this claim is barred based upon Miller's failure to follow state procedural rules, the procedural default doctrine precludes federal review of this claim. *See Coleman v. Thompson*, 501 U.S. 722, 731 (1991) ("When a petitioner fails to raise his federal claims in compliance with relevant state procedural rules, the state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate ground for denying federal review."); *Cone v. Bell*, 556 U.S. 449, 465 (2009).

174

## (2)    Merits

Even without the procedural default, this claim lacks merit.  If trial counsel had brought *Apprendi* to the attention of the court, Miller still would not have been entitled to a new penalty phase because the court and the attorneys notified the jurors that they must find the existence of the aggravating factor – that the crime was especially heinous, atrocious, or cruel – beyond a reasonable doubt before they could even consider whether to recommend the death penalty.

The court instructed the jurors:

> Now, as I stated to you before, the burden of proof is on the State of Alabama to convince each of you beyond a reasonable doubt as to the existence of any aggravating circumstance considered by you in determining what punishment is to be recommended in this case.  This means that before you can even consider recommending the defendant's punishment be death, each and every one of you must be convinced beyond a reasonable doubt based upon the evidence that an aggravating circumstance exists.

(R. Vol. 8, Tab 27, at 1433).

Based on this instruction, the court submitted to the jurors the question of whether the state proved the existence of the aggravating circumstance beyond a reasonable doubt.  This instruction reflects what *Apprendi* requires.  *See Apprendi*, 530 U.S. at 490 ("[A]ny fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.").  The fact that ten out of the twelve jurors recommended

175

sentencing Miller to death demonstrates that all of the jurors must have determined that the aggravating circumstance existed beyond a reasonable doubt. *See Brown v. Jones*, 255 F.3d 1273, 1280 (11th Cir. 2001) ("[J]urors are presumed to follow the court's instructions."); *Raulerson v. Wainwright*, 753 F.2d 869, 876 (11th Cir. 1985) ("Jurors are presumed to follow the law as they are instructed."); *Ingram v. Zant*, 26 F.3d 1047, 1053 (11th Cir. 1994). Therefore, because Miller was not entitled to a new trial under *Apprendi*, trial counsel was not ineffective for failing to bring the case to the attention of the court. Likewise, appellate counsel could not be ineffective for failing to present this ineffective assistance of trial counsel claim. This court finds this claim would be due to be denied on the merits even if it were not procedurally defaulted.

### 5.    Claim B(vi): Miller's Claim that Appellate Counsel was Ineffective in the Appeal to the Alabama Court of Criminal Appeals

In this claim, Miller sets forth numerous arguments as to appellate counsel's ineffectiveness regarding the brief submitted to the Alabama Court of Criminal Appeals by appellate counsel. (Doc. 1, at 145-49). Specifically, Miller alleges that appellate counsel's brief presented truncated and cursory challenges to trial counsel's guilt phase opening statement, trial counsel's failure to present an insanity defense, trial counsel's failure to investigate and present mitigating evidence, and trial counsel's penalty phase opening statement. (*Id*.). Miller contends that but for

176

appellate counsel's unreasonable representation, a reasonable probability exists that he would have been granted either a new trial or a new sentencing hearing. (*Id*.).

### a)    Procedural Default

Miller failed to present this claim before either the Rule 32 court or the Alabama Court of Criminal Appeals. His failure to properly exhaust this claim bars this court from granting habeas corpus relief. *See Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) ("Exhaustion of state remedies requires that the state prisoner 'fairly presen[t] federal claims to the State courts to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'") (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)).

### b)    Merits

Alternatively, this claim would also be due to be denied on the merits under a *de novo* standard of review. This court has examined all of the ineffective assistance of trial counsel claims that Miller alleges appellate counsel failed to adequately present in his brief, and has determined each claim lacks merit. Therefore, this court finds this claim of ineffective assistance of appellate counsel also lacks merit.

## C.   MILLER'S CLAIM THAT HIS DEATH SENTENCE VIOLATES THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS

Miller argues that Alabama's advisory capital sentencing scheme violates *Ring v. Arizona*, 536 U.S. 584 (2000) and *Hurst v. Florida*, 136 S. Ct. 616 (2016),[35] and effectively eliminated the jury's role and responsibility for sentencing Miller to death in several ways.  (Doc. 1 at 149, Doc. 43).  First, Miller alleges that although *Ring*'s fundamental principle is that the jury occupies a determinative role in capital sentencing, the trial court's instructions misled the jurors into believing their sentencing role was purely advisory.  (*Id.* at 149-50).

Second, Miller argues that because *Ring* requires the jury to "find beyond a reasonable doubt, 'all facts essential to imposition of the level of punishment that the defendant receives,'" Alabama juries are required to determine beyond a reasonable doubt *both* that an aggravating circumstance existed *and* that the aggravating factors outweighed the mitigating factors. (*Id.* at 150-52) (quoting *Ring*, 536 U.S. at 610).  He claims that the jury in his case was not instructed that it had to find that the sole aggravating factor outweighed the mitigating circumstances beyond a reasonable doubt to return a verdict for death.  (*Id.* at 152).  Rather, he asserts that the court's instructions explained to the jurors that they were required to apply a beyond a

---

[35] The court granted Miller leave to cite *Hurst* in support of his petition.  (*See* Doc. 42).

178

reasonable doubt standard only when determining the existence of the aggravating factor, not in the weighing of aggravating and mitigating factors. (*Id.*).

Finally, Miller argues that his death sentence is "unsupported by any verifiable jury findings as required by *Ring*." (*Id.*). He maintains a "strong reason to doubt that the Miller jurors were unanimous in finding the necessary aggravating circumstance." (*Id.*).

The Alabama Court of Criminal Appeals reviewed and rejected these arguments on direct appeal:

> the jury's 10-2 recommendation of death during the sentencing phase indicated that it must have found the existence of the aggravating circumstance that the offense was "especially heinous, atrocious, or cruel compared to other capital offenses." § 13A-5-49(8), Ala. Code 1975. This was the only aggravating circumstance the court instructed the jury on. Indeed, during the court's penalty-phase instructions, the court clearly instructed the jury that it could not proceed to a vote on whether to impose the death penalty unless it first found beyond a reasonable doubt the existence of at least one aggravating circumstance. (R. 1433-35.) Thus, the jury's 10-2 vote recommending death established that the jury unanimously found the existence of the "especially heinous, atrocious, or cruel" aggravating circumstance, giving the trial judge the discretion to sentence Miller to death. *See* § 13A-5-46(e)(1)-(3), Ala. Code 1975; *see also Ex parte Slaton*, 680 So.2d 909, 927 (Ala. 1996), *cert. denied*, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997); *Duke v. State*, 889 So.2d 1, opinion on return to remand, 889 So.2d 40 (Ala. Crim. App. 2002).

*Miller*, 913 So. 2d at 1168-69 (footnote omitted).

179

As discussed below, the state court's rejection of these claims did not result "in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," and did not result "in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(d)(2).

Miller first argues that

*Ring*'s fundamental principle is that the jury occupies a determinative role in capital sentencing. The trial court's instructions in Mr. Miller's case misled the jurors into believing their sentencing role is purely advisory, notwithstanding *Ring*.

The jurors were told no fewer than 20 times that their sentencing decision was merely a recommendation to the court. The jurors were never advised that any aspect of their decision was binding on the trial court, let alone that they had final responsibility for making the necessary predicate finding of the existence of an aggravating factor, without which Miller could not be sentenced to death. The jurors simply had no way to know of their determinative role. To the contrary, they were led to believe just the opposite. By so diminishing the jury's sense of sentencing responsibility, the instructions in Miller's case violated Miller's Eighth Amendment rights under *Caldwell v. Mississippi*, 472 U.S. 320 (1985) (holding it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere).

(Doc. 1, at 149-50).    Miller adds that *Hurst* and *In re Bohannon v. State*, No. 1150640, 2016 WL 5817692, at *5 (Ala. Sept. 30, 2016) confirm that his death sentence violated *Caldwell*.    (Doc. 41, at 8-9; Doc. 48).

To establish a *Caldwell* violation, "a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Romano v. Oklahoma*, 512, U.S. 1, 9 (1994) (quoting *Dugger v. Adams*, 489 U.S. 401, 407 (1989)).    "The infirmity identified in *Caldwell* is simply absent" in a case where "the jury was not affirmatively misled regarding its role in the sentencing process." *Romano*, 512 U.S. at 9.    In this case, Miller's claim of *Caldwell* error must fail because the court correctly informed the jurors of their advisory function under Alabama law.

Under Alabama law, the jury's sentencing determination is "advisory."    *See* Ala. Code § 13A-5-46 (describing the jury's sentencing role as "advisory" ten separate times).    Thus, the court's instruction informing the jury that they were making a recommendation as to Miller's sentence does not constitute a *Caldwell* violation.    *See Davis v. Singletary*, 119 F.3d 1471, 1482 (11th Cir. 1997) ("'The infirmity identified in *Caldwell* is simply absent' in a case where 'the jury was not affirmatively misled regarding its role in the sentencing process.'")(quoting *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994)).    Therefore, this argument has no merit.

Miller further alleges that "*Hurst* confirms *Ring*'s holding that a jury must find all facts that make a defendant eligible for the death penalty, and it illustrates that under *Ring* an advisory jury verdict does not satisfy the Sixth Amendment's requirements." (Doc. 41 at 4) (citing *Hurst*, 136 S. Ct. at 621-22).  He asserts:

> This holding eviscerates the Alabama Court of Criminal Appeals' holding, in its decision affirming Mr. Miller's conviction and death sentence on direct appeal, that *Ring* was inapplicable because of the jury's advisory verdict: "It is unnecessary to address the [*Ring*] argument because the jury's 10-2 recommendation of death . . . indicated that it must have found the existence of the aggravating circumstance." *Miller*, 913 So. 2d at 1168-69. *Hurst* explicitly holds that *Ring* is not satisfied by any such inference from a jury's advisory verdict:
>
> > Florida argues that when Hurst's sentencing jury recommended a death sentence, it "necessarily included a finding of an aggravating circumstance." The State contends that this finding qualified Hurst for the death penalty under Florida law, thus satisfying *Ring*. . . .
> >
> > The State fails to appreciate the central and singular role the judge plays under Florida law. . . . [T]he Florida sentencing statute does not make a defendant eligible for death until "findings by the court that such person shall be punished by death." Fla. Stat. § 775.082(1) (emphasis added) . . . . The State cannot now treat the advisory recommendation by the jury as the necessary factual finding that *Ring* requires.
>
> 2016 WL 112683, at *6.

Alabama's capital sentencing scheme similarly assigns a decisive, central role to the trial court. *Hurst* thus confirms the correctness of Mr. Miller's argument that the jury's advisory verdict cannot satisfy *Ring*. Pet. ¶¶ 413-15.

(Doc. 41, at 4-5).

In *Hurst*, the Supreme Court held that in light of *Ring*, Florida's death penalty scheme violated the defendant's Sixth Amendment right to an impartial jury because it "required the judge alone to find the existence of an aggravating circumstance." *Hurst*, 136 S. Ct. at 624.  Miller maintains that "*Hurst* confirms *Ring*'s holding that a jury must find all facts that make a defendant eligible for the death penalty, and illustrates that under *Ring*, an advisory jury verdict does not satisfy the Sixth Amendment's requirements."  (Doc. 41, at 4).

First, *Hurst* does not apply retroactively to Miller, because his conviction was final before the decision in *Hurst* was announced.  *See Teague v. Lane*, 489 U.S. 288, 310-11 (1989).  The Supreme Court has not indicated that the rule announced in *Hurst* is retroactive.  Further, the Supreme Court has held that "*Ring* announced a new procedural rule that does not apply retroactively to cases final on direct review." *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004).  Likewise, *Hurst*, which applied *Ring* in Florida, is not retroactive.  *Lambrix v. Sec'y, Florida Dep't of Corr*., No. 16-10251, 2017 WL 992416 at *4 n.2 (11th Cir. March 15, 2017) ("*Hurst*, like *Ring*, is not retroactively applicable on collateral review.").  *See also Lotter v. Britten*, 4:04CV3187, 2017 WL 744554 at *2 (D. Neb., Feb. 24, 2017) ("[T]here is no precedent or reason to believe that *Hurst* would be made retroactive when *Ring* was

not made retroactive."); *McKnight v. Bobby*, Case No. 2:09-cv-059, 2017 WL 631411 at *5 (S.D. Ohio, Feb. 15, 2017) ("*Hurst* does not apply to cases in which the conviction became final on direct appeal before January 2016 . . ."); *Chappell v. Ryan*, No. CV-15-00478-PHX-SPL, 2017 WL 432542 at *3 (D. Ariz., Feb. 1, 2017) ("*Hurst*, which applies *Ring* in Florida, is also nonretroactive.").

Further, even if *Hurst* were to apply retroactively to Miller, this claim lacks merit.   As the Alabama Supreme Court recently explained, Alabama's capital sentencing scheme complies with the Sixth Amendment:

> As previously recognized, *Apprendi* holds that any fact that elevates a defendant's sentence above the range established by a jury's verdict must be determined by the jury.  *Ring* holds that the Sixth Amendment right to a jury trial requires that a jury "find an aggravating circumstance necessary for imposition of the death penalty." *Ring*, 536 U.S. at 585, 122 S.Ct. 2428.  *Hurst* applies *Ring* and reiterates that a jury, not a judge, must find the existence of an aggravating factor to make a defendant death-eligible.  *Ring* and *Hurst* require only that the jury find the existence of the aggravating factor that makes a defendant eligible for the death penalty – the plain language in those cases requires nothing more and nothing less.  Accordingly, because in Alabama a jury, not the judge, determines by a unanimous verdict the critical finding that an aggravating circumstance exists beyond a reasonable doubt to make a defendant death-eligible, Alabama's capital-sentencing scheme does not violate the Sixth Amendment.

*In re Bohannon v. State*, No. 1150640, 2016 WL 5817692, at *5 (Ala. Sept. 30, 2016).

Next, Miller argues that *Ring* requires that the jury find beyond a reasonable doubt *both* the existence of an aggravating circumstance *and* that the aggravating circumstances outweigh the mitigating circumstances.  (Doc. 1, at 150-51).[36]  Miller contends that, because the jury was not instructed that it must find beyond a reasonable doubt that the aggravating factor outweighed the mitigating factors, his death sentence violates *Ring*.  (*Id*. at 152).  This claim also has no merit.

 *Ring* only requires that "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact – no matter how the State labels it – must be found by a jury beyond a reasonable doubt."  536 U.S. at 602.  Under Alabama's sentencing scheme, the jury's weighing of the aggravating and mitigating circumstances does not make a defendant eligible for a death sentence.  Instead, the jury's *finding* of an aggravating circumstance is determinative.  *See* Ala. Code § 13A–5–45(f) ("Unless at least one aggravating circumstance as defined in Section 13A–5–49 exists, the sentence shall be life imprisonment without parole.").  The trial judge may disregard the jury's balancing of the mitigating and aggravating factors.  *See* Ala Code § 13A–5–47(e) ("While the jury's recommendation concerning sentence shall be given consideration, it is not binding upon the court.").  Accordingly, the jury's determination of whether the aggravating factors outweighed

---

[36] He adds that *Hurst* confirms that *Ring* requires the jury to find "all facts necessary to sentence a defendant to death." (Doc. 41, at 8).

the mitigating factors could not have increased the maximum sentence for which Miller was eligible.   Therefore, *Ring* does not require a jury to find beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors, and this claim lacks merit.

Miller further argues that the "jury's 10-2 vote, as reflected in the general verdict form used in Mr. Miller's case, failed to indicate what findings, if any, the jury made in support of Mr. Miller's death sentence." (Doc 1, at 152).   Miller argues that verifiable jury findings do not support his death sentence as required by *Ring* because the jury was not required to enumerate explicitly in its advisory verdict that it unanimously found the existence of a statutory aggravating factor beyond a reasonable doubt.   (*Id*.; Doc. 41 at 7-8).   Miller contends that the jury's split recommendation creates doubt as to whether all of the jurors found the aggravating circumstance.   In support of this contention, Miller points out that during the course of the jury's deliberations, the jury sent a note to the court that read, "can we have a sentence if we have the appropriate number of required votes but we have one juror undecided?"  (*Id*.) (quoting R. Vol. 8, Tab 26, at 1446).   Miller adds that "*Hurst* confirms that a general verdict recommending the death penalty, without any specific findings, violates *Ring*." (Doc. 41 at 6).   He maintains that the jury did not make a specific factual finding that his crime was especially heinous.  (*Id*. at 7).

186

This court recognizes that a system in which the jury must explicitly indicate that it found the existence of an aggravating factor would be preferable.  Indeed, the Alabama Supreme Court has recognized as much.  *See Ex Parte McGriff*, 908 So. 2d 1024, 1038 (Ala. 2004) (directing lower court to provide a jury form requiring the jury to indicate whether it found the existence of an aggravating factor beyond a reasonable doubt).  However, as addressed previously, the trial court instructed the jury that before determining whether to recommend the death sentence, the jury must first unanimously find the existence of an aggravating factor beyond a reasonable doubt.  (R. Vol. 8, Tab 27, at 1433, 1439).  The fact that ten out of the twelve jurors recommended death supports the presumption that the jurors must have found the existence of the aggravating circumstance beyond a reasonable doubt.  *See Evans v. Sec'y, Fla. Dep't Of Corr.*, 699 F.3d 1249, 1260 (11th Cir. 2012) ("The jury's verdict necessarily contained [findings than an aggravating circumstance existed] because the jury was instructed that it could not recommend a death sentence unless it found beyond a reasonable doubt that one or more aggravating circumstances existed . . . ."); *United States v. Townsend*, 630 F.3d 1003, 1013-14 (11th Cir. 2011) (finding that because the court instructed the jury that it must make a prerequisite finding as to the existence of an element before convicting the defendant, the jury's guilty verdict necessarily meant the jurors found the element).

187

Because the jury must have found the existence of the aggravating factor beyond a reasonable doubt before considering a recommendation of the death penalty, Miller's death sentence does not violate *Ring*. Therefore, the state court's rejection of this claim was reasonable, and Miller is not entitled to relief.

## VII.  CONCLUSION

Based on the foregoing, the petition for writ of habeas corpus is due to be **DENIED**. A separate final judgment will be entered contemporaneously with this Memorandum Opinion.

Rule 11(a) of the Rules Governing Section 2254 Cases requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. This court may issue a certificate of appealability "only if the applicant has a made a substantial showing of the denial of a constitutional right." 28 U.S.C. 2253(c)(2). To make such a showing, a "petitioner must demonstrate that reasonable jurist would find the district court's assessment of the constitutional claims debatable and wrong," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), or that "the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotations omitted).

This court finds that Miller's claims do not satisfy either standard. Accordingly, a motion for a certificate of appealability is due to be **DENIED**.

**DONE** and **ORDERED** this 29th day of March, 2017.

_____

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE

189